**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>JENNIFER VELEZ, in her official capacity as Commissioner, State of New Jersey Department of Human Service, and<br><br>MARY O'DOWD, in her capacity as the Acting Commissioner of the State of New Jersey, Department of Health and Senior Services,<br><br>      Defendants. | Civ. No. 10-0950(DRD)<br><br>**O P I N I O N** |

*Appearances by:*

WILLIAM EMMETT DWYER, ESQ
210 South Broad Street, Third Floor
Trenton, New Jersey 08608

KIRLAND & ELLIS LLP
by: Robert Cohen, Esq.
   Shiva Farouki, Esq.
   Michael David Reisman, Esq.
   Alexandra P. Kolod, Esq.
601 Lexington Avenue
New York, New York 10022

  *Attorneys for Plaintiff*

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS
By:     Susan K. O'Connor, Esq.
40 Paterson Street
PO Box 480
New Brunswick, New Jersey 08903

*Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

Plaintiff, Disability Rights New Jersey ("DRNJ") brings this action against Defendants Jennifer Velez and Mary O'Dowd in their capacities as Commissioners of the New Jersey Department of Human Services ("DHS") and New Jersey Department of Health and Senior Services ("DHSS") respectively. Plaintiff represents psychiatric patients who either are or will be treated at psychiatric hospitals in the state of New Jersey. Plaintiff alleges that Administrative Bulletin A.B. 5:04, governing the involuntary administration of psychotropic drugs, is routinely violated in New Jersey hospitals. As a result, psychiatric patients are forced to consume psychotropic drugs against their will in violation of New Jersey law, the New Jersey and Federal Constitutions, and the regular and prudent practice of medicine. Plaintiff also alleges that the "Three Step" process by which patients are involuntarily medicated is constitutionally infirm even if followed, as it denies patients the ability to meaningfully challenge this dangerous violation of their bodies and minds.

Plaintiff now brings this emergency motion for a protective order, claiming that agents of the Defendants have engaged in efforts to harass, intimidate, and threaten potential witnesses who have cooperated with Plaintiff. For the reasons set forth below, Plaintiff's motion is DENIED.

## I.   BACKGROUND

DRNJ is a not-for-profit corporation that engages in advocacy on behalf of individuals with disabilities. Plaintiff is under contract with New Jersey to provide services as authorized under the Protection and Advocacy for Individuals with Mental Illness Act. 42 U.S.C. § 10801 *et seq*. Pursuant to statute, DRNJ has been allocated federal funds to "investigate incidents of abuse and neglect of individuals with mental illness", "pursue administrative, legal, and other

appropriate remedies to ensure the protection of individuals with mental illness", and initiate legal action "to ensure the protection of individuals with mental illness who are receiving care or treatment in the State…." Id.

Defendant DHS is a state agency that provides medical care and assistance programs for economically disadvantaged or disabled residents of New Jersey. As part of its role in caring for individuals suffering from mental illness, DHS operates five inpatient psychiatric hospitals. DHS also funds most of the cost of indigent inpatient care at six other psychiatric units and hospitals that are independently operated. Defendant DHSS is a state agency charged with overseeing the delivery of medical care in New Jersey. DHSS does not operate any hospitals, but instead acts as a licensing body for all hospitals in the state, public and private.

Plaintiff brings this case as a broad challenge to the current rules and practices surrounding the involuntary administration of psychotropic drugs in New Jersey. Specifically, Plaintiff questions the application of Administrative Bulletin A.B. 5:04, published by the New Jersey Division of Mental Health and Hospitals and entitled "The Administration of Psychotropic Medication to Adult Voluntary and Involuntary Patients." A.B. 5:04 codifies procedures designed to protect the constitutional and statutory rights of patients receiving treatment for mental illness. Plaintiff claims that the procedures set forth in A.B. 5:04 are constitutionally infirm as written and rarely followed in practice. Plaintiff sues for an order compelling Defendants to reform their regulations, procedures, and practices to appropriately protect the rights of psychiatric patients as guaranteed by the United States and New Jersey constitutions and applicable laws.

Plaintiff's complaint contains numerous accounts of anonymous patients who have suffered mistreatment while under the care of doctors at psychiatric hospitals in New Jersey.

(Complaint ¶¶ 121-138). After this case was filed, Defendants filed a motion for a more definite statement, seeking to uncover the identities of the eight anonymous patients. (Doc. No. 14). Plaintiff initially resisted turning over this information without a protective order. (Complaint ¶ 4 at n.1). However in its papers, Defendants claimed that there was no need for this Court to issue a protective order, writing that:

> [T]here is no valid basis for Plaintiff's hiding the complainants' identities from Defendants in the absence of a protective order and confidentiality agreement because Defendants are already required to keep this information confidential. Indeed, all records identifying any individual receiving services in a State psychiatric hospital are required to be kept confidential by State agencies.

(Def. Defin. St. Br. 5).

Apparently satisfied with Defendants' assurances that they would properly handle the information, Plaintiff revealed the identities of the eight patients described in the Complaint. (Doc. No. 16). Defendant subsequently filed a motion to dismiss the Complaint, which is still pending. (Doc. No. 21).

During the pendency of the motion to dismiss, two of the patients whose names were revealed to Defendants complained of retaliation by staff members at the hospitals where they are currently confined. Patient S.L. had a news article describing this lawsuit placed in his chart, apparently to inform anyone with access to the chart that he was one of the patients named. In correspondence with Plaintiff, counsel for Defendants *admits* that this was done, and further admits that the improperly placed article was *deliberately destroyed* after Plaintiff's counsel learned about it. (Reisman Dec. Ex. B). Alarmingly, Defendant destroyed the document even though it had no other evidence of who might have placed the article in the patient's chart or the motivation for this act. Id.

Another patient, A.R., complained that three of Defendants' agents, Dr. Jacqueline McFarlane, Dr. Renee Wilson, and social worker Denise Chadwick threatened him after learning that he was cooperating with Plaintiff's lawsuit. Specifically, A.R. claimed that Dr. McFarlane had told him that she believed that he was suing her and that she would keep him hospitalized for as long as she could because of the lawsuit. (Reisman Dec. ¶ 3) (Lukens Dec. ¶¶ 3-4). An employee of Plaintiff, Louan Lukens, confirmed that A.R.'s chart contained an entry indicating that Dr. McFarlane was aware of the lawsuit and had discussed it with the patient. (Lukens Dec. ¶ 2). Ms. Lukens also spoke to Dr. McFarlane and claims that Dr. McFarlane admitted to discussing the litigation with the patient. Id.

Dr. McFarlane is not the only staff member from whom A.R. reported pressure. A.R. also claimed that Dr. Rene Wilson told him that he would have been discharged from the hospital sooner if he had not sued Dr. McFarlane. (Reisman Dec. ¶ 4). In addition, A.R. stated that a social worker, Denise Chadwick told him that "[m]aybe if you did not sue her, you would have been out of here a long time ago." (Lukens Dec. ¶ 5). An additional staff member who is not named in Plaintiffs' papers purportedly told A.R. "now that you have a lawsuit against us, you didn't expect us to take it easy on you." (Reisman Dec. ¶ 5). For his trouble, A.R. has been moved to a different unit at the hospital where he is now confined, for reasons unknown. (Lukens Dec. ¶ 7).

On the basis of these allegations, Plaintiff filed an emergency motion seeking a protective order that would prohibit Defendants and their employees and agents from: (1) discussing this litigation with any patients currently being treated in New Jersey psychiatric hospitals; or (2) retaliating against any patient for cooperating with this suit.

On July 13, 2011, the Court had an evidentiary hearing in connection with the instant motion. At that time, Ms. Lukens, Dr. McFarlane, Ms. Chadwick, and Dr. Wilson testified concerning their interactions with A.R. Ms. Lukens testified that A.R. told her that his doctors had instructed him that he had jeopardized his chances for release by cooperating with the lawsuit. She also testified that A.R. was deeply frightened by this possibility and told her by telephone that he no longer wished to assist with Plaintiff in bringing the suit.

Dr. McFarlane, Ms. Chadwick, and Dr. Wilson each testified that they had taken no actions to extend A.R.'s treatment within the hospital. To the contrary, each testified that they had been working actively to find A.R., whose current status permits discharge, a place within the community to which he could be released. Dr. McFarlane admitted to placing information about A.R.'s lawsuit within his May 1, 2011 psychological evaluation, but denied ever making any affirmative statements about the case to A.R. or retaliating against him in any fashion.

Drs. McFarlane and Wilson also testified that A.R. has serious mental disorders that predispose him to extreme emotional variability, brief psychotic episodes, and self-interested deception and manipulation. They also testified that A.R. has been frustrated by his inability to leave the hospital and has lashed out against others as a result.

## II.   DISCUSSION

There is some dispute as to the standard governing issuance of the requested order. Defendants argue that Plaintiff has effectively requested a preliminary injunction under Fed. R. Civ. P. 65. (Def. Br. 1). In contrast, Plaintiff argues that it has sought only a protective order, issued pursuant to the inherent equitable powers of the court to prevent abuses, oppression, and injustices. (Pl. Br. 6).

An injunction is "an extraordinary remedy which should be granted only in limited circumstances." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989). To prevail on a motion for a preliminary injunction, the moving party must prove "that (1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief." Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (quoting Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." Nutrasweet Co. v. Vit-Mar Enters., 176 F.3d 151, 153 (3d Cir. 1999).

In contrast, a protective order may be issued "for good cause" to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" Fed. R. Civ. P. 26(c). Protective orders directed against non-parties or over material not obtained in discovery are issued pursuant to the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785 (3d Cir. 1994) (internal citations omitted). [1] Indeed, it is "beyond question that a court may issue orders prohibiting disclosure of documents or information." F.D.I.C. v. Ernst & Ernst, 677 F.2d 230, 232 (2d Cir. 1982).

---

[1] A non-exclusive and non-mandatory list of factors that courts have considered in determining whether "good cause" exists includes "(1) the interest in privacy of the party seeking protection; (2) whether the information is being sought for a legitimate purpose or an improper purpose; (3) the prevention of embarrassment, and whether that embarrassment would be particularly serious; (4) whether the information sought is important to public health and safety; (5) whether sharing of the information among litigants would promote fairness and efficiency; (6) whether the party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public." Arnold v. Pa. Dept. of Transp., 477 F.3d 105, 108 (3d Cir. 2007) citing Pansy, 23 F.3d at 787-88.

Defendant contends that the relief sought by Plaintiff may only be obtained via a preliminary injunction. This is simply incorrect. While some forms of witness intimidation or document destruction doubtlessly necessitate injunctive relief under Rule 65, protective orders are also an appropriate vehicle to prevent interference with potential witnesses. On this point, Ben David v. Travisono, 495 F.2d 562 (1st Cir. 1974) is instructive. In Travisono, a putative class of prisoners sued to challenge the conditions of their confinement, specifically alleging that "prison rules had been suspended and that they were being subject to unconstitutional treatment in the form of beatings, mental abuse, inhumane and unsanitary conditions, mail censorship, and the like." Travisono, 495 F. 2d at 563. After a hearing complaining of harassment and intimidation of potential class members, the trial court issued an order prohibiting agents of the prison:

> 1. from perpetrating or suffering to be perpetrated the physical and mental abuse, brutalization and beatings of plaintiffs and members of plaintiffs' class by the defendants and their agents;
>
> 2. from taking any action in retaliation against plaintiffs and members of plaintiffs' class or of depriving plaintiffs and members of plaintiffs' class of any and all rights and privileges on account of plaintiffs and members of their class participating, assisting, or volunteering any facts or circumstances in the furtherance of this lawsuit.
>
> Id.

In issuing the order, the lower court made no findings of likelihood of success on the merits or balancing of equities, claiming instead that the order was properly issued under the All Writs Act and did not require an evidentiary determination. Id.

On review, the Court of Appeals for the First Circuit disagreed with the applicability of the All Writs Act, but largely upheld the order as reasonable under the court's discretionary powers. The Court of Appeals held that "where the purpose of an injunctive order of this sort

9

was to reassure fearful witnesses and thereby to assist the court's fact-finding, the actual likelihood of the enjoined conduct was secondary." Id. at 564. The court further held that "the findings necessary to support such a protective order are simply that the plaintiffs reasonably fear retaliation and that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order." Id. While the court struck down the first paragraph of the order "both because of its vagueness and because it crosses the line from a limited protective order, which we hold permissible, to a more expansive preliminary injunction appropriate only upon express findings that the prohibited conduct is likely" it upheld the second paragraph as "sufficiently within the court's discretionary authority." Id. at 564-565.

    While the patients confined in this case are not technically prisoners, their situation is very similar and the relief requested nearly identical. In both cases, relevant witnesses to the constitutional violations alleged are in the exclusive custody and care of the defendants. In both cases a plaintiff has suggested that the witnesses fear that their participation in this lawsuit will give rise to mistreatment at the hands of Defendants. And in both cases, the plaintiff seeks only to prohibit acts of retaliation that would interfere with the ability of the court to conduct a thorough and just inquiry into the dispute at hand.

    However, unlike the court in Travisono we have not been presented with evidence of any conduct giving rise to a reasonable fear of retaliation. Plaintiff has been unable to demonstrate that any of the treatment decisions made concerning T.L. or A.R. were in any way improper or punitive. While the certifications and testimony offered by Plaintiff are credible, they are ultimately double hearsay filtered through the perceptions of an emotionally unstable and deeply disturbed patient. Moreover, the evidence introduced by the state demonstrates that A.R.'s treatment team has worked to reduce the length of A.R.'s commitment, and has not made good

10

on the purported threats to keep A.R. confined because of his participation with the suit. While the Court cannot discount the statements made by A.R. simply because he suffers from mental illness, it may not accept his account of the events to the extent that it is completely unsupported—and in some places refuted—by all other evidence.

That said, the Court is cognizant of the significant power that Defendants have over a multitude of potential witnesses to this action. Some of the statements made by Dr. McFarlane, in which she indicated that she would feel comfortable counseling patients that they were impairing their treatment by participating in a civil rights suit, are disturbing. Moreover, the comments inserted into A.R.'s Psychiatric Assessment by Dr. McFarlane concerning this litigation appear—by her own admission—to have no medical purpose. Nor do they appear to have been based upon any real understanding of the case at bar.

However, counsel for Defendants have represented to the Court that steps both have been and will continue to be taken to prevent any retaliation against patients for participation in this lawsuit. Taking counsel at her word, the Court will not issue a protective order at this time. On the basis of the evidence presented, insufficient cause has been shown to require all treating physicians and staff at New Jersey psychiatric hospitals to seek a court order every time that a patient wishes to discuss his or her thoughts and feelings concerning this litigation. While the rational fears of a witness may be grounds for relief, it would be inappropriate to issue an order based solely upon irrational fears or mere conjecture.

That no order is immediately forthcoming should not be taken as an endorsement of physician commentary on or interference with this case. Any efforts by agents of Defendants to

coerce or intimidate witnesses will be addressed with severity.[2] The Court does not dismiss the possibility that judicial intervention, including a protective order, preliminary injunction, or sanctions may be later required if evidence of harassment or intimidation is found. To be clear, even some of the conduct that Defendants already admit is clearly improper.[3] Counsel would be advised to ensure that physicians and staff who may have access to patient files or occasion to discuss this litigation with patients are well informed as to the ethical duties of litigants and the severe penalties associated with witness tampering and/or spoliation. Plaintiff is entitled to a fair hearing, and the Court is obligated to protect the integrity of that process.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion is DENIED.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 19, 2011

---

[2] See, e.g., Shepherd v. American Broadcasting Companies, Inc., 62 F.3d 1469, 1473 (D.C. Cir. 1995) (a district court may "use its inherent power to enter a default judgment" in cases of willful discovery abuse.).

[3] The Court is particularly disturbed by the destruction of patient records to which Defendants freely admit. All parties to this case have a legal duty to preserve evidence. Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000) ("While a litigant is under no duty keep or retain every document in its possession, even in advance of litigation it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."); see also Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."). Evidence that doctors or staff placed documents in patient files quite possibly for the purpose of intimidation is properly discoverable and admissible in this action. Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968) ("an attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false").