**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC., | |
| Plaintiff, | Civ. No. 10-3950(DRD) |
| v. | **O P I N I O N** |
| JENNIFER VELEZ, in her official capacity as Commissioner, State of New Jersey Department of Human Service, and | |
| MARY O'DOWD, in her capacity as the Acting Commissioner of the State of New Jersey, Department of Health and Senior Services, | |
| Defendants. | |

*Appearances by:*

WILLIAM EMMETT DWYER, ESQ
210 South Broad Street, Third Floor
Trenton, New Jersey 08608

KIRLAND & ELLIS LLP
by:     Robert Cohen, Esq.
        Shiva Farouki, Esq.
        Michael David Reisman, Esq.
        Alexandra P. Kolod, Esq.
601 Lexington Avenue
New York, New York 10022

        *Attorneys for Plaintiff*

PAULA T. DOW, ATTORNEY GENERAL OF NEW JERSEY
by:     Gerard Hughes, Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS
By:     Susan K. O'Connor, Esq.
40 Paterson Street
PO Box 480
New Brunswick, New Jersey 08903

*Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

Plaintiff, Disability Rights New Jersey ("DRNJ") brings this action against Defendants Jennifer Velez and Mary O'Dowd in their capacities as Commissioners of the New Jersey Department of Human Services ("DHS") and New Jersey Department of Health and Senior Services ("DHSS") respectively. Plaintiff represents psychiatric patients who either are or will be treated at psychiatric hospitals in the state of New Jersey. Plaintiff alleges that Administrative Bulletin A.B. 5:04, governing the involuntary administration of psychotropic drugs, is routinely violated in New Jersey hospitals. As a result, psychiatric patients are forced to consume psychotropic drugs against their will in violation of New Jersey law, the New Jersey and Federal Constitutions, and the regular and prudent practice of medicine. Plaintiff also alleges that the "Three Step" process by which patients are involuntarily medicated is constitutionally infirm even if followed, as it denies patients the ability to meaningfully challenge this dangerous violation of their bodies and minds.

Defendants now move to dismiss this action. For the reasons set forth below, Defendants' Motion is GRANTED as to all Counts with respect to Defendant O'Dowd, and GRANTED as to Count IV with respect to Defendant Velez. Count IV of Plaintiff's Complaint is DISMISSED. Defendant's Motion is otherwise DENIED.

## I. BACKGROUND

DRNJ is a not-for-profit corporation that engages in advocacy on behalf of individuals with disabilities. Plaintiff is under contract with New Jersey to provide services as authorized under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"). 42 U.S.C. § 10801 *et seq*. Pursuant to PAIMI, DRNJ has been allocated federal funds to "investigate incidents of abuse and neglect of individuals with mental illness", "pursue administrative, legal,

and other appropriate remedies to ensure the protection of individuals with mental illness", and initiate legal action "to ensure the protection of individuals with mental illness who are receiving care or treatment in the State…." Id.

DHS is a state agency that provides medical care and assistance programs for economically disadvantaged or disabled residents of New Jersey. As part of its role in caring for individuals suffering from mental illness, DHS operates five inpatient psychiatric hospitals (the "State Hospitals").[1] The State Hospitals have a combined average daily population of approximately 1,800 patients as of May 2010. (Complaint ¶ 33). DHS also funds most of the cost of indigent inpatient care at six other psychiatric units and hospitals that are independently operated (the "County Hospitals").[2] The County Hospitals have approximately 750 patient beds. Id. at 34. DHSS is a state agency charged with overseeing the delivery of medical care in New Jersey. DHSS does not operate any hospitals, but instead acts as a licensing body for all hospitals in the state, public and private.[3] As part of these duties, DHSS drafts and enforces regulations concerning billing rates, medical records, patient care, and other aspects of hospital operations.

---

[1]     The State Hospitals include: (a) Ancora Psychiatric Hospital ("Ancora") in Winslow Township, which serves a general adult population, elderly and forensic patients, and people who have been dually diagnosed to have both a developmental disability and a mental illness; (b) Greystone Park Psychiatric Hospital ("Greystone") in Morris Plains, which serves adults; (c) Hagedorn Psychiatric Hospital ("Hagedorn") in Glen Gardner, which serves general and elderly populations; (d) Trenton Psychiatric Hospital ("Trenton Psychiatric") in Trenton, which serves adults; and (e) Ann Klein Forensic Center in Trenton, which serves people who have been determined by the courts to be not guilty by reason of insanity or incompetent to stand trial, or who require special security measures due to the nature of their illness. (Complaint ¶ 33).

[2]     The County Hospitals include (a) Bergen Regional Medical Center in Paramus; (b) Buttonwood Hospital in Pemberton Township; (c) Camden County Health Services Center in Blackwood; (d) Essex County Hospital Center in Cedar Grove; (e) Meadowview Hospital in Secaucus; and (f) Runnells Hospital in Berkeley Heights. (Complaint ¶ 34).

[3]     Licensed private hospitals providing psychiatric care include Ramapo Ridge Psychiatric Hospital in Wyckoff; (b) Hampton Behavioral Health Center in Westhampton; (c) Saint Barnabas Behavioral Health Center in Toms River; (d) East Mountain Hospital in Belle Mead;

4

Plaintiff brings this case as a broad challenge to the current rules and practices surrounding the involuntary administration of psychotropic drugs in New Jersey. Specifically, Plaintiff questions the application of Administrative Bulletin A.B. 5:04, published by the New Jersey Division of Mental Health and Hospitals and entitled "The Administration of Psychotropic Medication to Adult Voluntary and Involuntary Patients." (Complaint Ex. 3). A.B. 5:04 codifies procedures designed to protect the constitutional and statutory rights of patients receiving treatment for mental illness. Plaintiff claims that the procedures set forth in A.B. 5:04 are constitutionally infirm as written and rarely followed in practice. (Complaint ¶ 83). Plaintiff sues for an order compelling Defendants to reform their regulations, procedures, and practices to appropriately protect the rights of psychiatric patients as guaranteed by the United States and New Jersey constitutions and applicable laws. Id. at 11.

There can be no doubt that all patients in New Jersey, including patients with severe mental illness or injury, have the right to participate meaningfully in the course of their treatment, to be free from unnecessary or unwanted medication, and to have their rights to personal autonomy and bodily integrity respected by agents of the state. The New Jersey Patient's Bill of Rights specifically provides that "[e]ach patient in treatment shall have" the rights to, *inter alia*, "be free from unnecessary or excessive medication", "[n]ot to be subjected to experimental research", "To be free from physical restraint and isolation", "[t]o be free from corporal punishment", "[t]o privacy and dignity", and "[t]o the least restrictive conditions necessary to achieve the purposes of treatment." N.J.S.A. 30:4-24.2(d)-(e). In addition, the constitutional basis for each individual to control his or her own medical treatment is well established. Washington v. Harper, 494 U.S. 210, 221-222 (1990) ("in addition to the liberty

---

(e) the Carrier Clinic in Belle Mead; and (f) Monmouth Medical Center in Long Branch. Together, these independent hospitals have over 500 psychiatric beds. (Complaint ¶ 35).

interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.").[4]

To uphold these rights and protect the interests of patients who have been involuntarily committed and may be forcibly medicated, A.B. 5:04 requires that hospitals retain "Rennie Advocates" to review the administration of psychotropic drugs. These Rennie Advocates are charged with counseling patients about their medical decisions and right to refuse treatment. They are also responsible for advocating on behalf of of patients to Medical Directors and other individuals with supervisory authority over the administration of drugs. However these Rennie Advocates are not independent of the hospital organizational structure. They are instead hospital employees "responsible to the CEO and Division director."

A.B. 5:04 provides four mechanisms by which adult voluntary or involuntary patients in New Jersey hospitals may be given psychotropic medication. First, under Section IV(A) a psychotropic medication may be administered to a patient "after the patient has given informed, voluntary, consent in writing to that specific medication."[5] Informed consent to a psychotropic medication requires that

> (a)   A physician has discussed with the patient: the nature of the patient's condition, the purpose, nature, type and dosage of the medication prescribed, the anticipated benefits of the medication, the probability that the medication will be successful in achieving its purposes, the risks, consequences and side effects of the medication, the advantages and risks

---

[4]   See also Cruzan by Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 278 (1990) ("a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); Karp v. Cooley, 493 F.2d 408, 420 (5th Cir. 1974) ("The root premise jurisprudentially is that every human being of adult years and sound mind has a right to determine what shall be done with his own body") (internal citation omitted).

[5]   The section also provides that oral consent may be substituted if supported by written accounts of two treatment team members.

of feasible alternative treatments, the prognosis if medication is not given and the method of administering medication; and

(b)     The physician, assisted by members of the treatment team, has provided the patient with a consent form and medication fact sheet, discussed the consent of the forms, offered to answer questions and advised the patient that s/he may revoke consent at any time.

Consent forms and medication fact sheets for specific medications are available from the Medical Director. The physician is responsible for ensuring that the contents of the consent form and medication fact sheets are communicated to the patient in his/her primary language or mode of communication. If such communication is other than in English and through the documents provided, the nature of the communication shall be document ed on the consent form by the physician; and

(c)     The physician determines that the patient understands the information disclosed pursuant to paragraph A 1(a), above, and has based his/her decision on rational grounds.

If a patient does not consent to the medication or is incapable of giving the informed consent necessary for the administration of psychotropic drugs, there are three alternatives mechanisms by which the drugs may be administered.

Under Section IV(C)(1), drugs may be administered to a patient on an emergency basis if "a physician certifies in a patient's chart that it is essential to administer psychotropic medication, because without medication there is a substantial likelihood that the patient will harm him/herself or others or that the patient's health will be significantly impaired, in the recently foreseeable future…." Such emergency authorizations are effective only for 72 hours and may not involve "long acting medication." The emergency authorizations are also reviewable by the Medical Director at the direction of the Hospital Liason or Rennie Advocate.

Additionally, under Section IV(C)(3), drugs may be administered to patients who are not capable of giving informed consent, provided that a physician certifies that:

(1)     Medication is a necessary part of the patient's treatment plan; and

   (2)  The patient is unable, because of his/her illness, to give informed consent to the medication, and

   (3)  The patient is not refusing the medication.

Like emergency authorizations, the delivery of psychotropic drugs to patients unable to consent is reviewable by the Medical Director at the direction of the Hospital Liason or Rennie Advocate.

   Last, under Section IV(C)(2), non-emergency psychotropic drugs may be involuntarily given to a patient who refuses medication if a "Three Step" procedure is followed. First, the treating physician who wants to administer the drugs must "speak to the patient to discuss and attempt to respond to the patient's concerns about the medication." As a part of this conversation, the doctor must inform the patient that "the matter will be discussed at a meeting of the patient's treatment team," inform the patient of his or her rights to "discuss the matter with a person of his own choosing, such as a relative or friend [or] Rennie Advocate" and "invite the patient to attend the treatment team meeting."

   Second, the treatment team must "meet to discuss the physician's determinations and recommendations and the patient's response." If the treatment team concurs with the physician, then "the Medical Director shall conduct a personal examination of the patient and a review of the patient's chart" to determine whether the psychotropic drugs are appropriate. If Medical Director agrees with the treating physician and the treatment team, and the patient is involuntary—that is to say, forcibly committed to the hospital as the result of a civil proceeding—the drugs may be involuntarily administered.

   The decision to medicate psychiatric patients against their will must be reviewed by the Rennie Advocate as soon as possible and once per month thereafter. Throughout the Three Step

8

process, participants must document compliance with A.B. 5:04 by completing the appropriate portions of a "Three Step Form."

Plaintiff's complaint contains a panoply of serious allegations concerning the practice of psychiatric medicine in New Jersey hospitals. Plaintiff alleges that hospitals routinely violate the Three Step process set out in A.B. 5:04 by, *inter alia*:

- Failing to inform patients about the Rennie Advisor and their rights to refuse medication. (Complaint ¶ 84).

- Performing steps two and three of the process in a rapid and cursory fashion that precludes meaningful review. Id. at ¶ 85.

- Approving "blank check" Three Step Forms that permit involuntary administration of virtually any psychotropic drug. Id. at ¶ 87.

- Forbidding patients from attending step two "team meetings." Id. at ¶ 89.

- Failing to perform meaningful Medical Director reviews. Id. at ¶ 91.

- Delegating Medical Director reviews to a lower level functionary who lacks independence and the ability to overrule the treatment team. Id.

- Failing to conduct required weekly reviews of involuntary medication orders. Id. at ¶¶ 92-93.

- Approving involuntary medication treatment plans that do not expire and are not reviewed. Id. at ¶ 93.

- Misusing emergency procedures for non-emergency medication of patients. Id. at ¶ 94.

- Threatening patients with painful and unnecessary medical procedures to coerce "consent" to treatment. Id.

- Failing to have a Rennie Advisor on staff for years at a time. Id. at ¶ 100.

- Discouraging Rennie Advisors from reviewing treatment decisions. Id. at ¶ 104

- Failing to review treatment decisions. Id. at ¶¶ 105-106

- Forcibly medicating patients who have not been involuntarily committed. Id. at ¶ 128.

9

Moreover, Plaintiff alleges that psychopharmacology practices in New Jersey hospitals substantially deviate from generally accepted professional standards. Plaintiff makes explicit reference to a 2009 report from the Department of Justice which concluded that Ancora Hospital prescribed excessive psychiatric medication and had little or no means to track the amount of medication administered to psychiatric patients. Id. at ¶ 115. Plaintiff provides anecdotal evidence of numerous episodes of reckless polypharmacy and unchecked medication errors, often resulting in tragic consequences. Id. at ¶¶ 116-119.

Moreover, Plaintiff contends that the rules set forth in A.B. 5:04, even if followed, would not past constitutional or statutory muster. Plaintiff argues that the Three Step procedure lacks meaningful due process protections due to its lack of a judicial hearing, access to legal counsel, independent outside review, or evaluation of less invasive alternatives. Id. at ¶ 140. Plaintiff submits that patients in New Jersey hospitals are accorded substantially fewer protections than convicts in New Jersey prisons. (Complaint ¶ 8). Plaintiff further argues that the functional incompetence procedures described under Section IV(C)(3) fail to meet any conceivable standard of constitutional due process, as they permit a single doctor to involuntarily medicate a patient without any hearing or review. Id. at ¶¶ 108-110.

Defendants now move to dismiss, arguing that Plaintiff's numerous claims are each defective as a matter of law.

## II.     DISCUSSION

### A.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true and draw all

reasonable inferences in favor of the plaintiff. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The court's inquiry "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6) in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, the Court in Twombly held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 545. The assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," Id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (in order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the court must assume the veracity of the facts asserted in the

complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Defendants do not substantially challenge the truth or plausibility of the factual averments made by Plaintiff. Rather, they claim that the allegations of lawless and barbaric conduct detailed in Plaintiff's complaint are not actionable as a matter of law. This Court will evaluate the arguments advanced by Defendants in turn.

**B.    Does <u>Rennie</u> Mandate Dismissal?**

Defendants first argue that the holdings of the <u>Rennie</u> cases[6] dictate the result here, claiming that the decisions "held that the procedures currently embodied in the Administrative Bulletin 5:04 meet constitutional requirements." (Def. Br. 8). Defendants assert that the issues before the Court are "quite simple: whether subsequent cases from the United States Supreme Court have overruled the Third Circuit's decision in <u>Rennie</u>. If they have not, then this Court is bound to follow <u>Rennie</u>, and Plaintiff's complaint should be dismissed." Id. at 11.

In <u>Rennie I</u>, the Court of Appeals evaluated a patient challenge to the then-existing rules governing involuntary administration of psychotropic drugs in New Jersey as set forth in Administrative Bulletin A.B. 78-3. The plaintiffs in <u>Rennie I</u> were a putative class[7] of patients

---

[6]    <u>Rennie v. Klein</u>, 476 F.Supp. 1294 (D.N.J. 1979) <u>on</u> <u>appeal</u>, 653 F. 2d 836 (3d Cir. 1981), <u>remanded</u> 458 U.S. 1119 (1982), <u>on remand</u> 720 F. 2d 266 (3d Cir. 1983). The original Court of Appeals opinion ("<u>Rennie I</u>") and the subsequent opinion on remand ("<u>Rennie II</u>" collectively "<u>Rennie</u>") differ in some of their analysis, but reach the same conclusions regarding the constitutionality of the challenged procedures.

[7]    Strictly speaking, there were three <u>Rennie I</u> subclasses, including: (1) patients who are or may be hospitalized at Ancora Psychiatric Hospital; (2) all adult patients involuntarily committed to any of the five state mental health facilities; and (3) all adult patients voluntarily committed to the five state mental health facilities. <u>Rennie 1</u> at 839. However for our purposes, <u>Rennie I</u>

under treatment at any of the five State Hospitals who might be involuntarily administered

psychotropic drugs. The <u>Rennie I</u> plaintiffs claimed that the existing procedures, consisting of a

review of an attending psychiatrist's decision by the hospital Medical Director, were insufficient

to protect their constitutional rights. 476 F. Supp. at 1297. The lower court agreed with the

plaintiffs and issued a preliminary injunction requiring state hospitals to hold hearings to

determine whether patients could be medicated against their will, and to retain independent

psychiatrists to make the ultimate determinations at those hearings. <u>Id</u>. at 1306.

On review, the court first upheld the categorical right of voluntary patients to refuse

psychotropic drugs, writing that "[a]n individual who has not been committed to a mental

institution has a right to refuse medication sought to be administered against his will." <u>Rennie I</u>,

at 843. Turning then to persons "one step removed" by virtue of their commitment to a mental

health facility, the court nevertheless found that they retained a significant liberty interest. <u>Id</u>.

The <u>Rennie I</u> court specifically held that "the patient's liberty interest is diminished only to the

extent necessary to allow for confinement by the state so as to prevent him from being a danger

to himself or others." <u>Id</u>.

In mapping the parameters of this liberty interest, the court looked to the "right of

personal security recognized in <u>Ingraham v. Wright</u>." The court rejected the notion that patients

were entitled only to the protections from cruel and unusual punishment afforded to prisoners,

writing:

> It is necessary to distinguish the status of prisoners who are legitimately being
> punished for commission of a crime from that of persons who are mentally ill or
> retarded through no fault of their own and are innocent of any offenses against
> society. These people are victims who are entitled to society's assistance and
> understanding. They do not merit retribution. It is a throwback to a more callous

concerned itself with any patient in a State Hospital that was likely to be brought under the
auspices of A.B. 78-3. Moreover, <u>Rennie II</u> stated that it was "concerned only with the second
sub-class." <u>Rennie II</u>, 720 F. 2d at 268.

> attitude of the past to equate the mentally ill or retarded person's constitutional right of personal integrity to that of criminals. We reject the eighth amendment, therefore, as the proper minimal standard for the treatment of the plaintiff classes. They are entitled to more humane consideration.

> Id. at 844.

Instead citing Ingraham, the court held that "involuntary administration of drugs [is] justified only when accompanied by appropriate restrictions" because a patient retains a "residuum of liberty" and may demand to be free from "unjustified intrusions on his personal security." Id. at 845. To protect this interest, the court held that the "least intrusive means" should be examined "when objections to forced administration of drugs are raised." Id.

Having recognized that even involuntarily committed patients retained some right to refuse medical care, the court set about analyzing what due process protections were required to guard that right against arbitrary violation by physicians. The court rejected the notion that due process concerns should give way entirely to medical judgment, noting that "in a society ruled by laws, social actions that infringe or control individual freedoms must be judged by legal standards" and that "[l]iberty includes the freedom to decide about one's own health. This principle need not give way to medical judgment. Id. at 847 quoting In re K.K.B., Okl., 609 P.2d 747 (1980).

Instead, the court examined the proceedings mandated by A.B. 78-3 using the rubric set forth in Matthews v. Eldridge, 424 U.S. 319 (1976). The Eldridge factors examined by the court included "(1) the private interest; (2) the risk of an erroneous decision through the procedures used as well as the value of the any of additional or substituted safeguards; and (3) the governmental interest, including fiscal and administrative burdens that other procedural requirements would impose." Rennie I, at 848. In applying Eldridge, the Rennie I court noted that the narrowness of the analysis, and that the court was not to "compare the procedures of

Bulletin 78-3 with those ordered by the district court, nor to determine which of the two programs is more effective in protecting a patient's right to refuse treatment" but rather to determine whether "the procedures established by New Jersey satisfy due process…." Id. at 849-850.

The court focused on the second of the two Eldridge factors, the risk that the threadbare internal review offered by A.B. 78-3 would lead to erroneous decisions. Here the court explicitly assumed the expertise, professionalism, and ethics of the doctors operating in New Jersey psychiatric hospitals, finding that:

> We are satisfied that the state's procedures, if carefully followed, pose only a minor risk of erroneous deprivation…
>
> The decision to compel medication will generally be made by members of the hospital medical staff who have had more connection with the treatment of the individual patient than an independent psychiatrist, whose experience would necessarily be limited to ad hoc situations. The weeks or months that a patient spends in these institutions should provide a more accurate and reliable basis for the staff's judgment as to whether the patient poses a danger to himself or to others and whether he is capable of making a rational treatment decision.
>
> Id. at 850.

However, the court left open the possibility that further evidence might call this assumption into question:

> If, after a reasonable time, it develops that the state procedures are not working, then the court may explore other methods to guarantee the patient's constitutional rights. The record as it now stands does not demonstrate that the time for such action has arrived.
>
> Id. at 851.

On this basis, the court reversed the finding of the district court and upheld A.B. 78-3.

Rennie I was appealed, and the Supreme Court issued a remand opinion requiring the Court of Appeals to reconsider the decision in light of the holding of Romeo v. Youngberg, 457 U.S. 307 (1982).

On remand, the court once again overturned the district court injunction, finding that "the Supreme Court's decision in Youngberg does not require any change in the judgment which accompanied our earlier opinion." Rennie II, 720 F. 2d at 269. However the court noted that "the analysis leading to that judgment does require amendment," specifically the court's reliance on the "least restrictive means" analysis. Id. The Supreme Court in Youngberg chose not to apply the "least restrictive" or "least intrusive" means test when evaluating a § 1983 claim brought by a resident in a state institution, instead examining whether the complained-of conduct "is such a substantial departure from the accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg, at 323. The Rennie II court found that under this standard, A.B. 78-3 provided sufficient protection of patient's liberty interests. The court summarized its revised holding as follows:

> [A]ntipsychotic drugs may be constitutionally administered to an involuntarily committed mentally ill patient whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others. Once that determination is made, professional judgment must also be exercised in the resulting decision to administer medication.

> Id. at 269-270.

The Rennie decisions are obviously relevant to the instant case. But for several reasons they do not mandate dismissal of Plaintiff's claims. First, the Court of Appeals never reviewed A.B. 5:04 in rendering its decisions in Rennie. It instead looked to an older set of rules embodied in A.B. 78-3. Defendant cites to no authority suggesting that A.B. 5:04 has ever been the subject

16

of a judicial determination that is binding on this Court. This is not merely a technical point—the most contentious portion of A.B. 5:04, permitting a physician to rule a patient "functionally incompetent" was not discussed by the Court of Appeals in <u>Rennie</u>.[8] It would be entirely inappropriate to presume acceptance of these procedures, or any set of rules permitting these procedures, without formal review.

Second, <u>Rennie I</u> specifically held that the involuntarily committed patients were to be accorded no fewer constitutional protections than prisoners. <u>Rennie I</u>, at 846 ("We reject the eighth amendment, therefore, as the proper minimal standard for the treatment of the plaintiff classes. They are entitled to more humane consideration…The Constitution is at least as viable behind the walls of a psychiatric hospital as in a prison."). Since <u>Rennie</u>, the law concerning prisoner refusal of psychoactive medication has evolved to mandate additional due process protection. <u>Harper</u>, 494 U.S. at 233 (upholding prisoner rights to refuse medication and noting that "[a] State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account."). Indeed, <u>Harper</u> upheld a procedural system under which a prisoner:

> must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary. At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved.

---

[8]     Neither party has attached A.B. 78-3, but a copy was included as an appendix to a prior decision of the district court in <u>Rennie</u>, 462 F. Supp. 1131, 1148 (D.N.J. 1978).  While many of the procedures in A.B. 78-3 were incorporated into A.B. 5:04, there are significant differences between the two bulletins. A.B. 5:04 adds both "functional incompetence" and a heavy reliance upon "Rennie Advocates" to review medical decisions. It would be improper for this Court to conclude that A.B. 78-3 and A.B. 5:04 are functional equivalents or that a prior ruling concerning A.B. 78-3 controls any evaluation of A.B. 5:04.

Harper, at 216.

New Jersey statutory law mirrors the Harper standards. A New Jersey prisoner may not be involuntary medicated on a non-emergency basis without a hearing by "Treatment Review Committee" consisting of a psychiatrist, a psychologist, and the Administrator or designee, none of whom "may be currently involved in the inmate's treatment or diagnosis." N.J.ADMIN. CODE 10A:16-11.2 (2007). The inmate must be given twenty-four hours notice of such a meeting and has the following statutory rights:

1. To refuse medication(s) until the Treatment Review Committee reaches a decision on the administration of involuntary medication(s);

2. To be present at the hearing and to make a statement to the Treatment Review Committee, unless the Treatment Review Committee determines that it is likely that the inmate's attendance would subject the inmate to substantial risk of serious physical or emotional harm or pose a threat to the safety of others;

3. To have the aid of a staff advisor to assist in presenting evidence and questioning adverse witnesses;

4. To have disclosed the evidence which supports involuntary medication to the extent such disclosure is consistent with the inmate's best medical interests and with correctional facility security;

5. The opportunity to call witnesses and present evidence;

6. The opportunity for confrontation and cross-examination of witnesses;

7. To receive a written and for illiterate inmates, inmates not sufficiently conversant with the English language and inmates otherwise unable to read due to a physical/medical inability, a verbal report of findings and conclusions to include the length of time involuntary medications are to be given within 24 hours of the Treatment Review Committee hearing; and

8. The opportunity to appeal in writing or receive assistance to appeal in writing when the inmate is illiterate, not sufficiently familiar with the English language or otherwise unable to write an appeal due to a physical/medical inability, to the health care authority within 24 hours of receipt of the written/verbal notification of the Treatment Review Committee's decision.

18

N.J.ADMIN. CODE 10A:16-11.2 (2007)

These due process protections dwarf those available to patients in New Jersey hospitals. And nothing Rennie II suggests that civilly committed patients—who are innocent of any crime—enjoy fewer constitutional rights than convicted criminals. Even if it did, subsequent decisions of the Supreme Court have confirmed that the rights enjoyed by individuals not convicted of a crime are at least as great as those of prisoners. See e.g., Riggins v. Nevada, 504 U.S. 127, 135 (1992) ("detainees… who have not been convicted of any crimes… retain at least those constitutional rights that we have held are enjoyed by convicted prisoners").

Third, the "least intrusive means" analysis that was rejected by Rennie II has subsequently been accepted by Supreme Court. In Rennie II, after remand from the Supreme Court, the Court of Appeals examined A.B. 78-3 without recourse to the "least intrusive means standard." Instead, the court looked at whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Rennie II, at 268 quoting Youngberg. The court held that psychotropic drugs could be administered "whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others." Id. at 269.

Rennie II viewed the "least intrusive means" analysis as fundamentally separate from an analysis of whether the proposed treatment was "medically appropriate." However subsequent decisions involving psychotropic drugs have looked to the availability of alternative means in determining whether a decision to involuntarily medicate is appropriate. In Harper, the court looked at the "absence of ready alternatives" in determining whether a prison regulation which permitted involuntary medication was reasonable. Harper, at 225. In Riggins, the court

19

overturned a conviction on due process grounds, holding that a decision to involuntarily medicate a defendant required a finding "that treatment with antipsychotic medication was medically appropriate and, ***considering less intrusive alternatives***, essential for the sake of [defendant's] own safety or the safety of others." Riggins, at 135 (emphasis added). In Sell v. United States, the Supreme Court held that a decision to medicate a defendant for the purpose of holding a trial required that the court "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." 539 U.S. 136, 181 (2003). While the holding of Rennie II has not been entirely undone, these subsequent Supreme Court decisions have called at least one of is conclusions—that the viability of alternative treatments need not be considered in evaluating a decision to involuntarily medicate a patient— into serious question.[9]

Last, Rennie II explicitly states that "[i]f, after a reasonable time, it develops that the state procedures are not working, then the court may explore other methods to guarantee the patient's constitutional rights." Id. at 851. Given that thirty years have passed since Rennie I, and Plaintiff has come forward with evidence of appalling treatment of patients at New Jersey psychiatric hospitals, a powerful case can be made that that the procedures evaluated in Rennie are not working. Rennie II held that the decisions of medical personnel are only to be accorded deference where they do not differ from "accepted professional judgment." However the

---

[9]  Defendants attempt to distinguish these cases by arguing that patients in psychiatric hospitals have already been committed and thereby found to be "mentally ill and dangerous." (Def. Br. 14). Defendant argues that this prior determination satisfies the constitutional requirement in Harper that medication only be administered if a failure to do so would render the patient "gravely disabled or … a significant danger to themselves or others." Harper, at 226. But this argument conflates two very different determinations. A civil commitment hearing seeks to determine whether a patient has a "mental illness [that] causes the person to be dangerous to self or dangerous to others or property and … needs outpatient treatment or inpatient care at a … psychiatric facility…." N.J.S.A. 30:4-27.2. It has nothing to do with the administration of particular drugs. A finding that a patient needs to be hospitalized to prevent harm is not the same as a finding that the patient needs to be forced to receive medication to prevent harm. A patient may be incapable of caring for his or herself independently, but pose little threat to anyone once hospitalized.

evidence put forth by Plaintiff suggests that that such judgment is alarmingly absent from New Jersey psychiatric facilities. To the extent that Rennie invites subsequent factual review after a "reasonable time," the time is now.

The Rennie cases do not mandate dismissal of this action.

### C.    Does DRNJ Have Standing to Challenge the Pervasive Failure of New Jersey Hospitals to Follow the Law?

Defendants also argue that Plaintiff lacks standing to challenge pervasive violations of A.B. 5:04 in New Jersey hospitals. As detailed above, Plaintiff's complaint contains detailed descriptions of serious and widespread violations of patient rights. These descriptions are vividly illustrated by examples of specific mistreatment suffered by individual patients.[10] Plaintiff seeks injunctive relief to prevent further mistreatment of patients by agents of the State, County, and private hospitals.

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Com'n, 432 U.S. 333, 343 (1977). Suits brought by an association on behalf of members are particularly appropriate where, as here, "the association seeks a declaration, injunction, or some other form of prospective relief [that] can reasonably be supposed …will inure to the benefit of those members of the association actually injured." Warth v. Seldin, 422 U.S. 490, 515 (1975). Of the three Hunt requirements, only the first two are jurisdictional. The

---

[10]    Plaintiff's complaint does not state the names of the patients who have been mistreated, referring to them instead by initials. After this case was filed, Defendants requested and obtained the names of the anonymous patients. (Doc. No. 16). Since then, Plaintiff alleges that those patients have been subjected to repeated harassment and intimidation by agents of Defendants. As made clear in this Court's July 19, 2011 Opinion, these allegations, if true, constitute serious judicial misconduct that this Court will not hesitate to punish.

third concerns itself with matters of prudence and judicial management and may be waived by Congress through statute. United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 557 (1996) ("the third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.").

Defendants characterize Plaintiff's claim as an "as applied" challenge to A.B. 5:04. (Def. Br. 18). Defendants argue that as an association, Plaintiff does not have standing to bring "as applied" challenges that would require the participation of individual members. Id. at 24-25. Defendants acknowledge, however, that the first two Hunt requirements are satisfied and that the individual participation requirement is prudential rather than constitutional. Id. at 21.

To prevail, Defendants must demonstrate two things. First, Defendants must show that the "as applied" claims advanced by Plaintiff actually "require[] the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343. Second, Defendants must prove that Congress did not abrogate this requirement in empowering advocacy organizations under the Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Act. 42 U.S.C. § 10801 et seq.

In hopes of prevailing on this point, Defendants liberally mischaracterize the allegations of Plaintiff's complaint, claiming that "Plaintiff seeks to redress injuries allegedly suffered by patients, rather than injuries to itself." (Def Br. 21). This is incorrect. Plaintiff's complaint does not seek redress of any past misconduct or damages for the benefit of any particular individual. Plaintiff does not ask the Court to overturn individual treatment decisions or to order that specific individuals be free from medication. Rather, Plaintiff argues that the constitutional rights of psychiatric patients in New Jersey hospitals are being violated on an ongoing basis and asks that this Court order injunctive relief to halt to what it sees as unlawful and unconstitutional

practices. "[I]ndividual participation is not normally necessary when an association seeks

prospective or injunctive relief for its members." United Food, 517 U.S. at 546.

Some of the conduct about which Plaintiffs complain is authorized under A.B 5:04, but

other portions are already prohibited. Indeed, some of the treatment decisions that Plaintiff

describes are clearly illegal. Even if this Court were to bless A.B. 5:04 in its entirety, it could still

enjoin practitioners at New Jersey hospitals from, *inter alia*:

- Involuntarily medicating any voluntary patients;

- Involuntarily medicating any patient at institutions which lack Rennie Advocates;

- Involuntarily medicating any patient whose treatment plan has not been timely reviewed in accordance with the requirements of A.B. 5:04;

- Classifying any patient who has refused medication as "Functionally Incompetent";

- Threatening any patient with abuse or mistreatment to coerce consent to medication;

- Approving any Three Step form which permits administration of more than one psychotropic drug;

- Delegating Medical Director Review of Three Step decisions to a mere functionary with no supervisory authority;

All of these practices are alleged in the complaint, and none are consistent with the directives of

A.B. 5:04 or The New Jersey Patient's Bill of Rights. As these practices are already prohibited, it

is unclear that any participation by any individual plaintiff is required. Plaintiff could potentially

prove its case entirely through Defendant's own documents and witnesses or through the results

of independent investigations into New Jersey's psychiatric hospitals like the recent DOJ

investigation of Ancora. (Complaint Ex. D). But even if some "limited individual participation"

by patients is necessary, that participation would not be fatal to DRNJ's standing. Pa. Psychiatric

Soc. v. Green Spring Health Services, Inc., 280 F.3d 278, 287 (3d Cir. 2002) ("If [plaintiff] can

establish these claims with limited individual participation, it would satisfy the requirements for associational standing."); <u>N. J. Protection & Advocacy, Inc. v. N. J. Dept. of Educ.</u>, 563 F.Supp.2d 474, 483 (D.N.J. 2008) ("some limited participation by the individual members of the organization does not bar associational or representational standing under this third element"). Nor should the court presume that significant participation is required. <u>Pa Psych. Soc.</u>, 280 F.3d at 287 ("[a] suit should not be dismissed before [plaintiff] is given the opportunity to establish the alleged violations without significant individual participation").

Moreover even if substantial individual participation were required, Plaintiff has been authorized by Congress under the PAMII Act to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness", and initiate legal action "to ensure the protection of individuals with mental illness who are receiving care or treatment in the State…." 42 U.S.C. § 10805. Other courts in this district have found that PAIMI confers standing on advocacy organizations, provided that the constitutional minimums are satisfied. <u>See</u> <u>e.g.</u>, <u>N. J. Protection and Advocacy, Inc. v. Davy</u>, No. 05-1784, 2005 WL 2416962, *2 (D.N.J. Sept. 30, 2005). ("PAMII[11] expressly grants protection and advocacy groups, such as NJP & A, standing to pursue legal remedies on behalf of individuals with disabilities for violations of their rights.").

Defendants' standing arguments fail. Plaintiff may assert claims for injunctive relief based on failures to follow appropriate laws and regulations in New Jersey psychiatric hospitals.

---

[11]     PAIMI was amended in the year 2000. Pub. L. 106-310, Div. B, Title XXXII, § 3206(a), Oct. 17, 2000, 114 Stat. 1193. Prior to the amendment, it was referred to as the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII").

**D.      Do Patients Have a Right to Challenge Violations of their Constitutional Rights in Court?**

Defendants also invoke <u>Rennie</u> in seeking to dismiss Plaintiff's claims concerning their constituents' right to counsel and access to the courts. (Def. Br. 25). Defendants essentially argue that psychiatric patients have no right to challenge their treatment after civil commitment, writing that "[a]fter an individual is committed, his treatment professionals must only exercise professional judgment to determine that the individual is dangerous to medicate the individual against his will." <u>Id</u>.

As stated above, <u>Rennie</u> does not foreclose Plaintiff's constitutional claims. But even if A.B. 5:04 were entirely proper, Defendants' dismissive characterization of the rights of psychiatric patients would still be utterly wrong.[12] All individuals have the right to challenge the conditions of their confinement in the courts. U.S. Const. art. I, § 9, cl. 2; <u>see also</u> <u>Tennessee v. Lane,</u> 541 U.S. 509, 533 (2004) ("ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts."). Numerous courts have held that individuals in state custody have a protectable right of access to the courts to protest the conditions of their confinement. <u>Bounds v. Smith</u>, 430 U.S. 817, 822 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."). That right is as viable for psychiatric patients as it is for prisoners. <u>Ward v. Kort</u>, 762 F.2d 856, 858 (10th Cir. 1985) ("We hold that plaintiff, as a person under a mental commitment, is entitled to protection of his right of access to the courts.").

---

[12]      Defendants argue at other points in their brief that this action should be dismissed because the individual involuntary treatment decisions made by physicians can be effectively challenged by patients. (Def. Br. 38). It is difficult to fathom how these patients could be expected to meaningfully challenge their treatment decisions—often made at meetings to which they are not invited—without access to counsel or the courts.

Moreover, the right of access to the courts also requires that the state provide persons in its care "adequate law libraries or adequate assistance from persons trained in the law." <u>Bounds</u>, 430 U.S. at 828. While <u>Bounds</u> did not create an "abstract, freestanding right to a law library or legal assistance", it did provide a cause of action for confined individuals who can demonstrate that "shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996). Civilly committed patients are entitled to at least those constitutional protections afforded to prisoners. <u>Riggins,</u> 504 U.S. at 135 ("detainees… who have not been convicted of any crimes… retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"). Indeed, other courts in this district have specifically upheld the right of psychiatric patients to bring <u>Bounds</u> challenges to their right of access to the courts. <u>See</u>, <u>e.g.</u>, <u>Bragg v. Ann Klein Forensic Center</u>, No. 09-3743, 2010 WL 4366255, *5 (D.N.J. Oct. 28, 2010) (permitting patient to challenge adequacy of law library and legal assistance).

Defendants' arguments fail. Plaintiff will be permitted to advance its claims charging denial of counsel and the right of access the courts.

**E.    Does Inferior Treatment of Psychiatric Patients Survive Rational Basis Scrutiny?**

Defendants next argue that Plaintiff's Equal Protection claims are insufficiently pled. Defendants argue that individuals with mental illness are not a "suspect class" and as such, laws which make distinctions on the basis of mental illness are subject to a permissive rational basis review. (Def. Br. 26) Defendants contend that Plaintiff has not sustained its burden to "negative every conceivable basis which might support" the distinction it attacks. <u>Id</u>. at 28.

Plaintiff argues that New Jersey's procedures concerning involuntary administration of psychotropic drugs amount to a denial of the equal protection of law. (Complaint ¶¶ 197-205). Plaintiff claims that under A.B. 5:04 its constituents are afforded fewer legal protections than other patients with respect to their medical treatment. In particular, Plaintiff notes that prisoners with mental illness and individuals with developmental disabilities in addition to mental illness are entitled to hearings before they may be forcibly medicated. (Complaint ¶ 76). Plaintiff submits that this disparate treatment of like individuals is without rational basis and cannot be reconciled with the Fourteenth Amendment's requirement that no state deny to any person within its jurisdiction the equal protection of the laws.

In reviewing an equal protection challenge, the court must "first determine the appropriate standard by which [it is] to review the claim." Doe v. Pa. Bd. of Probation and Parole, 513 F.3d 95, 107 (3d Cir. 2008). If challenged action does not "burden a fundamental Constitutional right or target a suspect class" then the action "must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. (internal citations omitted). Put another way, rational basis review "requires merely that the statute be rationally related to a legitimate government objective." Parker v. Conway, 581 F.3d 198, 202 (3d Cir. 2009).

In making this inquiry, the state "has no obligation to produce evidence to sustain the rationality of a statutory classification." Heller v. Doe, 509 U.S. 312, 321 (1993). Every statute is "presumed constitutional" and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it…." Id. But though this is a highly deferential standard, the court must still inquire into the rationality of the provision. Indeed, "even in the ordinary equal protection case calling for the most deferential of standards, we insist

on knowing the relation between the classification adopted and the object to be attained." Romer v. Evans, 517 U.S. 620, 633 (1996).

The parties essentially agree that individuals with mental illness have never been held a "suspect class" and that consequently, A.B. 5:04 is properly subject to rational basis scrutiny.[13] Plaintiff argues that this Court should uphold its challenge even under this standard, claiming that "there is no justification for granting prisoners hearings on forced medication while denying such hearings to persons in psychiatric hospitals." (Pl. Br. 19). In support, Plaintiff cites to zoning cases such as Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985), and Sullivan v. Pittsburgh, 811 F. 2d 171 (3d Cir. 1987), where ordinances prohibiting group homes for mentally disabled individuals or alcohol treatment facilities were struck down for lack of a rational basis. Plaintiff argues that A.B. 5:04 is similarly prejudiced in its denial of procedural rights to patients based on their status as mentally ill.

But unlike the ordinances of Cleburne and Sullivan, there are many legitimate reasons why the state would impose heightened procedural protections governing the administration of psychotropic drugs to prisoners. Unlike civilly committed psychiatric patients, many prisoners

---

[13]     Plaintiff's only argument to the contrary is the assertion that the ADA "strongly suggested that the disabled should be considered a suspect class…." (Pl. Br. 19). It is unclear that the passage quoted by Plaintiff actually suggests this. 42 U.S.C. § 12101(a)(7). But even if Congress were dropping "hints" about the proper classification of individuals with disabilities, the weight of authority is clearly to the contrary. See e.g., Cospito v. Heckler, 742 F.2d 72, 83 (3d Cir. 1984) ("classification according to mental illness has not been recognized as a suspect class which requires heightened or strict scrutiny under the equal protection clause."); Lavia v. Pennsylvania, Dept. of Corrections, 224 F.3d 190, 199 (3d Cir. 2000) ("the mentally disabled are neither a suspect nor a quasi-suspect class."); Cleburne v. Cleburne Living Center, 473 U.S. 432, 445-446 (1985) ("if the large and amorphous class of the mentally retarded were deemed quasi-suspect for the reasons given by the Court of Appeals, it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. One need mention in this respect only the aging, the disabled, the mentally ill, and the infirm. We are reluctant to set out on that course, and we decline to do so.").

do not have a documented history of mental illness, and are entitled to demonstrate that they are not in need of any psychiatric treatment. The stigma associated with mental illness is serious and may lead to future difficulties for prisoners who are treated for allegedpsychiatric problems by the state. In contrast, civilly committed patients, by definition, all suffer from mental illness, and have already been accorded process to challenge that initial classification. Alternatively, the state might believe that doctors in prisons have fewer colleagues and resources available to them to help confirm diagnoses and treatment plans. The Three Step process required for involuntary drug administration in psychiatric hospitals requires the cooperation of multiple doctors with psychological training, a resource which may not be available in all prisons. The state might grant prisoners additional opportunities to challenge treatment in recognition of a limited ability of the prison psychiatric system to internally review and prevent mistakes.

Moreover, a state might legitimately believe that psychotropic drugs are more likely to be inappropriately administered in a prison setting and offer prisoners additional protections to prevent such abuses. It would not be unreasonable to fear that psychotropic drugs could be improperly used by unscrupulous corrections officials to punish or tranquilize prisoners who do not cooperate with prison rules. Granting prisoners a hearing at which they can challenge the motivations behind a proposed treatment plans is a rational mechanism for deterring this sort of abuse. A state could reasonably believe that hospitals, populated by doctors rather than guards and expressly non-punitive by nature, would be less in need of this oversight.

This is not to suggest that patients have fewer constitutional rights than prisoners. But while the law is clear that civilly committed patients are entitled to no fewer constitutional protections than prisoners, this does not mean that the state may not, in the exercise of reasonable discretion and laudable prudence, establish procedures governing prisoner treatment that go

above and beyond the minimum required by the constitution. State hospitals are not prisons, and there are a multitude of reasons why the state might rationally propagate different sets of regulations for each institution. Plaintiff has not met its burden of alleging that no rational basis exists for A.B. 5:04's differentiation between psychiatric patients and prisoners. Plaintiff's equal protection claim will be DISMISSED.

### F.    Does Rennie Control First Amendment Claims?

Defendants argue that Plaintiff's First Amendment claims are also subject to dismissal under Rennie. (Def. Br. 28). In particular, Defendants claim that challenging an involuntary medication policy on First Amendment grounds rather than a Fourteenth Amendment grounds "does not change the analysis…." Id. This may or may not be the case[14], but in any event, we have already held that Rennie does not bar Plaintiff's Fourteenth Amendment claims. As Defendants have offered no additional grounds for dismissal, we similarly decline to dismiss Plaintiff's First Amendment claims.

### G.    Are Claims Under the ADA or Rehabilitation Act Subject to Rational Basis Review?

Defendants claim that Plaintiff's Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims fail because A.B. 5:04 satisfies "rational basis review." (Def. Br. 29). Defendant claims that the ADA "was designed to enforce the Fourteenth Amendment's prohibition against disability discrimination" and that claims under the ADA must fail unless the "classification based on a disability lacks a rational relationship to a legitimate government purpose." (Def. Reply Br. 10) (Def. Br. 30). This argument betrays a fundamental

---

[14]    As Plaintiff notes, the holding of Scott v. Plante, 532 F.2d 939 (3d Cir. 1976) suggests an independent First Amendment right to refuse medication. We are doubtful of Plaintiff's claim that the Rennie decision "did not disturb" Scott (Pl. Br. 20), given that the district court in Rennie relied heavily upon Scott in formulating its decision. But we need not reach this issue, as Rennie does not bar Plaintiff's Fourteenth Amendment claims.

misapprehension of the controlling law. As the Court of Appeals wrote in <u>Lavia v. Pennsylvania,</u>

<u>Dept. of Corrections</u>, 224 F.3d 190, 200 (3d Cir. 2000):

> In comparing the protections guaranteed to the disabled under the ADA, see text
> supra, with those limited protections guaranteed under the rational basis standard
> of the Fourteenth Amendment*, it is clear that the former imposes far greater
> obligations and responsibilities on the States than does the latter*. As such, the
> ADA cannot be seen as enforcing direct violations of the Fourteenth Amendment.
>
> (emphasis added).

Claims under the ADA are unambiguously not subject to the same rational basis review as those

brought under the 14th Amendment. Indeed, "[t]he ADA's main target is an employer's *rational*

consideration of disabilities." <u>Erickson v. Board of Governors of State Colleges and Universities</u>

<u>for Northeastern Illinois University</u>, 207 F.3d 945, 949 (7th Cir. 2000); <u>see</u> <u>also</u> <u>Board of</u>

<u>Trustees of University of Alabama v. Garrett</u>, 531 U.S. 356, 373 (2001) ("The ADA also forbids

"utilizing standards, criteria, or methods of administration" that disparately impact the disabled,

without regard to whether such conduct has a rational basis.") <u>quoting</u> 42 U.S.C. §

12112(b)(3)(A).[15]

 To establish a violation of the ADA or RA for discrimination in connection with a

government program, a plaintiff must demonstrate only that "she (1) has a disability; (2) is

otherwise qualified to participate in the … program; and (3) was denied the benefits of the

program or was otherwise subject to discrimination because of her disability. <u>Millington v.</u>

<u>Temple University School of Dentistry</u>, 261 Fed. App'x. 363, 365 (3d Cir. 2008). Neither party

seriously contests that many of Plaintiff's constituents are disabled. Indeed, "mental impairment

---

[15]    Nor are claims under the RA subject to "rational basis review." <u>Strathie v. Department of</u>
<u>Transp.</u>, 716 F.2d 227, 231 (3d Cir. 1983) ("broad judicial deference resembling that associated
with the 'rational basis' test would substantially undermine Congress' intent in enacting section
504 that stereotypes or generalizations not deny handicapped individuals equal access to
federally-funded programs.").

that substantially limits one or more major life activities" is expressly included within the definition of "disability" found within the ADA itself. 42 U.S.C.A. § 12102(1)(A). Nor is there any dispute as to whether the psychiatric services offered by the DHS run hospitals qualify as programs for the purposes of the act.

Plaintiff alleges that its constituents have been denied the opportunity to meaningfully participate in the treatment offered by state facilities because of their mental illness. (Complaint ¶¶ 218, 225). Plaintiff further alleges that other medical patients under the care and supervision of the state, such as patients without mental illness, prisoners with mental illness, and individuals with both mental illness and developmental illness are accorded this ability, resulting in superior treatment and greater access to the benefits provided by the state program. Id. at 205. Defendants have offered no argument as to why this differential treatment does not constitute a denial of benefits by reason of disability. Consequently, Plaintiff's claims under the ADA and RA will be permitted to proceed.

### H.      Can DHSS Ignore Pervasive Violations of the Rights of Psychiatric Patients?

Defendants next argue that Ms. O'Dowd, Acting Commissioner of DHSS, is not a proper party to this case. As stated above, DHSS does not administer any psychiatric hospitals. DHSS instead oversees the delivery of medical care in hospitals throughout New Jersey. In this capacity, DHSS acts as a licensing body for all hospitals in the state, including private hospitals run by third parties. Defendant argues that DHSS cannot be held responsible for the actions of the private hospitals that it regulates, and its decisions to issue licenses to hospitals in New Jersey cannot be collaterally attacked through this lawsuit. (Def. Br. 31).

Plaintiff contends that the Court should "exercise its equitable powers to compel DHSS to ensure that the federal and New Jersey constitutions and federal and state statutes are honored

within the walls of New Jersey's health care facilities." (Pl. Br. 23). Plaintiff also asks this Court to "hold DHSS accountable for its discriminatory policies" under the ADA. Id. at 24. However Plaintiff has offered no authority suggesting that it has any viable claims against DHSS or that this Court has the authority to appropriate DHSS's licensing authority for use as a broad cudgel against private hospitals.

DHSS is legally animated by the Health Care Facilities Planning Act of 1971 (HCFPA). N.J.S.A. 26:2H-1 *et seq*. Pursuant to this statute, DHSS is authorized to "inquire into health care services and the operation of health care facilities and to conduct periodic inspections of such facilities with respect to the fitness and adequacy of the premises, equipment, personnel, rules and bylaws and the adequacy of financial resources and sources of future revenues…." N.J.S.A. 26:2H-5. DHSS is further directed to "adopt and amend rules and regulations… [providing for] standards and procedures relating to the licensing of health care facilities and the institution of certain additional health care services." Id. By law no hospital may operate within New Jersey without a license from DHSS. N.J.S.A. 26:2H-12. In addition to approving licenses, DHSS is empowered under HFCPA to "assess penalties", "deny, place on probationary or provisional license" or "revoke or suspend any and all licenses granted" to any institution that it finds to be "violating or failing to comply with the provisions of this act, or the rules and regulations promulgated hereunder." N.J.S.A. 26:2H-13. However, DHSS may not unilaterally or arbitrarily impose any penalty, and all medical facilities have a right to hearing with notice and counsel before any sanction is applied. Id.

Plaintiff does not allege that DHSS has ever been involved in the decision by private medical practitioners to medicate patients in violation of law. Nor is there an accusation that DHSS has deliberately ignored violations of its regulations. Unlike the licensing body in A v.

33

Nutter, No. 08-4100, 2010 WL 3420106, (E.D. Pa. Aug. 27, 2010), there is no accusation that DHSS "purposefully engaged in a policy of pretextually restoring … licenses even though the [licensee], over a 20 year period, was considered to be unsafe by any standards of professional practice." Id at *10. Rather, Plaintiffs complain that DHSS has not promulgated mandatory procedures regarding the administration of psychotropic drugs in hospitals that it licenses. (Complaint ¶ 82). But neither HCFPA nor any other statute provided by Plaintiff contains a cause of action permitting a third-party challenge to DHSS's rule-making authority or licensing decisions. There is no cause of action for "failure to draft a regulation."

Plaintiff asserts that private hospitals in New Jersey do not respect the constitutional rights of their psychiatric patients and routinely medicate them with psychotropic drugs. Plaintiff further claims that these hospitals operate with lawless abandon, ignoring the holding of Rennie, the New Jersey Patient's Bill of Rights, and the New Jersey and Federal Constitutions. Plaintiff finally complains that patients committed to these hospitals occupy a "legal black hole" in which they have no procedural recourse and from which they cannot effectively challenge the conditions of their confinement. If these allegations are true, Plaintiff or its constituents have multiple viable claims against both the private hospitals and the doctors and staff who work there. But this Court cannot appropriate the powers of an administrative agency merely because they might be useful in vindicating third-party rights.

It is unclear from the statute that DHSS even has the authority to promulgate specific procedures concerning the administration of psychotropic drugs. But even it had such authority, it would be inappropriate for this Court to order it to do so. Plaintiff's claims against Defendant O'Dowd will be DISMISSED.

## I.      Should the Court Abstain?

Finally, Defendants argue that the Court should apply the Burford doctrine and decline to decide this case. (Def. Br. 37). As a general matter, the federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them" and hear cases arising within that jurisdiction. Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992) quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). The Burford doctrine is a narrow exception to this rule. Burford provides that "a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state's efforts to regulate an area of law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available." Chiropractic America v. Lavecchia, 180 F.3d 99, 104 (3d Cir. 1999). The purpose of Burford abstention is to "avoid federal intrusion into matters of local concern and which are within the special competence of local courts." Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295, 303-304 (3d Cir. 2004) quoting Chiropractic America.

Determining whether Burford abstention is appropriate involves a "two-step analysis." Matusow v. Trans-County Title Agency, LLC, 545 F.3d 241, 247 (3d Cir. 2008). First we must examine "whether timely and adequate state law review is available." Id. If there is no adequate state law review, Burford abstention is inappropriate. Riley v. Simmons, 45 F.3d 764, 771 (3d Cir. 1995) ("Only if a district court determines that such review is available, should it turn to the other issues."). If adequate review exists, we must then "determine if the case involves difficult questions of state law impacting on the state's public policy or whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." Matusow, 545 F. 3d at 247-248.

Defendants argue that individual patients may obtain timely and adequate review of decisions by DHS in the Appellate Division of New Jersey Superior Court after exhausting their administrative remedies. (Def. Br. 38). And indeed, the New Jersey Rules of Court do permit appeal of "final decisions or actions of any state administrative agency or officer" and review of "the validity of any rule promulgated by such agency or officer…." N.J. Ct. R. 2:2-3(a)(2). However the allegations of Plaintiff's complaint make the adequacy of this remedy highly suspect.

As a threshold matter, it is highly dubious to expect any patient to successfully pursue lengthy and difficult litigation against a party with the ability to arbitrarily drug them into a stupor. The purported acts of harassment and intimidation that some patients have suffered as the result of cooperating with this lawsuit illustrate the vulnerable nature of these would-be plaintiffs, many of whom suffer from debilitating disease. And even if individual patients were willing to risk challenging treatment decisions, Plaintiff has alleged that the administrative reviews by Treatment Teams, Rennie Advocates and Medical Directors that are required under A.B. 5:04 are frequently not performed. In fact, Plaintiff alleges that some hospitals have so little respect for the letter of the law and the rights of patients that the position of Rennie Advocate goes unfilled for lengthy periods of time.

But even if effective review is assumed, the second step of the Burford analysis is fatal to Defendants argument. First, "plaintiffs' claims of federal constitutional violation represent the exact sort of disputes over citizens rights with which the federal courts were created to deal." Hanna v. Toner, 630 F.2d 442, 446 (6th Cir. 1980). While the assertion of a constitutional right is not a perfect talisman against abstention, courts have regularly rejected abstention in cases involving the mistreatment of individuals in state custody. See e.g., Campbell v. McGruder, 580

F.2d 521, 525 (D.C. Cir. 1978) (<u>Burford</u> abstention inappropriate in case involving constitutional claims by pretrial detainees); <u>Stovall v. Hayman</u>, No. 07-3062, 2008 WL 2625222, *3 (D.N.J. June 30, 2008) (<u>Burford</u> abstention inappropriate in case involving inmate rights).

Second, this case does not involve the kind of "complex, technical regulatory scheme to which the <u>Burford</u> abstention doctrine usually is applied" <u>Id</u>. The applicable guideline is only 14 pages long. (Complaint Ex. 3). While the proper course of treatment of any individual patient involves specialized knowledge and medical ability, the due process issues advanced by Plaintiff's complaint are well within the competency of the court. In contrast, the regulatory framework in <u>Burford</u> involved a complex system of land and natural resources management designed to balance private property rights, state revenues, market demand, the economically efficient extraction of oil and gas, and environmental protection. It relied upon significant amounts of engineering and economic expertise and advanced specific public policy objectives.

It is unclear that the regulations and practices at issue in this case advance any such objectives or are the product of the kind of considered analysis that the <u>Burford</u> court wished to respect. To the contrary, Plaintiff suggests that the current administrative regime is largely ignored by Defendants and their agents. While Defendants argue that "[t]he health and safety of patients and staff is of paramount importance" to the state (Def. Br. 39), the facts alleged by Plaintiff suggest that this objective is frequently ignored.

Last, the notion that abstention will somehow preserve the autonomy of New Jersey's regulation of patient care is frankly untenable. The constitutionality of New Jersey's involuntary medication guidelines has already been repeatedly challenged in federal court. Indeed, the very regulation that is attacked in this case was drafted in response to prior federal challenge and contains elements that make specific reference to the holding of that court. If ever there were a

time for abstention, it has clearly passed. <u>Burford</u> abstention is improper here, and this Court will not decline to hear this case.

### III.    CONCLUSION

For the reasons set forth above, Defendants' Motion is GRANTED with respect to Defendant O'Dowd as to all Counts, and GRANTED with respect to Defendant Velez as to Count IV. Count IV of Plaintiff's Complaint is DISMISSED. Defendant's Motion is otherwise DENIED.


<u>s/ Dickinson R. Debevoise</u>
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 20, 2011