**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC., <br><br> Plaintiff, <br><br> v. <br><br> JENNIFER VELEZ, in her official capacity as Commissioner, State of New Jersey Department of Human Services. <br><br> Defendant. | Civ. No. 10-3950(DRD) <br><br><br> **O P I N I O N** |

*Appearances by:*

WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, New Jersey 08608

KIRLAND & ELLIS LLP
by:   Robert Cohen, Esq.
       Melody Wells, Esq.
       Alexandra P. Kolod, Esq.
601 Lexington Avenue
New York, New York 10022

   *Attorneys for Plaintiff*

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS
Susan K. O'Connor, Esq.
40 Paterson Street
PO Box 480
New Brunswick, New Jersey 08903

   *Attorney for Defendant*

1

**DEBEVOISE, Senior District Judge**

Plaintiff, Disability Rights New Jersey ("DRNJ") brings this action against Defendant Jennifer Velez in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS").  DRNJ represents psychiatric patients who either are or will be treated at psychiatric hospitals in the State of New Jersey.  DRNJ alleges that Administrative Bulletin A.B. 5:04, governing the involuntary administration of psychotropic drugs, is routinely violated in New Jersey hospitals.  As a result, psychiatric patients are forced to consume psychotropic drugs against their will in violation of New Jersey law, the New Jersey and Federal Constitutions, and the regular and prudent practice of medicine.  DRNJ also alleges that the "Three Step" process by which patients are involuntarily medicated is constitutionally infirm even if followed, as it denies patients the ability to meaningfully challenge this dangerous violation of their bodies and minds.

Currently before the Court is a motion filed by DRNJ for leave to file a first amended complaint to add the State of New Jersey as a party to two counts.  For the reasons set forth below, DRNJ's motion is GRANTED in part as to Count VI for violations of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C.A. 12131, *et seq*., and DENIED in part as to Count VII for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

## I. BACKGROUND

The circumstances surrounding this case are well known to the parties and set forth in this Court's June 20, 2011 Opinion (Doc. No. 40).  The facts relevant to this motion are as follows.  DRNJ is a not-for-profit corporation that engages in advocacy on behalf of individuals with disabilities. DRNJ is under contract with New Jersey to provide services as authorized under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI").  42

U.S.C. § 10801 *et seq*.  Pursuant to PAIMI, DRNJ has been allocated federal funds to "investigate incidents of abuse and neglect of individuals with mental illness", "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness", and initiate legal action "to ensure the protection of individuals with mental illness who are receiving care or treatment in the State…." Id.

DHS is a state agency that provides medical care and assistance programs for economically disadvantaged or disabled residents of New Jersey.  As part of its role in caring for individuals suffering from mental illness, DHS operates five inpatient psychiatric hospitals (the "State Hospitals").  DHS also funds most of the cost of indigent inpatient care at six other psychiatric units and hospitals that are independently operated (the "County Hospitals").

DRNJ brings this case as a broad challenge to the current rules and practices surrounding the involuntary administration of psychotropic drugs in New Jersey.  Specifically, DRNJ questions the application of Administrative Bulletin A.B. 5:04, published by the New Jersey Division of Mental Health and Hospitals and entitled "The Administration of Psychotropic Medication to Adult Voluntary and Involuntary Patients." (Compl., Ex. 3).  A.B. 5:04 codifies procedures designed to protect the constitutional and statutory rights of patients receiving treatment for mental illness.  DRNJ claims that the procedures set forth in A.B. 5:04 are constitutionally infirm as written and rarely followed in practice.  DRNJ specifically alleges that the current regulatory regime permits patients to be forcibly injected with dangerous psychotropic medications against their will. (Compl. ¶ 83).  Plaintiff sues for an order compelling a reformation of DHS regulations, procedures, and practices to appropriately protect the rights of psychiatric patients as guaranteed by the United States and New Jersey constitutions and applicable laws.

On July 20, 2011, this Court denied, in part, DHS's motion to dismiss this action[1], holding that "[t]here can be no doubt that all patients in New Jersey, including patients with severe mental illness or injury, have the right to participate meaningfully in the course of their treatment, to be free from unnecessary or unwanted medication, and to have their rights to personal autonomy and bodily integrity respected by agents of the state." (Doc. No. 40 at 5). The Court found that DRNJ had presented "a panoply of serious allegations concerning the practice of psychiatric medicine in New Jersey hospitals" including practices that plainly violate existing New Jersey law. Id. at 9.  Consequently, the Court refused to dismiss DHS from this case.

DHS filed its answer on August 4, 2011.  On August 25, 2011, DRNJ filed a motion to strike thirty-three of DHS's defenses, arguing them to be frivolous, irrelevant, and/or legally insufficient. (See Opinion, Sept. 23, 2011; Doc. No. 56).  The Court granted DRNJ's motion to strike, finding the defenses to be "boilerplate", "highly repetitive and containing almost no factual specificity."[2]  Id. at 4.

On January 30, 2012, DRNJ filed a motion for leave to file a First Amended Complaint, with the only substantive difference from the original Complaint being to add the State of New Jersey as a party to the action.  (Pl.'s Br.; Doc. No. 78-1).  The proposed First Amended Complaint only includes the State of New Jersey as to two counts – Count VI, for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq.*, and Count VII, for violations of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a).  DHS filed a Letter brief in opposition on February 27, 2012, arguing amendment to the claims is futile

---

[1] The Court granted Defendants' motion to dismiss all claims against Mary O'Dowd, the acting commissioner of the New Jersey Department of Health and Senior Services ("DHSS").

[2] For example, the Court found with respect to the defenses related to damages, that "[c]ontrary to the ex-post justifications by Defendant, it is clear what happened here. Defendant's counsel appears to have carelessly copy-pasted boilerplate personal injury defenses into the answer despite their inapplicability." Id. at 7.

and should be denied. (Def.'s Opp. Br.; Doc. No. 82). Specifically, DHS argues that the ADA amended claim has no merit because DRNJ has failed to show that the State caused the harm, and that the Rehabilitation Act claim is similarly futile because the State has not waived sovereign immunity.

On February 15, 2012, DHS moved to vacate a Consent Order governing New Jersey's procedures for administration of antipsychotic drugs without consent by involuntarily committed mentally ill patients, codified in Administrative Bulletin 5:04. See <u>Rennie v. Klein</u>, 720 F.2d 266 (3d Cir. 1983) ("<u>Rennie</u> Consent Order"). In support of its motion, DHS first argued the involuntary medication procedures to be undermined by subsequent Supreme Court rulings in <u>Washington v. Harper</u>, 494 U.S. 210 (1990) and its progeny.[3] Second, DHS sought to vacate the <u>Rennie</u> Consent Order, "so that [Ms. Velez] may issue an involuntary medication policy in accord with Supreme Court decisions subsequent to <u>Rennie</u>, which this court has found applicable to State psychiatric hospitals." (Doc. No. 89, p. 21). DHS further explained:

> Defendant included the proposed involuntary medication policy to demonstrate that she will implement enhanced procedures meeting or exceeding <u>Harper</u> if the motion is granted. Plaintiff's demands for court hearings and assigned counsel are based on policy preferences which are not required by law. Defendant does not ask in this motion that the court rule on the constitutionality of the proposed policy or dismiss the action. Rather at this juncture, Defendant requests only that the court vacate the <u>Rennie</u> consent order so that the agency may implement the new policy.

(<u>Id.</u> at 2).

---

[3] DHS noted the Court's prior ruling in this case on July 20, 2011, wherein the Court found that the Supreme Court's decision in <u>Harper</u>, which involved involuntary medication procedures for prisoners, applied to individuals who have been civilly committed to State psychiatric hospitals, and further found that "the law concerning . . . refusal to psychoactive medication has evolved to mandate additional due process protection." See Opinion of Motion to Dismiss at p. 17 (July 20, 2011) (Doc. No. 40).

DRNJ did not oppose the motion to vacate the Rennie Consent Order, arguing it to be constitutionally infirm and essentially the better of two evils. However, DRNJ "strenuously oppose[d]" any motion or request that asks the Court to approve or order the new involuntary medication policy. (Doc. No. 83). Accordingly after considering the papers and oral arguments, on March 19, 2012, the Court entered an order vacating the Rennie Consent Order which is codified in Administrative Bulletin 5:04. (Doc. No. 91). Currently before the Court is whether DRNJ's motion to amend the Complaint to add the State of New Jersey as a party should be granted.

## II.   DISCUSSION

### A.  Standard of Review

Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." It is well-settled by the Third Circuit that, "leave to amend should be granted freely . . . and court[s] should use 'strong liberality' in considering whether to grant leave to amend." Sutton v. New Century Financial Services, Civ. No. 05-3125 (DRD), 2006 WL 3676303, at *1 (D.N.J. Dec. 11, 2006) (Debevoise, J.) (quoting Dole v. Arco Chemical Co., 921 F.2d 484, 486-487 (3d Cir. 1997). Leave to amend may be denied if the amendment is futile and would not survive a motion to dismiss for failure to state a claim upon which relief could be granted. See Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) (citing Smith v. NCAA, 139 F.3d 180, 190 (3d Cir. 1998), reversed on other grounds, 525 U.S. 459 (1999)). To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twobly, 550 U.S. 544, 570 (2007)).

Refusal to grant leave to amend is reviewed for abuse of discretion.  See <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 1644, 544 (3d Cir. 1998).  It is an abuse of discretion to deny leave to amend unless "plaintiff's delay in seeking amendment is undue, made in bad faith, prejudicial to the opposing party, or [the amendment] fails to cure the jurisdictional defect."  <u>Berkshire Fashions, Inc. v. M.V. Hakusan II</u>, 954 F.2d 874, 886 (3d Cir. 1992); see also <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).

      DRNJ's proposed Fist Amended Complaint differs from the original Complaint only to the extent necessary to add the State of New Jersey as a party and to make minor, non-substantive edits to the language.  DRNJ notes that there has been no evidence that the proposed addition is the product of undue delay, bad faith, or a dilatory motive, and that to the extent the parties wish to engage in settlement discussions, the presence of the State of New Jersey will only facilitate such talks.  (Pl.'s Br. ¶ 13).  Moreover, DRNJ argues that the allegations against the State of New Jersey are not futile "because it is responsible for the statutory and regulatory framework by which involuntary psychiatric patients who are competent to make medical decisions are forcibly medicated without a judicial hearing and the accompanying legal safeguards, such as the right to be represented by counsel."  (<u>Id.</u> ¶ 10).  DRNJ's proposed Amended Complaint repeats this language (Doc. No. 78-4, ¶ 215).

    **B.   Proposed Amendment as to Count VI, for Violations of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C.A. 12131, *et seq*.**

      Title II of the ADA is the most recent and extensive endeavor to address discrimination against persons with disability.  See <u>Olmstead v. L. C. by Zimrig</u>, 527 U.S. 581, 588 (1999).  Indeed, Title II was enacted "against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights."  See <u>Tennessee v. Lane</u>, 541 U.S. 509, 524 (2004).  The statute as a whole is intended "to

provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b) (1).  Congress's findings in enacting the ADA include the following:

> historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> [ ] discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services; [ . . . ]
>
> [ ] individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities[.]
>
> 42 U.S.C.A. §§12101 (a) (2), (3), (5).

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Title II's definition of "public entity" includes "any state or local government," and "any department, agency, or special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. §§ 12131(1) (A), (B).

Congress instructed the Attorney General to promulgate regulations to implement provisions of Title II.  42 U.S.C.S.A. §12134(a).[4]  Accordingly, the Attorney General issued regulations to effectuate Title II, set forth at 28 CFR §35.101.  The regulations include the following:

> [(b)](3) A public entity may not, *directly or through contractual or other arrangements*, utilize criteria or methods of administration:
>
>   (i) That have the *effect* of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or]
>   (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities [ . . . ]
>
> [(b)](7)  A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. [ . . . ]
>
> (h)  A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities.  However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.
>
> 28 CFR § 35.130 (emphasis added).

Additionally, the ADA provides an explicit waiver of sovereign immunity.

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in[a] Federal or State court of competent jurisdiction for a violation of this Act [the ADA]. In any action against a State for a violation of the requirements of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent

---

[4] Moreover, the Attorney General's regulations "shall be consistent with this Act and with the coordination regulations . . . applicable to recipients of Federal financial assistance under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794)." 42 USCS 12134(b).

> as such remedies are available for such a violation in an action against any public or private entity other than a State.
>
> 42 U.S.C.S. § 12202.

Section 12202 is an "unequivocal expression of Congress's intent to abrogate state sovereign immunity." United States v. Georgia, 546 U.S. 151, 154 (2006). In United States v. Georgia, the Supreme Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." Id. at 159 (emphasis in original).

"States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." Olmstead v. L.C. ex rel. Zimrig, 527 U.S. 581, 603, n. 14. In Olmstead, the Supreme Court found the unjustified institutional isolation of persons with disabilities to be a form of discrimination. Justice Stevens's concurring opinion further explains that "[u]njustified disparate treatment, in this case, 'unjustified institutional isolation,' constitutes discrimination under the Americans with Disabilities Act of 1990."[5] Id. at 607 (Stevens, J., concurring). The facts in Olmstead do not turn on whether specific regulations or statutes promulgated by a department, agency, or state, give rise to the institutional isolation, but focus on the condition itself within a statutory construction of Title II. See Id. at 588, 593. Similarly in United States v. Georgia, a quadriplegic brought suit against both the State of Georgia and the state Department of Corrections, challenging his prison conditions in general, without contention to a specific regulation or statute giving rise to the condition. 546 U.S. at 151. The same was contended in Tennessee v. Lane, as per physical barriers in courthouses and courtrooms. 541 U.S. 509 (2004).

---

[5] Justice Stevens further notes that "if a plaintiff requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs." Id. (Stevens, J., concurring).

DHS contends that that the motion should be dismissed as futile, because "Plaintiff must show that the services, programs, or activities of the State caused the harm, not just that the State can provide the desired remedy. 42 U.S.C. § 12132. It, however, has already been established that it is the DHS policy at issue, not a State statute, legislative enactment, or executive order. In fact, Plaintiff's proposed complaint fails to cite to any statute, enactment or executive order of the State that violates the ADA." (Def.'s Opp. Br. at 3).

The overall purpose and scheme by which the ADA was implemented does not isolate liability of an implementing program or department from the overall enabling state construct. Supreme Court cases, described above, regarding construction of Title II in claims against a state or its agencies, do not turn on a specific law or regulation giving rise to the discriminatory condition challenged, but focus on the overall condition itself. Moreover, DHS's contention that DRNJ must show that the State "caused the harm" is a mischaracterization of the prescription of Section 12132, which focuses on the exclusion from participation, denial of benefits of a public entity's services, programs, or activities, and discrimination by the entity. Regulations promulgated by the Attorney General further instruct that no public entity may *directly or through contractual or other arrangements* utilize criteria or methods of administration that have the *effect of subjecting* one to discrimination based on disability. See 28 CFS § 35.139(b) (3), supra. Here, the construct of the state and its resources, including facilities and employees, is applying an outdated and constitutionally-suspect policy which *affects* the right of state residents to refuse the forced consumption of psychotropic drugs. Presumably, this is the rationale which was used in United States v. Georgia, wherein both the State of Georgia and its Department of Corrections were sued by the United States and the petitioner for disability discrimination. 546 U.S. 151, supra. In accordance with ADA Regulations, see 28 CFR § 35.130(b)(7), supra,

11

"reasonable modifications in policies, practices, and procedures" are assumed, based on agreement of the parties to vacate the Rennie Consent Order, and DHS's submission of an alternate policy aimed to conform to subsequent Supreme Court decisions.  Thus, the Court finds that amendment to the Complaint to the extent necessary to add the State of New Jersey as a party is not futile as to Count VI, and DRNJ's motion to amend the complaint as to this part is granted.

### C. Proposed Amendment as to Count VII for Violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in programs receiving Federal financial assistance.  Section 504 of the Rehabilitation Act of 1973 provides that:

> (a) No otherwise qualified individual with a disability in the United States, as defined in section 702(29) [29 USCS § 705(20)] of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance [ . . . ]
>
> (b) For the purposes of this section, the term "program or activity" means all of the operations of –
>
>> (1) (A)  a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>>
>> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.
>
> [ . . . ]

29 U.S.C. § 794.

Section 504 of the Rehabilitation Act and Title II of the ADA offer similar protections for persons with disabilities. Although Title II applies to state and municipal governments, Section 504 applies only to those agencies or departments receiving federal funds. Under the statutory definition in Section 504, the state, as a whole, cannot be a "program or activity."

Section 504 intended to overrule Grove City College v. Bell, 465 U.S. 555 (1984), so that "program or activity" was expanded from a specific program or specific activity to "all the operations" of the university or hospital or other institution that conducted the program or activity. See Schroeder v. Chicago, 927 F.2d 957, 962 (7th Cir. 1991) (J. Posner), quoting S. Rep. No. 64, 100th Cong., 2d Sess. 16 (1998) ("If federal health assistance is extended to a part of a state health department, the entire health department would be covered in all of its operations. If the office of a mayor receives federal financial assistance and distributes it to local departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies which actually get the aid").

However the expansion of Section 504 from a specific program or activity to the conduit institution or department, does not reach the state as a whole. In Koslow v. Commonwealth of Pennsylvania, The Third Circuit found that:

> As other courts have noted, if the entire state government were subject to §504 whenever one of its components received federal funds, subsection (b)(1)(B) would be redundant. . . . Therefore, if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency – but only against that department or agency.
>
> Therefore, if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency – but only against that department or agency.
>
> 201 F.3d 161, 171 (3d Cir. 2002) (internal citation omitted).

13

Thus, the Third Circuit found that where the state accepted designated federal funds for the Department of Corrections, the state waived immunity under Section 504 for claims against the Department. "To put it another way, the waiver of immunity conditioned on receipt of Rehabilitation Act funds applies on an agency-by-agency, or a department-by-department basis[.]" Id. at 176.

DRNJ argues that "because the State of New Jersey accepts federal funds to support, *inter alia*, the Department of Human Services' Division of Mental Health Services, it is not immune from suits for violations of Section 504 of the Rehabilitation Act." (Pl.'s Br. ¶ 12). Indeed, federal funds were directed to DHS, Division of Mental Health Services, for "Patient Care and Health Services and "Administration and Support Services." (See Def.'s Opp. Br., Ex. A). In accordance with Koslow and the language of Section 504, the State's acceptance of funds waives sovereign immunity as to DHS, but not as to the state as a whole. Thus, the motion to amend the complaint is dismissed as to Count VII due to futility.

### III.  CONCLUSION

For the foregoing reasons, DRNJ's Motion for leave to amend the complaint to the extent necessary to add the State of New Jersey as a party is GRANTED in part, as to Count VI, and DISMISSED in part, as to Count VII. The Court will enter an order implementing this opinion.

  /s/Dickinson R. Debevoise_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  March __23_, 2012