HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903
(732)545-4717
Attorneys for Defendants, Jennifer Velez, in her official capacity as Commissioner, State of New Jersey Department of Human Services and State of New Jersey

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK, NEW JERSEY

| | |
|---|---|
| Plaintiff,<br><br>DISABILITY RIGHTS NEW JERSEY, INC., a New Jersey non-profit corporation<br><br>     vs.<br><br>Defendants,<br><br>JENNIFER VELEZ, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and POONAM ALAIGH, in her official capacity as Commissioner, State of New Jersey Department of Health and Senior Services and State of New Jersey | Honorable Dickinson R. Debevoise, Sr., U.S.S.D.J<br><br>CIVIL ACTION NO. 2:10-cv-3950(DRD/PS)<br><br><br><br>**ELECTRONICALLY FILED** |

## STATEMENT OF FACTS
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
Attorneys for Defendants, Jennifer Velez, in her official capacity as Commissioner, State of New Jersey Department of Human Services and State of New Jersey
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903
(732) 545-4717

## UNDISPUTED STATEMENT OF MATERIAL FACTS

1.     The New Jersey Department of Human Services (DHS), serves more than one million of New Jersey's most vulnerable citizens, or about one of every eight New Jersey residents.  DHS serves individuals and families with low incomes, people with mental illnesses, developmental disabilities, late-onset disabilities; the blind, visually impaired, deaf, hard of hearing, or deaf-blind.  In addition, the Department serves parents needing child care services, child support and/or healthcare for their children; as well as families facing catastrophic medical expenses for their children.  DHS and its operational Divisions strive to assist, support and improve the lives of individual and families in need.  (Exhibit E, Excerpts of DMHAS OMB No. 0930-0168 approved July 19, 2011, p. 15).

2.     Jennifer Velez is the Commissioner of the State of New Jersey Department of Human Services ("DHS").  Plaintiff brings this action against Defendants Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"), and the State of New Jersey. (Plaintiff's Amended Complaint, Docket No. 95).

3.     Of the State's 2012 budget of $29.6 billion, the DHS budget is $5.303 billion.  The State primarily bears the burden of funding the public mental health system. (Exhibit F, Excerpts of the State and DHS Budget).

4.     DHS is the umbrella organization for several divisions, including the Division of Mental Health and Addiction Services (DMHAS).  (Exhibit E at p. 15). DMHAS, as the single state authority for mental health and substance abuse disorders, has a budget that exceeds $900 million, employs over 5,000 persons and serves approximately 250,000 New Jersey residents. (Exhibit G, DMHAS Office Descriptions, p. 1).  Lynn Kovich is the Assistant Commissioner, responsible for DMHAS.  (Exhibit H, DMHAS Organizational Chart).

1

5.      DMHAS is the state mental health authority that oversees the State's public system of adult mental health services, operating three non-forensic, regionally-based adult psychiatric hospitals and one adult forensic hospital. (Hereinafter the "State Hospitals"). (Exhibit E at p. 31). To ensure that the four[1] State Hospitals function in a similar manner, such as organizational structure, provision of active treatment, census reduction efforts, implementation of evidence-based practices, reduction of violence and workforce development initiatives, the Division sets forth policies, requires training and oversees the clinical aspects of all inpatient and outpatient treatment programs, including the programs at the State Hospitals. (Exhibit I, DHS Website, Office of State Hospital Management; Exhibit J, Deposition of Eilers, T33:20-21, T42:18-22). Specific to this matter, the Division has a Medical Director of DMHAS[2], Dr. Robert Eilers, and a Chief Nursing Officer for DMHAS, who under the Medication Policy also serves as the Coordinating Chief of Client Service Advocates, Karen Piren. (Exhibit H).

6.      Each of the State hospitals has been accredited by The Joint Commission (formerly the Joint Commission on Accreditation of Hospital Organization or JCAHO).   Only those organizations deemed to be in compliance with all or most of the applicable standards are accredited. To provide their consumers with the highest level of service, at a minimum, a hospital must be completely familiar with the current standards, examine current processes, policies and procedures relative to the standards and prepare to improve any areas that are not currently in compliance. To obtain accreditation, healthcare organization staff members must be able to demonstrate proficiency

---

[1] At the time this Complaint was filed, DMHAS operated five State Hospitals: Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Hagedorn Psychiatric Hospital, Trenton Psychiatric Hospital, and the adult forensic hospital, Ann Klein Forensic Center.  Hagedorn Psychiatric Hospital was closed in June of 2012. (Exhibit G at p. 2).

[2] Dr. Eilers oversees the clinical aspects of all inpatient and outpatient treatment programs, including the programs at the State Hospitals. (Exhibit J, Deposition of Eilers, T33:20-21).

across specific job competencies and receive performance evaluations based on specific job descriptions. The hospital must demonstrate compliance with the standards for at least four months prior to the initial survey and the accreditation is renewed on a three year cycle. (See www.jointcommission.org).

7.      State Hospitals are authorized to accept persons in need of involuntary inpatient commitment under N.J.S.A. 30:4-27.2 et seq. Most persons who are admitted to State Hospitals are committed in a civil court. (Exhibit O, Deposition transcript of Micaela Bennett, dated April 4, 2012, T63:25-T64:12)

8.      In New Jersey, an individual who is "in need of continued involuntary commitment" to a psychiatric hospital must be found by a Court, at regular intervals during hospitalization, by clear and convincing evidence, to be a danger to self or to others or to property, due to mental illness, and to continue to refuse to accept appropriate treatment. (N.J.S.A. 30:4-27.2m; N.J. Ct. R. 4:74-7(f)(1)).

9.      "In need of involuntary commitment" or "in need of involuntary commitment to treatment" means that an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered, needs outpatient treatment or inpatient care at a short term care of psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs. (N.J.S.A. 30:4-27.2m).

10.     "Dangerous to self" is defined as "by reason of mental illness, the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care, or shelter, so that it is probable that substantial bodily injury, serious physical debilitation or death will result within the reasonably foreseeable future." However, no person shall be deemed to be unable

3

to satisfy his need for nourishment, essential medical care or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available to help. (N.J.S.A. 30:4-27.2h).

11.     Finally, the statute defines "dangerous to others or property" as those persons, by reason of mental illness, who have a substantial likelihood of inflicting serious bodily harm upon another person or will cause serious property damage within the reasonably foreseeable future. This determination must take into account the person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration. (N.J.S.A. 30:4-27.2i).

12.     After an order of temporary commitment, a hearing is held within 20 days of the admission that reviews the statutory requirements of dangerousness, mental illness that generates the dangerousness, determines whether or not the need for involuntary commitment is present, and whether or not there's a less restrictive alternative available. (Exhibit O, Deposition of Bennett, T21:16-20; T33:15-20; T62:21-T63:2; N.J. Ct. R. 4:74-7(c)(1), (e)).

13.     Following the initial commitment hearing and the entry of a final order of commitment, the patient is entitled to periodic review of the commitment. (N.J. Ct. R. 4:74-7(f)(2); Exhibit O, Deposition of Bennett, T67:3-4; T68:7-10; T68:22-T69:1)

14.     Patients may be placed on Conditional Extension Pending Placement (CEPP) status during their admission at the State hospitals. The Court may enter an order of CEPP when a patient no longer satisfies the standard for involuntary commitment and is entitled to discharge, but appropriate placement in the community cannot be found. This happens when the patient cannot be discharged to live on his/her own or with family and there is no appropriate housing immediately available. A placement review hearing is scheduled within 60 days of the CEPP order. N.J. Ct. R.

4:74-7(h)(2). The intent of this order is to assess the hospital's efforts to discharge the patient and to identify an appropriate placement.

15.     In 2011, there were 1,854 civil commitment hearings at Greystone, 1,033 hearings at Hagedorn, 2,637 hearings at Trenton Psychiatric Hospital, 783 hearings at Ann Klein, and 2,329 hearings at Ancora, totaling 8,636 civil commitment hearings. (Exhibit P, Deposition Exhibit No. 51 introduced at the Deposition of Micaela Bennett; Exhibit Q, Letter dated April 20, 2012 amending list of annual number of Civil Commitment Hearings).

16.     Ann Klein Forensic Center in Trenton, a 200-bed psychiatric hospital, serves inmates from the state correctional system, people who have been charged with, convicted of, or determined by the courts to be Not Guilty by Reason of Insanity or Incompetent to Stand Trial of particularly violent crimes, or who require special security measures due to the nature of their illness[3]. (Plaintiff's Amended Complaint, Docket No. 95, ¶35).  Patients at the Ann Klein facility are "forensically involved", have "criminal charges" against them or have been found not guilty by reason of insanity. (Exhibit K, Deposition transcript of DRNJ Advocate Louan Lukens, dated March 3, 2012, T28:19-T29:10).  Patients who were committed under the criminal system or who presented voluntarily are not at issue in this matter. (Exhibit L, Plaintiff's Responses to Defendants' Request for Admissions, dated June 15, 2012 at pp. 7-8, Request No. 7; Exhibit B, Plaintiff's Responses to Defendants' Demand for Admissions, dated August 14, 2012, No. 10a and 8b).

17.     The population at the State hospitals, excluding Ann Klein, as of December 31, 2011, was 1,569. (Exhibit R, Census Data Chart).  Of those 1,569 patients, there were 526 patients

---

[3] Not Guilty by Reason of Insanity (NGRI) are those persons charged with a crime of personal violence or potential personal violence and are grouped separately.  Patients classified as "Detainer" are those facing criminal charges, being evaluated for competence to stand trial, or serving sentences for criminal charges.  Finally, an "IST" designation is for those who are being evaluated for or have been designated as persons incompetent to stand trial.

classified as CEPP, 803 patients who were involuntarily committed, 13 patients who were judicially designated as incompetent to stand trial, 15 patients who were criminally committed for an IST evaluation 183 patients who were judicially adjudged not guilty by reason of insanity (NGRI), and 29 patients who were voluntarily committed. (Exhibit R, Census Data Chart).

18.     Once there is a legally mandated admission, and a patient is assigned to a particular State Hospital, that patient, and his/her family, undergo orientation. The orientation addresses many facets of patient care, including information concerning the patient's bill of rights, due process, civil rights, and medication while admitted at the State hospitals.  Patients and their families are also made aware of the existence and availability of Client Service Representatives (formerly called Rennie Advocates) for assistance in addressing complaints. (Exhibit S, Orientation Documents; Exhibit T, Deposition transcript of Karen Piren, dated January 30, 2012, T29:18-T30:14; Exhibit U, Deposition transcript of Anthony Haynes, dated January 24, 2012, T32:2-14; Exhibit V, Deposition of Luchkiw, T40:12-24, T41:6-7, T42:2-12, T73:24- T74:7; and Exhibit W, Deposition transcript of Kim Evans-Mallory, dated March 20, 2012, T87:19-25).

19.     In addition, information concerning patients' rights and contact information of State Client Service Advocates and Representatives, as well as DRNJ advocates, is conspicuously posted on bulletin boards throughout the State Hospitals. Id. (See also Exhibit X, Examples of posted notices on bulletin boards at Ancora; Exhibit Y, Deposition transcript of Rachel Parsio, dated February 21, 2012, T41:5-T42:7, T170:9-13; Exhibit Z, Deposition transcript of Marilyn Spensley, dated February 2, 2012, T79:8-14, T94:1-20, T97:23-T98:18; Exhibit K, Deposition of Lukens, T43:1-16, T44:1-4; Exhibit AA, Deposition of Young, T30:10-16).   The DRNJ Advocates further testified that the contact numbers are listed on plaques by the telephone and contained on the informed consent forms. (Exhibit Z, Deposition of Spensley, T98:19-T99:2; Exhibit K, Deposition of Lukens, T46:5-12).  In

short, patients are aware of the existence of each Hospital's Advocates and the assistance that they provide. (Exhibit W, Deposition of Evans-Mallory, T137:8-11l; Exhibit Y, Deposition of Parsio, T40:25-T41:15, T42:1-4; T47:22-25; T170:9-19).

20.     The State Legislature enacted N.J.S.A. 30:4-24.2, more commonly known as the Patient's Bill of Rights in 1965. The law provides that within five days of admission, every patient shall receive written notice of the rights to which they are entitled. If a patient cannot read, the rights will be read out loud to him or her. If a patient does not understand English, the rights must be provided in a language that the patient understands. (N.J.S.A. 30:4-24.2).

21.     The Patient's Bill of Rights is presented to patients upon admission to the State hospitals. (Exhibit AA, Deposition transcript of Joseph Young, dated March 8, 2012, T81:19-23). This document includes both absolute rights, which cannot be denied under any circumstances, and other limited rights which will only be denied for reasons having to do with the patient's recovery or treatment. (N.J.S.A. 30:4-24.2).

22.     Specific to this matter, N.J.S.A. 30:4-24.2(c) states that "no patient may be presumed to be incompetent because he has been examined or treated for mental illness, regardless of whether such evaluation or treatment was voluntarily or involuntarily received." It is the policy of DMHAS that every patient who is committed is to be treated as legally competent, unless a court has assigned a guardian after a judicial determination of incapacity. (Exhibit J, Deposition transcript of Dr. Robert Eilers, dated March 26, 2012, T96:14-20).

23.     The policy at issue in this matter, A.B. 5:04B, echoes the Patient Bill of Rights as "every individual who has a mental illness is entitled to medical care and other professional services in accordance with accepted standards, and that patients in the care of the State have the right to participate in planning for their own treatment to the extent that their conditions permit. Voluntary

and involuntary patients are presumed competent." (Exhibit A, Administrative Bulletin Transmittal Memorandum dated June 1, 2012, A.B. 5:04B effective June 4, 2012, and June 7, 2012 Transmittal Correspondence, at JV251534, Section I (A)).

24.     N.J.S.A. 30:4-24.2(d) maintains that patients are to be free from unnecessary or excessive medication and free from physical restraints and isolation. Involuntary patients "have a limited right to refuse to take psychotropic medication, and to have that medication order reviewed before [they] are required to take the medication." This right will only be denied for good cause. (N.J.S.A. 30:4-24.2(d)).

25.     Further, under the Patient's Bill of Rights, patients are entitled to the least restrictive conditions necessary to achieve the purposes of treatment. (N.J.S.A. 30:4-24.2(e)).

26.     Under no circumstances shall a patient's right to communicate with his attorney, physician or the courts be restricted, N.J.S.A. 30:4-24.2(g)(1), and a patient shall be entitled to enforce any of the rights stated in this statute by civil action or other remedies otherwise upon proper petition by himself, by a relative, or a friend to any court of competent jurisdiction.

27.     Every person admitted to a State Hospital is assigned a treatment team, consisting of a psychiatrist, a psychologist, a physician, a nurse, a social worker and other support personnel. The treatment planning process begins at the moment of admission and continues through discharge. The treatment team devises an individualized treatment plan for the consumer, which may include psychotherapy, behavior modification, structural environment, recreation therapy and individual, group and family therapy. Treatment plans are individualized and strength-based to ensure that patients are able to use their own unique skills to achieve maximum functioning and independence, with movement toward successful community reintegration and recovery. (Exhibit BB, Division of Mental Health Services Website, Treatment Teams Descriptions; N.J.A.C. 13:42-1.1).

28.     Plaintiff identified a number of constituent patients in its Complaint. Each of these

constituent patients, as with other involuntarily committed patients, has been found by a Court to be

dangerous to themselves, others or property.  For instance:

- N.B. was admitted to Hagedorn in October 2005 after threatening to blow up his residence and kill people. (See Exhibit N, Excerpts from Exhibit A to Defendant's Answers to Interrogatories).

- S.D. was admitted to Ancora in August of 2008 secondary to assaultive behavior. He had a long history of aggressive and violent behaviors, suicide attempts, and at least eleven prior psychiatric hospitalizations. S.D. also heard voices commanding him to kill himself and others. (See Exhibit N, Excerpts from Exhibit A to Defendant's Answers to Interrogatories).

- P.D. was living in the woods and claiming to be God's second son before his first admission to Ancora in 2001.  He was admitted again later that year with delusions that he was controlled by Satan.  Before his re-admission in 2003, P.D. had been charged with terroristic threats and stalking.  This followed an instance when he entered a church and threatened the congregation. There was also a restraining order filed against P.D. by his sister, whom he had attempted to strangle. (See Exhibit N, Excerpts from Exhibit A to Defendant's Answers to Interrogatories).

- S.L., like many of the other constituent patients, had multiple psychiatric admissions in his history. After he was discharged from Hagedorn in 2006, he stopped taking his medication and decompensated, becoming delusional and threatening his landlord and neighbors. He was jailed for several days and was assaultive during his incarceration. His transfer to Hagedorn required the assistance of five police officers. (See Exhibit N, Excerpts from Exhibit A to Defendant's Answers to Interrogatories).

- J.C. had a history of multiple psychiatric admissions, and followed a pattern of being released on medications and ceasing to take the medications when he was released. This resulted in decompensation with delusions, disorganization, and a disheveled appearance. After being released from Hagedorn in June of 2007, J.C. stopped taking medications and destroyed some of his parents' property, lit candles in the house, and threw a lit cigarette in a pile of leaves. He was returned to Hagedorn in November of 2007. At that time, although he maintained the belief that he was not mentally ill, J.C. also believed that his cat was talking to him and that he had retractable pens stuck in his back. (See Exhibit N, Excerpts from Exhibit A to Defendant's Answers to Interrogatories).

29.     Many patients who are severely and persistently mentally ill also present with

complicating factors such as homelessness, substance abuse, criminal justice systems involvement,

financial instability, lack of health benefits, and ineligibility for public supported benefits.  As such,

any successful treatment plan must also address these issues in an integrated managed approach. (Exhibit M, Excerpts from Governor's Task Force on Mental Health Final Report, dated March 31, 2005, pp. 8-9, 33, 187, 204).  Accordingly, DMHAS has moved towards a more patient centered plan which includes a wellness and recovery transformation. (Exhibit J, Deposition of Eilers, T38:17-T39:7; T46:17-T47:16).

30.     The average cost to maintain one state hospital bed is $146,000 annually. (Exhibit M at p. 6).

31.     Effective June 4, 2012, DMHAS implemented a revised policy concerning the administration of psychotropic medication.   The policy has three (3) parts: the Medication Informed Consent Policy (A.B. 5.04); the Emergency Medication Policy (A.B. 5.04A); and the Non-Emergent Administration of Psychotropic Medication to Non-Consenting Involuntary Patients (A.B. 5.04B). (Exhibit A).

32.     Plaintiff challenges the policy concerning the non-emergent involuntary administration of psychotropic drugs to patients committed in the State psychiatric hospitals in New Jersey. (Plaintiff's First Amended Complaint, Docket No. 95)[4].   Specifically, Plaintiff questions the constitutionality of Administrative Bulletin ("A.B.") 5:04.   In New Jersey, the former A.B. 5:04 prescribed the procedures by which a patient in a New Jersey State-operated psychiatric hospital could be medicated without informed consent on a non-emergent basis with psychotropic medication. Since the time this Complaint was filed, the A.B. 5:04 policy has been revised and new procedures implemented.   Only the portion of the policy concerning the Involuntary Administration of Medication, found at A.B. 5.04B, is at issue in this lawsuit. (Exhibit B, Plaintiff's Responses to

---

[4] Plaintiff is no longer challenging policies concerning patients at the six County psychiatric units and hospitals. (Plaintiff's Amended Complaint, Docket No. 95, ¶36; Exhibit L at p. 4-6, Responses No. 8b.)

Defendants August 14, 2012 Demand for Admissions, pp. 4-5, Response no. 8b; Plaintiff's Amended Complaint, Docket No. 95, ¶11).

33.   A.B. 5:04 states that patients are encouraged to participate in treatment decisions, and will be given a meaningful opportunity to invite a person of their choice, for example, a family member or Client Services Advocate, to any treatment team meeting where medication is discussed. (Exhibit A at JV251534, Section I (A)).

34.   The goal of A.B. 5.04B is to promote the wellness and recovery of every consumer of the State's mental health services. (Exhibit A at JV251534, Section (B)(1)).  The guidelines provided by the policy are intended to "enhance the ability of consumers, while they are patients in the state psychiatric hospitals, to direct their own treatment through their engagement in a collaborative treatment planning process when they are capable of participating, and, when they are not capable of direct participation, by the engagement of guardians or mental health care representatives guided by advance directives for mental health treatment that will promote recovery." (Exhibit A at JV251534, Section (B)(2)).

35.   Psychotropic medication enables patients to better manage the abnormalities in brain chemistry of those with mental health disorders. Dr. Eilers, Medical Director of the DMHAS, testified that although the use of psychotropic medication can at times restrict the autonomy of patients, the medication can also improve their autonomy. (Exhibit J, Deposition of Eilers, T94:18-20). He stated that "autonomy is the person's ability to make decisions for themselves, and I think oftentimes medication can improve their autonomy if they can't make decisions for themselves because they're having delusional thinking or having frequent hallucinations or... as a result of their behaviors are being confined or in some cases even...restrained or secluded. These obviously take away from their autonomy." (Exhibit J, Deposition of Eilers, T94:16-25). In short, psychiatric

treatment is likely to require medication, since the focus of the treatment is on the psychiatric illness and medication is a common treatment for such conditions. (Exhibit J, Deposition of Eilers, T288:4-8; T302:24-T304:11). Dr. Eilers opined that generally, medication improves the patients' autonomy, and that the goal of DMHAS is to have patients with maximal autonomy. (Exhibit J, Deposition of Eilers, T95:8-12).

36.    Judge Robert Killian, Plaintiff's witness and one of 54 Judges with the Probate Division of the State of Connecticut, supports the view that psychotropic medication is significant in the treatment of psychiatric patients. (Exhibit CC, Deposition transcript of Judge Robert Killian, dated May 18, 2012, T29:5-15). Judge Killian asserted during his deposition, "I generally believe that psychotropic medications are a very important part of treatment for a significant subset of the mental health population." (Exhibit CC, Deposition of Killian, T40:14-18). Similarly, Judge Killian testified that "...the proper utilization of psychotropic medication is very important and I think that it is almost always a benefit to the patient." (Exhibit CC, Deposition of Killian, T214:18-20).

37.    Judge Killian further testified that "There's a practice of recidivism with the population for whom commitments are sought" and that the cause of the recidivism is "noncompliance with ... medication." (Exhibit CC, Deposition of Killian, T129:7-13). Judge Killian went on to state, "I believe that for most patients who have a serious psychiatric disability, treatment without medication doesn't work effectively." (Exhibit CC, Deposition of Killian, T131:21-24). Similarly, Judge Killian testified that "meds are an almost essential component of treatment for a patient who is severely enough disturbed to require involuntary hospitalization." (Exhibit CC, Deposition of Killian, T136:2-6).

38.    Similarly, Plaintiff's witness, former Director of Whiting Forensic Hospital in Connecticut, Dr. Patrick Fox testified that psychotropic medications are almost universally a part of

successful treatment for patients in psychiatric hospitals. (Exhibit DD, Deposition transcript of Patrick Fox, dated June 1, 2012, T55:7-11).

39.     DRNJ's Senior Advocates also acknowledged the importance of medication in the treatment of patients. DRNJ Advocate Ms. Spensley testified during her deposition that medications, when properly utilized, can effect an improvement in the disease process in a patient. (Exhibit Z, Deposition of Spensley, T40:1-8). She further acknowledged that a patient's particular condition can cause suffering if not treated. (Exhibit Z, Deposition of Spensley, T148:15-25). DRNJ Advocate Ms. Lukens also testified that in her experience in dealing with mental health patients, medication can improve one's condition. (Exhibit K, Deposition of Lukens, T120:11-15).

40.     A.B. 5.04B, hereinafter the "Policy", states that "In a non-emergency situation, when an involuntary patient (or, where applicable, guardian or mental health care representative) does not provide or cannot provide consent to the proposed administration of psychotropic medication after being given the opportunity to consent pursuant to the informed consent policy, and the patient's prescriber documents that the patient has been diagnosed with a mental illness, and, as a result of mental illness, poses a likelihood of serious harm to self, others, or property without the medication, the treating prescriber shall initiate the Involuntary Medication Procedure ..., if he or she has determined, after considering less restrictive interventions, that medication is appropriate." (Exhibit A at JV251495. Section IV).

41.     The Policy requires the State psychiatric hospital staff to assure that the administration of psychotropic medication in such circumstances conforms to the standards in <u>N.J.S.A.</u> 30:4-24 et seq., which provides that every individual who is treated for a mental illness is entitled to medical care and other professional services in accordance with accepted standards, and that patients in the

care of the State have the right to participate in planning for their own treatment to the extent that their conditions permit. (Exhibit A at JV251491, Section I(B)).

42.     Under the Policy, involuntary patients are those patients who are civilly or criminally committed by a court pursuant to New Jersey Court Rule 4:74-7, N.J.S.A. 30:4-27.1 et seq., or 2C:4-6(b), or N.J.S.A. 2C:4-8 (Not Guilty by Reason of Insanity/Krol patients), or involuntary patients on CEPP status pursuant to R. 4:74-7(h)(2). (Exhibit A at JV251494, Section III).

43      By legal definition, patients on CEPP status remain on committed status pending appropriate placement in accordance with the Court Rules and thus are subject to the Policy. (N.J. Ct. R. 4:74-7(h)(2); Exhibit EE, Deposition transcript of Lisa Ciaston, dated April 10, 2012, T13:23-T16:12; T154:12-17, T156:13-25, T159:1-9; Exhibit T, Deposition of Piren, T153:14-25).

44.     AB. 5.04B addresses the protocols for the non-emergent administration of psychotropic medication for both patients who refuse medication and for those patients who cannot consent to medication, i.e. those who do not have the current capacity to make a decision about medication. Plaintiff is challenging only those patients who have been involuntarily civilly committed. (Exhibit L at pp. 7-8, Response no. 7).

45.     In the Policy, the prescriber, defined as a professional licensed in New Jersey to prescribe or renew a prescription for psychotropic medication, must provide the patient with the opportunity to consent pursuant to the informed consent policy prior to the initiation of the Involuntary Medication Procedure. (Exhibit A at JV251495, Section IV). That is, the patient must be informed of the nature, benefits, and risks of the medications that are being recommended and that s/he has a qualified right to refuse medication. The patient must be provided with information about the specific medication and the proposed dosage range, including the presence of other potential adverse reactions.  All information should be reviewed with the patient and any questions that the

14

patient may have about the medication(s) should be answered. If consent is provided, without coercion, the Involuntary Medication Procedure is not initiated. (Exhibit A at JV251538, Section IV(B)(1)).

46.    It is noted that at any time during the Involuntary Medication Procedure, both before and after the Medication Hearing, a patient may consent in accordance with the informed consent policy and the involuntary medication procedure concludes and the administration of the involuntary medication ends. (Exhibit A at JV251498, Section IV(N)).

47.    Moreover, the Policy only refers to psychotropic medication, that is agents used for the treatment of psychiatric disorders as well as any co-medications or tests required for the safe and effective administration of such agents. (Exhibit A at JV251495, Section III).

48.    Deposition testimony also stressed the differences between mental and other illnesses, with a focus on the fact that medication is frequently a critical aspect of treatment for mental illness more than for non-mental illnesses and injuries. Dr. Eilers testified that the medication with psychotropics of involuntarily committed mental patients is a unique situation. These patients are committed for the express purpose of receiving psychiatric treatment. Psychiatric treatment generally requires medication. Dr. Eilers stressed that when patients are involuntarily committed to a psychiatric hospital, they are committed for the purpose of receiving treatment against their will. Given the nature of the commitment and their placement in the psychiatric hospitals, medication is a more common requirement and necessity for those receiving treatment for mental rather than medical conditions. (Exhibit J, Deposition of Eilers, T288:2-299:4).

49.    N.J.S.A. 30:3-7.1, et seq sets forth the procedures to be followed and the situations under which patients can be medicated with non-psychiatric medication. (N.J.S.A. 30:3-7.2; Exhibit EE, Deposition of Ciaston, T173:17-22, T174:4-19). Thus, if a patient refuses non-psychotropic

necessary medication for a period of time, the patient will be transported to a hospital and may be forced to take medication against his/her will at the hospital. (Exhibit W, Deposition of Evans-Mallory, T216:8-T217:3).

50.     Additionally, Dr. Eilers testified that it is very common for psychiatric patients to present with the likelihood of being dangerous to themselves or others if they are not medicated. The medication is necessary both to provide a safe environment for patients and staff, as well as to meet the patient's treatment needs. This necessitates a procedure to allow for involuntary medication. Such a procedure is not necessary for those seeking non-psychiatric medical treatment in non-psychiatric hospitals. (Exhibit J, Deposition of Eilers, T288:13-21).

51.     The policy defines "likelihood of serious harm or dangerousness" as meaning that "within the reasonably foreseeable future either: (a) a substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide, or to inflict physical harm on one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health or safety; or (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (c) a substantial risk that physical harm will be inflicted by an individual upon property as evidenced by behavior which has caused substantial loss or damage to property." (Exhibit A at JV251494, Section III).

52.     Dr. Eilers explained that the meaning of the term 'likelihood of serious harm' is not harm that is imminent or immediate, as required in the emergency medication policy. Rather, 'harm', as defined by this Policy, is injury to self or others or destruction of property and the likelihood of

that harm goes to the potential of danger that the harm presents occurring in the reasonably foreseeable future. A patient's past behavior(s) is predictive of future behavior and recent incidents or similar past behaviors should be considered and factored in to determine if there is a likelihood of serious harm. (Exhibit J, Deposition of Eilers, T138:2-24, T139:5-T140:4).

53.     The Policy requires the treating prescriber to considering less restrictive interventions before initiating the Involuntary Medication Procedure. A less restrictive intervention is defined as "a treatment that has, compared to another, fewer probable negative lasting effects on the consumer, is less likely to interfere with the consumer's therapeutic progress, and interferes less with the consumer's rights to autonomy and liberty." A proposed intervention can be requested by the consumer at the time it is needed or can be implemented pursuant to an advance directive or negotiated as part of the consumer's patient safety plan. Less restrictive alternatives range from verbal de-escalation, re-direction, the offer of consensual oral medication, up to and including seclusion and restraints. (Exhibit A at JV251494, Section III).

54.     The treating physician must document that all available less restrictive alternatives to forced medication have been considered. (Exhibit A at JV251477).

55.     A treating physician is required to meet with the patient prior to the initiation of the refusing procedure. If a patient is to be involuntary medicated, less restrictive alternatives are discussed and those alternatives will be provided if available and effective. (Exhibit J, Deposition of Eilers, T198:6-T200:12).

56.     After the prescriber has spoken to the patient and after such alternative treatments are exhausted or ruled out, and the patient still does not consent to the psychotropic medication, the prescriber shall complete the first section of the Involuntary Medication Administration Report ("IMAR") and document the following: the patient's name and hospital number, diagnosis, the

specific medication(s) and co-medications to address side effects as well as any testing required because of the administration of the specific psychotropic medication being recommended for the patient, the rationale for the recommendation (including an explanation of the patient's likelihood of serious harm to self or others or property if no medication is administered), the formulations and dosage ranges of the proposed medication(s), less restrictive alternatives attempted or ruled out, the efforts made to explain the need for the medication to the patient, and the objections, if any, expressed by the patient to the medication(s). (Exhibit A at JV251495-JV251496, Section IV(A)).

57.    Once the IMAR is completed and signed by the prescriber, the IMAR is submitted to the hospital's Medical Director who shall review it for completeness. Moreover, the IMAR shall be submitted to the Client Services Advocate (CSA). (Exhibit A at JV251496, Section IV(B), (G)).

58.    The Policy required the hiring of new clinical staff to fill the role of a CSA. A CSA must be an Advanced Practice Nurse, licensed to prescribe medications or a masters-prepared psychiatric nurse, which is an advanced nursing degree beyond the RN, specializing in mental health care. (Exhibit A at JV251493, Section III).

59.    The new policy presents greater protections to the patient through the hiring of the CSAs who are clinicians and who directly supervise CSRs. (Exhibit J, Deposition of Eilers, T60:10-T61:5, T110:3-T111:12; T152:12-23).

60.    Legal Liaison Ciaston testified that "the CSA [Client Services Advocate] is going to be able to voice the patient's concerns in a very articulate way because they are clinicians. ... the intent of the policy is to have the CSA voice the concerns of the patient." (Exhibit EE, Deposition of Ciaston, T115:3-5, T117:15-17). Dr. Fox, Plaintiff's witness, agreed that allowing a medically trained individual, such as an Advanced Practice Nurse, to look at the treatment records and advise

the patient would further enhance the fairness of the process. (Exhibit DD, Deposition of Fox, T46:8-17).

61.     The CSA's primary responsibility is to evaluate individuals receiving treatment with psychotropic medication. (Exhibit A at JV251493, Section III).  The CSA accomplishes this by individual patient assessment, consultation with the treatment team, and participation in the Medication Review Hearings process.  The CSA conducts ongoing assessment and oversight to ensure that medication is only continued if that medication is the least restrictive alternative appropriate alternative available and that it has been appropriately approved. Additionally, the CSA is responsible for developing and providing orientation and training programs on these procedures for staff and patients. The CSA may delegate non-clinical monitoring and patient communication and education activities to appropriate staff including CSRs.  (Exhibit A at JV251493, Section III).

62.     A CSA's responsibilities are defined as follows: "The CSA at each hospital is responsible for reviewing the chart of each patient who is prescribed psychotropic medication and for reporting, both on a monthly basis and as needed and appropriate, any departures from the bulletin to the hospital's Medical/Clinical Director and the DMHAS Medical Director.  S/he, or, if unavailable, his/her designee shall meet with the hospital's Medical Director and other medical staff weekly to review difficult cases and any current medication issues.  S/he also has the responsibility to ensure that those patients who consent to medication have done so voluntarily, and that those who are medicated without consent are medicated in accordance with the policy.  The Client Services Advocate shall have access to all charts and prescribers, and shall ensure that the hospital provides an orientation for new patients that includes information about their medication rights." The CSA must also submit monthly statistical reports to the Coordinating Chief of CSAs (Coordinator)[5] which shall include statistical data compiled by the CSR, and must report any non-compliance with the

---

[5] Karen Piren now serves in the capacity of Coordinating Chief of CSAs ("Coordinator"). (Exhibit FF).

involuntary medication procedure to the Coordinator and CEO. (Exhibit A at JV251492, Section II(E)).   The CSA directly reports to the CEO or Deputy CEO of each hospital and has a reporting relationship to the DMHAS Medical Director through the Coordinator. (Exhibit A at JV251493, Section III).

63.     The individuals specifically hired for the CSA position and holding the necessary clinical certifications are David Bokor at Ann Klein Forensic Center; Pierre Ngili at Trenton Psychiatric Center; Evelyn K. Ngwa at Ancora Psychiatric Hospital; and Kathleen Mencher at Greystone Park Psychiatric Hospital. (Exhibit FF, Defendants' Letter Amending Discovery Responses dated August 6, 2012).

64.     In addition to the CSA, the CSRs also monitor the administration of non-emergent medication through the process of medication review hearings, chart reviews and intervene to resolve patient complaints about medication. (Exhibit A at  JV251492-93.

65.     The CSR is a full-time staff member assigned to each hospital to assist patients with respect to medication issues.  (Exhibit A at JV251493).  The CSR reports to the hospital's CSA and is responsible for ensuring compliance with due process procedures when a patient will not or cannot provide informed consent for psychotropic medication in non-emergent situations. The CSR will meet with patients to understand their concerns, inform patients of their rights to the least restrictive effective treatments, and explain their right to give informed consent and the circumstances under which that right can be overridden by their need for treatment. (Exhibit A at JV251493, Section III; see also, Exhibit T, Deposition of Piren, T95:21-T16:12, T218:8-18; Exhibit K, Deposition of Lukens, T125:4-T126:7; T47:16-T48:15; Exhibit U, Deposition of Haynes, T71:20-T73:3, T134:6-13; Exhibit W, Deposition of Evans-Mallory, T96:24-T97:7, T97:17-20; T98:18-T99:5).

66.    DRNJ Advocates testified that the CSRs work to protect patients' rights, by reviewing patients that are on refusing status on a monthly basis, preparing reports for the administration of the hospital and meeting with patients as part of the involuntary medication process to discuss their issues with medication.  (Exhibit Y, Deposition of Parsio, T47:1-15; Exhibit K, Deposition of Lukens, T43:20-25).

67.    Further, DRNJ Advocate, Ms. Parsio testified that it is her understanding that the CSRs deals with patient complaints that are geared towards medication related issues.  (Exhibit Y, Deposition of Parsio, T106:19-22).  In fact, Ms. Parsio indicated that both she and the CSRs are active in bringing patient concerns to the attention of the hospital, and that she will work in conjunction with the Advocates to address concerns. (Exhibit Y, Deposition of Parsio, T106:4-12). The DRNJ Advocates testified that their role towards a patient will overlap with the CSRs in some cases in terms of medication. (Exhibit Y, Deposition of Parsio, T110:9-13; Exhibit Z, Deposition of Spensley, T97:3-8).

68.    CSRs received training relative to their job functions, such as patient's rights, risk management presentation, fire safety and interactions with deaf patients.  In addition to departmental orientation, there are hospital training sessions.  They have been trained on the legal opinions that led to the former A.B. 5.04, the policy itself and the three step process. (Exhibit V, Deposition of Luchkiw, T111:15-T112:18).

69.    Ms. Piren, the Chief Nursing Officer for DMHAS, who under the new Policy also serves as the Coordinator, leads monthly meetings with CSAs and CSRs at which time issues at each of the hospitals is discussed and addressed.  (Exhibit T, Deposition of Piren, T124:20-25).  In addition to these meetings, Ms. Piren is an advisor and consultant to the Advocates and frequently visits with the Advocates to assist them in fulfilling their duties, specifically addressing issues

regarding Administrative Bulletin 5:04, the hospitals, or the patients. (Exhibit T, Deposition of Piren, T48:17-20, T47:3-8). She also evaluates and monitors their implementation of the Policy to assure compliance. (Exhibit T, Deposition of Piren, T308:1-10).

70.     To this end, all of the participants were trained on the new Policy, not only as to the changes in the Policy from the former A.B. 5:04, but also as to forms and the Medication Review Hearings. (See Exhibit II, Training Materials, JV251524-JV251530; Exhibit J, Deposition of Eilers, T21:11-24).

71.     The CSRs assigned to Greystone are Charles Petty and John Luchkiw. Mr. Luchkiw, who was deposed, has been an Advocate, since 1999. (Exhibit V, Deposition of Luchkiw, T13:10-16). He described his job function as "Under [the] general direction of a supervisory officer, promotes and initiates client advocacy, receives, investigates, and makes recommendations concerning client complaints and members of their family to ensure the protection of client rights; does related work as required." (Exhibit V, Deposition of Luchkiw, T28:21-T29:11). Mr. Luchkiw stated that his responsibilities include "assisting patients with respect to medication issues." (Exhibit V, Deposition of Luchkiw, T32:2-5) In fact, Mr. Luchkiw testified that if a patient has a particular concern about their medication, he will listen to the patient and seek to address the concern in a satisfactory manner." (Exhibit V, Deposition of Luchkiw, T125:17-23, T126:4-7). Mr. Luchkiw also will assist professional staff by explaining to patients the nature of the proposed treatment and the risks involved and will inform a patient of his/her right to withhold consent to such treatment. (Exhibit V, Deposition of Luchkiw, T47:18-T48:2). Mr. Luchkiw explained that he will advise the patient that, "although they do have a limited right to refuse their medication, the hospital has a co-related responsibility to treat them to the best of our ability, and that may fall under them getting

medications - involuntarily or potentially against their will." (Exhibit V, Deposition of Luchkiw, T48:4-14).

72.     Mr. Luchkiw indicated that part of his function included providing "protection for the client from official error, abuse, or neglect" and functioning "as a preventive influence by providing a means by which the patient can ventilate feelings." (Exhibit V, Deposition of Luchkiw, T48:15-23). Further, Mr. Luchkiw agreed that his duties include the following: "Visits resident area on a frequent basis and discusses complaints with clients and/or staff and attempts to resolve them by recommendations, negotiations, direct action, or appropriate referral." (Exhibit V, Deposition of Luchkiw, T52:15-22). In sum, Mr. Luchkiw testified that he advocates for the patients. (Exhibit V, Deposition of Luchkiw, T63:14-16).

73.     At Ancora, CSR Anthony Haynes has been employed by DHS, primarily at Ancora Psychiatric Hospital since 1977. (Exhibit U, Deposition of Haynes, T18:2-4; T18:7-12, T19:6-8). Mr. Haynes testified that his role as an Advocate is to ensure compliance with the procedures required by A.B. 5:04 and to advocate for the patients. He indicated that his role is to ensure that the patients' due process rights have been adhered to and that the patients' right to refuse treatment is protected. (Exhibit U, Deposition of Haynes, T71:8-19, T135:15-18, T224:17-19).

74.     CSR Kim Evans Mallory has worked at Trenton Psychiatric Hospital since December 2005. (Exhibit W, Deposition of Evans-Mallory, T11:20-25, T12:11-14). Prior to that date, Ms. Evans-Mallory worked as a Program Development Specialist, and later a Patient Advocate, at Arthur Brisbane Treatment Center in Wall Township until that facility closed. (Exhibit W, Deposition of Evans-Mallory, T12:7-18). Ms. Evans-Mallory testified that as an advocate, her role is to speak on behalf of the patient and make the patient's wishes and desires known to the treatment team. (Exhibit W, Deposition of Evans-Mallory, T61:2-9). She is qualified to speak on behalf of the patient and to

ensure that the parties can come to an accommodation. (Exhibit W, Deposition of Evans-Mallory, T60:25-T61:4). She stated that the role of an Advocate is to meet with the patients prior to the team meetings to let them know what their rights are with regard to involuntary medication, and to meet with the patients prior to the involuntary administration of medication. (Exhibit W, Deposition of Evans-Mallory, T96:24-25, T97:2-4).

75.     When the IMAR is complete, the Medical Director shall take appropriate steps to appoint a three person panel to conduct a Medication Review Hearing. The composition of the panel includes a non-treating psychiatrist who shall act as chairperson of the committee. This psychiatrist shall be trained to implement the procedures of this policy. The non-treating psychiatrist may have other duties at the hospital or Division, but shall not be currently involved in the treatment of the patient who is challenging the administration of medication. (Exhibit A at JV251496, Section IV(C)).

76.     Instead of utilizing a psychiatrist who is employed by the State of New Jersey, DMHAS contracted with two physicians to serve in the capacity of independent psychiatrists to chair the Medication Review Hearings. Dr. Lily Arora, M.D., is affiliated with Robert Wood Johnson-University Behavioral Health Care. Dr. Arora is responsible to chair the Medication Review Hearings held at Trenton Psychiatric Hospital, Ann Klein Forensic Center, and Greystone Park Psychiatric Hospital. (Exhibit A, Cover Letter dated June 7, 2012). Dr. David Rissmiller, D.O., is affiliated with UMDNJ - School of Osteopathic Medication. Dr. Rissmiller is responsible to chair the Medication Review Hearings at Ancora Psychiatric Hospital. (Exhibit A, Cover Letter dated June 7, 2012).

77.     The Policy requires that the Panel consist of three individuals: a non-treating psychiatrist, an administrator (Unit Director or above), and another clinician --none of whom is currently involved in the patient's treatment or diagnosis. Any Unit Director assigned shall not be

from the patient's unit. The administrators and clinicians who are assigned to sit as panel members shall be selected on a rotating basis. (Exhibit A at JV251496, Section IV(D)).

78.     The purpose of the hearing is for the Panel to hear evidence, including but not limited to the treating prescriber's recommendation and the patient's objections, to determine whether the patient may be medicated without consent in accordance with the Policy. (Exhibit A at JV251496, Section IV(E)).

79.     Once the Medical Director has reviewed the IMAR and found it to be complete, he or she shall notify the hospital's CSA to participate in the hearing and to support the patient in presenting his or her objections to taking the proposed medication. The CSA shall consult with the patient within one business day of being assigned to the patient if such consultation has not already occurred. (Exhibit A at JV251496, Section IV(E)).

80.     The Medical Director or his or her administrative staff must give the patient (or any guardian or mental health care representative) and the CSA a Notice of Hearing with a copy of the IMAR attached. A copy of the Notice of Hearing and IMAR must also be provided to the treating prescriber and the three Panel members. (Exhibit A at JV251496, Section IV (G); Notice of Hearing form at JV251503; IMAR form at JV251501).

81.     The Notice of Hearing must provide the date, time, and location of the hearing and advise the patient of the right to consult with the CSA, to have the CSA assist the patient at the hearing, to testify, to present witnesses and documentary evidence, and to question witnesses. The patient shall also have the right at his or her own expense to have another mental health professional or counsel present at the hearing. If a patient cannot consent, the CSA must be at the hearing to assist the patient in all circumstances. (Exhibit A at JV251496, Section IV (G); Notice of Hearing form at JV251503).

82.     The Medical Director must schedule the Medication Review Hearing to take place no later than five (5) business days after receiving the completed IMAR and must provide the patient and the CSA with the Notice of Hearing and IMAR at least two (2) business days prior to the hearing date.  (Exhibit A at JV251497, Section IV (H) and (I)).

83.     Providing for a five day period prior to the hearing limits the adverse consequences associated with untreated psychosis, including violence and other behavioral disruptions, as well as ensuring that all those persons necessary to attend can be available.  (Exhibit C, Expert report of Dr. Paul S. Appelbaum, p. 6; Exhibit J, Deposition of Eilers, T208:22-25).

84.     Unless an emergent situation emerges, a patient is not involuntarily medicated after his/her refusal to consent during this 5 day period and during the hearing process. (Exhibit J, Deposition of Eilers, T211:9-14).

85.     In addition to receiving the IMAR and Notice of Hearing, the panel members shall be provided with copies of any documentation the patient submits prior to the hearing.  The patient's clinical records are made available to the panel members and to the CSA prior to the hearing.  The chairperson will review the patient's clinical record prior to the hearing. (Exhibit A at JV251497, Section IV (J)).

86.     The Medication Review Hearing shall take place on the patient's unit. The treating prescriber shall be present, as shall the patient, his or her guardian or mental health care representative if applicable, and any other mental health professional or representative retained by the patient, and any other witness, if available, called by the patient. The CSA must be present at the hearing in order to support the patient and may assist the patient in presenting evidence if requested. (Exhibit A at JV251497, Section IV (I)).

87.     Accompanied by and with the assistance of the CSA, the patient has the right to attend and present testimony and documentary evidence, and to question witnesses and question documents during the hearing. (Exhibit A at JV251497, Section IV (I)).  At the hearing, testimony is taken concerning the diagnosis, the specific medication(s) and co-medications to address side effects as well as any testing required because of the administration of the specific psychotropic medication being recommended for the patient, the rationale for the recommendation, (including an explanation of the patient's likelihood of serious harm to self or others or property if the medication is not administered), the formulations and dosage ranges of the proposed medications, less restrictive alternatives attempted or ruled out, and the objections, if any, expressed by the patient to the medications. (Exhibit A at JV251497, Section IV (I)).

88.     The medication review hearing is administrative and clinical in nature, as the focus of DMHAS has been on a clinical, rather than judicial, model for hearings. (Exhibit EE, Deposition of Ciaston, T37:15-17).  Ms. Ciaston defined a clinical model as one driven by clinical input, with independent psychiatrists as decisionmakers. (Exhibit EE, Deposition of Ciaston, T55:12-15).  Ms. Ciaston testified that DMHAS believes a clinical model to be superior to a judicial model, as it is "patient centric", with the patient participating in the administrative hearings, and provides for swift and efficient decisions by very qualified clinicians who understand medications. (Exhibit EE, Deposition of Ciaston, T56:16-20; Exhibit A at JV251477 and at JV251491).

89.     The patient centric clinical model is rooted in the Patient's Bill of Rights which provides a patient with the "absolute right to participate in [his/her] treatment plan to the extent [his/her] condition permits ...participation." (N.J.S.A. 30:4-24.2).  With regard to treatment modalities, a determination is made by way of a combination between the treatment team and the patient's preferences, "so the patient has input." (Exhibit V, Deposition of Luchkiw, T22:13-17).

90.     Dr. Fox, Plaintiff's witness, also commented on the importance of a "therapeutic alliance", that being the relationship that a patient has with his or her treaters. (Exhibit DD, Deposition of Fox, T73:2-4).  He describes therapeutic alliances as dealing with whether a patient feels that he or she has been afforded a fair and objective process.  This comes from the knowledge that there is "some outside body who they perceive to be objective, separate and apart from the facility" and treatment team. Dr. Fox stated that it is that perceived impartiality by the patient that maintains a therapeutic alliance. (Exhibit DD, Deposition of Fox, T73:16-T74:10). Dr. Fox testified that a therapeutic alliance can be maintained in both the administrative and judicial forums. (Exhibit DD, Deposition of Fox, T74:10-11).

91.     The Rules of Evidence, such as hearsay, do not apply in a clinical hearing. (Exhibit EE, Deposition of Ciaston, T203:20-T205:4).

92.     After all witnesses have been heard, the members of the panel must convene out of the presence of the patient and other hearing participants to discuss the matter.  (Exhibit A at JV251497, Section IV (K)).

93.     If the panelists determine by a majority vote, with the non-treating psychiatrist in the majority, that the patient has a mental illness and that, as a result of that mental illness, without psychotropic medication the patient poses a likelihood of serious harm to self, others, or property, the patient may be medicated without his or her consent.  (Exhibit A at JV251497, Section IV (K)).

94.     If the chairperson/non-treating psychiatrist is not in the majority or votes against the involuntary medication, the proposed medication will not be authorized. (Exhibit A at JV251497, Section IV (K)).

56.     Upon reaching its decision, the panel must record its decision and complete the required information on the Hearing Outcome Form, which contains the following information: (1)

The disposition, (2) The names of the witnesses presented, (3) A list of evidence presented, (4) A summary of the patient's position and objections to the proposed medication, (5) If the medication of the patient was not authorized, what alternative treatments the panel believes should be attempted, if any, (6) If the medication was authorized over the objection of the patient, why the medication is necessary to treat the patient and to avoid the likelihood of dangerousness or harm to self, others, or property and as such is essential to the current treatment plan, (7) Whether or not the patient has requested any modifications or will consent to other types of medication, (8) Authorization for the treating prescriber to administer medication for up to 14 days, and (9) The formulation and dosage of the medication(s) authorized by the panel.  (Exhibit A at JV251498, Section IV (L); Hearing Outcome Form at JV251506).

96.     The Hearing Outcome Form must be provided to the CSA, the patient, and the treating psychiatrist by the end of the business day on which the hearing is held.  A copy of the Hearing Outcome Form must be sent to the Medical Director and a copy must be placed in the patient's chart. (Exhibit A at JV251497, Section IV (K)).  If medication has been authorized, the CSA must provide the patient verbal and written notice of his or her appeal rights. (Exhibit A at JV251497, Section IV (K)).

97.     If the involuntary administration of psychotropic medication is not authorized by the panel, the patient's treatment team must convene to adjust the treatment plan to reflect the absence of the proposed psychotropic medication.  If a different medication is part of the new treatment plan, and the patient subsequently refuses the medication, the Involuntary Medication Process must be repeated before the revised medication can be administered on a non-emergency basis. (Exhibit A at JV251498, Section IV (M)).

98.     The involuntary medication can be authorized by the panel for up to 14 days after the first administration of medication.  The treating psychiatrist shall submit a report to the CSA by the 12th calendar day after the hearing describing the patient's positive and negative responses to the medication, what less restrictive interventions have been attempted or ruled out, and whether the patient is continuing to withhold consent.  (Exhibit A at JV251498, Section IV (N)).

99.     The CSA must send copies of the prescriber's report to the panel that will be holding hearings during the week which shall convene before the expiration of the 14 day period to decide whether to authorize further involuntary medication for up to 90 days.  (Exhibit A at JV251498, Section IV (N)).

100.    For the duration of the involuntary treatment, the treating prescriber must submit biweekly reports to the Medical Director, with a copy to the CSA, setting forth the patient's progress and the justification for continued involuntary treatment.  Continued treatment must be supported by the clinical record and the report from the treating prescriber.  (Exhibit A at JV251498, Section IV(N); Biweekly Report Form, Exhibit A at JV251511).

101.    If the patient consents to the medication at any time, the biweekly report shall so note, the CSA shall confirm and document in the patient's chart that the consent is informed and voluntary, and the authorization and review process shall end.  (Exhibit A at JV251498, Section IV (N)).

102.    The patient will have 24 hours following notice of the panel's initial decision permitting involuntary medication to submit an appeal to the Hospital Medical Director, or if a holiday or weekend, the next business day.  (Exhibit A at JV251499, Section IV(O)).  Each of the State psychiatric hospitals has its own Medical Director: Dr. David Roat (Ancora); Dr. J. Nurenberg (Greystone), Dr. Sasi Pasupuleti (Ann Klein) and Dr. Lawrence Rossi (Trenton).   (Exhibit GG, Defendant's Answers to Interrogatories, No. 5).

103.    The CSA shall offer to assist the patient in filing an administrative appeal. (Exhibit A at JV251499, Section IV (O)). The Notice of Appeal Form to be used states that the patient wishes to appeal the decision of the panel. It includes the date of the hearing and the time and date that the Hearing Outcome Report was delivered to the patient. The form allows for the patient to express why s/he believes that the panel's decision was wrong, for example, that the panel did not follow the procedure, that the evidence showed that the patient does not need the prescribed medication, or that the medications prescribed are not within the standard of care. The Notice of Appeal Form informs patients that they have the right to the assistance of the CSA in preparing the appeal to the Hospital Medical Director. (Exhibit A at JV251514-JV251515).

104.    The patient may continue to refuse medication and medication shall not be administered, in accordance with the panel decision, until the time in which to appeal the panel's decision to the Medical Director has passed. While an administrative appeal is pending, only emergency medication may be administered to the patient. (Exhibit A at JV251499, Section IV (O); Exhibit J, Deposition of Eilers, T224:14-22).

105.    If the patient appeals the panel's decision, the Hospital Medical Director, or his/her designee if the Medical Director is absent, shall review the patient's appeal, the IMAR, and the Hearing Outcome Form. If the Medical Director concludes that the panel followed the Involuntary Medication Procedures in this Policy and that its conclusions of fact were supported by the evidence presented and that the medications authorized are within the current standard of care, s/he shall affirm the decision in writing. (Exhibit A at JV251499, Section IV (P)). The Notice of Appeal form includes sections requiring that the Medical Director explain his or her reasons for upholding or reversing the panel's decision. (Exhibit A at JV251514-JV251515).

106.    If the Medical Director concludes that the panel did not follow the Involuntary Medication Procedures in this Policy or that its conclusions of fact were not supported by the evidence presented or that the medications authorized were not within the current standard of care, the Medical Director will vacate the panel's decision. (Exhibit A at JV251499, Section IV(P)).

107.    With respect to the Medical Director's review for completeness, as per the new Policy, Ms. Ciaston testified that part of "completeness" would include ensuring that there was specificity of the patient's likelihood of serious harm as well as the sufficiency of the less restrictive alternatives that have been attempted and ruled out. (Exhibit EE, Deposition of Ciaston, T198:16-19, T199:10-14).

108.    The Medical Director must issue his/her decision within 24 hours of his/her receipt of the appeal, or the next business day if that falls on a weekend or holiday. The Medical Director will arrange for the delivery of the decision to the patient, the CSA's office, and the prescriber. (Exhibit A at JV251499, Section IV(P)).

109.    Dr. Eilers has had discussions with each State Hospital's Medical Director to ensure adherence to A.B. 5:04 (Exhibit J, Deposition of Eilers, T144:10-25).  Dr. Eilers testified that he continually strives to ensure that the Medical Directors are conducting the appeals, and that the staff is knowledgeable about the procedures.  (Exhibit J, Deposition of Eilers, T48:18-T49:6).

110.    Any further appeal beyond the Medical Director shall be to the Appellate Division of the Superior Court pursuant to New Jersey R. Ct. 2:2-3(a)(2).[6] (Exhibit A at JV251499, Section IV(Q)).

111.    Should a patient wish to appeal and seek legal assistance, there are lists of attorneys available to patients, and "there are organizations that we provide patients with if they want legal advice that are outside civil commitment...some of it's posted, some of it's through DRNJ.  Some of its through their court appointed counsel," assigned during commitment hearings.  (Exhibit EE, Deposition of Ciaston, T218:8-18).

112.    Patients have access to lawyers through several channels: DRNJ attorneys, the public defender, or private counsel.  (Exhibit T, Deposition of Piren, T183:4-18).  Ms. Evans-Mallory also testified that the patients do have access to the public defender, DRNJ or a private attorney and that social workers are available to guide the patients in finding an attorney (Exhibit W, Deposition of Evans-Mallory, T196:24-25).

113.    The availability of counsel was also acknowledged by the DRNJ Senior Advocates. Ms. Spensley agreed that patients have access to legal counsel through DRNJ. (Exhibit Z, Deposition of Spensley, T256:3-11).  Ms. Lukens testified that it is not unusual for DRNJ to provide contact information for the local attorney referral service. (Exhibit K, Deposition of Lukens, T207:3-8).  Ms. Lukens further testified that if a patient is looking for legal representation, DRNJ will refer the patient or have legal resources provided to the patient. (Exhibit K, Deposition of Lukens, T221:17-21).

---

[6] N.J. Ct. R. 2:2-3(a)(2) states: "...appeals may be taken to the Appellate Division as of right....to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer excepting matters prescribed by R. 8:2 (tax matters) and matters governed by R. 4:74-8 (Wage Collection Section appeals), except that review pursuant to this subparagraph shall not be maintainable so long as there is available a right of review before any administrative agency or officer, unless the interest of justice requires otherwise

114.    In addition to appeals, patients can also file civil suits.  A recent example is <u>Bacon v.</u> <u>Burns</u>, 10-5484, where Judge Simandle denied a motion to dismiss, stating that although the former policy concerning involuntary medication was constitutional, there remained a question as to whether the policy's procedures were followed. <u>Bacon v. Burns</u>, 10-5484, 2011 U.S. Dist. LEXIS 132148 (D.N.J. November 15, 2011).  See also, federal court complaints concerning involuntary medication: 1) <u>John Brandt</u>, Civil Action No. 08-0984; 2) <u>Philip Wood</u>, Civil Action No. 07-138; 3) <u>Woodrow</u> <u>Bullock Jr.</u>, Civil Action No. 10-1412; 4) <u>John Brandt</u>, Civil Action No. 10-4223; and 5) <u>Akuma-Eze</u>, Civil Action No. 10-5171 and <u>Brandt v. Monte</u>, 626 F. Supp. 2d 469, 490-491 (D.N.J. 2009). (See Exhibit HH, Defendant's response to production of documents, No. 15)

115.    Unless a shorter time is approved by the panel or the biweekly review, or consent ends the authorization, an Involuntary Medication Administration Report expires 90 days from the date the medication is first administered. (Exhibit A at JV251499-JV251500, Section V(C)).  This 90 day clinical review limits the time period for the administration of involuntary medication. (Exhibit J, Deposition of Eilers, T79:12-18).

116.    If the medication is continued and the patient has not consented at the end of 90 days, and it is the treating psychiatrist's opinion that the patient presents a danger without the treatment of psychotropic medication, a new IMAR form is required to be completed and Medication Review Hearing is required to be held prior to continuing the involuntary medication of a patient.  Exhibit A at JV251498, Section IV (N).  At the time any second or subsequent Involuntary Medication Procedure is initiated, the prescriber must consider alternative medications and interventions, must indicate his or her opinion as to why the medication has not improved the patient's clinical condition and encouraged the patient's voluntary adherence, and must document the reason for the patient's continued rejection of alternatives. (Exhibit A at JV251499-JV251500, Section V(C)).

117.    If a patient is medicated in accordance with the Policy, the CSA must meet with the patient as soon as possible and must also review the patient's chart at that time and once every month thereafter. The CSA must document the review on a Medication Review Form, sign the original, and notify the prescriber by email or in writing of the results of the review. The prescriber must acknowledge receipt of the notification by email or in writing, and report the resolutions of any discrepancies noted during the review to the CSA. (Exhibit A at JV251499, Section V(B)).

118.    In short, the CSA has a responsibility to advocate for the patient's expressed desires and to ensure the continued need for medication by ongoing oversight. (Exhibit J, Deposition of Eilers, T131:6-24). The CSA monitors the patient's response to the medication. So if the CSA observed that the medication was not effective or produced untoward side effects, it is their obligation to report the same to the Medical Director and/or address it directly with the treating psychiatrist and team. (Exhibit J, Deposition of Eilers, T150:1-14).

119.    The CSR must also document side effects as reported by the patient or as noted in the record, and report side effects or other events to the CSA. The CSR conducts record reviews, follows up with the treatment teams when procedural discrepancies occur, compiles monthly reports, collects other data as required by the CSA, and meets with the CSAs and Coordinator as needed to assure conformity across the system with the standards set forth in the Policy. (Exhibit A at JV251493, Section III).

120.    Although not clinicians, based on their experience and common sense, the CSRs can tell if a patient is exhibiting side effects or appears over-medicated, as indicated by drooling, drowsiness and/or tremors. (Exhibit W, Deposition of Evans-Mallory, T171:9-24). Mr. Luchkiw testified that, "I know as part of justification for medication if you are going above prescribed therapeutic levels, I do believe there has to be a review by the chief of psychiatry. And we also have

two independent pharmacies on the grounds of the hospital, so if there is something irregular, I'm sure that they would be able to catch it. We have a distribution pharmacy is one agency, and the second agency is a QA pharmacy; so it's like double and triple checking." (Exhibit V, Deposition of Luchkiw, T214:25-T215:10).

121.    Since before 2007, DMHAS has been moving away from the medical model and toward a more patient centered recovery and wellness focus, and has begun to provide much more intentionally patient-centered services. (Exhibit J, Deposition of Eilers, T39:2-7). Dr. Eilers reported that over the years, there have been discussions about changes to the then existing policy to enhance the Three-Step procedure, as well as the medication issues related to A.B. 5:04. (Exhibit J, Deposition of Eilers, T44:3-T46:5). Less restrictive alternative treatments are now considered as part of the medication process. (Exhibit J, Deposition of Eilers, T48:7-8). (See also, Exhibit EE, Deposition of Ciaston, T165:16-23). He stressed that the process has moved towards a patient centered focus with a recovery initiative. Dr. Eilers also testified that the current emphasis is on how medication can be provided so that the patient's wishes and concerns are addressed and a plan is developed which meets the goals for recovery. (Exhibit J, Deposition of Eilers, T46:5-T47:16).

122.    Ms. Piren also testified that "in that regard, over the years we have moved towards less restrictive interventions overall, including medicine, including seclusion, restraint, including the use of forced medication...to one where we hopefully are using less restrictive, more person centered treatments so the patient has a right to choose and talk about ahead of time before an incident occurs what interventions might be helpful to him." (Exhibit T, Deposition of Piren, T190:11-15, T191:1-3).

123.    Ms. Ciaston testified that over the past 3 years, "the policy had been reviewed and was continually evaluated, and the process is pretty comprehensive ... it's taken quite some time to review

36

and see what the best way of providing guidance and implementation for the facilities would be."
(Exhibit EE, Deposition of Ciaston, T39:3-13; T22:6-12).

124.   Part of the formulation of this new policy required consideration of other agencies'
policies, in New Jersey and out of state, including the Department of Corrections involuntary
medication policy, which is "an administrative model with an independent psychiatrist and a panel
member." (Exhibit EE, Deposition of Ciaston, T35:15-18). (Exhibit J, Deposition of Eilers, T108:5-
21; T123:1-T124:25).

125.   Incarcerated persons who are mentally ill but not in need of in-patient psychiatric
commitment, as defined by N.J.S.A. 30:4-27.2m, are provided treatment at the jail or prison. (Exhibit
M at p. 6, Recommendation No. 26).   Individuals with mental illness are disproportionally
represented among the inmate population.   It is generally accepted that 16 percent of persons
incarcerated are mentally ill. (Exhibit M at p. 6, Recommendation No. 26).   The New Jersey
Administrative Code, N.J.A.C. 10A:16-11 et seq, governs the involuntary administration of
psychotropic medication to inmates.

126.   N.J.A.C. 10A:16-11.1 permits an inmate to be involuntarily medicated under certain
conditions.  Psychotropic medications, which have been prescribed for the inmate by a psychiatrist
as part of an individualized treatment plan, may be administered by the responsible health care
provider to any seriously mentally ill inmate against the will of the inmate if that medication is
consistent with the medical interests of the inmate.   (N.J.A.C. 10A:16-11.1(a)).  Medication is
considered in the inmate's medical interests when:  1. There is substantial likelihood of serious
physical harm to the inmate or to others; 2. There is a substantial likelihood of significant property
damage; 3. The inmate is unable to care for himself or herself so that the inmate's health or safety is

endangered; and/or 4. The inmate is incapable of participating in any treatment plan which would offer the inmate a realistic opportunity to improve his or her condition. (N.J.A.C. 10A:16-11.1(b)).

127.   Once an inmate refuses medication, within 24 hours of receiving the psychiatrist's involuntary medication recommendation, a Treatment Review Committee is appointed, composed of a psychiatrist, a psychologist, and the Administrator or designee, none of whom are involved in the inmate's treatment or diagnosis. (N.J.A.C. 10A:16-11.2(a)(c)). The Treatment Review Committee shall review the inmate's medical record and the psychiatrist's recommendation to institute involuntary medication and shall schedule a hearing no more than five calendar days from the review. (N.J.A.C. 10A:16-11.2(e)).

128.   The DOC also requires that the inmate be notified of the involuntary medication hearing at least 24 hours prior to the hearing, N.J.A.C. 10A:16-11.3(a), which notice outlines the inmate's mental health diagnosis; the medication(s) prescribed to treat the inmate's illness; the recommendation to administer the prescribed medication to the inmate against the will of the inmate; the reason(s) for the recommendation; the date, time and location of the hearing; and the identity of the staff advisor appointed by the chairperson of the Treatment Review Committee, assigned to assist the inmate. (N.J.A.C. 10A:16-11.3).

129.   During the DOC process, pursuant to N.J.A.C. 10a:16-11.4, an inmate has the following rights:

- To refuse medication(s) until the Treatment Review committee reaches a decision on the administration of involuntary medications;

- To be present at the hearing and to make a statement to the Treatment Review Committee, unless the Treatment Review Committee determines that it is likely that the inmate's attendance would subject the inmate to substantial risk of serious physical or emotional harm or pose a threat to the safety of others;

- To have the aid of a staff advisor to assist in presenting evidence and questioning adverse witnesses;

- To have disclosed the evidence which supports involuntary medication to the extent such disclosure is consistent with the inmate's best medical interest and with correctional facility security;

- The opportunity to call witnesses and present evidence;

- The opportunity for confrontation and cross examination of witnesses;

- To review a written ....report of findings and conclusions to include the length of time involuntary medications are to be given with 24 hours of the Treatment Review Committee hearing; and

- The opportunity to appeal ....within 24 hours of receipt of the written/verbal notification of the Treatment Review Committee's decision.

130.   In addition to reviewing the DOC policies and observing hearings of their Treatment Review Committee (Exhibit J, Deposition of Eilers, T122:13-T123:15; T128:5-21), recommendations were also solicited from the managing physicians and the patient Advocates. (Exhibit EE, Deposition of Ciaston, T41:8-18).   Ms. Evans-Mallory testified that recommendations for changes to the involuntary medication process have been discussed at the Advocate's monthly meetings. (Exhibit W, Deposition of Evans-Mallory, T43:5-23). Ms. Evans-Mallory testified that the most recent recommendation for a change that she made was related to the type of form used by physicians in completing the monthly progress notes.  (Exhibit W, Deposition of Evans-Mallory, T44:18-25, T45:2-18).  Ms. Evans-Mallory stated that her recommendation was brought to the attention of Central Office by the liaison, Ms. Piren, and the monthly progress note form was changed in response to her recommendation.  (Exhibit W, Deposition of Evans-Mallory, T45:2-11, T51:21-25).

131.   Dr. Eilers, who was extensively involved in crafting this new policy, (Exhibit J, Deposition of Eilers, T102:18-T103:13; Exhibit EE, Deposition of Ciaston, T35:12-14) testified that the focus of the policy is on a patient's recovery and that patients are better served by a clinically driven process that has adequate protections in place.  (Exhibit J, Deposition of Eilers, T112:13-25, T113:2-8; Exhibit EE, Deposition of Ciaston, T38:15-17) He testified that the Policy has more due

process protections in place for the patients. (Exhibit J, Deposition of Eilers, T88:23-25; T89:2-16). Thus, Dr. Eilers believes that a clinically driven hearing procedure is superior to one which is judicially driven. Dr. Eilers stated that medication issues are often complex decisions, and he did not believe that "a legally-driven process with a [judicial] hearing substantially would change" the prescriber's recommendations. (Exhibit J, Deposition of Eilers, T89:5-7). Dr. Eilers testified that the discussion between the patient and the treatment team is very critical, and "that need for engagement is so critical to their eventual recovery and discharge from the hospital." (Exhibit J, Deposition of Eilers, T91:2-9). In accordance with Dr. Eilers's testimony, a judicial hearing, rather than a clinically driven approach to a hearing, would take away from that treatment-based approach and add delays. (Exhibit J, Deposition of Eilers, T90:3-T91:10). Further, the adversarial nature of a court hearing could affect the doctor/patient relationship, creating tension and mistrust by and between the patient and the clinician. (Exhibit J, Deposition of Eilers, T260:5-25).

132.   CSRs Evans-Mallory and Luchkiw also testified that judicial hearings were likely to add delays, lengthen the hearing process, and potentially delay patient discharge. (Exhibit W, Deposition of Evans-Mallory, T210:2-4. Exhibit V, Deposition of Luchkiw, T266:1-10).

133.   Legal Liaison Lisa Ciaston testified that the focus of DMHAS has been on a clinical, rather than judicial, model for hearings. (Exhibit EE, Deposition of Ciaston, T37:15-17). Ms. Ciaston further testified that "it is an appropriate administrative hearing that has a certain level of formality with a clinical focus and with the ability for clinicians to raise and resolve treatment related involuntary medication issues." (Exhibit EE, Deposition of Ciaston, T209:8-13).

134.   Chief Nursing Officer Piren also testified that she did not support a judicial process for involuntary medication hearings. She stated that "somebody needs to be there to uphold the rights of the patient....but I do also believe that the serious nature of the patients we have with mental

illness and the very acute states that they…are in requires a psychiatrist or a psychiatric advanced practice nurse" rather than a judge.  An involuntary medication hearing "requires that kind of clinical intervention and knowledge about patient illness to make a really good informed decision." (Exhibit T, Deposition of Piren, T182:2-18).

135.    In reviewing data accumulated by other states who employ judicial hearings, it is clear that 90-98% of the time, the treating psychiatrist's request for involuntary medication is upheld. (Exhibit C at p. 5). For instance, in Connecticut, as one of 52 judges, Plaintiff's witness Judge Killian presided over 29 involuntary medication hearings in 2011. (Exhibit CC, Deposition of Killian, T54:9). These hearings were to involuntarily medicate patients who were capable of consenting but refused medication as well as hearings to appoint a conservator to patients incapable of consenting. Of those 29 hearings, he granted involuntary medication in 22 cases. (Exhibit CC, Deposition of Killian, T58:1-4).   In 2011, there were 109 involuntary medication hearings, which petitions originated from Institute of Living, the second largest psychiatric hospital in Hartford, of which 105 were granted. (Exhibit CC, Deposition of Killian, T64:1-16; Exhibit JJ, Killian Deposition Exhibit D-64).

136.    It is also clear that judges assigned to conduct these judicial hearings on involuntary medication are not trained as clinicians. Again, in Connecticut, when Judge Killian, Plaintiff's witness, was first appointed as a probate judge in 1983, he had no formal training in psychotropic medications, as he is "trained as a lawyer, not a doctor." (Exhibit CC, Deposition of Killian, T39:13-14). In a hearing, none of the criteria that Judge Killian focuses on is medical in nature. (Exhibit CC, Deposition of Killian, T105:1-25). In the great majority of cases that he has heard, he has found that the doctor is right and he has accepted their clinical judgment.  He testified that he has upheld the

decision to involuntarily medicate a patient in a "high percentage" of cases. (Exhibit CC, Deposition of Killian, T162:4).

137.    Judge Killian is also aware of the "difficulties in predicting and preventing violence-especially the uncommon acts of brutality that galvanize the media and the public." (Exhibit KK, Judge Killian article JV251778-JV251780). During Judge Killian's deposition, he testified that he was stabbed by a patient, during a hearing, while he was sitting as a judge. (Exhibit CC, Deposition of Killian, T156:22-25;T157:1-11).

138.    In contrast, Joseph Young, Executive Director of DRNJ, testified that he had "never reviewed the data or any reports to find out how many times judges actually…uphold the medication decisions of care givers in the state hospitals." (Exhibit AA, Deposition of Young, T117:21-T118:1). He has never looked at how well systems work in other states. (Exhibit AA, Deposition of Young, T117:1-8). Further, when provided with data that judges in jurisdictions using judicial hearings for involuntary medication uphold the decisions of the treating psychiatrists over ninety (90) percent of the time, his only comment was that those judges need clinical training. (Exhibit AA, Deposition of Young, T118:7-14).

139.    DRNJ Senior Advocates Ms. Parsio and Ms. Lukens testified that they had no experience with any other states concerning their processes or procedures for involuntarily medicating patients. (Exhibit Y, Deposition of Parsio, T63:23-T64:2.  Exhibit K, Deposition of Lukens, T64:18-21; T223:5-10).

140.    Delays in a judicial system is also an issue to be considered.  Delays could be occasioned by discovery or availability issues, as the particular case would not be heard until the parties are ready, regardless of the court's availability. (Exhibit W, Deposition of Evans-Mallory, T212:7-21).

141.    DRNJ Executive Director Young testified that he thought that a judicial hearing within 21 days could be considered expeditious in involuntary medication cases. (Exhibit AA, Deposition of Young, T102:23-T103:1).  While waiting for this judicial hearing, Mr. Young stated that if a patient became violent during that time frame, the 72 hour emergency procedure could be used to medicate the patient. (Exhibit AA, Deposition of Young, T103:23-T104:2).  Mr. Young could not provide a response as to how a patient, awaiting his hearing and having exhausted the 72 hour emergency certification, should be treated if he again became a threat. (Exhibit AA, Deposition of Young, T107:2-19).

142.    Similarly, when questioned as to what she envisioned the State Hospitals doing with violent patients while waiting for judicial hearings to be completed, DRNJ Advocate Ms. Spensley suggested that a patient be involuntarily medicated on an emergency basis for a 72-hour period. (Exhibit Z, Deposition of Spensley, T143:17-25).  When asked what should be done after the 72-hour period expires, Ms. Spensley suggested the use of seclusion or physical restraints.[7] (Exhibit Z, Deposition of Spensley, T144:1-T146:3).

143.    Patients being involuntarily medicated in the State Hospitals require medication for their own safety and the safety of other patients, hospital staff, and the public. Safety is an important component in the State Hospitals for both the clients and the staff.  Every aspect of this process is closely monitored for compliance so an environment of physical and emotional safety will be maintained for everyone.( Exhibit Y, Deposition of Parsio, T102:20-25; Exhibit K, Deposition of Lukens, T103:1-6).

---

[7]    Seclusion and physical restraint are considered to be among the most restrictive interventions available in an emergency in the state psychiatric hospitals.  (Exhibit A at JV251494, Section III).

144.   Documents provided by Plaintiff, concerning complaints made to DRNJ by patients[8,]

establishes the dangerousness of patients, to themselves or others, which led to involuntary

medication. For instance:

- A constituent patient, S.L., exhibited aggressive behavior and believes that he is a healer. (Exhibit LL, Documents produced by Plaintiff concerning patients, DRNJ-M03695, and Exhibit MM, CEO letter re S.L, July 2008).  Specifically, he is very combative and believes that he is "God" and can heal himself. (Exhibit LL DRNJ-M03695).

- Another constituent patient, W.B., was medicated on one occasion, on April 3, 2006, after it took eight (8) staff members to subdue him after he struck another patient. (Exhibit LL, DRNJ-M03541).

- L.G. maintained that she could not take psychotropic medication due to a traumatic brain injury.  DRNJ staff determined that a traumatic brain injury could not be substantiated and that proper procedure was followed at Greystone in order to involuntarily administer medication. (Exhibit LL, DRNJ-M03080).

- E.G. complained to DRNJ that he suffered a stroke because of involuntary medication. After investigation, DRNJ found no support for the allegation and closed their file. (Exhibit LL, DRNJ-M03103). It is noted that E.G. assaulted a staff member who received sutures for his injury. (Exhibit LL, DRNJ-M03106).

- DRNJ spoke with the treating psychiatrist concerning the dosage of medication given to M.L.  Once the medications had taken effect, the patient advised DRNJ that the medications were working and he felt better.  It is noted that when the patient had been off the medication, an incident occurred where he was charged with the murder and rape of the dead body of a fellow inmate. (Exhibit LL, DRNJ-M03203).

- As to B.P., DRNJ spoke with Dr. Eilers who indicated that patients should be involved in their treatment as much as possible and that a non-refusing patient should be allowed to take medication in the least restrictive form possible.  However, there were limited options for B.P., as he was unwilling to take any psychotropic medication other than Haldol and was unwilling to take any oral medication.  B.P. can become very dangerous without medication and has been verbally aggressive and had been involved in an altercation with two patients. (Exhibit LL, DRNJ-M03446-47).

---

[8]  Ms. Parsio testified that DRNJ responds to complaints made, and "if we see other system issues, we address those also." (Exhibit Y, Deposition of Parsio, T33:19-21).

- DRNJ also investigated a complaint by J.R. who had punched another patient and was restrained and medicated. He was assaultive, combative and spit blood at the staff. The complaint was determined to have no merit. (Exhibit LL, DRNJ-M03290).

- Similarly, DRNJ investigated a complaint by W.R. who tried to bring in contraband strapped to his chest and when discovered, threatened violence towards the staff and threatened to kill a female staff member. (Exhibit LL, DRNJ-M03301)

- DRNJ's investigation as to P.W. showed that when he did not take medication, he became assaultive and threatening. On one occasion, he lit his mattress on fire. There were other instances of assault on other patients, staff and physicians. His unwillingness to compromise with medication and his refusal to take any medication was verified by DRNJ before closing their file. (Exhibit LL, DRNJ-M03411)

145. Testimony from DRNJ Advocates has also addressed the potential danger and harm presented by some involuntarily committed psychiatric patients, as well as the State's interest in protecting patients and its employees.

- DRNJ Senior Advocate Lukens was questioned regarding the danger presented by individual patients for whom DRNJ was advocating. Ms. Lukens testified that she was aware that one particular patient had threatened to punch and kill a pregnant patient's baby. (Exhibit K, Deposition of Lukens, T150:3-5). Specifically, in September of 2008, T.B., a constituent patient who had been in residential psychiatric treatment for most of his life, as he had manifested violent tendencies, while admitted at Greystone, threatened to punch a pregnant patient and kill her baby. He also destroyed computer equipment at a nurse's station. (Exhibit N at p. 67).

- Ms. Lukens was also aware that a different patient had assaulted a peer and slammed him against the wall. (Exhibit K, Deposition of Lukens, T174:4-8).

- Ms. Lukens also testified that an attorney with the Public Advocate's office was assaulted by a patient who was a client of the said attorney at the time. (Exhibit K, Deposition of Lukens, T210:11-20). DRNJ Advocate Parsio also testified about the same assault, wherein the attorney was interviewing a patient and was knocked to the floor and assaulted by the patient. (Exhibit Y, Deposition of Parsio, T100:1-18). The attorney employed by the Department of the Public Advocate, Lorraine Gormley, was assigned to represent clients with mental illnesses in connection with their commitment to, treatment at, and discharge from psychiatric hospitals. The patient struck Ms. Gormley several times. When she attempted to flee, B.R. pulled Ms. Gormley backwards by the hair until her head struck the ground. Ms. Gormley tried to fight B.R. off, but lapsed in and out of consciousness. Gormley v. Wood-El, 422 N.J. Super. 426, 430-431 (App. Div. 2011).

- DRNJ Advocate Spensley agreed that she has encountered a number of patients who she felt threatened by or that she considered dangerous. (Exhibit Z, Deposition of Spensley, T156:17-18). H.B. is one such patient, who left a voice mail message for Ms. Spensley, that she transcribed and retained, such that it was produced in litigation. (Exhibit LL, DRNJ-M03011).

146.    The ever-present possibility of violence of patient on patient assaults, patient on staff assaults, and suicide attempts are encountered by the Rennie Advocates/CSRs. Ancora CSR Haynes testified that he would interface with the patient "If they will allow my approach. In the psychiatric business you learn when to approach a patient and when not to. They have a space and you've got to know when do you go into that space, and you'd best be invited. If not, you can be harmed." (Exhibit U, Deposition of Haynes, T216:22-T217:7).

147.    Similarly, Greystone CSR Luchkiw was questioned as to whether the patients at Greystone Park Psychiatric Hospital are dangerous, and he advised "Yeah, a lot of them are. ... I think there's an unpredictability out of almost every one of them." (Exhibit V, Deposition of Luchkiw, T69:18-T70:2).  Mr. Luchkiw indicated that he has been attacked and punched in the face by a patient. (Exhibit V, Deposition of Luchkiw, T70:12-14).  Mr. Luchkiw also stated that he has seen patients attack others. (Exhibit V, Deposition of Luchkiw, T71:21-23).

148.    Plaintiff's witness Judge Killian said of those who require involuntary hospitalization, "I'm talking about people who are profoundly mentally ill, most of who are hearing voices, voices that tell them to do things, many of which are antisocial things and part of the problem is our inability to properly treat this segment of the mentally ill". (Exhibit KK, JV251778-JV251780).

149.    DRNJ presented two (2) witnesses from the State of Connecticut, a State which provides for the involuntary administration of psychotropic medication through an internal administrative hearing for medications prescribed up to 30 days and, for longer periods of medication, judicial hearings and a right to appointed counsel. These two witnesses, Judge Killian,

a judge with the Probate Division in Connecticut, and Dr. Fox, the former Director of Whiting Forensic Division of Connecticut Valley Hospital, testified that they have never practiced in New Jersey and have no expertise or familiarity with the laws, regulations or policies of the State Hospitals. (Exhibit CC, Deposition of Killian, T30:8-21, T176:10-15; Exhibit DD, Deposition of Fox, T13:1-14:5).

150.    During his deposition, Judge Killian described Connecticut's non-emergent involuntary medication policy. In 1993, a Committee "met to address the issue of medications against will" which resulted in a statutory enactment in the State of Connecticut which exists today. (Exhibit CC, Deposition of Killian, T44:10-17).  Judge Killian testified that the committee reviewed the procedures in Massachusetts and New Jersey, wherein he asserted that "We looked ... at the two closest states that had a procedure that had been tested in courts and that was Massachusetts and New Jersey." (Exhibit CC, Deposition of Killian, T187:1-3) The Connecticut Statute "created two roots [sic] by which a hospital could seek to medicate a patient against their will, an inpatient against their will.  One was what we call the internal bypass, and the other is through the appointment of a conservator for the purposes of approving medication or the court directly approving medication. That would mean the patient is incapable or if the patient is capable the court can directly approve the medication." (Exhibit CC, Deposition of Killian, T45:4-12).

151.    This 'internal bypass', as set forth in Conn. Stat. 17a-543(d), provides for an internal administrative procedure which "utilizes a[n] independent psychiatrist to review the patient's chart and to conduct a hearing at which the decision can be made to order the medication." (Exhibit CC, Deposition of Killian, T45:24-T46:2).  The independent psychiatrist serves as the "hearing officer." (Exhibit CC, Deposition of Killian, T46:6-7).  Should the psychiatrist agree, the hospital would then have the authority to medicate a patient for 30 days. (Exhibit CC, Deposition of Killian, T48:15-18).

47

There is no requirement, in accordance with the Connecticut statute, for a filing with the Probate Court if the hospital is seeking to involuntarily medicate a patient for 30 days or less. (Exhibit CC, Deposition of Killian, T73:22-T74:1; see also the Connecticut Dept of Mental Health and Addiction Services Commissioner's Policy Statement and Implementing Procedures on Emergency and Involuntary Medication, issued November 1, 2011).

152.    The patient has a right to appeal the decision of the hospital to medicate to the Probate Court, wherein the Court must conduct a hearing within 15 days. During this 15 day intervening time period while the patient is waiting for the appeal, the hospital has the authority to medicate the patient against their will. (Exhibit CC, Deposition of Killian, T49:21-T50:9; T123:9-12).

153.    In Connecticut, if there is a need to medicate a patient for more than 30 days, and the patient is incapable of giving informed consent to medication for the treatment of his psychiatric disability and such medication is necessary for the patient' treatment, as determined by the head of the Hospital and two qualified physicians, a mental health facility may apply to the Probate Court for the appointment of a conservator of that person with specific authority to consent to the administration of medication. Conn. Stat. §17a-543(d), (e).

154.    During his deposition, Judge Killian testified that he may authorize involuntary medication if the patient is capable of giving informed consent but refuses, and if without medication the patient's psychiatric disabilities will continue unabated and place the patient or others in direct threat of harm which is consistent with the State Statute. (Exhibit CC, Deposition of Killian, T72:1-8; T73:1-4; T74:21-T75:5) Conn. Stat. §17a-542(f)(1) and (2).  Judge Killian acknowledged that reference to "direct threat of harm" means dangerousness. (Exhibit CC, Deposition of Killian, T75:6-16).  In fact, Judge Killian indicated that a key factor in the decision to involuntarily medicate a

48

patient is whether they present a danger to themselves or others. (Exhibit CC, Deposition of Killian, T106:23-T107:2).

155.    In making his decision, Judge Killian will review the evidence to determine whether there is clear and convincing evidence that the patient is dangerous, in that the patient presents a danger to themselves or others, or whether the patient has a grave disability, that is an inability to provide for basic human needs. (Exhibit CC, Deposition of Killian, T195:19-21). To determine whether a patient is dangerous, Judge Killian will look at the historical behavior of the patient and at the function of the patient. Judge Killian does not review the patient's chart. (Exhibit CC, Deposition of Killian, T105:3-4). Judge Killian will review a two page report submitted by the facility, usually authored by the treating psychiatrist, and a two page report drafted by an independent consultant as to why the patient needs the medication. He will also hear testimony from the treating psychiatrist and sometimes the patient, family members, social workers, therapist and/or outpatient case managers. (Exhibit CC, Deposition of Killian, T108:8-14).

156.    In conducted risk assessments to determine whether a person needed to be hospitalized, Dr. Fox would analyze the dangerousness of the person, considering the risk of violence, risk of fire setting, and sex offender risk. (Exhibit DD, Deposition of Fox, T26:1-12). He has testified in more than 20 involuntary medication matters. (Exhibit DD, Deposition of Fox, T74:12-16). He has never testified or participated in a hearing where his position was that the patient should not be involuntarily medicated. (Exhibit DD, Deposition of Fox, T76:17-22).

157.    During the deposition of Dr. Fox, it was his opinion that the procedures, as detailed in the new A.B. 5:04 policy, afford a fair hearing so long as the administrative hearing officer is someone separate and apart from the institution. (Exhibit DD, Deposition of Fox, T54:9-17; T48:9-15; T47:5-15). Dr. Fox acknowledged that there are administrative systems in existence which can

provide a fair and informed hearing, and that can work as well as systems involving a judicial hearing. (Exhibit DD, Deposition of Fox, T63:10-T64:1).

158.    In Massachusetts, an adult is presumed competent to make his own decisions regarding the administration of anti-psychotic medication until he is proved incompetent to do so in Court. For those patients committed to a state mental hospital, a guardianship proceeding is initiated in the District Court by a physician and the patient is represented by counsel to participate in a hearing to determine the competency of the patient. Dangerousness is the criteria upon which such medication decisions are based. (ALM GL ch. 123, §8B' Exhibit NN, Deposition transcript of Dr. Matthew Dumont, dated October 15, 2012, T12:18-25).

159.    Plaintiff retained Matthew Dumont, M.D., a psychiatrist from Massachusetts, to render an expert report in this matter. Dr. Dumont works for the Committee for Public Health Services, which provides free legal representation and Independent Expert Consultation to criminal offenders and patients in state and private mental hospitals who are unable to pay their own legal expenses. (Exhibit NN, Deposition of Dumont, T10:1-9). Given his position, Dr. Dumont will not testify in Court with respect to the involuntary administration of medication unless it is his opinion that a patient should not be involuntarily medicated. (Exhibit NN, Deposition of Dumont, T11:16-25). If, after his review, it is his opinion that the patient should be involuntarily medicated, particularly when the patient has committed violent acts, he will advise the patient's attorney of that conclusion and will decline to testify. (Exhibit NN, Deposition of Dumont, T11:16-25). He acknowledged that his expertise is in Community Psychiatry, which is a different practice from psychiatrists that practice in state mental hospitals. (Exhibit NN, Deposition of Dumont, T26:15-19).

160.    Dr. Dumont was the Medical Director of the Admissions Unit in Metropolitan State Hospital in 1991 for a short period of time prior to its closing. (Exhibit NN, Deposition of Dumont,

T48:7-15).  In that position, he was responsible for determining that the patients met the criteria for

admission. (Exhibit NN, Deposition of Dumont, T48:21-T49:2).  While he was a Staff Psychiatrist

at Westborough State Hospital from 1991 to 2003, he prescribed anti-psychotics and psychotropic

medication. (Exhibit NN, Deposition of Dumont, T49:11-19; T114:15-18). Dr. Dumont testified that

some patients, because of their mental illness, may be dangerous to themselves or others.  (Exhibit

NN, Deposition of Dumont, T116:19-25).  While at Westborough State Hospital, before testifying

that the patient required involuntary antipsychotic medication because of his dangerousness, Dr.

Dumont would negotiate with the patient to try to encourage voluntary acceptance of treatment.

(Exhibit NN, Deposition of Dumont, T73:1-17).   However, if dangerousness was present, anti-

psychotic medications, even administered involuntarily, are within the standard of care to deal with

dangerous behaviors. (Exhibit NN, Deposition of Dumont, T12:13-21; T:65/1-4).

     161.   Dr. Dumont would not hesitate to medicate an individual who exhibited dangerous

conduct, such as if a patient is an imminent risk of picking up a weapon and stabbing a spouse or

child, that is good enough for him.  He described his medication procedure as "You jab them as

quickly as possible and as often as necessary." (Exhibit NN, Deposition of Dumont, T119:22-23).

During the deposition, Dr. Dumont discussed one of his patients who slaughtered a cat in front of his

four year old child and stated that the devil was now in the screaming child. He advised that when

the wife called him, "I went out there with a needle in my hand and the cops behind me and I said

listen pal, you are going to the hospital and I want you to take this medicine now.  I didn't want

anything to happen before the ambulance could get there. ... I am not going to let somebody get hurt

if I can stop it." (Exhibit NN, Deposition of Dumont, T119:11 - T120:11).

     162.   In rendering his opinions, Dr. Dumont relied only upon his experience or anecdotal

evidence.  (Exhibit NN, Deposition of Dumont, T18:2-25; T128:19-T129:5).  He did not utilize

studies or data to support his assertions. (Exhibit NN, Deposition of Dumont, T17:22-25).  Further,

he did not conduct any research of the available medical literature to come to any of the opinions that

are stated in his report. (Exhibit NN, Deposition of Dumont, T17:22-T18:1).

163.    Dr. Dumont was provided with materials from this matter, which he deemed sufficient

for him to express an opinion. (Exhibit NN, Deposition of Dumont, T103:7-17). However, Dr.

Dumont was not provided with the current Policy for the Non-Emergent Administration of

Involuntary Medication, effective June 4, 2012. (Exhibit OO, Deposition Exhibit D-2 introduced at

the Deposition of Dr. Matthew Dumont). Further, the policy that he did review did not contain any

of the necessary forms or attachments thereto. (Exhibit OO; Exhibit NN, Deposition of Dumont,

T67:2-3; T67:17-21;T68:7-13: T1-3:13-17; T112:11-15). He also acknowledged that he had based

his entire opinion concerning the New Jersey system upon his review of that incorrect policy and

without the necessary forms. (Exhibit NN, Deposition of Dumont, T103:7-17).

164.    Dr. Dumont testified that the presence of violence, or the dangerousness standard, is

the criteria he uses to decide that involuntary medication of a patient is necessary. (Exhibit NN,

Deposition of Dumont, T12:13-21; T65:1-4; T70:5-25). If a patient is an imminent threat based upon

the dangerousness standard, Dr. Dumont will prescribe anti-psychotic and other psychotropic

medications. (Exhibit NN, Deposition of Dumont, T12:13-21; T65:1-4; T49:11-19). Thus, in his

opinion, the administration of psychotropic medications on an involuntary basis if the patient is

dangerous is appropriate, which is the standard for medication under the State's Policy.   (Exhibit

NN, Deposition of Dumont, T116:14:25; T67:1-6).

165.    Dr. Dumont asserted, as a general proposition, that anti-psychotic agents, to a large

extent, do reduce the severity of a patient's psychotic symptoms and reduce the acute severity of

positive psychotic symptoms, such as acute delusional behaviors, hallucinations and tendencies towards violence. (Exhibit NN, Deposition of Dumont, T91:1-25).

166.    Although he has never practiced in New Jersey, Dr. Dumont's "expectation is that every patient admitted to a state hospital [in New Jersey] is given a medical evaluation as part of an intake procedure". (Exhibit NN, Deposition of Dumont, T78:4-7). Further, Dr. Dumont is unaware of the commitment standards in the State of New Jersey, nor does he have any idea what screening process is in place in the State of New Jersey before a patient reaches a New Jersey state hospital. (Exhibit NN, Deposition of Dumont, T80:2-5; T104:14-25).

167.    Dr. Dumont confirmed that a voluntary arrangement wherein the patient consents to the medication is far superior to a Court Ordered one. (Exhibit NN, Deposition of Dumont, T105:10-18). He also confirmed that a policy or procedure that allows for negotiation between the patient and physician would be better. (Exhibit NN, Deposition of Dumont, T105:10-18).

168.    Dr. Dumont testified that good patient care is not dependent upon a Judge making the determination that involuntary medication is necessary. (Exhibit NN, Deposition of Dumont, T87:7-14).

169.    Without reviewing the deposition testimony of the CSRs Anthony Haynes, John Luchkiw, or Kim Evans-Mallory, Dr. Dumont opined that the CSAs and CSRs could not be effective in their representation of a patient, as they are employed by the State and answer to the hospital administrator. (Exhibit NN, Deposition of Dumont, T102:13-T103:7). This attribution of bias does not apply to Dr. Dumont's professional services, wherein he served as an independent reviewer. Although his services are paid for by the State of Massachusetts, he does not believe that salary, in any way, creates a situational bias for him. (Exhibit NN, Deposition of Dumont, T106:1-25).

53

170.    Similarly, with respect to the independent psychiatrists who chair the Medication Review Hearings, the fact that the independent psychiatrist time is reimbursed by the State of New Jersey does not necessarily mean that the psychiatrist is not independent, nor their opinion biased. (Exhibit NN, Deposition of Dumont, T107:1-13).

171.    According to Dr. Dumont, regardless of whether or not a Judge was involved, a process that considered alternative medications and dosing, alternative therapies and least restrictive therapies is optimal.  (Exhibit NN, Deposition of Dumont, T126:16-T127:1). Obviously he was unaware that the forms associated with the Policy at issue in this litigation do require such information.

172.    Dr. Dumont believes that judicial hearings are optimal, as the delay in obtaining a decision and the adversarial nature of the process decision enhances the patient's understanding of the risk and benefits analysis and allows the psychiatrist the opportunity to engage the patient. (Exhibit NN, Deposition of Dumont, T109:17-25).  It is noted that during the few weeks delay, prior to appearing before a Judge for a medication hearing, he would administer involuntary medication on an emergency basis, repeatedly if necessary. (Exhibit NN, Deposition of Dumont, T73:3-25). However, he has no information as to how much time the physicians in the State of New Jersey spend with their patients negotiating and working through medication issues.  He also could not state authoritatively that the New Jersey policy doesn't offer the patient of the treating psychiatrist the opportunity to negotiate. (Exhibit NN, Deposition of Dumont, T111:1-9).

173.    Dr. Dumont is unaware of the statistics that set forth that with a judicial system, over 90% of the time the Judges uphold the decisions of the treating psychiatrist. (Exhibit NN, Deposition of Dumont, T107:14-T108:10).

174.   The Defendants retained Dr. Paul Appelbaum, the Elizabeth K. Dollard Professor of Psychiatry, Medicine, and Law at the College of Physicians & Surgeons at Columbia University, where he is routinely consulted by clinicians dealing with patients refusing treatment.  He is also an affiliated faculty member at Columbia Law School, where he teaches mental health law and other courses. (Exhibit C; Exhibit D, Curriculum Vitae of Dr. Paul S. Appelbaum; Exhibit PP, Deposition transcript of Dr. Paul Appelbaum, dated November 14, 2012, T23:16-23).

175.   Dr. Appelbaum's career has been spent studying legal and ethical issues in psychiatry and general medicine, including informed consent, decisional capacity, and refusal of treatment.  He has written extensively on these subjects.  Dr. Appelbaum conducted the first empirical study of patients who refuse psychiatric treatment, and later coordinated what is still the largest study on the subject. (Exhibit C at p. 1).

176.   Dr. Appelbaum's work has provided a widely used framework for classifying approaches to rights to refuse treatment, and an integrative review of the evolution of the issue. (Exhibit C at p. 1).

177.   Dr. Appelbaum states that psychotropic medication "enhances patients' abilities to think normally, and hence to function autonomously." (Exhibit C at p. 2). These medications reduce the psychotic symptoms of patients, so that patients become more functional.  This increased ability to care for themselves, participate in other activities, and control their behavior makes it possible for a large number of patients who would otherwise have spent their lives committed in psychiatric hospitals to live in the community. (Exhibit C at pp. 2-3).

178.   Dr. Appelbaum explains that the introduction of antipsychotic medications played a major role in the process of deinstitutionalization, by which "the more than half-a-million patients

in state hospitals in 1955 have been reduced to less than one-tenth of that number today." (Exhibit C at p. 3).

179.   Dr. Appelbaum acknowledges that, as with all medications, anti-psychotics can produce unwanted side effects.  However, he states that, notwithstanding these risks, antipsychotic medications represent the "standard of care for treatment of psychosis " and are essential for effective treatment. (Exhibit PP, Deposition of Appelbaum, T139:18-24).   As explained by Dr. Appelbaum, "Without medication to reduce psychotic symptoms, patients with schizophrenia, schizoaffective disorder, and other psychotic illnesses are usually unable to take advantage of other treatments, or to return to or remain in the community." (Exhibit C at p. 3).  Specifically, Dr. Applebaum testified that the use of psychotropic medication is an effective intervention to reduce dangerousness and help patients become functional members of society. (Exhibit PP, Deposition of Appelbaum, T100:23-25; T101:5-7)

180.   Dr. Appelbaum reiterates that "effective antipsychotic medications enhance patients' ability to think coherently and engage in rational decision making, thus affording them greater autonomy in their lives.  Thus, anti-psychotic medications have become integral to what is usually conceptualized as the least restrictive alternative for care of patients with these disorders." (Exhibit C at p. 3).

181.   Dr. Appelbaum explains that over time," two broad approaches have characterized the mechanisms that have developed… for resolving involuntarily committed psychiatric patients' refusal of treatment with antipsychotic medication." (Exhibit C at p. 4).

182.   The first is the "rights-driven model," in which involuntary medication is precluded unless a patient has been found incompetent to make treatment decisions.  Typically, determinations of incompetence have to be made by courts, although some jurisdictions have allowed administrative

panels to play this role. Under this rights-driven model, patients were usually recognized as having the right to legal representation in their hearings. (Exhibit C at p. 4).

183.    Based on Dr. Appelbaum's research he concludes "the [rights-driven model is] inefficient, awkward, and doesn't contribute to the quality of [the] patient's care." The rights-driven model "doesn't give you that second look at the process, a decision-maker who can bring clinical judgment and background to the process." (Exhibit PP, Deposition of Appelbaum, T117:17-25).

184.    The second approach, known as a "treatment-driven model," focused more on patients' rights to appropriate medical treatment. This approach concluded that patients could best be protected by leaving the ultimate treatment decision in medical hands. This model might apply to all committed patients, or only to those who were found to present a danger to themselves or others. The determination as to the appropriateness of recommended treatment and/or dangerousness might be left to the treating physician, require a second opinion, or be entrusted to a clinical-administrative panel. Legal representation "was not generally guaranteed in treatment-driven approaches, although patients were often offered the assistance of lay advocates." (Exhibit C at p. 4).

185.    Dr. Appelbaum notes that the United States Supreme Court's decision in Washington v. Harper accepted this treatment-based approach, "explicitly noting that clinicians were in a superior position to judges to make determinations related to the appropriateness of treatment." (Exhibit C at p. 4).

186.    Regarding rates of treatment refusal by patients, Dr. Appelbaum reports that "in general, rates of treatment refusal in civil facilities have been under 10% of involuntary admissions, although forensic facilities show higher rates." Dr. Appelbaum notes that most refusing patients ultimately accept treatment, but "in the meantime they display higher rates of violence and other behaviors requiring seclusion and physical restraint, and the use of emergency medications." Lengths

of stays in psychiatric hospitals are also longer for refusers. (Exhibit C at p. 4; Exhibit PP, Deposition of Appelbaum, T146:19-24[9]).

187.    Dr. Appelbaum's report reveals the consequences associated with each approach to treatment refusal. Overall, Dr. Appelbaum's report indicates that treatment-driven approaches are preferable to rights-driven systems, and provide more benefit to patients, the mental health system, and the legal system. (Exhibit C at p. 7).

188.    Rights-driven approaches include judicial hearings systems with appointed counsel. These models tend to require substantial amounts of clinician time, personnel time, legal time for representation of the state and the respondents, and court time. Dr. Appelbaum reports that a widely cited study in Massachusetts found that "the state provided over an 18 month period 10,500 hours of attorneys' time and 3,000 hours of paralegals' time." (Exhibit C at p. 4).

189.    The other category of consequences reported by Dr. Appelbaum involves the delay associated with formal hearings in court. Dr. Appelbaum states, "hospital days awaiting hearings vary across jurisdictions, with studies from several states, including Massachusetts and New York, suggesting average delays of 1 to 4 months." (Exhibit C at p. 9; Exhibit PP, Deposition of Appelbaum, T19:1-6; T20:6-10; T22:9-15). Dr. Appelbaum explains that prolonged periods during which patients are untreated extend the length of hospitalization, and account for a higher incidence of violence and other disruptive behaviors. (Exhibit C at p. 4).

190.    The delay under the rights driven models "leave patients untreated for substantial periods, weeks to months . . . ." (Exhibit PP, Deposition of Appelbaum, T36:21-25). According to Dr. Appelbaum the time between which a petition for medication is filed and a patient is medicated

---

[9] On November 14, 2012, Dr. Applebaum was deposed. Unlike Dr. Dumont, Dr. Appelbaum reviewed the medical charts of the constituent patients in order to ascertain the nature of the patient population in the State of New Jersey. (Exhibit PP, Deposition of Appelbaum, T127:9-18).

subjects the patient to continued psychosis in which the patient may continue to deteriorate, and may engage in self-harmful behavior or behavior that's harmful to others. (Exhibit PP, Deposition of Appelbaum, T42:34-35; T43:1-7).

191.    Dr. Appelbaum states that in contrast to the delays presented by the rights-driven model, a clinically-based process for reviewing and overriding objections in Virginia "resulted in average lengths of refusal prior to determination of 2.8 days." (Exhibit C at p. 4).

192.    Dr. Appelbaum's report shows that a judicial model does not necessarily provide a greater benefit to patients.  The outcomes of review procedures have been examined in a large number of states. Dr. Appelbaum states that, "in general, judicial review has resulted in approval of the vast majority of requests for override of refusal.  Rates of approval are generally over 90%, and in one large Massachusetts study they exceeded 98%." (Exhibit C at p. 5; Exhibit PP, Deposition of Appelbaum, T50:7-15).

193.    Interestingly, clinical-administrative review procedures often result in lower rates of approval of involuntary treatment, "often in the 60-80% range."  Dr. Appelbaum states that these differences may "in part result from a greater willingness of clinical reviewers [as opposed to judges] to challenge the conclusions and recommendations of treating psychiatrists." (Exhibit C at p. 5; Exhibit PP, Deposition of Appelbaum, T50:16-25).

194.    Dr. Appelbaum reports that clinicians express concerns "that a more formal adjudicatory process, with the introduction of legal counsel, can adversarialize the treatment relationship." (Exhibit C at p. 5). This would reduce the inclination of patients to collaborate with their treaters. Dr. Appelbaum states that, based on his experience, "patients subject to a rights-driven process often come to view their psychiatrists as opponents to be defeated in court."  Trust and willingness to collaborate in treatment is thereby reduced. Dr. Appelbaum explains, "in contrast, a

clinical/administrative review process using a treatment-driven model is more likely to sustain a collaborative physician-patient relationship." (Exhibit C at p. 5).

195.    Dr. Appelbaum also addresses patients' attitudes towards models of review. Explicit studies comparing patient's attitudes towards these different approaches are lacking. However, Dr. Appelbaum explains that "data on involuntary commitment proceedings suggest that patients - like most people involved in the legal process - particularly value the opportunity to be heard and to have their objections taken seriously, including by their clinicians, even if they disagree with the ultimate outcome of the process." (Exhibit C at p. 5). The published data offers no indication that patients are less satisfied with non-judicial review, so long as they are offered an opportunity to voice their positions and their views are treated respectfully. (Exhibit C at p. 5; Exhibit PP, Deposition of Appelbaum, T79:12-25; T80:1-11).

196.    "Affording refusing patients the opportunity to state their objections and to question witnesses, and providing the CSA for support, offers the patient the opportunity for 'voice' in the process." (Exhibit PP, Deposition of Appelbaum, T82:9-25). It is important for patients to have an opportunity and voice in the process. It is the perception of fairness, independent of the outcome, which is important. (Exhibit C at p. 6). According to Dr. Appelbaum, this perspective is embodied in the New Jersey policy. (Exhibit PP, Deposition of Appelbaum, T83:13-17).

197.    Overall, Dr. Appelbaum states that rights-driven judicial models of review are costly to patients, the mental health system, and the courts. They infrequently result in rejection of requests to authorize involuntary treatment, and are plagued by lengthy delays in the adjudication of individual cases. This leads to prolonged periods without treatment, longer hospital stays, and increased rates of violence and other disruptive behaviors. (Exhibit C at p. 6).

198.    Treatment-driven approaches, such as the one utilized in New Jersey, resolve cases of refusal more rapidly and at substantially lower cost. Dr. Appelbaum summarizes, "Since untreated psychosis is associated with increased violent and disruptive behavior, and treatment with antipsychotic medication is essential in most cases, more rapid treatment reduces the incidence of these unwanted consequences and speeds patients' return to the community."  Additionally, with treatment-driven models more patient refusals are upheld.  (Exhibit C at pp. 6-7).

199.    Dr. Appelbaum reviewed and analyzed New Jersey's policy in great detail. Dr. Appelbaum believes that scheduling hearings within 5 days will limit the adverse consequences associated with untreated psychosis, including violence and other behavioral disruptions.  (Exhibit C at p. 6).

200.    It is Dr. Appelbaum's opinion that under the New Jersey Policy, the documentation requirements for the hearing and for on-going treatment, along with the requirement for periodic re-authorization hearings, are "well designed to ensure that the treatments being recommended are appropriate and that their administration continues to be indicated." (Exhibit C at p. 6).

201.    Dr. Appelbaum found under the New Jersey Policy patients are afforded notice of the hearing and have the ability to consult with two different staff members who are both charged with ensuring that the rights of the patient are respected. (Exhibit PP, Deposition of Appelbaum, T90:1-25; T91:1-4). The patients have the right to speak at the hearing, call witnesses, cross-examine witnesses, and have their case heard by a panel which includes an independent psychiatrist. There is an opportunity for appeal both internally to the medical director and externally to the courts. (Exhibit PP, Deposition of Appelbaum, T89:5-19). Lastly, there is an ongoing process of monitoring to ensure that the treatment is appropriate and does not go on longer than is necessary. (Exhibit PP, Deposition of Appelbaum, T89:15-19; T15:17-20; T115:16-25).

202.   Dr. Appelbaum views New Jersey's approach as one that "embraces the treatment-driven model in a reasonable manner that is likely to protect patients' interests, ensure that they receive appropriate treatment when indicated, and maximize their sense of fairness with the process." (Exhibit C at p. 7).  Dr. Applebaum opines that "based on my experience, these procedures are likely to minimize the adverse outcomes associated with refusal of treatment while protecting patients' interests...". (Exhibit C at pp. 6-7).

203.   According to Dr. Appelbaum the New Jersey process maximizes the patients' interest. (Exhibit PP, Deposition of Appelbaum, T88:3-5).  New Jersey's Policy "offers patients a chance to have their say in a fair way" in addition "offers the independent input of other clinicians to the appropriateness of the treatment that was being recommended, provide[s] ongoing oversight of that treatment, and would likely result in patients having a sense that they've been treated decently and fairly throughout that process." (Exhibit PP, Deposition of Appelbaum, T83:9-19).

204.   As a whole, New Jersey's treatment driven model for resolving patients' refusal of treatment appears to benefit from the experience of the field over the last 30 years and to offer a finely tuned approach to this situation." (Exhibit C at pp. 6-7).

205.   Documents concerning the Medication Review Hearings for September 2012 show that the new policy is working well.  Under the new policy, there are two elements that trigger the involuntary administration of medication: that the patient has been diagnosed with a mental illness, and that there is a serious likelihood of harm to self, others, or property without medication. (Exhibit EE, Deposition of Ciaston, T89:2-8). With regard to the term 'likelihood of serious harm' as contained in the new policy, "likelihood of serious harm is informed by clinical data ... it's informed by medical and clinical data and judgment and examination of the patient." (Exhibit EE, Deposition of Ciaston, T97:19-25, T98:2).

206.    There have been multiple hearings concerning the use of involuntary medication. The Policy has been invoked in cases where patients were a danger to others and where patients were a danger to themselves. Furthermore, in some instances, collaboration with the patient resulted in consent to medication, thereby terminating the process.

207.    The following are examples of the 34 medication review hearings, held in September, 2012, in instances where patients created a danger or were injurious to others.

- CJ - The patient is a paranoid schizophrenic. He was transferred to Ancora from Camden County Jail for evaluation of fitness to stand trial (IST), where he was awaiting disposition of charges that he had violated a restraining order and resisted arrest. CJ is aggressive, hostile, agitated, and very psychotic. While at Ancora, he has made threats to hurt the staff, and stated that if he is kept in the hospital, someone will be hurt. CJ has also approached staff with a clenched fist and on September 21, 2012 threw mattresses and made threats when he was stopped. The patient has extreme delusions, believing that spiders are coming out of his body, the staff stole his sperm, people put sperm in his food, and believing that he has no organs, because they were taken by aliens. Patient also has a history of weapons charges in the past, as noted in the Hearing Outcome Report. CJ attended his panel hearing on September 27, 2012. He advised the panel that "he is the son of the house of Israel, the resurrection, and Queen Mary. He was poisoned and lost his pancreas. Alien bodies kidnapped him. Sperm is put in his food. The staff are involved in this 'heinous crime' and he should be released from the hospital." The panel reviewed his medical records and labs and approved involuntary medication, as they found that CJ was markedly delusional, making threats and approaching staff with clenched fists, and throwing mattresses. CJ appealed the Medication Hearing Outcome, which decision the Medical Director upheld. The first dose of medication was given on September 29, 2012 and the first biweekly report, of October 11, 2012 notes that there is an improvement in CJ's delusional thought content and aggressive behavior. The patient has been calmer and more logical. (Exhibit QQ, September 2012 Hearing Documents regarding specific patients, JV251872-JV281884).

- MP - MP is a schizoaffective d/o bipolar type. He is disheveled and very disorganized, and has religious delusions. The patient is verbally abusive to staff, yells, and makes bizarre remarks (ex: "she is a reptilian creature and has to yield to me."). He is hostile and agitated. The patient has been in Ancora since 2007. The patient is on Krol status for a bank robbery and terroristic threats made in 2007 while delusional. Eighteen months ago, the patient attacked and severely injured a staff nurse, causing her to need Emergency Room treatment. MP has violent outbursts, including pushing chairs aggressively two weeks prior to the hearing, and punching walls one month before the hearing. MP has a history of consenting to medication, only to revoke the consent shortly thereafter, as he believes that he does not need "all

63

these chemicals," and that he is not mentally ill. MP believes that "giving me these poisons is against the Islamic, Freemasonic, and Rabbinical law." MP attended his hearing on September 20, 2012 and advised the panel that he is not mentally ill so giving him medications which make him feel tired is a form of torture, and torture is illegal. The panel upheld the decision to medicate, as it is likely that the patient will be less dangerous if his mental illness is treated with medication. MP appealed to the Medical Director, who upheld the panel's decision. The Biweekly Report Form completed on October 4, 2012 extends authorization for an additional 90 days and notes that all less restrictive interventions have been tried. The patient remains on the highest level of supervision, and remains grossly delusional and insightless. However, MP no longer paces up and down as he used to, is no longer intrusive, and his religious preoccupation has improved. It is also noted that the patient is agitated and dangerous without medication. (Exhibit QQ at JV251915-JV251929).

- AM-- AM admits to command auditory hallucinations (voices telling him to hurt people), has a long history of aggressive behavior, and engaged in several physical altercations most recently on August 26, 2012, when he punched a female patient. AM refused medication and was recommended for involuntary treatment and was given notice of the hearing via hand delivery on August 30, 2012 for a hearing scheduled for September 4, 2012. The Hearing Outcome Report upheld the decision to medicate, finding in the past that the patient has stated medication has helped with auditory commands and it would benefit him. The Initial Biweekly Report Form was completed on September 18, stating that the patient is less aggressive. (Exhibit QQ at JV252237-JV252254).

- MM- MM, a patient at Trenton Psych, is "extremely intrusive, loud, disorganized, delusional about being a ninja and other military personnel, and experiences auditory hallucinations  On September 13, 2012, the CSA and the CSR notified him of a Medication Review hearing on September 18, 2012. No hearing was held because the patient verbally consented to take medication on September 18, 2012. The informed consent form was signed on September 20, 2012. The next day, he revoked his consent. A new IMAR report was completed documenting that the patient was highly agitated, disorganized, and intrusive. According to his doctor (Feibusch, MD) MM asked him "Do you want to die?" and raised a clutched fist over his head, aiming at the doctor's face. After receiving notification of the hearing, MM presented evidence that he is a "5 star general/ Secret Service" and stated that he does not want the medication because it produces homicidal thoughts" in him. The Panel found that MM was still agitated and threatening staff, but when he is medicated, he is less threatening and assaultive. MM did not appeal the decision. (Exhibit QQ at JV252316-JV252344).

- LS - LS has had multiple hospitalizations since 1960 and has been non-compliant with medication at which time he decompensated, became agitated and went after his son-in-law with a knife and threatened to kill him. He also has a history of stabbing his wife. While at Greystone, the patient was threatening staff and was "sequestering knives" while residing in one of the cottages. Although he received the appropriate

notification, LS refused to attend the Panel Hearing on September 6, 2012. Medication was authorized as the patient has a long psychiatric history exhibiting behaviors that are a danger to others. The patient did not appeal the outcome of the hearing which occurred on September 6, 2012. The Initial Bi-Weekly Report indicates that no injection was necessary, as the patient took an oral medication, and an authorization was provided for a period of 90 days. The CSA spoke with the patient and he was taking his medication. The continuing report reflects that the patient has improved nicely, but without medication will likely have an exacerbation of paranoia and engage in physical altercations. (Exhibit QQ at JV252159-JV252180).

- LY- LY is unpredictable and violent. Outside of seclusion she is violent towards staff and peers, self-injurious, and has made several suicide attempts. It is noted that normal forms of counseling are ineffective, that the patient continues to "cheek" meds, and that staff recently found three pills hidden in bed on September 12, 2012. LY received notification of the hearing on September 13, 2012. She attended the hearing on September 18, 2012 and the panel approved the use of Haldol. LY appealed the decision to the Medical Director on September 19, 2012, contending that Haldol makes her "feel bad" and "out of it, and creates "bad thoughts of wanted to act out." The Medical Director upheld the panel decision, reasoning that the evidence demonstrated that the patient was in "clear" need of medication. The Initial Biweekly Report, completed on September 28, 2012, indicated that LY's condition was improving. (Exhibit QQ at JV251996-JV252010).

- SG- SG is paranoid and manic. He bangs on doors at night and keeps other patients awake. He makes threatening calls to his mother telling her to "drop dead" and "die." The patient is sexually inappropriate to female staff. On September 11, 2012, SG flipped over a table, breaking it. He assaulted his ICMS worker and police. On September 13, 2012, SG received notification of a medication hearing, which was held on September 18, 2012. SG did not appeal the panel decision permitting involuntary medication. (Exhibit QQ at JV251967-JV251980).

- WS- WS is delusional and easily agitated and assaulted two (2) peers on July 13, 2012 and July 20, 2012, and assaulted another peer on August 27, 2012. WS was notified of the hearing on September 20, 2012. He did not attend the September 25, 2012 hearing. WS did not appeal the panel's decision permitting involuntary medication. (Exhibit QQ at JV252052-JV252064).

208.    The following is an example of the medication review hearings, held in September,

2012, in instances where patients were a danger to themselves

- OJ - OJ's delusions include the belief that his daughter was his girlfriend, and the belief that he was a doctor and could treat his own medical conditions. He has a history of violence, and had attacked a peer at a group home with a knife. He also has a history of attempted suicide. In 2009, OJ hijacked a car and caused a serious motor

vehicle accident and severe injuries to himself. He has had multiple hospitalizations, including hospitalizations at Greystone, Ann Klein, and Ancora. Since his psychotropic medications were discontinued when he refused them on July 27, 2012, OJ decompensated, becoming paranoid, irritable, and refusing to shower or take necessary non-psychotropic medications. He also refused anti-hypertensive medication, leading to a high risk of medical complications including stroke. After being notified of the September 13, 2012 hearing, with CSR Anthony Haynes attending the hearing and Lolita Micu, RN testifying, the panel authorized the medication for OJ because of paranoia and neglect of self-care. Two subsequent bi-weekly reports were filed, concerning the medication, with OJ's paranoia and self-care improved. (Exhibit QQ at JV251855-JV251871).

209.    In some instances, patients signed consent forms after the process began, but before a final decision by the panel. In those instances, which are illustrated below, the process was stopped at the time of the consent.

- JL - Patient JL has schizoaffective disorder, bipolar type and is housed at Ancora. The IMAR form notes that the patient's consent has been inconsistent in the past, but he refused to allow modification of medications when recommended because of a dangerous escalation in his aggression, agitation, and hostility. The patient made verbal threats and comments to staff and peers. On the afternoon of September 12, 2012, JL got into a fight with a peer. Less restrictive interventions were implemented, including having JL placed in restraints and later placed in a separate single room to reduce stimulation. These attempts were to no avail. A hearing was scheduled for September 20, 2012. Prior to the hearing, and after speaking with the CSA and the CSR, JL signed an informed consent and the hearing did not occur. (Exhibit QQ at JV251945-JV251950).

- WR--WR continues to be threatening, assaultive and self-injurious. Moreover, past attempts to voluntarily medicate him have failed. In addition, on August 30, 2012, the patient was sent to segregation for attempting to assault/provoking multiple peers. WR received the notice of hearing on August 30, 2012. At the September 4, 2012 hearing, WR attended and advised that he voluntarily consented to the medication. Accordingly, the hearing was concluded without the panel reaching a decision. (Exhibit QQ at JV252026-JV252036).

210.    Further, Medical Directors, staff and Advocates are "good partners" in making the patients better, so that they can obtain a quicker recovery to allow the patients to be discharged into the community. (Exhibit U, Deposition of Haynes, T145:15-18; Exhibit J, Deposition of Eilers, T91:1-5). Thus, forced medication frequently restores the capacity to patients to make competent

decisions and often results in a more rapid return of the freedom to be discharged from involuntary hospitalization. (Exhibit T, Deposition of Piren, T242:23-T243:3).

211.    DRNJ Advocates also identify client concerns for the state facilities. (Exhibit K, Deposition of Lukens, T33:7-11).  Those advocates have stated that when they present complaints on behalf of the patients to the hospital or staff, whether to the CEO, Medical Director or Chief of Psychiatry, the State Hospitals address these concerns and take corrective action. (Exhibit K, Deposition of Lukens, T38:15-21).

212.    It is acknowledged that prior to the institution of the lawsuit, DRNJ did not set forth any complaints concerning systemic violations of A.B. 5.04 or with violations of the procedures. (Exhibit K, Deposition of Lukens, T55:22-T56:1).

213.    It is further acknowledged that DRNJ knew that the State was in the process of developing a new policy for the involuntary medication of patients prior to the Complaint being filed. (Exhibit EE, Deposition of Ciaston, T72:16-17; Exhibit V, Deposition transcript of John Luchkiw, dated March 15, 2012, T275:6-16; Exhibit K, Deposition of Lukens, T55:2-6, T57:3-7, T57:16-20.) Specifically, Ms. Ciaston has testified that Joseph Young, the Executive Director of DRNJ, was aware that the policy was in development more than three years ago.  (Exhibit EE, Deposition of Ciaston, T74:5-14). Ms. Ciaston further testified that the new policy was being drafted prior to 2007 and that DRNJ was advised of the same. (Exhibit EE, Deposition of Ciaston, T19:10-11, T80:14-22). Ms. Ciaston stated that she had discussed changing the non-emergent involuntary medication policy with Joseph Young during quarterly meetings with DRNJ. (Exhibit EE, Deposition of Ciaston, T73:25-T74:6).  Ms. Ciaston testified that no specific questions were asked by Mr. Young, nor did Mr. Young offer any substantive comments. (Exhibit EE, Deposition of Ciaston, T74:17-T75:4). Notwithstanding DRNJ's knowledge of revisions being made to the policy, DRNJ never made an

offer to participate or submit anything with regard to a revised policy. (Exhibit EE, Deposition of Ciaston, T287:15-20). Executive Director Young and DRNJ Advocate Lukens agree that DRNJ had knowledge concerning the policy revisions and that the organization made no efforts to participate in the formulation of the policy.  (Exhibit AA, Deposition of Young, T134:19-T135:5, T96:8-11, T132:9-15; Exhibit K, Deposition of Lukens, T59:17-20; See also Exhibit RR, Minutes of PAIMI Advisory Council, March 8, 2008).

214.    Plaintiff filed its complaint on August 3, 2010 and its Amended Complaint on March 22, 2012.  The only claims remaining in this case are the challenges regarding the constitutionality of the current non-emergent involuntary medication policy, the Americans with Disabilities Act (ADA) and the Rehabilitation Act.  (Exhibit B, Plaintiff's Responses to Defendants August 14, 2012 Demand for Admissions, Response no. 8b). Plaintiff seeks only prospective injunctive relief.  The following injunctive relief is sought by Plaintiff:

- Plaintiff's Complaint requests that the Court issue a permanent injunction requiring DHS to prohibit the non-emergency, involuntary administration of psychotropic medication in State psychiatric hospitals without court order, and only allow medication to be administered in the manner required by the Due Process and Equal Protection[10] Clauses of the United States Constitution. Plaintiff's amended complaint, Docket No. 95 at p. 77, ¶3).

- Plaintiff's Complaint requests that the Court issue a permanent injunction requiring Defendants to provide Plaintiff's constituents with the "appropriate professional judgment" when attending to the treatment of these individuals, as required by the Due Process and Equal Protection Clauses[11] of the United States Constitution, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the regulations promulgated thereto." Plaintiff's amended complaint, Docket No. 95 at p. 78, ¶5).

---

[10] The Equal Protection cause of action was dismissed on July 20, 2011.

[11] See fn. 14.

215.   Defendants now file this motion for summary judgment contending that the Policy is constitutional and comports with the American with Disabilities Act and the Rehabilitation Act. Further, Plaintiff's request for a permanent injunction must be denied.