HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903
(732)545-4717
Attorneys for Defendants, Jennifer Velez, in her official capacity as Commissioner, State of New
Jersey Department of Human Services and State of New Jersey

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK, NEW JERSEY

| | |
|---|---|
| Plaintiff, | Honorable Dickinson R. Debevoise, Sr., U.S.S.D.J |
| DISABILITY RIGHTS NEW JERSEY, INC., a New Jersey non-profit corporation | CIVIL ACTION NO. 2:10-cv-3950(DRD/PS) |
| vs. | |
| Defendants, | |
| JENNIFER VELEZ, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and POONAM ALAIGH, in her official capacity as Commissioner, State of New Jersey Department of Health and Senior Services and State of New Jersey | **ELECTRONICALLY FILED** |

**PROCEDURAL HISTORY AND BRIEF IN SUPPORT OF
DEFENDANT, JENNIFER VELEZ,
IN HER OFFICIAL CAPACITY AS COMMISSIONER, STATE
OF NEW JERSEY DEPARTMENT OF HUMAN SERVICES AND
STATE OF NEW JERSEY'S, MOTION FOR SUMMARY JUDGMENT**

HOAGLAND, LONGO, MORAN,
DUNST & DOUKAS, LLP
Attorneys for Defendant, Jennifer Velez, in her
official capacity as Commissioner, State of New
Jersey Department of Human Services and State of
New Jersey
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903
(732) 545-4717

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

LEGAL ARGUMENT

POINT I

DEFENDANT ENTITLED TO SUMMARY JUDGMENT AS
TO PLAINTIFF'S DUE PROCESS CLAIMS BECAUSE AB
5:04B AFFORDS THE SAME OR GREATER PROTECTIONS AS THE
PROCEDURES RULED CONSTITUTIONAL IN HARPER AND ITS PROGENY . . . . . . . . . 6

      A.    DEFENDANT'S POLICY, WHICH REQUIRES THAT A NON-
             CONSENTING PATIENT BE DANGEROUS WITHOUT MEDICATION
             TO BE MEDICATED, SATISFIES SUBSTANTIVE DUE PROCESS
             REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    DEFENDANT'S POLICY MEETS PROCEDURAL DUE PROCESS
             REQUIREMENTS BECAUSE IT AFFORDS PATIENTS THE SAME OR
             MORE PROCEDURAL PROTECTIONS THAN THOSE AFFORDED IN
             HARPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

POINT II

DEFENDANT, VELEZ, IS ENTITLED TO
SUMMARY JUDGMENT, AS TO PLAINTIFF'S
CONSTITUTIONAL CLAIM OF RIGHT OF ACCESS TO THE COURTS . . . . . . . . . . . . . . 28

POINT III

SUMMARY JUDGMENT SHOULD BE GRANTED TO
DEFENDANT, VELEZ, AS TO THE ADA AND REHABILITATION
CLAIMS AND TO DEFENDANT, STATE OF NEW JERSEY, AS TO
THE ADA CLAIM BECAUSE PLAINTIFF CANNOT PROVE A PRIMA
FACIE CASE AND BECAUSE PROVIDING THE RELIEF PLAINTIFF
SEEKS WOULD FUNDAMENTALLY ALTER DEFENDANTS' SERVICES . . . . . . . . . . . 31

     A.    Plaintiffs Cannot Demonstrate the Elements Required to Sustain a Cause of
           Action Under the ADA or Rehabilitation Act . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     B.    Any Further Changes To The Policy Would Cause a Fundamental Alteration
           to the Nature of the Services Provided by DHS and the State . . . . . . . . . . . . . . 36

POINT IV

PLAINTIFF CANNOT SATISFY THE
ELEMENTS REQUIRED FOR A PERMANENT INJUNCTION . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF AUTHORITIES

(Cases)

Addington v. Texas, 441 U.S. 418 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Alexander v. Choate, 469 U.S. 287 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 36

Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . 39

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Aruanno v. Glazmin, 2007 U.S. Dist. LEXIS 29646 (D.N.J. 2007) . . . . . . . . . . . . . . . . . . . . 12

Bell v Wolfish, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Benn v. Universal Health System, Inc., 371 F.3d 165 (3d. Cir. 2004) . . . . . . . . . . . . . . . . . . 12

Bounds v. Smith, 430 U.S. 817 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Bowers v. National Collegiate Athletic Ass'n, 118 F. Supp. 2d. 494 (D.N.J. 2000) . . . . . . . . 33

Brandt v. Monte, 626 F. Supp. 2d 469 (D.N.J. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Chao v. Rotehrmel, 327 F.3d 223 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Chisolm v. Manimon, 97 F. Supp. 2d 615 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Christopher v. Harbury, 536 U.S. 403 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Church & Dwight Co. v. S.C. Johnson & Son, 873 F. Supp. 893 (D.N.J. 1994) . . . . . . . . . . . 38

Coleman v. State Supreme Court, 697 F. Supp. 2d. 493 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . 10

County of Sacramento v. Lewis, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cruzan v. Director, Missouri Dept of Health, 487 U.S. 261 (1990) . . . . . . . . . . . . . . . . . . . . . 7

Doe v. County of Centre, PA, 242 F.3d 437 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Doe v. Div. of Youth & Family Servs., 148 F. Supp. 2d 462 (D.N.J. 2001) . . . . . . . . . . . . . . . 33

DRNJ v. Velez, 2011 U.S. Dist. LEXIS 79687 (D.N.J. 2011) . . . . . . . . . . . . . . . . . . . 12, 20, 28

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (U.S. 2006) . . . . . . . . . . . . . . . . . . . . . . 38-40

Florence v. Bd. of Chosen Freeholders of Burlington, 132 S. Ct. 1510 (2012) . . . . . . . . . . . . . 27

Frank's GMC Truck Center, Inc. v. General Motors Corp.,
847 F.2d 100 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Gallo v. Hamilton Twp. Police Dep't,
2006 U.S. Dist. LEXIS 48206 (D.N.J. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 34

Gooden v. Ricci, 2011 U.S. Dist. LEXIS 16608 (D.N.J. 2011)(Pisano, J.) . . . . . . . . . . 12, 20, 29

Hargrave v. Vermont, 340 F.3d 27 (2d. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Hersh v. Allen Prods. Co., 789 F.2d 230 (3rd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hodinka v. Delaware County, 759 F. Supp. 2d 603 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . 39

In re Diet Drugs, 369 F.3d 293 (3d. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Jurasek v. Utah State Hospital, 158 F.3d 506 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 9, 10, 28

Lang v. New York Life Ins. Co., 721 F.2d 118 (3rd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lewis v. Casey, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-30

Lowrance v. Achtyl, 20 F. 3d. 529 (2d. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mathews v. Eldridge, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 24, 26

Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743 (U.S. 2010) . . . . . . . . . . . . . . . . 39, 40

Morgan v. Rabun, 128 F.3d 694 (8th Cir. 1997) cert. den. 140 L. Ed. 2d. 947 (1998) . . . . . . . . 10

Noble v. Schmitt, 87 F.3d 157 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Oliver v. Fauver, 188 F.3d 177 (3d. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PA. v. Finley, 481 US 551 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Parham v. J.R., 442 U.S. 584 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23-25, 28

Paulone v. City of Fredrick, 787 F. Supp. 2d. 360 (D. Md. 2011) . . . . . . . . . . . . . . . . . . . . . . 33

Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.,
757 F. Supp. 2d 443 (D.N.J. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Procunier v. Martinez, 416 U.S. 396 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 28

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 18, 20

Sandin v. Conner, 515 U.S. 472 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA,
821 F. Supp. 2d 681 (D.N.J. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Scott v. Plante, 532 F.2d 939 (3d. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sell v. United States, 539 U.S. 166 (2003) . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 12, 18-20

Shields v. Zuccarini, 254 F.3d 476 (3d. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Southeastern Community College v. Davis, 442 U.S. 397 (1079) . . . . . . . . . . . . . . . . . 32

Tabron v. Grace, 6 F.3d 147 (3d. Cir. 1993), cert. den. 510 U.S. 1196 (1994) . . . . . . . . . . . . 28

Thomas v. Christie, 2010 U.S. Dist. LEXIS 109983 (October 15, 2010) . . . . . . . . . . . . . . . . 30

Thornburgh v. Abbott, 490 U.S. 401 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Toyota Motor Manuf. Ky. Inc. v. Williams, 534 U.S. 184 (2002) . . . . . . . . . . . . . . . . . . 33

U.S. Airways, Inc. v. Barnett, 535 U.S. 291 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

U.S. v. Grape, 549 F.3d 591 (3d. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13, 17

U.S. v. Loughner, 672 F.3d 731 (9th Cir. 2012) . . . . . . . . . . . . . . . . 6, 12-14, 18-20, 24, 27

U.S. v. Muhammad, 398 Fed. Appx. 848 (3d. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Evans, 404 F.3d 227 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Green, 532 F.3d 538 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Morrison, 415 F.3d 1180 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 12

United States v. White, 431 F.3d 431 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

<u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

<u>Vitek v. Jones</u>, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

<u>Washington v. Harper</u>, 494 U.S. 210 (1990) . . . . . . . . . . . . . . . . . . . 1, 6-24, 26, 27, 29

<u>White v. Napoleon</u>, 897 F.2d 103 (3d. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Yeskey v. Pennsylvania Dep't of Corrections</u>, 118 F.3d 168 (3d Cir. 1997) . . . . . . . . . . . 31, 33

<u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

### (Codes)

18 <u>U.S.C.</u> §3626(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

28 U.S.C. §1915(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 U.S.C. §705(20)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

29 U.S.C. §794(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

29 U.S.C. §794(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

42 U.S.C. §12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-34

### (Rules)

<u>Fed.R.Civ.P.</u> 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>L. Civ. R.</u> 56.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>N.J. Ct. R.</u> 2:2-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

New Jersey Court Rule 2:2-3(a)(2)(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

### (Statutes)

<u>N.J.S.A.</u> 30:4-24.2(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

(Other Authorities)

28 C.F.R. §35.102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

28 C.F.R. §35.130(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36

28 C.F.R. §35.130(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 C.F.R. §35.139(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

28 C.F.R. §549.46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 C.F.R. §549.46(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 28

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15, 16, 28

N.J. Const. Art. VI, Sec. 5, para. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## PRELIMINARY STATEMENT

In <u>Washington v. Harper</u>, 494 U.S. 210 (1990), the Supreme Court held that it was constitutionally permissible for a state to medicate an inmate after a three-person administrative panel found him to be dangerous because of mental illness. The Court explicitly dismissed the notion that due process required a judicial hearing or the assignment of legal counsel. Since this decision, the Supreme Court and various Circuit Courts of Appeals have continually held that, when medicating a confined individual with mental illness to alleviate dangerousness, a State may employ the administrative review detailed in Harper regardless of whether the individual has been convicted of a crime. No court has held that judicial hearings or assigned legal counsel are required in such circumstances, which is the relief Plaintiff seeks in this case.

AB 5:04B, Defendants' non-emergent involuntary medication policy, meets or exceeds the substantive and procedural due process protections outlined in Harper and its progeny. Like the policy at issue in Harper, AB 5:04B requires a showing that a non-consenting patient is dangerous without medication before medication can be considered. Further, the policy entitles the patient to an administrative hearing before a panel consisting of three non-treating professionals, one of whom is an independent psychiatrist who is not employed by the hospital. Therefore, AB 5:04B is constitutional and Defendants are entitled to summary judgment.

## PROCEDURAL HISTORY

1.       On August 3, 2010, Plaintiff Disability Rights of New Jersey ("DRNJ") filed a Complaint against Jennifer Velez, in her official capacity as Commissioner of the New Jersey

Department of Human Services ("DHS"), and Poonam Alaigh[1], the then Commissioner of the State of New Jersey Department of Health and Senior Services.[2] (Docket Entry No. 1)

2.      The Complaint challenges those provisions of Administrative Bulletin ("AB") 5:04 which addressed the non-emergent involuntary administration of psychotropic medication to involuntarily civilly committed patients refusing medication in the State psychiatric hospitals. The State hospitals are Ancora Psychiatric Hospital, Trenton Psychiatric Hospital, Hagedorn Psychiatric Hospital[3], Ann Klein Forensic Center, and Greystone Park Psychiatric Hospital. (See Plaintiff's First Amended Complaint, Docket Entry No. 95 at 80.)

3.      The Complaint alleged violations of the Due Process Clause of the Fourteenth Amendment (Count I); the Right of Access to the Courts (Count II); the Right to Counsel (Count III); the Equal Protection Clause of the Fourteenth Amendment (Count IV); the First Amendment (Count V); the Americans with Disabilities Act (ADA) (Count VI), and the Rehabilitation Act (Count VII). (See Docket Entry No. 95, Plaintiff's First Amended Complaint at 175-229.)

4.      On September 3, 2010, Defendant filed a Notice of Motion for a More Definite Statement, seeking the identities of eight constituent individuals identified by initials in the complaint, and to strike portions of the Complaint. (Docket Entry No. 14)

5.      Subsequent to the filing of this Notice of Motion, Plaintiff voluntarily provided the identities of individuals referenced in the Complaint. On September 20, 2010, Defendant withdrew the portion of their Motion seeking a more definite statement. (Docket Entry No. 16)

---

[1] Ms. Alaigh later resigned her position. The Court entered an Order on April 27, 2011 directing that Mary O'Dowd be substituted for Poonam Alaigh. (Docket Entry No. 29.)

[2] Plaintiff filed an Amended Complaint on March 27, 2012. References to paragraphs contained in the Complaint refer to the First Amended Complaint.

[3] Hagedorn Psychiatric Hospital was closed in June of 2012.

2

6.    On October 5, 2010, the Court denied Defendant's Notice of Motion to strike portions of the Complaint. (Docket Entry No. 20)

7.    On October 25, 2010, Defendant filed a Notice of Motion to Dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. (Docket Entry No. 21)

8.    On July 20, 2011, this Court granted the Notice of Motion to Dismiss in part, specifically dismissing the claims proffered against Mary O'Dowd, Commissioner of the New Jersey Department of Health and Senior Services in their entirety, and dismissing the Equal Protection claims with respect to Defendant Velez. (Docket Entry No. 40)

9.    On August 4, 2011, Defendant Velez filed her Answer. (Docket Entry No. 46)

10.    On August 25, 2011, Plaintiff filed a Notice of Motion to strike certain affirmative defenses raised by Defendant in her answer. (Docket Entry No. 50) The Court granted Plaintiff's Notice of Motion on September 23, 2011. (Docket Entry No. 57)

11.    On January 30, 2012, Plaintiff filed a Notice of Motion for leave to file a First Amended Complaint adding the State of New Jersey as a Defendant to the claims seeking prospective injunctive relief under the ADA and the Rehabilitation Act. (Docket Entry No. 78)

12.    On February 27, 2012, Defendant filed a Letter Brief in Opposition to the Notice for Motion to file a First Amended Complaint, arguing that amendment to the claims was futile and should be denied. Specifically, Defendant argued that the ADA claim contained in the proposed Amended Complaint had no merit because Plaintiff had failed to show that the State caused the harm. It was further argued that the Rehabilitation Act claim was similarly futile because the State had not waived sovereign immunity. (Docket Entry No. 82 at p. 3-4)

13.    On March 23, 2012, the Court granted Plaintiff's Motion to name the State as a Defendant as to Count VI for alleged violations of Title II of the Americans with Disabilities Act,

3

42 U.S.C. §12131, et seq., and denied the Motion to name the State as a Defendant as to Count VII

for alleged violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794. (Docket

Entry No. 93)

      14.     Plaintiff filed the first Amended Complaint on March 27, 2012. (Docket Entry No.

95).

      15.     Defendant filed an answer to the first Amended Complaint on April 23, 2012.

(Docket Entry No. 100)

      16.     On February 15, 2012, Defendant moved, pursuant to Fed. R. Civ. P. 60(b), to vacate

the Rennie Consent Order[4] so that she might implement procedures that conformed to the Supreme

Court's decision in Harper and this Court's decision on Defendant's Motion to Dismiss. (Docket

Entry No. 81).

      17.     On March 19, 2012, the Court entered an order vacating the Rennie Consent Order.

(Docket Entry No. 91)

      18.     The Hon. Patty Schwarz, U.S.M.J. entered a Pretrial Scheduling Order dated August

2, 2012, permitting the service of expert reports and requiring the filing of dispositive motions on

October 12, 2012.  (Docket Entry No. 111)

      19.     On September 25, 2012, Judge Schwarz entered an Order permitting Plaintiff an

extension of time within which to serve its expert report and extended the filing date for motions for

summary judgment to November 21, 2012. (Docket Entry No. 116)

---

    [4]  In Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983), the Court of Appeals ruled that New Jersey's procedures for medicating individuals without their consent in State psychiatric hospitals satisfied due process requirements. The District Court then entered the Rennie Consent Order on August 20, 1984. The Rennie Consent Order permanently enjoined the State to comply with these procedures, which were then memorialized in Administrative Bulletin 78-3, and at the time this Complaint was filed, were detailed in Administrative Bulletin 5:04.

20.     On November 16, 2012, Judge Schwarz entered an Order permitting the parties to file dispositive motions on November 28, 2012.  (Docket Entry No. 121)

21.     Defendants Jennifer Velez and the State of New Jersey now move for Summary Judgment.

## STATEMENT OF FACTS

Defendants incorporate by reference the statement of undisputed material facts being filed with this brief pursuant to L. Civ. R. 56.1(a).

## STANDARD OF REVIEW

The summary judgment procedure is designed to expedite the resolution of cases by dismissing factually insufficient claims and avoiding unwarranted consumption of public and private resources.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); See Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3rd Cir. 1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3rd Cir. 1983).  An issue is "genuine" only if the evidence proffered by the non-moving party is such that a reasonable fact finder could find for that party. Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).  Whether or not a fact is material will be defined by reference to substantive law. Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment – [f]actual disputes that are irrelevant or unnecessary will not be counted." Ibid.

Here, it is undisputed that Defendants have implemented a non-emergent involuntary medication policy that affords patients the same or more protections than have already been ruled constitutional by the Supreme Court and various Courts of Appeals. Therefore, there are no genuine

issues of material fact to be litigated, and Defendants are entitled to summary judgment as a matter of law.

## LEGAL ARGUMENT

## POINT I

### DEFENDANT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S DUE PROCESS CLAIMS BECAUSE AB 5:04B AFFORDS THE SAME OR GREATER PROTECTIONS AS THE PROCEDURES RULED CONSTITUTIONAL IN HARPER AND ITS PROGENY.

In Washington v. Harper, 494 U.S. 210 (1990), the Supreme Court found that a state may administer psychotropic medication to a prisoner when he is found to be dangerous because of mental illness by an administrative panel, which included a non-treating psychiatrist. The Court explicitly dismissed the notion that a judicial hearing was required. Subsequent cases have repeatedly confirmed that a state may medicate a confined individual, whether or not he has been convicted of a crime, to alleviate dangerousness after following Harper-type procedures. See e.g. Sell v. United States, 539 U.S. 166 (2003) and U.S. v. Loughner, 672 F.3d 731 (9th Cir. 2012).

A.B 5:04B, Defendants' non-emergent involuntary medication policy, is constitutional. The policy affords non-consenting patients substantive and procedural due process protections which mirror or exceed those procedures ruled permissible in Harper. A non-consenting patient may only be medicated when he is found to be dangerous because of mental illness without medication, and afforded an administrative hearing before a three-person panel chaired by an independent psychiatrist. Therefore, Defendants are entitled to summary judgment with regard to Plaintiff's due process claims.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law". U.S. Const. Amend. 14. The core

6

concept of due process is protection against arbitrary government action. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998). In this matter, DRNJ challenges the State's policy of involuntary medication of civilly committed patients on substantive and procedural due process grounds. As explained below, their allegations are without merit.

### A. DEFENDANT'S POLICY, WHICH REQUIRES THAT A NON-CONSENTING PATIENT BE DANGEROUS WITHOUT MEDICATION TO BE MEDICATED, SATISFIES SUBSTANTIVE DUE PROCESS REQUIREMENTS.

To state a valid claim for a violation of substantive due process, that being a deprivation of life, liberty or property, a plaintiff must show that the State exercised power "without any reasonable justification in the service of a legitimate governmental objective." Lewis, supra, 523 U.S. at 846. Substantive due process protects individuals from government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d. Cir. 1994). It does not protect "against government action that is incorrect or ill-advised" but against those circumstances in which "government action might be so arbitrary that it violates substantive due process regardless of the fairness of the procedures used." Id. Here, the substantive due process at issue concerns what factual circumstances must exist before the State may administer psychotropic drugs to a person against his will. See Harper, supra, 494 U.S. at 220. The Supreme Court has held that individuals in state custody enjoy protectable liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of psychotropic drugs. Cruzan v. Director, Missouri Dept of Health, 487 U.S. 261, 278 (1990); Youngberg v. Romeo, 457 U.S. 307, 316 (1982); Harper, supra, 494 U.S. at 221. However, the right to refuse medical treatment is limited. Harper, supra, 494 U.S. 210; White v. Napoleon, 897 F.2d 103 (3d. Cir. 1990).

In Harper, supra, 494 U.S. at 222, Harper argued that he had a liberty interest to refuse anti-psychotic drugs which the State could not override unless he was found to be incompetent, and that

7

if he was competent, he would agree to such treatment[5]. In rejecting plaintiff's argument, the Court

held that the State's involuntary medication policy, which allowed medication when the individual

was "found to be 1) mentally ill and 2) gravely disabled or dangerous," met the substantive standards

of the Due Process Clause.  Id. at 221.  It is noted that the policy at issue required "the State

establish, by a medical finding, that a mental disorder exist[ed] which [was] likely to cause harm if

not treated," and the fact that the medication must first be prescribed by a psychiatrist, and then

approved by a reviewing psychiatrist "ensured that the treatment in question [would] be ordered only

if it [was] in the prisoner's medical interests, given the legitimate needs of his institutional

confinement".  Id. at 222.

The Harper Court stressed the "legitimacy and importance of the governmental interest" at

issue, finding that "[t]he State has undertaken the obligation to provide prisoners with medical

treatment consistent not only with their own medical interests, but also with the needs of the

institution."  Id. at 225.  The Court observed that "[p]rison administrators have not only an interest

in ensuring the safety of prison staffs and administrative personnel, but also the duty to take

reasonable measures for the prisoner's own safety," and that "these concerns have added weight

when a penal institution [] is restricted to inmates with mental illnesses."  Ibid.  The Court further

noted that, "[w]here the inmate's mental disability is the root cause of the threat he poses to the

inmate population, the State's interest in decreasing the danger to others necessarily encompasses

an interest in providing him with medical treatment for his illness."  Id. at 225-26.  It concluded that

the challenged policy was a rational means of furthering the State's legitimate objectives.  Id. at 226.

---

[5]  Notably, like Harper, DRNJ incorrectly argues that legal incompetence, and not dangerousness, should be the substantive due process standard in this matter.  Plaintiff's Amended Complaint at page 79.

The rationale set forth in Harper applies with equal force to individuals committed to state psychiatric hospitals for several reasons. First, the safety and treatment concerns at correctional facilities are equally present at psychiatric hospitals. The majority of patients have been civilly committed by a court because they have a documented history of mental illness, are a danger to themselves or others, and have demonstrated the need for psychiatric treatment. Thus, the threat of violent and aggressive behaviors are present in the State hospitals. This proclivity for antisocial and often violent conduct is more frightening for its unpredictability and suddenness. Deposition testimony of Judge Killian, Dr. Fox and other Plaintiff's witnesses confirms that the use of psychotropic medication is often an essential component in the treatment of psychiatric patients to effectively manage dangerousness. Second, civil committees are not entitled to greater protections than prisoners in this context because involuntary medication is not a form of punishment, but rather a form of treatment. Jurasek v. Utah State Hospital, 158 F.3d 506, 511 (10th Cir. 1998). This conclusion is well-supported by the numerous court decisions which have held that pre-trial detainees, who have not been convicted of a crime, can be medicated under Harper, as explained below. Finally, to the extent Rennie, supra, 720 F.2d 266,[6] has been superseded, it has only been by Harper and its progeny, and only Harper-type procedures can be required in the civil commitment context.[7]

---

[6] "Notably, Rennie also required a finding of dangerousness before a non-consenting civil committee could be medicated." Id. at 269.

[7] In ruling on Defendants' motion to dismiss, this court held that Harper requires greater protections than those ruled constitutional in Rennie because civil committees may be afforded no fewer protections than prisoners. Defendants do not concede that Rennie has been overruled, but, notwithstanding, have implemented procedures that meet or exceed those found constitutional in Harper.

This conclusion is buttressed by the decisions of other Circuit Courts of Appeal which have addressed this issue. In Morgan v. Rabun, 128 F.3d 694 (8th Cir. 1997) cert. den. 140 L. Ed. 2d. 947 (1998), a patient alleged that his due process rights were violated when he was medicated without consent at a state psychiatric hospital. The court ruled that the Harper standard was applicable. Id. at 697. It found that "[t]he governmental interests in running a state mental hospital are similar in material aspects to that of running a prison [because] [a]dministrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety." Ibid. The court therefore concluded that, if the psychiatrist found that the patient was a danger to himself or others, the patient's substantive due process rights were not violated." Ibid.

Likewise, in Jurasek, supra, 158 F.3d at 511, the court held that "the standards established in Harper strike the appropriate balance ... between [the patient's] due process rights with the Hospital's interests in health and safety." The court noted that its reasoning was supported by the Supreme Court's application of Harper principles to pre-trial detainees who, like civil committees, had not been convicted of a crime. Ibid. It remarked that any argument that pre-trial detainees deserve greater protection than prisoners because they have not been convicted of a crime was implicitly rejected by the Supreme Court's application of Harper standards to a pretrial detainee in Riggins. Ibid.; see also Noble v. Schmitt, 87 F.3d 157 (6th Cir. 1996)("[A] state may administer involuntary medical treatment to an institutionalized [] patient if that patient poses a threat to himself or other patients."); Coleman v. State Supreme Court, 697 F. Supp. 2d. 493, 508 (S.D.N.Y. 2010).

In Riggins v. Nevada, 504 U.S. 127 (1992), the Supreme Court addressed the substantive due process requirements for medicating a non-consenting criminal defendant, but for the purpose of rendering him competent to stand trial rather than to alleviate his dangerousness. It held that a state may "justify medically appropriate, involuntary treatment with the drug by establishing that it could

not obtain an adjudication of [the defendant's] guilt or innocence by using less intrusive means."
Id. at 135.  In so doing, however, the Court remarked on its decision in Harper, noting that Nevada
would have satisfied due process if it had demonstrated "that treatment with antipsychotic
medication was medically appropriate and, considering less intrusive alternatives, essential for the
sake of Riggins' own safety or the safety of other." Ibid. (citing Harper, supra, at 225-26; Addington
v. Texas, 441 U.S. 418 (1979)).

Eleven years later, in Sell v. United States, 539 U.S. 166 (2003), the Supreme Court revisited
the Riggins issue, as to whether the forcible medication of an inmate solely for trial competence
purposes is constitutional.  While setting forth the standard to determine whether involuntary
administration of drugs is necessary to further significantly the particular government interest of
rendering the defendant competent to stand trial, the Court re-iterated the distinction between
medicating a criminal defendant to restore him to capacity and medicating him because he is
dangerous: "A court need not consider whether to allow forced medication [to restore competency],
if forced medication is warranted for a different purpose, such as the purposes set out in Harper
related to the individual's dangerousness, or purposes related to the individual's own interests where
refusal to take drugs puts his health gravely at risk." Id. at 181-82.

In U.S. v. Grape, 549 F. 3d. 591(3d. Cir. 2008), the Third Circuit Court of Appeals addressed
the dichotomy between medicating an individual to restore him to competency and medicating him
to alleviate dangerousness.  In that case, the District Court ordered that the defendant could be
medicated against his will to restore him to competency following a "Sell hearing." Id. at 592. After
the Court of Appeals stayed this order, the Medical Center medicated him without consent following
a non-judicial "Harper hearing" because he had physically and verbally assaulted a corrections
officer and was found to be dangerous. Id. at 597. Although it heard the appeal on Sell grounds, the

11

Court of Appeals recognized the propriety of medicating the defendant for dangerousness following an administrative hearing: "We do not reach consideration of the four-factor <u>Sell</u> test unless an inmate does not qualify for forcible medication under <u>Harper</u>, as determined at a <u>Harper</u> hearing generally held within the inmate's medical center." <u>Id.</u> at 599.

Every Circuit Court of Appeals that has addressed this issue has recognized the dichotomy between medicating a pre-trial detainee for <u>Sell</u> purposes and for <u>Harper</u> purposes. <u>United States v. Green</u>, 532 F.3d 538, 545 n.5 (6th Cir. 2008) ; <u>United States v. White</u>, 431 F.3d 431, 435 (5th Cir. 2005); <u>United States v. Morrison</u>, 415 F.3d 1180, 1186 (10th Cir. 2005) ; and <u>United States v. Evans</u>, 404 F.3d 227, 235 n.3 (4th Cir. 2005). Thus, it is now firmly-established that a pre-trial detainee or prisoner may be medicated against his will if it is established that the patient without medication, is a danger to himself, others or property. <u>Harper</u>, 494 U.S. at 227; <u>Aruanno v. Glazmin</u>, 2007 U.S. Dist. LEXIS 29646 at *18 (D.N.J. 2007); <u>Brandt v. Monte.</u> 626 F. Supp. 2d 469, 478 (D.N.J. 2009); Accord <u>U.S. v. Muhammad</u>, 398 Fed. Appx. 848 (3d. Cir. 2010); <u>Benn v. Universal Health System, Inc.</u>, 371 F.3d 165, 175 (3d. Cir. 2004)(Alito, J.); <u>Gooden v. Ricci</u>, 2011 U.S. Dist. LEXIS 16608 (D.N.J. 2011)(Pisano, J.). Once dangerousness has been established, the decision to forcibly administer medication must be within accepted professional standards and in the patient's medical interest, after the consideration of lesser intrusive alternatives. <u>Brandt</u>, <u>supra</u>, 626 F. Supp. 2d. at 489. See also <u>Riggins</u>, <u>supra</u>, 504 U.S. at 136. Accord, <u>DRNJ v. Velez</u>, 2011 U.S. Dist. LEXIS 79687 at *31-32 (D.N.J. 2011); <u>U.S. v. Loughner</u>, 672 F. 3d. 731 (9th Cir. 2012). Accordingly, the standard set forth in <u>Harper</u> applies in the context of civil commitment, where a patient, like a pre-trial detainee, is being medicated because he is dangerous. As set forth below, AB 5:04B satisfies this constitutional standard.

AB 5.04B mandates a substantive due process standard that mirrors the standard ruled constitutional in Harper and its progeny.  The Policy permits the involuntary administration of medication to a patient who does not or cannot provide consent to the medication, if without medication the patient presents a likelihood of serious harm within the reasonably foreseeable future as a result of mental illness. AB 5.04B defines "likelihood of serious harm or dangerousness" to the patient, to others or to property in virtually the same manner as the policy deemed constitutional in Harper.  Id. at 216.  Further, under the amended policy, the treating psychiatrist must evaluate the potential side effects and benefits of the medication, attempt to rule out less restrictive alternatives to the medication, and consult with the patient on these medication issues, before making a determination that as a result of the patient's mental illness, without psychotropic medication, the patient poses a likelihood of serious harm to self, others or property.  Once that determination is made, the psychiatrist and the patient, accompanied by a trained clinician, participate in an administrative hearing, chaired by an independent psychiatrist.  By requiring the participation of the psychiatrist and the clinician, AB 5:04B insures that the decision to administer medication is within accepted professional standards and in the patient's medical interests.

While some anti-psychotic medications have side effects, differences exist between first generation anti-psychotics, which were at issue in the Harper case, and second generation anti-psychotics, which are being used today.  Loughner, supra, 672 F.3d at 745, citing to Grape, supra, 549 F.3d at 591.  In Loughner, the Court found that the Supreme Court's concerns in Harper "have been lessened to some extent by significant pharmacological advances" as the second generation medications have a reduced risk of side effects.  Id. at 745, fn. 10.  Under AB 5:04B notwithstanding these pharmacological advances, the psychiatrist who makes the presenting determination that a patient is dangerous and that anti-psychotic medication is in the patient's medical interests is

13

required to evaluate and discuss with the patient the potential side effects of the intended medication. Further, as part of the protocol, testing and monitoring of potential side effects is a requirement of any proposed treatment plan.

AB 5:04B also requires psychiatrists to also consider the use of less restrictive alternatives. Less restrictive alternatives, such as psychotherapy, counseling in group and individual sessions, and other non-psychotropic medications are utilized daily in the State Hospitals.  However, less restrictive alternatives are not always practical and may only be temporary protective measures, not designed to "address the fundamental problem" or have a "direct effect on the core manifestations of the mental disease".  Loughner, supra, 672 F. 3d. at 737.

Thus, the State's involuntary medication policy not only affords the substantive due process protections announced in Harper, but also provides greater protection by incorporating the consideration of less restrictive alternatives.  Like Harper, the State policy is "an accommodation between a [patient's] liberty interest in avoiding the forced administration of psychotropic drugs and the State's interest in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself and others."  Id. at 236.  Use of psychotropic medication in accordance with the State policy is necessary to provide a safe environment for the patients and staff, as well as to meet the patient's treatment needs.  The involuntary administration of psychotropic medication to those patients who are a danger to themselves or others is reasonably related to the State's commitment to providing opportunity, support and treatment to individuals with mental illness in a safe environment.  The liberty interest, held by the patient, in avoiding unwanted administration of psychotropic medication is not absolute and yields to these legitimate State interests.  Accordingly, the State policy comports with the

14

substantive Due Process provisions of the United States Constitution and summary judgment is warranted.

### B. DEFENDANT'S POLICY MEETS PROCEDURAL DUE PROCESS REQUIREMENTS BECAUSE IT AFFORDS PATIENTS THE SAME OR MORE PROCEDURAL PROTECTIONS THAN THOSE AFFORDED IN HARPER

Procedural due process involves ascertaining "whether the State's nonjudicial mechanism used to determine the facts in a particular case are sufficient." Harper, supra, 494 U.S. at 220. The Harper Court noted that the procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case: "[t]he factors that guide us are well established. Under Mathews [v. Eldridge, 424 U.S. 319, 335 (1976)], we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." Id.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, supra, 424 U.S. at 333. However, "due process, unlike some legal results, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." Id. at 334. Further, "procedural due process rules are shaped by the risk of error inherent in the truth finding process as applied to the generality of cases, not the rare exceptions." Id. at 344. Here, DRNJ's challenge is a systemic one seeking prospective relief, not an attack on the past or individual determinations[8]. Thus, this Court is asked to decide whether the process designed

---

[8]  Plaintiff consistently represented that the alleged constitutional defects with the DHS systems are divorced from the facts of any individual claim and that the nature of the claims alleged and of the relief sought does not make the individual participation of each constituent patient indispensable to the proper resolution of the lawsuit.

to protect patients against the deprivation of their liberty interest is sufficient, or whether additional process is due. The Plaintiff contends that a judicial hearing and assignment of counsel is required under the Fourteenth Amendment. No court has agreed.

In Harper, the Supreme Court found that the procedures of a Washington Correctional Institution permitting the involuntary medication of an inmate were constitutional. Harper, supra, 494 U.S. at 222. Those procedures entitled a patient to an impartial hearing before a special committee consisting of a psychiatrist, psychologist and Associate Superintendent, none of whom were involved in the treatment decision, who would make the decision as to whether an inmate could be involuntarily medicated to treat a mental disorder that rendered him gravely disabled or posed a likelihood of serious harm to himself, others or property. Id. at 216. The inmate had a right to appeal to the Center's Superintendent. Id. The Harper Court further found that the Washington Correctional Institute's policy which provided for notice, the right to be present at the administrative hearing, the right to present and cross-examine witnesses, and the right to obtain judicial review of the hearing committee's decision by way of a personal restraint petition or petition for an extraordinary writ comported with the procedural requirements of the Due Process Clause. Id. at 233.

Notwithstanding the individual's substantial interest in avoiding forcible medication and the significant potential side effects of psychotropic medication, the Court concluded that an inmate's interests are adequately protected and perhaps better served by allowing the forcible medication decision to be made by medical professionals, rather than a judge, under fair procedural mechanisms. Id. at 231. In rejecting Plaintiff's contentions that only a judge can make a medication decision, the Court approvingly noted that the recommendation was made by a licensed psychiatrist and that the decisionmakers were not involved in the prisoner's daily care. Id. at 232-33. The Harper Court also

16

found that requiring judicial hearings would divert scarce prison resources from the care and treatment of mentally ill inmates. Id. at 232. The Supreme Court specifically found that the Due Process Clause does not require that an inmate be represented by counsel, or be afforded a hearing conducted according to the rules of evidence, or that a 'clear, cogent and convincing' standard of proof be applied. Id. at 235-36. In addition, the Court was persuaded by the policy provisions that the inmate had the right to be present at an adversarial hearing, the right to present and cross examine witnesses and the right to judicial review. Id. at 233.

In response to Harper, the Justice Department, Bureau of Prisons, established an administrative due process procedure for delivering involuntary psychiatric treatment and medication. 28 C.F.R. §549.46. The regulation provides for notice, 28 C.F.R. §549.46(a)(1), an administrative hearing, 28 C.F.R. §549.46(a), adjudication by a psychiatrist not involved in treating the inmate, 28 C.F.R. §549.46(a)(3), and the right to have a staff representative of the inmate present. 28 C.F.R. §549.46(a)(2). When a patient refuses psychotropic medication at a Federal Medical Center, in the absence of an emergency, the administrative hearing process is instituted. 28 C.F.R. §549.46(a). At that hearing, the patient will have a staff representative who can assist in questioning witnesses, and confer with the patient concerning the voluntary administration of an anti-psychotic drug. The psychiatrist conducting the hearing shall determine whether treatment or psychotropic medication is necessary because the inmate is dangerous to self or others, is gravely disabled, or is unable to function in the open population of the mental health referral center or a regular prison. See Grape, supra, 549 F.3d at 598-99. The hearing psychiatrist shall prepare a written report regarding the decision. 28 C.F.R. §549.46(a)(5). The facility must provide a copy of the hearing psychiatrist's report to the inmate and the inmate may appeal the decision to the administrator. 28 C.F.R. §549.46(a)(6).

In <u>U.S. v. Loughner</u>, 672 F.3d 731 (9th Cir. 2012), the Ninth Circuit considered the constitutionality of the Bureau of Prisons policy, specifically "whether there is any legal basis to medicate Loughner forcibly and whether Loughner has a legal right to a judicial hearing before involuntary medication." <u>Id</u>. at 743. While hospitalized, Loughner failed to take his psychotropic medication voluntarily, which resulted in three different <u>Harper</u> hearings to determine whether he should be forcibly medicated on the grounds of dangerousness. <u>Id.</u> at 736-40. A psychiatrist, employed by the facility but not involved in Loughner's treatment, was the sole panel member. <u>Id.</u> at 736. Loughner was assisted at the hearings by a licensed clinical social worker and Loughner's treating psychiatrists testified. <u>Id</u>. at 737, 739. The panel psychiatrist found that Loughner was a danger to others, set forth specific examples of this dangerousness, and reviewed other less intrusive alternatives to medication, before authorizing the involuntary medication. <u>Id</u>. at 737, 739-40. Two of Loughner's appeals were denied by the Associate Warden. <u>Id</u>. at 739. Loughner's counsel, arguing that Loughner's substantive and procedural due process rights were violated, filed successive emergency motions in the Federal District Court seeking to enjoin the involuntary medication orders. The District Court found that because Loughner was being medicated on dangerousness grounds, the substantive and procedural standards in <u>Harper</u>, not <u>Riggins</u> or <u>Sell</u> applied. <u>Id</u>. at 740.

Loughner contended that he was entitled to a judicial, not an administrative, determination of his dangerousness and need for medication. In rejecting that argument, the Ninth Circuit found that <u>Harper</u> "is clear that doctors, not lawyers and judges, should answer the question whether an inmate should be involuntarily medicated to abate his dangerousness and maintain prison safety." <u>Id</u>. at 738 (citations omitted). Thus, the "decision to medicate Mr. Loughner to prevent him from harming himself or others is best made by prison doctors following administrative procedures" and the only issue for the court was "whether the decision to medicate involuntarily was factually or

procedurally deficient". Id. at 740 (citations omitted). Loughner's argument that the subsequent Supreme Court decision of Sell mandated a judicial determination was also rejected, as the Ninth Circuit explained that the Sell Court's usage of the judiciary was as to determining competency at the time of trial, not the medication decision. Id. at 755.

Loughner also argued that there would be a "substantial added value" to having a judicial hearing with judicial decision makers, because the administrative review is not very probing and the medical expertise of the judge would be advanced by allowing the patient to present a defense. The Ninth Circuit rejected these arguments based upon the language in Harper. Id. at 755-56 (citing Harper, 494 U.S. at 233. )( "A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decision-makers.")). The Court also rejected the allegation that the prison doctors have a conflict of interest and are too subjective, based upon the language of Harper. Id. at 756. As to Loughner's argument that a judicial determination would not be unduly burdensome because a pretrial detainee is already subject to ongoing judicial proceedings, the Court also rejected that argument, contending that additional judicial determinations also have costs and, with this type of decision, would be an unnecessary intrusion into a medical judgment. Id. at 756 (citing Parham v. J.R., 442 U.S. 584, 606 (1979) (increase of judicial resources after Massachusetts began requiring state courts to review involuntary medication orders)). In short, the Court held that "the mere fact that a party can design a set of more expansive procedures does not entitle him to such process." Id.

Relying on the language in Harper, that "[i]t is less than crystal clear why lawyers must be available to identify possible errors in medical judgment, " Id. at 236, the Court considered Loughner's assertion that he was entitled to counsel at the hearing. Specifically, the Court found that although due process does not require representation by counsel or an adversarial hearing, it did

19

suggest that a representative must be qualified to make medical diagnoses or prescribe medication and "meet the inmate's treating psychiatrist on a level playing field." Loughner, supra, 672 F.3d at 763.

Similarly, the New Jersey Department of Corrections (NJDOC) policy concerning involuntary medication of inmates, which was reviewed by Dr. Eilers and Ms. Ciaston prior to the final implementation of the State Hospital Policy at issue, "mirrors, in all relevant respects, the policy upheld in Washington v. Harper. Indeed in some particulars, the NJDOC procedures go beyond that approved in Washington v. Harper. For example, under the NJDOC procedure, a prisoner is entitled to the assistance of a lay Staff Advisor." Gooden v. Ricci, 2011 U.S. Dist. LEXIS 16608 at *34. (D.N.J. 2011)(Pisano, J.)[9]; See also DRNJ v. Velez, 2011 U.S. Dist. LEXIS 79687 at *27 ("New Jersey statutory law mirrors the Harper standards").

In the present matter, prior to the initiation of the medication process, the Policy compels a psychiatrist to discuss with a patient the nature of the mental illness, the recommended medication for treatment of that condition, and the benefits and potential side effects of the recommended treatment. Less restrictive alternatives to the recommended medication must also be considered. Dangerousness of the patient, not competency, is the impetus for a Medication Review Hearing to be scheduled and conducted. Like Harper, procedural protections to the patient include being given written notification of the date, time and location of the hearing, the diagnosis, the rationale for the involuntary medication of psychotropic medication and that the patient is entitled to be present, call

---

[9] Judge Pisano did not rely upon either the Sell or Riggins decisions, in making his determination as to the procedural requirements of the NJDOC policy. Neither Riggins nor Sell discusses procedural due process, that is what procedures are required once it is determined that the state may constitutionality infringe upon Plaintiff's liberty interest. U.S. v. White, 431 F.3d 431, 434-35 (5th Cir. 2005).

witnesses and cross examine witnesses.  Unlike Harper's staff representative or Loughner's social worker, the State has provided for greater protections to the patient by mandating the use of and specifically hiring Advanced Practice Nurses as CSAs, who have the ability to knowledgeably and effectively advocate on behalf of the patient on medication issues, either with the treating psychiatrist directly or during the hearing.

The hearing in a State Hospital is chaired by an independent psychiatrist, clearly conversant with psychiatric illnesses, medication, and professional judgment, who is not employed in a State hospital, which exceeds the procedures in Harper which afforded only a non-treating psychiatrist who was employed by the correctional facility.  Further, the independent psychiatrist is the chair of a three person hearing panel, all of whom have no involvement in the patient's treatment and care. The patient is present during the entire hearing.  The panel, after listening to the evidence and reviewing the pertinent documents including the patient's medical records, discuss the evidence in a closed session, outside of the presence of all of the witnesses, treating psychiatrist and patient.  A decision is reached when the independent psychiatrist is in accord with the panel members.  That decision is timely communicated, in writing, to the patient and staff.  Like Harper, after the initial hearing, involuntary medication can continue only with periodic review, with a 14 day hearing to be held to determine whether further involuntary medication will be authorized, up to a period of 90 days. Id. at 216. The authorization for involuntary medication expires 90 days from the date the medication is first administered and any further involuntary medication would necessitate a new hearing.  Like Harper, the patient may appeal the decision, although in New Jersey, it is to the Hospital's Medical Director, who is also a psychiatrist.  Following this appeal, the patient may appeal to the Superior Court of New Jersey, Appellate Division, and then to the Supreme Court of New Jersey. See also N.J. Ct. R. 2:2-3.  It is Dr. Applebaum's opinion that this policy embraces the

treatment-driven model, focusing on patient's rights, in a reasonable manner that is likely to protect patients' interests, ensure that they receive appropriate treatment when indicated, and maximize their sense of fairness with the process.

Courts have held that a physician who serves as the neutral fact finder in an administrative hearing satisfies the Constitutional demand for due process. There is certainly "no reason to think judges...are better qualified than appropriate professionals in making [treatment] decisions."[10] Youngberg v. Romeo, 457 U.S. at 322-23. The Supreme Court in Harper explained that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge, "because an incompetent person's intentions are changeable and difficult to assess, a determination by a medical professional after frequent and ongoing clinical observation is preferable to a single judicial determination". Harper, supra, 494 U.S. at 232-33. It is without question that a patient's mental illness and its symptoms, as well as the effects that psychotropic medication will have, both beneficial and harmful on the patient, is strictly an analysis of the patient's medical condition.

> Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer. Surely, this is the case as to medical decisions, for neither judges nor administrative hearing officers are better

---

[10]   Specifically, the Youngberg Court, 457 U.S. at 322, found:

In determining what is 'reasonable'–in this and in any case presenting a claim for training by a state—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.... For these reasons, the decision, if made by a professional, is presumptively valid: liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

> qualified than psychiatrists to render psychiatric judgments....The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a [patient] is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the [patient] requires and that all sources of information that are traditionally relied on by physician and behavioral specialists should be consulted.

[Parham, supra, 442 U.S. at 607-608, citations omitted.]

Although Harper sanctioned the use of panel chairs who were employed by the institution, in this matter, the State retained two psychiatrists who are not employed in the State hospitals to serve as panel chairs. Due Process does not require that the pre-deprivation fact finder be a judicial officer, much less "come from outside the hospital administration". Vitek v. Jones, 445 U.S. 480. 495-96 (1980). Plaintiff's expert witness acknowledged that being paid by the State of Massachusetts does not influence his opinions, which are rendered in his professional capacity. Accordingly, the source of funding cannot be said to instill a bias on the part of the panel chairs. Another of Plaintiff's witnesses, Dr. Fox, confirms that as long as the administrative hearing officer was someone separate and apart from the institution, a fair hearing would be provided.

The Harper Court reiterated the reasoning in Parham that any fallibility in the judgment of medical professionals is not avoided by shifting the decision from those trained in medicine to one trained in law. Id. at 233.

> We do not accept the notion that the shortcomings of specialities can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial type hearing. Even after a hearing, the nonspecialist decisionmakers must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.

[Parham, supra, 442 U.S. at 610.]

23

In short, any risks of error involving a trained and qualified independent psychiatrist making medication decisions would not be ameliorated by a more formal, judicial type hearing. Parham, 442 U.S. at 607-13. The testimony of Judge Killian, Plaintiff's witness, is illustrative of this principle. Essentially, Judge Killian, who is not trained in medicine and has no formal training in psychotropic medications, leaves the medical aspects of a judicial hearing to the treating physician's clinical judgment. He also testified that he has upheld the decision to involuntarily medicate a patient in a "high percentage" of cases and further provided statistics that revealed that 96% of the time, the Connecticut Courts upheld the physician's decision to involuntarily medicate a patient. Dr. Applebaum also provided statistics and studies that establish that more than 90% of the time, Courts will agree with treating physicians concerning the need to medicate a patient. In Massachusetts, 98% of the Courts have agreed with treating physicians on medication issues. In contrast, psychiatrists on administrative hearing panels typically grant the request to medicate 60-80% of the time, as the panel psychiatrist is able to challenge the medical conclusions and recommendations of treatment. Thus, a legally-driven process involving a judicial hearing results in the infrequent rejection of a request to medicate and is not as effective as an administrative hearing in upholding patient refusals.

Further, an adversarial hearing, involving discovery rules and other procedural formalities, is not the "most effective method of decision making ." Mathews, supra, 424 U.S. at 349; Parham, supra, 442 U.S. at 608 n. 16. Due process does not require that the hearing be conducted in accordance with the rules of evidence or that a clear and convincing standard of proof is necessary. Harper, supra, 494 U.S. at 235; Accord Loughner, supra, 672 F.3d at 756. To impose an adversarial atmosphere on this process would undermine, or even prove counterproductive, to the State's beneficial goal of patient wellness. The State Hospitals have specifically designed the medication procedure to be clinical in nature, so that it is patient centric and determinations are made by those

24

clinicians who understand medications.  There is no doubt that an adversarial and potentially contentious hearing could subvert the "therapeutic alliance" which Plaintiff's witness, Dr. Fox, expressly contended is an important component in the patient/doctor relationship. A judicial hearing, rather than a clinically driven approach to a hearing, would take away from that treatment-based approach and that need for engagement which is so critical for a patient's eventual recovery and discharge from the hospital.

Another factor militating against a judicial hearing is the "[u]tilization of the time of psychiatrists, psychologists, and other behavioral specialists in preparing for and participating in hearings rather than performing the task for which their special training has fitted them.  Behavioral experts in courtrooms and hearings are of little help to patients." Parham, supra. 442 U.S. at 605-06. The time participants spend in preparing for and appearing in a judicial forum on successive occasions has led to approval and encouragement of the use of administrative proceedings, such as the State and Federal Court's alternative dispute resolution programs.  Further, the delay occasioned by discovery or availability of lawyers, experts and judges in judicial hearings is of specific concern. The patients to whom this process applies are dangerous to themselves or others.  According to Dr. Applebaum, the average delays in a judicial system are one (1) to four (4) months, during which a patient will not receive treatment and will display a higher rate of violence. Even the twenty-one days for a judicial determination, as hoped for by Mr. Young, is simply too long a period of time for the State to continue to satisfy it's obligation of safety to peers, staff and visitors and would further undermine the Hospital's ability to effectively treat the patient.  Here, the State has prioritized diagnosis and treatment of patients in a collaborative manner.

Obviously the cost of Plaintiff's suggested procedures would come from the public moneys the legislature intended for mental health care. Parham, supra, 442 U.S. at 606. "The Government's

interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a fact that must be weighed [and] may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." Mathews, supra, 424 U.S. at 347-48. The State of New Jersey bears the significant costs of funding the public mental health system. Statistics show that 10% of the hospital population refuse medication, either on occasion or consistently. For those patients who consistently refuse medication, panel review hearings are held every 90 days. For example, in September, 2012, there were 34 medication review hearings at the State hospitals, which hearings encompass patients who were on 90 day review and those who were participating in the hearing process for the first time. These records establish that any requirement to hold judicial hearings for the purposes of involuntary medication, which are not Constitutionally mandated, would be at substantial cost to the State.

The costs associated with a judicial hearing are multiplied by Plaintiff's desired retention of attorneys. Due Process does not require the appointment of counsel and is satisfied so long as a patient is provided with an independent and qualified advisor. Harper, supra, 494 U.S. at 236; Vitek v. Jones, supra, 445 U.S. at 500. Here, "the provision of an independent lay advisor who understands the psychiatric issues involved is sufficient protection." Harper, supra, 494 U.S. at 236. The Policy at issue requires that the patient be represented by a CSA who can knowledgeably discuss psychotropic medication. After meeting with the patient, the CSAs attend Medication Review Hearings and are able to voice the patient's concerns in a knowledgeable way, because of their education and experience. They also meet with the patients after the Hearing Panel decision is rendered and assist the patient with appeals of the decision. In addition, the patients are served by the CSRs who are qualified by experience and knowledge to advocate for the patient. The patients can articulate their concerns and are assisted by CSAs, who have the required "background necessary

to challenge either the diagnosis or the medical regimen prescribed by a psychiatrist." Loughner, supra, 672 F.3d at 762.

The Supreme Court has counseled against Courts involving themselves in the day to day operations of State facilities. Harper, 494 U.S. at 224, 235; Bell v Wolfish, 441 U.S. 520, 562 (1979); Sandin v. Conner, 515 U.S. 472,482 (1995); Florence v. Bd. of Chosen Freeholders of Burlington, 132 S. Ct. 1510, 1515, 1518 (2012). Substantial weight must be given to the State's interest in a fair and efficient administration of its Hospitals. The State's manner of examination, diagnosis and treatment of a mentally ill patient who is dangerous to himself, others or property, complies with due process and is entitled to deference.

In Harper, the United States Supreme Court had the benefit of an amicus brief filed by the National Association of Protection and Advocacy Systems (P&A), that patients have the right to judicial review prior to "long term forced drugging". (See Exhibit SS at 1). Much like DRNJ in the present matter, P & A contended that given the intrusiveness of neuroleptic drugs, as well as documented side effects, greater protections are warranted than the administrative process minimums as required by the United States Constitution. Like DRNJ, P & A also argued that the "medical staff of psychiatric institutions are not neutral decision makers and their interests directly conflict with the patient's interest in refusing neuroleptic drugs, as they take into account the needs of the patients, but also the concerns and interest of the nurses and ward staff". (See Exhibit SS at 9). Based upon these "conflicts" which prevent a physician from making a "balanced, independent decision", P & A argued that the Constitution requires a judicial hearing prior to involuntary medication. (See Exhibit SS at 10). These arguments were unavailing in Harper and should also be rejected by this Court.

27

Judicial hearings, with the attendant assignment of counsel, are not Constitutionally required nor do they contribute to the quality of a patient's care. Delays inherent in the system, costs of the proceedings, and the exceptional rate of judicial approval of requests to medicate result in patient commitment for longer periods of time in an increasing dangerous environment. The State policy, which is patient centric, comports with the procedural Due Process provisions of the United States Constitution and summary judgment is warranted.

### POINT II

### DEFENDANT, VELEZ, IS ENTITLED TO
### SUMMARY JUDGMENT, AS TO PLAINTIFF'S
### CONSTITUTIONAL CLAIM OF RIGHT OF ACCESS TO THE COURTS[11]

There is a fundamental Constitutional right of access to the courts for individuals to challenge the conditions of their confinement. U.S. Const. Art. 1, §9, cl. 2; Lewis v. Casey, 518 U.S. 343, 346 (1996); Procunier v. Martinez, 416 U.S. 396, 419 (1974) overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). As to civil actions, a prisoner may seek court intervention to address grievances, but there is no constitutional right in those cases to an attorney. See e.g. Parham v. Johnson, 126 F.3d 454, 456-57 (3d. Cir. 1997); Tabron v. Grace, 6 F.3d 147, 155-56 (3d. Cir. 1993), cert. den. 510 U.S. 1196 (1994); PA. v. Finley, 481 U.S. 551, 555 (1987)(citations

---

[11] In ruling on Defendants' motion to dismiss, this Court noted that Plaintiff's interpretation of Scott v. Plante, 532 F.2d 939 (3d. Cir. 1976) is that it suggests an independent First Amendment right to refuse medication. The Court indicated that "we are doubtful of Plaintiff's claim that the Rennie decision 'did not disturb' Scott", but permitted the claim to move forward given the Fourteenth Amendment claims. DRNJ. supra, 2011 U.S. Dist. LEXIS at *50 n. 14. Defendants agree with the Court and will rely upon the aforementioned discussion concerning the balancing of a patient's rights with the concerns of the institution. It is noted that the Jurasek Court found that even if the forcible administration of drugs triggers First Amendment rights, "such rights are subject to the same balancing test as liberty interests. Courts thus must determine whether the individual's rights are 'outweighed by demands of an organized society". Jurasek, supra, 158 F.3d at 510 n.1 Given that these arguments have been addressed above, this section will be directed solely to the claim of access to the Courts.

28

omitted.).   In those actions, it is within the discretion of the federal court whether to assign an

attorney to represent an indigent party. 28 U.S.C. §1915(d).

A prisoner may also bring to court direct criminal appeals and habeas petitions. Lewis, supra,

518 U.S. at 354, and a corollary requirement of access to the courts "requires prison authorities to

assist inmates in the preparing and filing of meaningful legal papers...". Bounds v. Smith, 430 U.S.

817, 828 (1977).  The United States Supreme Court, in Lewis, clarified the Bounds decision:

> Bounds did not establish a right to a law library or to legal assistance, The right that
> Bounds acknowledged was the already well established right of access to the
> courts....In other words, prison law libraries and legal assistance programs are not
> ends in themselves, but only the means for ensuring a reasonably adequate
> opportunity to present claimed violations of fundamental constitutional rights to the
> courts.

[Lewis, 518 U.S. at 350-51.]

The Lewis Court further clarified that this right of access to the courts was not the right to

discover grievances or to litigate effectively once in court. Lewis, 518 U.S. at 354. Thus, right of

access to the courts of those who are institutionalized is limited. Wolff v. McDonnell, 418 U.S. 539,

545 (1974).  "Impairment of any other litigating capacity is simply one of the incidental (and

perfectly constitutional) consequences of [commitment]." Lewis, supra, 518 U.S. at 355.

Here, AB 5.04B specifically provides for judicial review after a patient has been afforded

the opportunity to meaningfully challenge involuntary treatment decisions.  As discussed above, the

policy is not constitutionally infirm, as there is no constitutional requirement of a judicial hearing

or the assignment of legal counsel.  Like Washington State in Harper, "New Jersey law provides an

absolute right to appeal any action or decision of a State administrative agency to the Superior Court,

Appellate Division, both under the State Constitution, N.J. Const. Art. VI, Sec. 5, para. 4 and under

the New Jersey Court Rules, R. 2:2-3(a)(2)(2001)." Gooden, 2011 U.S. Dist. LEXIS at *35-36, n.14

(citations omitted). See also N.J.S.A. 30:4-24.2(g)(1) and ABw 5.04B.  In addition, a patient does have ready access to the courts, when his or her commitment status is reviewed by a Judge several times each year.  Thus, a patient is provided with the ability to meaningfully challenge any condition of their commitment.

Further, access to legal organizations is provided by the State Hospitals, the Public Defender, DRNJ attorneys, or a patient may contact their court appointed counsel, assigned during commitment hearings. Social workers, CSRs, and DRNJ advocates are available to guide the patients in finding an attorney or help the patient draft a letter to the court asking for the appointment of counsel.

A plaintiff alleging a violation of the right of access must show that State officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense, such as the inability to meet a filing deadline or present a claim.  Lewis, 518 U.S. at 348-51, 354-55; Oliver v. Fauver, 188 F.3d 177, 177-78 (3d. Cir. 1997).  Specifically:

> The Supreme Court has guided that, in order to state a claim of denial of access to courts, the inmate must assert fact(s) showing each of the following three elements: (1) a non-frivolous, underlying legal claim that the inmate was pursuing in connection with his criminal prosecution or his conditions of confinement; (2) the official acts successfully frustrating that particular litigation in the sense that (3) an actual loss of claim or defense resulted from such frustrative actions hence giving a basis to grant remedy that may be awarded, as recompense but that is not otherwise available in the frustrated suit.
>
> [Thomas v. Christie, 2010 U.S. Dist. LEXIS 109983 at 26 (October 15, 2010)(Debevoise, J.), citing Christopher v. Harbury, 536 U.S. 403 (2002).]

Here, there has been no claim of actual injury by any patient, much less have any facts been elicited in discovery concerning actual or imminent harm to a patient's right of access to the courts. Discovery has shown the opposite, that is that patients, while institutionalized, have instituted and maintained civil actions, either pro se or with Court appointed counsel. Accordingly, summary judgment is warranted.

## POINT III

**SUMMARY JUDGMENT SHOULD BE GRANTED TO
DEFENDANT, VELEZ, AS TO THE ADA AND REHABILITATION
CLAIMS AND TO DEFENDANT, STATE OF NEW JERSEY, AS TO
THE ADA CLAIM BECAUSE PLAINTIFF CANNOT PROVE A PRIMA
FACIE CASE AND BECAUSE PROVIDING THE RELIEF PLAINTIFF
SEEKS WOULD FUNDAMENTALLY ALTER DEFENDANTS' SERVICES**

DRNJ alleges that Defendant, Velez, violated the Americans with Disabilities Act ("ADA")

and the Rehabilitation Act, while the State of New Jersey violated the ADA.  Specifically, DRNJ

alleges that Defendants denied patients their right to participate in treatment, to refuse unwanted

psychotropic drugs, and to judicial hearings and legal counsel. (Plaintiff's amended complaint at ¶¶

222 and 229).

**A.     Plaintiffs Cannot Demonstrate the Elements Required to Sustain a Cause of Action
Under the ADA or Rehabilitation Act**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

U.S.C. §12132.  The ADA's coverage extends to "all services, programs, and activities provided or

made available by public entities," and is intended to "appl[y] to anything a public entity does."

Gallo v. Hamilton Twp. Police Dep't, 2006 U.S. Dist. LEXIS 48206 at *10 (D.N.J. 2006), citing

Yeskey v. Pennsylvania Dep't of Corrections, 118 F.3d 168, 171 (3d Cir. 1997) (quoting 28 C.F.R.

§35.102(a) and pt. 35, app. A, subpt. A at 456 (1996 version)).

A public entity is required to "make reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of disability,

unless the public entity can demonstrate that making the modifications would fundamentally alter

the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7).  However, "any requested

31

accommodation must first be deemed *necessary* to ensure an individual with disabilities has meaningful access to the benefit in question". Southeastern Community College v. Davis, 442 U.S. 397, 410 (1079). In other words, "a government entity is not required to provide every requested accommodation" or preference, only those that are necessary to provide meaningful access to the benefits. Id.; Alexander v. Choate, 469 U.S. 287, 300 n. 19 (1985); Accord, U.S. Airways, Inc. v. Barnett, 535 U.S. 291 (2002). Additionally, "a public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. §35.130(h).

"[T]o state a claim under [Title II of the] ADA, a plaintiff must demonstrate that: (1) she is a qualified individual with a disability; (2) she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of her disability." Gallo, 2006 U.S. Dist. LEXIS at *11; See also 42 U.S.C. §12132.

Similarly, §504 of the Rehabilitation Act provides, in pertinent part, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." 29 U.S.C. §794(a). The Rehabilitation Act defines an 'individual with a disability' as a person that "has a physical or mental impairment, which substantially limits one or more of such person's major life activities; has a record of such an impairment; or is regarded as having such an impairment." 29 U.S.C. §705(20)(B). Furthermore, 'program or activity' includes "all of the operations of a department, agency, special

purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." 29 U.S.C. §794(b)(1)(A)

In order to state a claim under the Rehabilitation Act, the plaintiffs must allege that they are disabled, that they were 'otherwise qualified' for the benefit sought or for participation in the program, that they were excluded from participation in, denied the benefit of, or subject to discrimination 'solely by reason of . . . their disability;' and that the 'program or activity receives federal financial assistance.' Doe v. Div. of Youth & Family Servs., 148 F. Supp. 2d 462, 490 (D.N.J. 2001); Bowers v. National Collegiate Athletic Ass'n, 118 F. Supp. 2d. 494, 525 (D.N.J. 2000) (quoting 29 U.S.C. §794(a)).

While both statutes are interpreted similarly, Doe, supra, 148 F. Supp. 2d at 490; See also Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Yeskey, supra, 118 F.3d at 170, and can be analyzed together, Toyota Motor Manuf. Ky. Inc. v. Williams, 534 U.S. 184, 193-94 (2002); 28 C.F.R. §35.102(a), there are some differences. "While both Title II of the ADA and §504 of the Rehabilitation Act proscribe discrimination on account of disability by public entities, the Rehabilitation Act applies only to entities that receive federal financial assistance, while the ADA applies to all public entities whether they receive federal funds or not." Doe, supra, 148 F. Supp. 2d at 490; See also Yeskey, supra, 118 F.3d at 170. Further, the causation requirements are different, in that the "ADA requires that plaintiff prove discrimination 'by reason of' a disability, while the Rehabilitation Act requires a showing of discrimination 'solely by reason of' a disability." Paulone v. City of Fredrick, 787 F. Supp. 2d. 360, 370 (D. Md. 2011), citing 42 U.S.C. §12132 and 29 U.S.C. §794(a).   Specific to this matter, there is a third difference between Plaintiff's ADA and Rehabilitation Act claims, that is, that the Court has ruled that the State and Velez are subject to the requirements of the ADA, but the Rehabilitation Act claim is only proffered against Velez.

33

Here, Plaintiff cannot demonstrate the elements required to state a claim under Title II of the ADA or §504 of the Rehabilitation Act. To state a prima facie case under the ADA or Rehabilitation Act, Plaintiff must demonstrate, in part, that the patients were "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity." Gallo, supra, 2006 U.S. Dist. LEXIS at *11; See also 42 U.S.C. §12132, Hargrave v. Vermont, 340 F.3d 27, 34-5 (2d. Cir. 2003). Plaintiff's constituents do not seek access to the State's "services, programs, or activities," but instead seek to assert a right to refuse certain medical treatment under the ADA and Rehabilitation Act. Neither the text of the ADA or Rehabilitation Act, nor any case law interpreting these laws, supports Plaintiff's novel argument that the right to refuse treatment is somehow a service, program or activity. Therefore, Plaintiff has not presented colorable ADA or Rehabilitation Act claims.

Moreover, even if the right to refuse treatment can be cast in ADA terms, the State's treatment-based policy encourages, and does not deny, the participation of patients in their treatment plans. The policy affords refusing patients the opportunity to state their objections to medication during the discussions with the psychiatrist prior to the initiation of the administrative review and to reiterate their concerns during the Medication Review Hearing, chaired by an independent psychiatrist. A patient, with assistance from the CSA, a clinician versed in medication issues, can question witnesses or documents, or present their own witnesses or documents. This process offers patients a "voice", or a meaningful opportunity to participate in the treatment offered by the State Hospitals.

Further, in providing administrative rather than judicial hearings to patients, Defendants are not discriminating against patients because of their mental illness. Rather, the differential treatment

34

is necessary due to the fundamental distinctions between psychiatric illness and other forms of illness, as well as the nature of psychiatric commitment in State hospitals.

Psychiatric illness differs in nature from medical illnesses. Due to the nature of their illness, many psychiatric patients are unable, in fact, to acknowledge or recognize the fact that they are mentally ill. As such, patients often do not believe that they are in need of treatment and will not agree to take medication, even when it is necessary. Moreover, unlike the treatment of many other medical conditions, treatment of psychiatric conditions cannot, in most cases, prove successful without the use of psychotropic medications. It is acknowledged, by Plaintiff's witnesses, Judge Killian and Dr. Fox, as well as defense witnesses, Dr. Applebaum and Dr. Eilers, that for psychiatric conditions, psychotropic medication is an essential component of successful treatment and represents the standard of care. Essentially, medication enhances a patient's ability to function autonomously, to regain an increased ability to care for themselves, to participate in other activities, and to control their own behavior. Hence, psychotropic medications allow large numbers of patients, who would otherwise have spent their lives in state hospitals, to live in the community. Without the use of these medications, it would be impossible to properly and fully treat patients and fulfill the State's obligation to provide treatment for involuntarily committed psychiatric patients.

Additionally, and as acknowledged by DRNJ Advocates Parsio and Lukens, the State has a significant interest in maintaining a safe environment in its hospitals for the patients themselves, other patients, staff, and the public. Prolonged periods during which patients requiring psychotropic medication are left unmedicated account for higher incidences of violence and other disruptive behaviors. For those patients who are dangerous to themselves, others or property, the Policy requires an administrative hearing, after affording the patient the full panoply of due process protections, in a shorter period of time than any judicial hearing could be accomplished. The

shortened period of time for a decision to be made concerning medication is in the best medical interests of the patients as well as enabling the State to effectively and safely meet its obligations. Thus, the differential treatment does not constitute a denial of benefits by reason of disability.

Finally, there is a specific ADA exception to the public entity's requirement "to permit individuals to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. §35.139(a). This exception, similar to the Policy language of dangerousness, requires an individualized assessment, based on reasonable medical judgment, to ascertain the nature of the risk and the potential of injury to the person or others. Thus, the individuals in question are excluded from qualified status under the ADA and §504.

**B.      Any Further Changes To The Policy Would Cause a Fundamental Alteration to the Nature of the Services Provided by DHS and the State**

In the alternative, although Defendants take the position that Plaintiff cannot set forth a prima facie case, the imposition of the ADA and the Rehabilitation Act is qualified by the reasonable modifications and fundamental alteration clauses. In short, a public entity is not required to make reasonable modifications in its policies, if it can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. §35.130(b)(7).

In making modifications, public entities "are not required to go beyond what is reasonable. Accommodation is not reasonable if it either imposes undue financial and administrative burdens on a public entity, or requires a fundamental alteration in the nature of the program." Chisolm v. Manimon, 97 F. Supp. 2d 615, 623 (D.N.J. 2000). "It should be obvious that administrative costs in implementing [a judicial forum and appointment of counsel] would be well beyond the accommodations" required under the ADA and §504. Choate, 469 U.S. at 308.

36

The current policy provides for patient participation in treatment, which minimizes the adverse outcomes associated with refusal of treatment while protecting patients' interests. Plaintiff's demanded modifications, which are unnecessary in this context, would impose undue financial and administrative burdens on the State and DHS. Additionally, systems utilizing judicial hearings have been shown through statistical data and studies to be a less efficient and effective approach to dealing with patient refusal of medication.[12]   Rights-driven models, such as models utilizing judicial hearings, have been shown to be costly to patients, the mental health system, and the courts. A judicial hearings system would greatly burden the courts and require substantial amounts of clinician time, personnel time, legal time for representation of the State and the patients, and court time. Additionally, judicial hearings would lead to very significant delays prior to a hearing, and prolonged hospitalizations for patients. In addition to these negative effects, judicial hearings systems have not been shown to provide greater benefits to patients than treatment-driven clinical models. Systems utilizing judicial hearings tend to result in the approval of a vast majority of requests for override of refusal, while clinical-administrative review procedures often result in significantly lower rates of approval of involuntary treatment.

In addition to administrative and financial burdens and delays, granting involuntarily committed patients the right to judicial hearings would fundamentally alter the nature of the treatment programs in State psychiatric hospitals. As discussed above, the State Hospitals are committed to a patient centric model, creating a therapeutic alliance. A judicial hearings process would adversarialize the treatment relationship, thereby damaging the collaborative physician-patient relationship.

---

[12] Dr. Appelbaum provides a detailed analysis of the benefits and drawbacks of a treatment-driven model as opposed to a "rights-driven" judicial model.

The very nature and purpose of the State and DHS's program – to treat psychiatric patients and ensure their safety and well-being, as well as those of the public, staff, and other patients – would be undermined and altered by Plaintiff's requested modifications. The purpose of involuntary commitment is for patients to receive necessary treatment. As discussed, psychotropic medication is an essential component of treatment for most psychiatric patients. Treatment is often unsuccessful without it. The modifications proposed by the Plaintiff would impede the State Hospitals' responsibility to provide complete and appropriate treatment to those individuals involuntarily committed to the State psychiatric hospitals, creating a potentially dangerous environment for staff and patients if individuals cannot be medicated efficiently and quickly.

In sum, Plaintiff cannot set forth a prima facie case for violations of the ADA and Rehabilitation Act. Further, the modifications that Plaintiff demands are not reasonable and would fundamentally alter the nature of the services and programs provided by DHS and the State to involuntarily committed psychiatric patients.

## POINT IV

### PLAINTIFF CANNOT SATISFY THE
### ELEMENTS REQUIRED FOR A PERMANENT INJUNCTION

A "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and such discretion must be exercised consistent with traditional principles of equity." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394 (U.S. 2006); Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA, 821 F. Supp. 2d 681, 693 (D.N.J. 2011). The 'grant of a permanent injunction is an "extraordinary remedy, which should be granted only in limited circumstances."' Church & Dwight Co. v. S.C. Johnson & Son, 873 F. Supp. 893 (D.N.J.

1994) (citing Frank's GMC Truck Center. Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir.

1988)).

The Supreme Court has articulated a four pronged test for use in obtaining a permanent

injunction. Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (U.S. 2010). This test

begins with the presumption that the analysis is being applied to a prevailing Plaintiff. That is, only

a Plaintiff who has achieved actual success on the merits is entitled to a permanent injunction. Port

Drivers Fed'n 18. Inc. v. All Saints Express. Inc., 757 F. Supp. 2d 443, 460 (D.N.J. 2010); See also

Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987); Univ. of Texas v.

Camenisch, 451 U.S. 390, 392 (1981).  A successful Plaintiff must demonstrate that: (1) he or she

has suffered an irreparable injury[13]; (2) remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) considering the balance of hardships between the

Plaintiff and Defendant, a remedy in equity is warranted, and (4) the public interest would not be

disserved by a permanent injunction. *See* Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. at 2747;

Port Drivers Fed'n 18. Inc. 757 F. Supp. 2d at 460; eBay Inc. v. MercExchange, 547 U.S. at 391.  An

injunction should issue *only* if each prong of the traditional four-factor test is satisfied.  Monsanto

Co. v. Geertson Seed Farms, 130 S. Ct. at 2747, (citing eBay Inc. v. MercExchange, 547 U.S. 388

(U.S. 2006)).  The fact that there has been some form of violation or injury does not in itself create

the presumption that injunctive relief should be granted. See Monsanto Co. v. Geertson Seed Farms,

130 S. Ct. at 2748, ("The existence of a National Environmental Policy Act violation does not create

---

[13]   There has been conflict in the Third Circuit as to the requirements for granting a
permanent injunction. The Supreme Court has resolved this question, making it clear that a showing
of irreparable harm is required.  Hodinka v. Delaware County, 759 F. Supp. 2d 603, 611-612, n. 4
(E.D. Pa. 2010); See also Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2758 (U.S. 2010);
eBay Inc. v. MercExchange, 547 U.S. 388, 391 (2006); and Chao v. Rotehrmel, 327 F.3d 223, 228
(3d Cir. 2003).

a presumption that injunctive relief is available and should be granted absent unusual circumstances."). If granted, the injunction should be no broader than that necessary to correct the violation. Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc., 757 F. Supp. 2d 443, 460 (D.N.J. 2010). See also In re Diet Drugs, 369 F.3d 293, 307 (3d. Cir. 2004) ("Any injunction a Court issues must be commensurate with the wrong it is crafted to remedy."); Shields v. Zuccarini, 254 F.3d 476 (3d. Cir. 2001); 18 U.S.C. §3626(a)(1)(A).

The burden of proof lies with the movant, who must demonstrate that all four factors favor permanent relief. See eBay Inc. v. MercExchange, 547 U.S. at 39; Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. at 2756 (U.S. 2010). In this instance, Plaintiff cannot establish the threshold element that it would achieve success on the merits, that is that judicial hearings and appointment of counsel is required by the Constitution, the ADA or the Rehabilitation Act, before a State Hospital may involuntarily medicate civilly committed patients. As demonstrated, Defendants have implemented procedures that mirror or exceed those deemed constitutional by the Supreme Court. The new Policy was implemented on June 4, 2012. At the time of implementation, the CSAs had been hired, the independent panel psychiatrists retained, and all staff had been trained. Since then, multiple medication review hearings have been conducted in accordance with the Policy. For example, in September, 2012, there were 34 medication review hearings at the State hospitals. Further, Plaintiff cannot establish the element of irreparable injury, as there has been no discovery provided establishing immediate irreparable injury to the patients participating in the administrative hearings outlined by the Policy. Any allegation of a substantial or irreparable injury at this juncture would be speculative, at best.

Second, any isolated issue which may arise could be remedied by appeal or by the filing of suit. To require a judicial hearing prior to the administration of involuntary medication, as explained

40

above, would substantially alter the clinical alliance necessary for treatment and release, mandate extended delays and costs, and increase the incidents of violence.  Given the high rate of approval of medication requests, a judicial system does not provide a greater benefit to patients.

Third, an involuntarily committed patient's liberty interest in avoiding the unwanted administration of psychotropic medication is not absolute and must yield to compelling State interests, such as the treatment of the patient's mental health and the significant interests of maintaining a safe environment and returning patients to the community at large.  Any prior alleged constitutional violations are not likely to recur, given the content, the detailed procedures, and plentiful safeguards of patient's rights encompassed in the new policy.  A patient's right of refusal of medication is not overruled absent the likelihood of danger and adherence to the detailed policy procedures, which conform with requirements of due process.

Finally, it is in the public interest to provide custody, care and treatment to those persons who have been involuntarily committed as a Court has already determined that the individual's mental illness resulted in the patient being dangerous to self or others.  To grant Plaintiff's request for a permanent injunction would interfere with the State's ability to provide timely and effective treatment and medication to those patients who, while committed, have displayed dangerous behavior to themselves, others or property.  As such, Plaintiff's request for injunctive relief should be denied.

## **CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that the Motion for Summary Judgment on behalf of Defendant, Jennifer Velez, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and the State of New Jersey, be granted.

Respectfully submitted,

HOAGLAND, LONGO, MORAN,
DUNST & DOUKAS, LLP
Attorneys for Defendant, Jennifer Velez, in her
official capacity as Commissioner, State of New
Jersey Department of Human Services and State of
New Jersey

By: _____
Susan K. O'Connor

Dated:  November 27, 2012

42