

CB-LIGHT-1

# EXHIBIT A

**HOAGLAND LONGO MORAN, DUNST & DOUKAS, LLP**

ATTORNEYS at LAW

40 Paterson Street
New Brunswick, NJ 08901
Tel: (732) 545-4717  Fax: (732) 545-4579
www.hoaglandlongo.com

Susan K. O'Connor
Partner
so'connor@hoaglandlongo.com

June 7, 2012

**BY E-MAIL AND LAWYERS' SERVICE**
Melody Wells, Esq.
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022-4611

**BY E-MAIL AND LAWYERS' SERVICE**
William Emmett Dwyer, Esq.
Disability Rights New Jersey, Inc.
210 South Broad Street, 3rd Floor
Trenton, NJ 08608

RE:    **Disability Rights New Jersey (DRNJ) v. Jennifer Velez**
    Docket No.:    2:10-cv-3950(DRD/MAS)

Dear Ms. Wells and Mr. Dwyer:

We are in receipt of your correspondence dated May 31, 2012, with respect to the production of documents related to Defendants' new involuntary medication policy. Enclosed please find the following documents pertaining to the policy which has an effective date of June 4, 2012.

- Division of Mental Health and Addiction Services Administrative Bulletin Transmittal Memorandum dated June 1, 2012 with an effective date of June 4, 2012, Bates Stamped JV 251,476 through JV 251,477;

- Administrative Bulletin 5:04 entitled: Medication Informed Consent Policy along with Psychotropic Medication Consent Form annexed thereto, Bates Stamped JV 251,534 through JV 251,543;

- Administrative Bulletin 5:04A entitled: The emergency exception to the necessity to obtain informed consent to treatment with psychotropic medications, along with Psychotropic Medication Emergency Certification Form annexed thereto, Bates Stamped JV 251,478 through JV 251,490;

- Administrative Bulletin 5:04B entitled: The Non-Emergent Administration of Psychotropic Medication to Non-Consenting Involuntary Patients (Non-Emergent Involuntary Medication Procedure) along with the following forms annexed thereto: Involuntary Medication Administration Report (IMAR), Notice of Hearing to Consider Recommendation of Involuntary Non-Emergency Administration of Psychotropic Medication, Notice of Assignment to Pool for Medication Review Hearings, Hearing Outcome Report Involuntary Medication Administration, Involuntary Medication Procedure Bi-Weekly Report Form, Adjusted Treatment Plan after Rejection of Involuntary Medication Authorization by Panel Treatment Team Notes, and Involuntary Medication Procedure Notice of Appeal, Bates Stamped JV 251,491 through JV 251,515

Further, enclosed herewith, please find the following job postings:

- Job Opportunity #048-12, Title: Advanced Practice Nurse, Function Title: Client Service Advocate Coordinator, Division of Mental Health & Addiction Services, Bates Stamped JV 251,516 through JV 251,517;

Page 2

- Job Opportunity #039-12, Title: Advanced Practice Nurse, Ann Klein Forensic Center, Bates Stamped JV 251,518 through JV 251,519;
- Vacancy Notice, Greystone Park Psychiatric Hospital, Title: Advanced Practice Nurse, Functional Title: Client Services Advocate, Bates Stamped JV 251,520 through JV 251,521;
- Trenton Psychiatric Hospital Promotional Job Opportunity Posting, Title: Advanced Practice Nurse (CSC) "Client Services Advocate, Bates Stamped JV 251,522 through JV 251,523;
- Reassignments, Title: Advanced Practice Nurse, Client Services Advocate, as set forth in the Job Postings for Ancora Psychiatric Hospital, Bates Stamped JV 251,533.

With respect to your request for Training Material, please be advised that a PowerPoint presentation Bates Stamped JV251,249 through JV 251,269 was previously served. Further, the following is provided Bates Stamped JV251,524 through JV251,532:

- Training Script and sample completed Involuntary Medication Administration Report (IMAR) which was utilized during training sessions.

With respect to your request concerning a list of the Client Service Representative responsibilities, the Plaintiff is directed to the Civil Service Job Specification which was previously produced and Bates Stamped JV 35,248 through JV 35,250. Further, the Plaintiff is also directed to the new policy referenced above which addresses this request. With respect to your request concerning e-mails announcing meetings of the group drafting the new policy, any and all such e-mails have either been produced or referenced in the Privilege Log which was previously served. With respect to your request concerning Service Contracts entered into by and between independent psychiatrists and the Division of Mental Health Services, the contracts specifying the scope of the work to be performed is in development. The Defendants do advise, however, that two (2) physicians have been retained to serve in the capacity of independent psychiatrists and they are as follows:

- Dr. Lily Arora, M.D., affiliated with UMDNJ - University Behavioral Health Care, who will be responsible for Trenton Psychiatric Hospital, Ann Klein Forensic Center, and Greystone Park Psychiatric Hospital.
- Dr. David Rissmiller, D.O., affiliated with UMDNJ - School of Osteopathic Medication, who will be responsible for Ancora Psychiatric Hospital.

The Defendants amend their discovery responses to include all of the aforementioned material. I trust that this correspondence responds to your letter dated May 31, 2012.

Thank you for your attention in this regard.

Very truly yours,

Susan K. O'Connor

SUSAN K. O'CONNOR

SO:jzs
Enclosure(s)
cc:     Alexandra P. Kolod, Esq. [BY E-MAIL]
        Robert S. Cohen, Esq. [BY E-MAIL]
        Gerard A. Hughes, DAG [BY E-MAIL]
        Stephanie Beaty, DAG [BY E-MAIL]



**State of New Jersey**

DEPARTMENT OF HUMAN SERVICES
DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
CAPITAL CENTER, 50 E. STATE STREET
PO BOX 727
TRENTON, NJ 08625-0727

CHRIS CHRISTIE
*Governor*

KIM GUADAGNO
*Lt. Governor*

JENNIFER VELEZ
*Commissioner*

LYNN A. KOVICH
*Assistant Commissioner*

**DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
ADMINISTRATIVE BULLETING TRANSMITTAL MEMORANDUM**

TO:        Chief Executive Officers

FROM:    Lynn A. Kovich, Assistant Commissioner
          Division of Mental Health and Addiction Services

DATE:    June 1, 2012          EFFECTIVE DATE:  June 4, 2012

SUBJECT:   **Administrative Bulletins 5:04, 5:04A and 5:04B**
           **This Bulletin replaces AB 78-3- dated 10/1/82, and AB 5:04 dated 9/15/83**
           **And AB 5:04 revised dated September 1, 2011**

Attached is the Administrative Bulletin that replaces the above referenced bulletin AB 5:04. Please distribute to staff as appropriate. The enclosed administrative bulletin is separated into three separate, discrete, stand-alone policies. All of the required forms necessary for implementation of each of the separate policies are attached and shall be distributed contemporaneously with these new bulletins. The above policies address informed consent, administration of psychotropic medication to adult voluntary and involuntary patients at state psychiatric hospitals. The policies are as follows:

- **AB 5:04**   is the informed consent policy
- **AB 5:04A** is the policy that creates the protocols for the involuntary
               emergency administration of psychotropic medication.
- **AB 5:04B** is the policy that creates the protocols for the administration of
               non-emergent involuntary administration of psychotropic medication.

<u>Informed Consent</u>

The informed consent policy confirms the requirement that medicating any person in any setting requires, where possible, informed consent. Additionally, if a patient has a guardian for medical informed consent or if someone holds a durable power of attorney for medical decisions, or if an advance psychiatric directive is in effect, the patient still should be informed as much as s/he is able, but the consent if given is by the guardian or representative.

1

*New Jersey Is An Equal Opportunity Employer*

JV 251476

<u>AB 5:04A Emergency Medication</u>

The protocols attached to AB 5:04A for the emergent administration of psychotropic medication have not been revised from the September 1, 2011 policy. AB 5:04A confirms the following process: that prior to involuntary medication for an emergency circumstance, less restrictive alternatives must be attempted and documented. Further, an emergency as defined in the policy is for a discrete period of time; one 72 hour period of medication is permitted for each emergency; additionally, 24 hour reviews continue during the emergency period to reassess if the situation remains emergent and the hospital Medical Director and Client Service Representative (CSR) must review every emergency medication event.

<u>AB 5:04B:  Non-Emergent Administration of Medication</u>

The changes in AB 5:04B are for the protocols for the non-emergent administration of psychotropic medication for both patients who refuse medication and for those patients who cannot consent to medication.

Under the new policy, prior to administration of medication to individuals who have the capacity to consent but choose to refuse medication (formerly referred to as refusal requiring the 3 step process) or for individuals who cannot consent (formerly functionally incompetent), the prescriber must document that all less restrictive alternatives to forced medication have been considered. After such alternative treatments are exhausted or ruled out, the procedure in paragraph IV of the new policy must be followed before medication can be administered unless there is an emergency or the patient becomes willing and able to consent.

AB 5:04B requires new clinical staff, a Client Services Advocate (CSA) in addition to the Client Services Representative (CSR), to monitor the administration of non-emergent medication through the process of medication review hearings.  For those individuals who cannot consent, the CSA will assist him/her throughout the medication review hearing which is administrative and clinical in nature.

The medication review hearing is before a three person panel: a non-treating psychiatrist as the panel chair, an administrator (Program Coordinator or above) as a panel member and another non-treating clinician. None of the panel members can be currently involved in the patient's treatment. Section IV C. and D.

The panel will convene and hold a medication review hearing within the timeframes in AB 5:04B. Panel members will review the Involuntary Medication Administration Report (IMAR), which has been completed by the prescriber, approved by the Medical Director, and explained to the patient by the CSA. A three person panel will convene, will hold a hearing according to the process in the policy and render a decision. The patient may appeal this decision according to the process set forth within the policy at section IV paragraphs O through Q.

<u>The policy is effective on June 4, 2012.</u>

2

JV 251477

DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
ADMINISTRATIVE BULLETIN A.B. 5:04B

**EFFECTIVE DATE: June 4, 2012**

SUBJECT: The Non-Emergent Administration of Psychotropic Medication to
Non-Consenting Involuntary Patients (Non-Emergent Involuntary Medication
Procedure)

I.     Policy

  A. This policy describes the procedures to be followed in situations in which:
     (1) an involuntarily committed consumer has been has been diagnosed with a mental
     illness, and, as a result of mental illness, poses a likelihood of serious harm to self,
     others, or property if psychotropic medication is not administered; and
     (2) the consumer will not or cannot provide informed consent to the administration of
     psychotropic medication recommended by the prescriber.

  B. Through the implementation of this policy, State psychiatric hospital staff shall assure
     that the administration of psychotropic medication in such circumstances conforms
     to the standards in N.J.S.A. 30:4-24 et seq., which provides that every individual
     who is treated for a mental illness is entitled to medical care and other professional
     services in accordance with accepted standards, and that patients in the care of the
     State have the right to participate in planning for their own treatment to the extent
     that their conditions permit.

II.    Responsibilities

  A. The Medical/Clinical Director is responsible for oversight of clinical decision-
     making under this bulletin at each psychiatric hospital, for reviewing the decisions of
     the prescribers, for supporting the actions of the Client Service Advocates at the
     hospital level, and for correcting any deviations from the policy by prescribers
     through counseling, using the PAR/PES system for evaluation of professional
     performance, and where necessary invoking discipline through A.O.4:08 and the
     appropriate licensing board.

  B. The CEO is responsible for the implementation of this and all policies at the hospital
     level. As such, the CEO or the Deputy CEO as his or her designee shall direct the
     deployment of CSAs to participate in hearings and provide consultation to treatment
     teams within the limits of their licenses, and shall create a pool of administrators and
     clinicians other than independent psychiatrists to serve on the panels for medication
     review hearings as described in this policy.

1

JV 251491

C. The Division shall arrange for psychiatrists, who are not currently involved in the patient's treatment ("non-treating psychiatrists"), to chair Medication Review Hearings and provide other staff development and consultative services as needed.

D. The hospital's Medical Director shall assign two panelists, other than the non-treating psychiatrist, out of the pool created by the CEO to participate in medication review hearings. The Medical Director shall review weekly with the CSA and the CSR as needed all incidents in which a patient is medicated without his or her consent.

E. The CSA at each hospital is responsible for reviewing the chart of each patient who is prescribed psychotropic medication and for reporting, both on a monthly basis and as needed and appropriate, any departures from the bulletin to the hospital's Medical/Clinical Director and the DMHAS Medical Director. S/he, or, if unavailable, his/her designee shall meet with the hospital's Medical Director and other medical staff weekly to review difficult cases and any current medication issues. S/he also has the responsibility to ensure that those patients who consent to medication have done so voluntarily, and that those who are medicated without consent are medicated in accordance with the policy. The Client Services Advocate shall have access to all charts and prescribers, and shall ensure that the hospital provides an orientation for new patients that includes information about their medication rights.

The CSAs and their staff are responsible for maintaining confidentiality of all information obtained when reviewing clinical records and for advising the executive staff of the hospital about questions patients ask about medications and the implementation of the involuntary medication policy.

Each CSA shall submit monthly statistical reports to the Coordinator which shall include statistical data compiled by the CSR, and shall report any non-compliance with the involuntary medication policy to the Coordinator and to the CEO.

F. Each prescriber is required to become familiar with the procedures in this bulletin and to conform his or her prescribing activity to its standards.

G. All direct care and nursing staff are to report observed side effects of medications to the prescriber, to inquire about an involuntarily medicated patient's willingness to accept medication on a regular basis, to observe and report any change in a patient's ability or willingness to consent to medication, and to monitor the proper administration of medication.

2

JV 251492

H.   All staff are responsible for participating in treatment activities as appropriate to their title, and doing so in a way that encourages shared decision-making and patients' wellness and recovery.

## III.  Definitions

Client Services Advocate (CSA) – is a licensed prescriber or Master's-prepared psychiatric nurse who directly reports to the CEO or Deputy CEO of each hospital and has a reporting relationship to the DMHAS Medical Director through the Coordinating Chief of CSAs (hereinafter Coordinator) and whose primary responsibility is to evaluate individuals receiving treatment with psychotropic medication.  The CSA accomplishes this by individual patient assessment, consultation with the treatment team, and participation in the Medication Review Hearings process, as ongoing assessment and oversight to ensure that medication is only continued if that medication is the least restrictive alternative and appropriately approved.   The CSA is responsible for developing and providing orientation and training programs on these procedures for staff and patients.   The CSA may delegate non-clinical monitoring and patient communication and education activities to appropriate staff including Client Services Representatives.

Client Services Representative (CSR) – is a hospital employee who reports to the hospital's CSA and who is responsible to ensure compliance with due process procedures when a patient will not or cannot provide informed consent for psychotropic medication in non-emergent situations. The CSR will meet with patients to understand their concerns, inform patients of their rights to least restrictive effective treatments, and explain their right to give informed consent and the circumstances under which that right can be overridden by their need for treatment. The CSR shall document side effects as reported by the patient or as noted in the record, and report side effects or other events to the CSA. The CSR shall conduct record reviews, follow-up with the teams when procedural discrepancies occur, compile monthly reports, collect other data as required by the CSA, and shall meet with the CSAs and Coordinator as needed to assure conformity across the system with the standards in this policy.

Coordinating Chief of Client Services Advocates / Coordinator ("Coordinator")- is an employee of the Division qualified by education and experience to clinically guide the CSAs who reports to the Division Medical Director.  He/she shall provide guidance to the CSAs, review their reports and assist with quality improvement.  The Coordinator shall work with the CEOs in establishing work duties of the CSAs, selecting qualified candidates, providing input into their performance evaluations, and ensuring coverage for all of the hospitals. The Coordinating Chief shall also assist the Division Medical Director in arranging for independent, non-treating

3

JV 251493

psychiatrists for Medication Review Hearings and for providing for their orientation and training. S/he shall meet regularly with the CSAs and the CSRs.

Decision-making capacity is the ability to understand and appreciate the nature and consequences of mental health care decisions, including the benefits and risks of each, and alternatives to any proposed mental health care, and to reach an informed decision. A patient's decision-making capacity is evaluated by a licensed professional relative to the demands of a particular mental health care decision.

Division means the Division of Mental Health and Addiction Services (DMHAS) in the New Jersey Department of Human Services.

Division Medical Director refers to the Medical Director for the Division of Mental Health and Addiction Services.

Involuntary patients are those consumers placed by DHS at a State psychiatric hospital or the Ann Klein Forensic Center who are civilly or criminally committed by a court pursuant to New Jersey Court Rule 4:74-7, N.J.S.A. 30:4-27.1 et seq., or N.J.S.A. 2C:4-6(b), or N.J.S.A. 2C:4-8 (Not Guilty by Reason of Insanity/Krol patients), or involuntary patients on CEPP status pursuant to R. 4:74-7(h)(2).

Less restrictive intervention means a treatment that has, compared to another, fewer probable negative lasting effects on the consumer, is less likely to interfere with the consumer's therapeutic progress, and interferes less with the consumer's rights to autonomy and liberty. A proposed intervention can be requested by the consumer at the time it is needed or can be implemented pursuant to an advance directive or negotiated as part of the consumer's patient safety plan. Less restrictive alternatives available in an emergency in the state psychiatric hospitals typically include verbal de-escalation, re-direction, and the offer of consensual oral medication. The most restrictive interventions available in an emergency in the state psychiatric hospitals are seclusion, restraint, and injected medication used consistent with those policies.

Likelihood of Serious Harm or Dangerousness means that within the reasonably foreseeable future either: (a) a substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide, or to inflict physical harm on one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health or safety; or (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (c) a substantial risk that physical harm will be inflicted by an individual upon property as evidenced by behavior which has caused substantial loss or damage to property.

4

JV 251494

<u>Medical Director</u> – means the Hospital Medical Director, as referenced throughout this policy. Each of the five State psychiatric hospitals has its own Medical Director. Whenever the Medical Director is referenced in this policy it allows for the Medical Director or hospital CEO to appoint a clinical designee at the Director or Supervisory level to perform functions where appropriate.

<u>Medication</u> or <u>psychotropic medication</u>, in this bulletin, means agents used for the treatment of psychiatric disorders, including but not limited to antipsychotics, antidepressants, mood stabilizers, anti-anxiety agents, anti-Parkinson agents, hypnotic agents, stimulants, and drugs for dementia, as well as any tests required for the safe and effective administration of such agents.

<u>Mental Health Care Representative</u> means the individual designated by a declarant pursuant to the proxy directive part of an advance directive for mental health care for the purpose of making mental health care decisions on the declarant's behalf, and includes an individual designated as an alternate mental health care representative who is acting as the declarant's mental health care representative in accordance with the terms and order of priority stated in an advance directive for mental health care.

<u>Mental illness</u> means any current substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, functioning, capacity to control behavior or capacity to recognize reality caused by any organic, mental or emotional impairment.

<u>Prescriber</u> means a professional licensed in New Jersey to prescribe or renew a prescription for psychotropic medication.

<u>State</u> means the State of New Jersey.

IV.   **Procedure**

In a non-emergency situation, when an involuntary patient (or, where applicable, guardian or mental health care representative) does not provide or cannot provide consent to the proposed administration of psychotropic medication after being given the opportunity to consent pursuant to the informed consent policy, and the patient's prescriber documents that the patient has been diagnosed with a mental illness, and, as a result of mental illness, poses a likelihood of serious harm to self, others, or property without the medication, the treating prescriber shall initiate the Involuntary Medication Procedure as follows, if he or she has determined, after considering less restrictive interventions, that medication is appropriate:

  A.   The prescriber shall complete the first section of the Involuntary Medication Administration Report ("IMAR") and document the following: the patient's name and hospital number, diagnosis, the specific medication(s) and co-medications to address side effects as well as any testing required because of the administration of the specific psychotropic medication being recommended for the patient, the rationale for the recommendation (including an explanation of the patient's likelihood of serious

5

JV 251495

harm to self or others or property due to non-compliance), the formulations and dosage ranges of the proposed medication(s), less restrictive alternatives attempted or ruled out, the efforts made to explain the need for the medication to the patient, and the objections, if any, expressed by the patient to the medication(s).

B. The prescriber shall submit the IMAR to the hospital's Medical Director who shall review it for completeness.

C. When the IMAR is complete, the Medical Director shall take appropriate steps to appoint a three person Panel to conduct a Medication Review Hearing. The composition of the panel shall include a non-treating psychiatrist who shall act as chairperson of the committee. This psychiatrist shall be trained to implement the procedures of this policy. The non-treating psychiatrist may have other duties at the hospital or Division, but shall not be currently involved in the treatment of the patient who is challenging the administration of medication.

D. The Panel shall consist of three individuals: a non-treating psychiatrist, an administrator (Unit Director or above), and another clinician --none of whom is currently involved in the patient's treatment or diagnosis. Any Unit Director assigned shall not be from the patient's unit. Utilizing the list created in accordance with Section IIA. of this policy, the Medical Director shall select the names of an administrator and a clinician and list the names of all panel members in a separate section of the IMAR. The administrators and clinicians who are assigned to sit as panel members shall be selected on a rotating basis.

E. The purpose of the hearing is for the Panel to hear relevant evidence, including but not limited to the treating prescriber's recommendation and the patient's objections, and to determine whether the patient may be medicated without consent in accordance with this policy.

F. Once the Medical Director has reviewed the IMAR and found it to be complete, he or she shall notify the hospital's CSA to participate in the hearing and to support the patient in presenting his or her objections to taking the proposed medication. The CSA shall consult with the patient within one business day of being assigned to the patient if such consultation has not already occurred.

G. The Medical Director or his/her administrative staff shall give the patient (or any guardian or mental health care representative) and the CSA a Notice of Hearing with a copy of the IMAR attached. A copy of the Notice of Hearing and IMAR shall also be provided to the treating prescriber and the three Panel members. The Notice of Hearing shall provide the date, time and location of the hearing and advise the patient of the right to consult with the CSA, to have the CSA assist the patient at the hearing, to testify, to present witnesses and documentary evidence and to question witnesses. The patient shall also have the right at his/her own expense to have another mental health professional or counsel present at the hearing. If a patient cannot consent the

6

JV 251496

CSA shall be at the hearing to assist the patient in all circumstances.

H. The Medical Director shall schedule the Medication Review Hearing to take place no later than five (5) business days after receiving the completed IMAR and shall provide the patient and the CSA with the Notice of Hearing and the IMAR at least two (2) business days prior to the hearing date.

I. The Medication Review Hearing shall take place on the patient's unit. The treating prescriber shall be present, as shall the patient, his or her guardian or mental health care representative if applicable, and any other mental health professional or representative retained by the patient, and any other witness, if available, called by the patient. The patient shall have the right to attend and present testimony and documentary evidence, and to question witnesses and question documents during the hearing. Testimony shall be taken concerning the diagnosis, the specific medication(s) and co-medications to address side effects as well as any testing required because of the administration of the specific psychotropic medication being recommended for the patient, the rationale for the recommendation (including an explanation of the patient's likelihood of serious harm to self or others or property due to non-compliance), the formulations and dosage ranges of the proposed medication(s), less restrictive alternatives attempted or ruled out and the objections, if any, expressed by the patient to the medication(s).The CSA shall be present at the hearing in order to support the patient and may assist the patient in presenting evidence if requested.

J. In addition to receiving the IMAR and Notice of Hearing, the panel members shall be provided with copies of any documentation the patient submits prior to the Medication Review Hearing. The patient's clinical records shall be made available to the panel members and to the CSA prior to the hearing. The chairperson will review the patient's clinical record prior to the hearing.

K. After all witnesses have been heard, the members of the panel shall convene out of the presence of the patient and other hearing participants to discuss the matter. If the panelists determine by a majority vote, with the non-treating psychiatrist in the majority, that the patient has a mental illness and that, as a result of that mental illness, without psychotropic medication the patient poses a likelihood of serious harm to self, others, or property, the patient may be medicated without his or her consent. If the chairperson/non-treating psychiatrist is not in the majority or votes against the involuntary medication, the proposed medication shall not be authorized. The panel shall record its decision and complete the required information on the Hearing Outcome Form, which shall be provided to the CSA and the patient and the prescriber by the end of the business day in which the hearing is held. If medication has been authorized, the CSA shall provide to the patient verbal and written notice of his or her appeal rights. A copy of the Hearing Outcome Form shall be sent to the Medical Director and a copy shall be placed in the patient's chart.

JV 251497

L. The Hearing Outcome Form shall contain the following information:

    1.   The disposition.

    2.   The names of the witnesses presented.

    3.   A list of the evidence presented.

    4.   A summary of the patient's position and objections to the proposed medication.

    5.   If the medication of the patient was not authorized, what alternative treatments the panel believes should be attempted, if any.

    6.   If the medication was authorized over the objection of the patient, why the medication is necessary to treat the patient and to avoid the likelihood of dangerousness or harm to self, others or property and as such is essential to the current treatment plan.

    7.   Whether or not the patient has requested any modifications or will consent to other types of medication.

    8.   Authorization for the treating prescriber to administer medication for up to 14 days.

    9.   The formulation and dosage of the medication(s) authorized by the panel.

M. If the involuntary administration of psychotropic medication is not authorized by the panel, the patient's treatment team shall convene to adjust the treatment plan to reflect the absence of the proposed psychotropic medication.   If a different medication is part of the new treatment plan, and the patient subsequently refuses the medication, the Involuntary Medication Administration process must be repeated before the revised medication can be administered on a nonemergency basis.

N. The involuntary medication can be authorized by the panel for up to 14 days after the first administration of medication. The treating prescriber shall submit a report to the CSA by the 12th calendar day after the hearing describing the patient's positive and negative responses to the medication, what less restrictive interventions have been attempted or ruled out, and whether the patient is continuing to withhold consent. The CSA shall send copies to the panel that will be holding hearings that week, which shall convene before the expiration of the 14 day period to decide whether to authorize further involuntary medication up to 90 days. For the duration of the involuntary treatment, the treating prescriber must submit biweekly reports to the Medical Director, with a copy to the CSA, setting forth the patient's progress and the justification for continued involuntary treatment. Continued treatment must be supported by the clinical record and the report from the treating prescriber. If the patient consents to the medication at any time, the biweekly report shall so note, the CSA shall confirm and document in the patient's chart that the consent is informed and voluntary, and the authorization and review process shall end. If the medication is continued and the patient has not consented at the end of 90 days, a new IMAR form and Medication Review Hearing is required to consider the need for continued involuntary medication.

JV 251498

O.  The patient will have 24 hours following notice of the panel's initial decision permitting involuntary medication to submit an appeal to the Hospital Medical Director or the next business day if that falls on a holiday or weekend. The CSA shall offer to assist the patient in filing an administrative appeal. The patient may continue to refuse medication and medication shall not be administered in accordance with the panel decision until the time in which to appeal the Panel's decision to the Hospital Medical Director has passed. While an administrative appeal is pending, only emergency medication may be administered to the patient without his or her consent.

P.  If the patient appeals the panel's decision, the Hospital Medical Director, or his/her designee if the Medical Director is absent, shall review the patient's appeal, the Involuntary Medication Administration Report, and the Hearing Outcome Form. If s/he concludes that the Panel followed the Involuntary Medication Procedures in this Policy and that its conclusions of fact were supported by the evidence presented and that the medications authorized are within the current standard of care, s/he shall affirm the decision in writing. The panel's decision to medicate will be vacated by the Medical Director if the policy was not adhered to procedurally. The Medical Director shall issue his/her decision within 24 hours of his/her receipt of the appeal, or the next business day if that falls on a holiday or weekend. The Medical Director will arrange for the delivery of the decision to the patient, the CSA's office, and the prescriber.

Q.  Any further appeal beyond the Medical Director shall be to the Appellate Division of the Superior Court pursuant to New Jersey R. Ct. 2:2-3(a)(2).

## V.  Implementation and Follow-up

A.  An oral form of medication must be offered if medically appropriate before an injection is forced.

B.  If the patient is medicated without his or her consent through the Non-Emergent Involuntary Medication Procedure, the CSA shall meet with the patient as soon as possible and shall also review the patient's chart at that time and once every month thereafter. The CSA shall document the review on a Medication Review Form, sign the original and notify the prescriber by email or in writing of the results of the review. The prescriber shall acknowledge receipt of the notification, by email or in writing, and report the results of any discrepancies noted during the review to the Client Service Advocate.

C.  Unless a shorter time is approved by the panel or the biweekly review or consent ends the authorization, an Involuntary Medication Administration Report expires 90 days from the date the medication is first administered under the process for patients who

9

do not or cannot consent to medication. If the patient continues not to provide consent for medication at the time of expiration, a new Involuntary Medication Administration Report shall be completed, and the Medication Review Hearing procedures shall be followed. At the time any second or subsequent Involuntary Medication Administration is initiated, the prescriber shall consider alternative medications and interventions, shall indicate his or her opinion as to why the medication has not improved the patient's clinical condition and encouraged his/her voluntary adherence, and shall document the reason for the patient's continued rejection of alternatives.

D. The CSA shall maintain files on every patient receiving an Involuntary Medication Administration review. In addition to containing copies of the Involuntary Medication Administration Report and the Hearing Outcome Report, the file shall contain copies of the Medication Review forms, although originals shall be maintained in the patient's medical record. The Medical Director shall maintain a log of all patients receiving involuntary medication.

_____  5/31/12

Lynn A. Kovich, Assistant Commissioner

10

JV 251500

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## INVOLUNTARY MEDICATION
## ADMINISTRATION REPORT (IMAR)

**Section I: (To be completed by Prescriber)**

Patient Name:_____

Diagnosis:_____

Rationale for recommending medication without informed consent including symptoms that indicate that the patient is or would be dangerous to self, others, or property without treatment: ❏ See addendum

_____

_____

_____

Less restrictive treatments or interventions considered or attempted before involuntary medication was considered: ❏ See addendum

_____

_____

(Attach copies of Treatment Team Notes as appropriate to document consideration or implementation of treatment modalities)

Informed consent of the patient was solicited by the signer on _____, 20_____ at ___:___ a.m. / p.m. Medication Fact Sheets were explained to the patient on _____, 20_____. Explain attempts to gain informed consent, including dates and content of efforts by any other staff: ❏ See addendum

_____

_____

_____

Objections expressed by the patient, if any:

_____

_____

_____

Does the patient have a Psychiatric Advance Directive (PAD)? ❏ Yes  ❏ No   If Yes, explain why PAD was insufficient to resolve the patient's dangerousness: _____

_____

_____

Recommended psychotropic medications and comedications for side effects:

_____ dosage range:_____ q_____

_____ dosage range:_____ q_____

_____ dosage range:_____ q_____

INVOLUNTARY MEDICATION ADMINISTRATION REPORT (IMAR)
Page 1 of 2 (6-4-12)

JV 251501

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## INVOLUNTARY MEDICATION
## ADMINISTRATION REPORT (IMAR)

Testing that will be required:

_____at_____

_____at_____

Submitted to Client Services Advocate via ❑ hand delivery ❑ email on _____, 20____
at ____:____ a.m. / p.m.

Prescriber Name:_____     Signature:_____

Date:____/____/____ Time:____:____ a.m. / p.m.

**Section II: (To be completed by Medical Director)**
I have reviewed Section I, signed by_____, in which s/he recommends that
psychotropic medication be administered on a nonemergent basis to _____,
a patient in his/her care.

(Check one)
❑ The documentation is insufficient to show that the patient would be dangerous because of a mental illness
without medication. My reasons follow:

_____

_____

_____

_____

(Review is complete. Sign below and return to prescriber, notify CSA)
❑ The matter should proceed to a hearing. I assign the following persons to conduct a Medication Review
Hearing:

_____, Psychiatrist, chairperson

_____, Administrator

_____, Clinician

The panel shall review Section I of this form and the patient's record, and shall convene a hearing in
accordance with DMHAS Administrative Bulletin 5:04 on the _____(Unit)
at
____:____ a.m. / p.m. on _____, 20____.

I further direct that a notice of hearing, with this form attached, be given the below at least 2 days before the
hearing and that the Client Services Advocate or his/her staff meet with the patient within 24 hours of the
patient's receipt of this notice:

Copy submitted to Patient via ❑ hand delivery on _____, 20____
Copy submitted to Client Services Advocate via ❑ hand delivery ❑ email on _____, 20____
Copy submitted to Treating Prescriber via ❑ hand delivery ❑ email on _____, 20____
Copy submitted to Panel Members via ❑ hand delivery ❑ email on _____, 20____

Medical Director Name:_____     Signature:_____

Date:____/____/____ Time:____:____ a.m. / p.m.

File in Consent Section

INVOLUNTARY MEDICATION ADMINISTRATION REPORT (IMAR)
Page 2 of 2 (6-4-12)

JV 251502

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

NOTICE OF HEARING TO CONSIDER
RECOMMENDATION OF INVOLUNTARY
NON-EMERGENCY ADMINISTRATION OF
PSYCHOTROPIC MEDICATION

To:_____     Unit:_____
    (Patient Name)

You have been diagnosed as having a psychiatric illness and psychotropic medication has been prescribed to treat that illness. You have been given information to allow you to make a decision about whether to take the medication, and you have not given your consent to take it voluntarily, which is your conditional right. Because the psychiatrist who is treating you for psychiatric illness, Dr._____,
believes that without medication you will be a danger to yourself or others, a panel will hear testimony on _____, 20____ at ____:____ a.m. / p.m. and will decide whether the medication can be given to you even though you do not consent to take it. The diagnosis, proposed medication, and the doctor's reasons for believing you should take the medication are explained in the attached Involuntary Medication Administration Report.

At the hearing, a psychiatrist who is not your treating psychiatrist, another clinician (doctor, psychologist, or other therapist), and a hospital administrator who have read the attached form and reviewed your record will listen to the opinion of your psychiatrist and any other witnesses. You will have an opportunity to explain your reasons for not being willing or able to consent to take the medication, to call witnesses, to present any documents you think the panel should see before making a decision, and to question the psychiatrist or any other witnesses who testify that you should take the medication. The panel will decide whether the medication may be given to you without your consent. The Client Services Advocate for the hospital, _____, and the Client Services Representative, _____ are available to help you prepare for the hearing, and will attend if you want one or both of them to do so. You have a right to bring witnesses to testify on your behalf, and if you have an attorney or personal physician you want to testify, you may also invite them, although the hospital will not pay any fees they might charge. The Client Services Advocate or the Client Services Representative will help you decide who to call and will assist you in understanding the hearing process and notifying any witnesses you want to call.

You will not be given the medication before the hearing unless you consent to take it or if there is an emergency that requires immediate medication to keep you from harming yourself or someone else and no less restrictive means of resolving the emergency works.

After the hearing, you will be given a written report signed by the psychiatrist on the panel that explains what the outcome is: whether you will be given medication or not and what facts the panel based that outcome on. The Client Services Advocate will also be given a copy of the report and will be available to discuss it with you. If the recommendation is that you take medication, and if you feel the report is not accurate or still want another person to review the findings and conclusion of the panel, you have 24 hours after receiving the report to appeal to the Medical Director. Until that 24 hour appeal period is past, or until the Medical Director notifies you that s/he agrees or disagrees with the report, whichever is later, you will not be given the medication unless you consent to take it or if there is an emergency that requires immediate medication to keep you from harming yourself or someone else and no less restrictive means of resolving the emergency works.

NOTICE OF HEARING TO CONSIDER RECOMMENDATION
OF INVOLUNTARY NON-EMERGENCY ADMINISTRATION
OF PSYCHOTROPIC MEDICATION
FRONT
6-4-12

JV 251503

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

NOTICE OF HEARING TO CONSIDER
RECOMMENDATION OF INVOLUNTARY
NON-EMERGENCY ADMINISTRATION OF
PSYCHOTROPIC MEDICATION

A copy of this notice and Involuntary Medication Administration Report was given to the patient by:

_____, on _____, 20____ at ____:____ a.m. / p.m.

Copy submitted to Client Services Advocate via ❑ hand delivery ❑ email on _____,20____

Copy submitted to Treating Psychiatrist via ❑ hand delivery ❑ email on _____,20____

Copy submitted to panel members via ❑ hand delivery ❑ email on _____,20____

CSA/CSR Print Name:_____Signature:_____

Date:____/____/____ Time:____:____ a.m. / p.m.

File in Consent Section

NOTICE OF HEARING TO CONSIDER RECOMMENDATION
OF INVOLUNTARY NON-EMERGENCY ADMINISTRATION
OF PSYCHOTROPIC MEDICATION
BACK
6-4-12

JV 251504

DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES

INVOLUNTARY MEDICATION PROCEDURE

NOTICE OF ASSIGNMENT TO POOL FOR MEDICATION REVIEW HEARINGS

To:

From:                          CEO

                               Medical Director

Date:

As you are aware, the Division is implementing new procedures for the non-emergent involuntary administration of medication. You are being assigned, effective immediately, to serve on panels when needed to review whether patients who do not or cannot consent to the administration of psychotropic medication can be medicated without informed consent. You will be assigned to serve only when the patient involved is not currently in your care or living on a unit you supervise. If you have any problem serving on a particular panel (scheduled leave, conflicts of interest) please notify me as soon as possible.

You will be notified at least 2 business days before any hearing and during that time will be required to review the prescriber's justification and the patient's record. It is not necessary for you to interview the patient before the hearing.

Please review AB 5:04B (attached) in preparation for your duties. I anticipate that you will not be required to serve on more than one panel a month, at which time you may hear more than one case. You may also be required on that day, to review, without a hearing, a report of the psychiatrist documenting the reactions of a patient after two weeks of medication under this process and to decide whether the patient may be medicated without consent for up to 90 additional days.

Thank you in advance for your cooperation with this very important process.

c. CSA

Attachment AB 5:04B

6-4-12

JV 251505

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## HEARING OUTCOME REPORT
## INVOLUNTARY MEDICATION
## ADMINISTRATION

On _____, 20____ a hearing was held on _____ at _____
   (Date)                                                (unit)                 (hospital)
to consider whether to accept the recommendation of _____, who has prescribed
                                                          (prescriber)
psychotropic medication for _____ to treat _____. The
                                 (patient name)                    (diagnosis)
patient was given full disclosure about the possible benefits and side effects and was ❑ unwilling ❑ unable
to give informed consent.

At the hearing, a panel chaired by_____, M.D. and having two
other members, _____ and _____
considered the matter. None of the panel members are currently treating the patient, and by signing this
report they affirm that they have no professional, legal, or ethical conflicts in the performance of their duties
as panelists. The patient was assisted in preparing for the hearing by the Office of the Client Services
Advocate.

Notice was given to the patient on_____, 20_____ and included a copy of the Involuntary
Medication.

Administration Report prepared on _____, 20_____ by the prescriber.
Committee members reviewed the IMAR and the patient's records and spoke as needed with members of
the treatment team.

## I. Record of the Hearing
At the hearing, the following persons were present:

_____              _____
(patient)                             (prescriber)

_____              _____
(panelist)                            (panelist)

_____              _____
(panelist)                            (Client Services Advocate staff)

_____              _____


Testimony was given by the prescriber and the patient was permitted to question the prescriber.
The prescriber testified that the patient has been assigned the following diagnosis(es):

_____

for which the following medications have been prescribed:

_____Dosage:_____Formulation:_____
_____Dosage:_____Formulation:_____
_____Dosage:_____Formulation:_____

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## HEARING OUTCOME REPORT
## INVOLUNTARY MEDICATION
## ADMINISTRATION

The prescriber testified that the medications are recommended because:

_____

_____

_____

_____

and that without this medication the patient is likely to cause serious harm to ❏ him/herself, ❏ others, or ❏ property.

The prescriber testified that the following co-medications and/or tests have been ordered to alleviate or prevent side effects and determine therapeutic levels of drug absorption:

_____ Dosage:_____

_____ Dosage:_____

_____ Frequency:_____

The prescriber testified as to the efforts made to encourage the patient to accept the prescribed medications and to use less restrictive interventions to resolve the symptoms of the illness represented by the diagnosis above.

The patient's position on the matter is summarized here, including objections expressed by the patient and/or witnesses on his or her behalf and alternative treatments or interventions to which the patient will consent:

_____

_____

_____

Testimony was provided by the following witnesses:

_____, called by ❏ patient  ❏ hospital

_____, called by ❏ patient  ❏ hospital

_____, called by ❏ patient  ❏ hospital

The following documentary evidence was considered during the hearing:

1._____ Source:_____

2._____ Source:_____

3._____ Source:_____

4._____ Source:_____

JV 251507

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## HEARING OUTCOME REPORT
## INVOLUNTARY MEDICATION
## ADMINISTRATION

**II. Decision**

The panel finds that:

❑ The patient shall be required to take the medication in the dosages and formulations prescribed for up to 14 days, starting 24 hours from the time the patient receives this or after the decision of the panel is confirmed by the medical director, whichever comes first.

   The panel finds the following with respect to the likelihood that dangerousness of this patient will be reduced by the use of the prescribed medication:

_____

_____

_____

❑ The patient shall not be required to take the medication as prescribed.

❑ The panel approves the following alternative treatments (include here any dosage or formulation changes to the proposed medication and any less restrictive treatments or different medications) even if the patient does not consent:

_____

_____

_____

If the patient indicated during the hearing a willingness to consent to a modified medication plan, what is that plan?

_____

_____

_____

**III. Summary of Hearing Results**

Narrative summary of the relevant oral and written evidence supporting the medication of the patient without consent.

_____

_____

_____

Narrative summary of the relevant oral and written evidence that the patient should not be medicated without consent.

_____

_____

_____

JV 251508

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

## HEARING OUTCOME REPORT
## INVOLUNTARY MEDICATION
## ADMINISTRATION

Chair Name:_____        Signature:_____

Date:____/____/____        Time:____:____ a.m./p.m.

Clinician Name:_____        Signature:_____

Date:____/____/____        Time:____:____ a.m./p.m.

Administrator Name:_____        Signature:_____

Date:____/____/____        Time:____:____ a.m./p.m.

Delivered to Patient:

Date:____/____/____        Time:____:____ a.m./p.m.

By:_____,    _____
       Staff name                                    Title

Copy submitted to Client Services Representative via ☐ hand delivery ☐ email on _____,20____

Copy submitted to Client Services Advocate via ☐ hand delivery ☐ email on _____,20____

Copy submitted to Medical Director via ☐ hand delivery ☐ email on _____,20____

## IV. Appeal rights
The patient shall have 24 hours from the time this report is delivered to him or her to appeal the decision of the panel to the Medical Director. (If the 24 hours ends on a weekend day or legal state holiday, the time shall be extended until the time of delivery on the next business day.)  The Client Services Advocate's staff shall assist any patient who wishes to pursue an appeal.

**Any appeal for this case must be filed by:**____:____ **a.m./p.m., on** _____, 20____.

Unless the patient consents or there is an emergency need for medication, the medication authorized under this process shall not be administered until the time for the appeal has passed, or the Medical Director has confirmed the decision of the panel in writing, whichever comes first.
Further appeals may be taken to the Appellate Division of the Superior Court, P.O. Box 006, Trenton, NJ 08625-0006, but medication may be administered during the pendency of the appeal.

## V. Authorization after 14 days
Every 2 weeks while this decision is operative, the prescriber treating the patient will submit a report to the Client Services Advocate's office describing the patient's positive and negative reactions to the medication, what less restrictive interventions have been attempted or ruled out and whether the patient has consented to take the prescribed medication. Within 14 days after the first medication is given under the authority of this finding, a panel consisting of a non-treating psychiatrist, another non-treating clinician, and an administrator will review the progress notes and medication notes in the patient's chart, the first biweekly report of the prescriber, and any written material regarding the medication authorized by this decision submitted to the Client Services Advocate or the treatment staff in that period by the patient.

This review will take place on or before _____, 20____ and a report from that review will be given to the patient, the Client Services Advocate, and the Medical Director. If the panel finds after this review that the patient is still not willing or able to consent to the medication but that the medication is still the least restrictive available treatment that will reduce or prevent the danger the patient would otherwise present, the panel shall authorize the involuntary nonemergency administration of the medication for another 90 days, at which time this authorization shall expire.

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

### HEARING OUTCOME REPORT
### INVOLUNTARY MEDICATION
### ADMINISTRATION

**Follow-up (Only for use of Client Services Advocate )**

❑ Patient appealed decision
    Outcome:  ❑ Medical director upheld. First dose of medication was given on _____, 20____
    at ____:_____ a.m. / p.m.

          ❑ Medical Director overturned, no medication authorized
          ❑ Medical Director overturned, sent to physician for revised IMAR, training for
          _____recommended

❑ Patient did not appeal outcome within 24 hours, and first dose of medication was given on
_____, 20____ at ___:___ a.m. / p.m.

    ❑ Patient accepted oral medication        ❑ IM given

❑ 14 days expires on _____, 20_____ at ___:___ a.m. / p.m.

❑ 90 days expires on _____, 20_____ at ___:___ a.m. / p.m.

CSA Print Name:_____ Signature:_____

Date:____/___/___ Time:___:___ a.m. / p.m.

Appeal result communicated to patient by _____ Date:___/___/___ Time:___:___ a.m. / p.m.

File in Consent Section

INVOLUNTARY MEDICATION PROCEDURE                    Addressograph
BIWEEKLY REPORT FORM

Instructions: Check as appropriate and document interventions and observations relevant to the involuntary
medications administered during for the past two week period (write N/A if none).

_____ Initial report (up to 12 days after first dosage of medication) (CSA will forward to panel)

_____ continuing report (90 days expires on _____, 2011) for the involuntary administration of the following
medications to the above-named patient pursuant to the Hearing Outcome Report dated _____, 20__

Changes in psychotropic medication/co-medication orders and number of intramuscular injections for refusal:
_____
_____
_____
_____

Authorized tests and results are (give dates and describe clinical significance of results): _____
_____
_____

Any less restrictive interventions that were attempted or ruled out:_____
_____
_____
_____
_____

Describe any significant positive or negative responses (including side effects) to the medication in this period, if any:
_____
_____
_____
_____
_____
_____

Patients Consensual Status:
_____ Patient signed informed consent to take the prescribed medication on _____, 20__ (CSA to
confirm that consent is informed and voluntary through chart review and patient interview)

_____ Patient continues to refuse to consent to the authorized prescribed medication, or is unable to consent, and it is
my professional opinion that the involuntary medication should no longer be administered because: _____
_____

_____ Patient continues to refuse to consent to the authorized prescribed medication, or is unable to consent, and it is
my professional opinion that the continued involuntary medication of this patient as authorized is justified because:
_____

**Certification of Prescriber** (print name): _____, MD/DO/APN

*I certify that all of the above statements are correct:* _____ ( *signature* )  ___/___/_____

JV 251511

**Panel decision after first 14 days on medication:**

_____ continue to monitor, authorization extended for _____days

_____authorization terminated because
      __ patient has given valid informed consent
      __ guardian has been appointed
      __ other:_____

     ___CSA notified of outcome


**CSA review:**

_____ Patient interviewed on _____, _____.  Chart reviewed on _____, _____

(check as many as apply):
_____ medication authorization process complies with policy
_____ side effects noted and discussed with prescriber   . . . .
_____ patient complaints noted and discussed with prescriber
_____ case discussed with medical director __ case discussed with Coordinator of CSA's


Outcome of discussions:
_____
_____
_____
_____


Authorization ends on _____, 20__; next report due from prescriber on _____, 20__


_Emailed to __prescriber, medical director_


_6-4-12_

JV 251512

N.J. DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES
INSERT HOSPITAL NAME

ADJUSTED TREATMENT PLAN AFTER REJECTION
OF INVOLUNTARY MEDICATION AUTHORIZATION
BY PANEL
TREATMENT TEAM NOTES

The below signed met on _____, 20_____ to follow up on the finding of an Involuntary Medication Procedures panel that medication was not authorized to be given without the patient's consent unless an emergency situation occurs.

Patient Name:_____     Date of Hearing:_____,20_____

The panel recommended that the following alternative less restrictive treatments be included in the treatment /recovery plan:

_____
_____
_____
_____
_____

The patient ☐ was  ☐ was not present at the meeting.

The treatment team discussed the recommendations and adopted the above recommendations; except that the following recommendations were not included for the following reasons (give details of dates attempted or reasons for ruling out and attach copy of revised treatment plan):

_____
_____
_____
_____

If psychotropic medications are part of this treatment plan, informed consent must be solicited by the prescriber.

Copy submitted to Client Services Advocate with revised Treatment Plan via ☐ hand delivery  ☐ email on _____,20_____

Treatment Team Members (Print Name/Title and Sign):

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

Name/Title:_____     Signature:_____
                                                   Date:____/____/20____ Time:____:____ a.m. / p.m.

File in Consent Section

ADJUSTED TREATMENT PLAN AFTER REJECTION OF
INVOLUNTARY MEDICATION AUTHORIZATION BY PANEL
TREATMENT TEAM NOTES
6-4-12

JV 251513

INVOLUNTARY MEDICATION PROCEDURE

NOTICE OF APPEAL

I WISH TO APPEAL THE DECISION OF THE PANEL THAT MET AND AUTHORIZED THE HOSPITAL STAFF TO GIVE ME PSYCHOTROPIC MEDICATIONS, CO-MEDICATIONS, AND /OR TESTS WITHOUT MY INFORMED CONSENT.

My name:_____ Date of Hearing:_____, 20___

Time and Date Hearing Outcome Report was delivered to me: _____, 20___ at _____ am/pm

I believe the panel's decision was wrong because:

____ the panel did not follow the procedure (explain what they failed to do):

_____

_____

_____

_____

_____

_____

____their conclusion was wrong because the evidence showed that I do not need the prescribed medication (explain what evidence was not properly weighed or was not admitted):

_____

_____

_____

_____

____the medications prescribed are not within the standard of care (explain what medications you will consent to, or why you believe this medication is not right for your symptoms or history):

_____

_____

_____

_____

____any other reason:

JV 251514

_____   _____

_____   _____

_____   _____

_____   _____

I understand that I have the right to the assistance of the Office of the Client Services Advocacy in preparing this appeal. I further understand that I have 24 hours or, if that falls on a weekend or holiday, until the next business day from receipt of the Hearing Outcome Report, to appeal this decision to the Hospital Medical Director or his/her designee, and that while the decision is pending I may not be given medication unless I consent or there is an emergency that requires that I be given those medications.  I understand that the Hospital Medical Director or his/her designee will render a decision within 24 hours of his/her receipt of the appeal or the next business day if that falls on a holiday or weekend. I further understand that if I do not appeal this decision I can be medicated when the 24 hours appeal period expires, and that a panel will review my progress within 14 days and must authorize the medication for it to continue, and that another hearing will be required in 90 days if I do not consent to take the medication before then.

I was assisted in preparing this appeal by:_____

Signed:_____

Date: _____, 20__         Time_____ am/pm

--------------------------------------------*for Medical Director's use only*--------------------------------------------

Date: _____   Time:_____

____The decision of the panel is upheld. The process was followed, the decision was supported by the facts in the record of the hearing, and the medication approved is within the standard of care. Further, I find that:

_____

_____

_____

____ The decision of the panel is reversed. The medication approved by the panel should not be administered because:

_____

_____

_____

_____

_____        _____
(print name and title)                                       (Signature)

*To be delivered to CSA by email or hand.*                           6-4-12

JV 251515

# EXHIBIT B

WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, NJ 08608
Tel: (609) 292-9742
Fax: (609) 777-0187

MITRA HORMOZI, ESQ. *(admitted pro hac vice)*
MELODY WELLS, ESQ. *(admitted pro hac vice)*
ALEXANDRA P. KOLOD, ESQ. *(admitted pro hac vice)*
JAKOB T. SEBROW, ESQ *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DISABILITY RIGHTS NEW JERSEY, INC.,** a New Jersey non-profit corporation, : : : | HON. DICKINSON R. DEBEVOISE, U.S.D.J. |
| Plaintiff, : : | Civil Action No. 2:10-cv-3950-DRD-MAS |
| - against - : : | |
| **JENNIFER VELEZ,** in her official capacity as Commissioner, State of New Jersey Department of Human Services, and : : : : | |
| **STATE OF NEW JERSEY** : | |
| Defendants. | |

**PLAINTIFF DISABILITY RIGHTS NEW JERSEY, INC.'S RESPONSES AND
OBJECTIONS TO DEFENDANTS' AUGUST 10, 2012 DEMAND FOR ADMISSIONS**

Pursuant to the requirements of the Federal Rules of Civil Procedure, and the Local Civil Rules for the District of New Jersey, Plaintiff Disability Rights New Jersey, Inc. ("DRNJ") hereby responds to the Demands for Admission to DRNJ (Defendants' "Demands") propounded by Defendant Jennifer Velez and the State of New Jersey ("Defendants"). DRNJ responds to each Demand to the best of its present knowledge. DRNJ reserves the right to further revise, amend, supplement, and correct its Objections and Responses as necessary.

## GENERAL OBJECTIONS

DRNJ makes the following General Objections to and Reservations regarding Defendants' Demands. DRNJ makes these General Objections and Reservations to each separate Demand in Defendants' Demands and incorporates them by reference into each of DRNJ's Specific Answers and Objections.

1.    DRNJ objects to the Demands to the extent that they fail to comply with, or seek to impose obligations in excess of, the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.    DRNJ objects to the Demands to the extent that they call for disclosure of information that is protected by the attorney-client privilege, the attorney work product privilege, and/or any other privilege or immunity. Nothing contained in these Responses is intended as, or shall in any way be deemed a waiver of, any attorney-client privilege, any work product privilege, or any other applicable privilege, immunity, or protection.

3.    DRNJ objects to the Demands to the extent that they seek information that is neither relevant to the subject matter of this proceeding nor reasonably calculated to lead to the discovery of admissible evidence.

4.    DRNJ objects to the Demands to the extent each is vague and/or ambiguous and/or does not request with sufficient particularity the information sought.

2

5.    DRNJ objects to the Demands that it seeks information that is not within DRNJ's possession, custody or control.

6.    DRNJ objects to each Demand to the extent that it is unreasonably cumulative and duplicative.

7.    DRNJ objects to each Demand to the extent that it is oppressive, overbroad and unduly burdensome.

8.    DRNJ's investigation is ongoing and continuing. Its responses to these the Demands are made to the best of DRNJ's present knowledge, information, and belief based upon information, documents, and/or things currently available to DRNJ, and based upon a reasonable and diligent search for responsive information. Thus, DRNJ's answers to these Demands are at all times subject to such amendments, elaborations and supplementation that further investigation and discovery may warrant and necessitate.

9.    Notwithstanding its answers to the Demands, DRNJ preserves and does not waive any objections or other challenges to the competence, relevance, materiality, privilege, or admissibility of evidence as to any information disclosed, or documents or things produced herein, whether in connection with this or any subsequent proceeding or trial in this or any other action.

10.    DRNJ's Specific Responses and Objections to Defendants' individual Demands incorporate, and do not waive, these General Objections.

## SPECIFIC RESPONSES AND OBJECTIONS

**Demand for Admission No. 8a:**

Plaintiff is pursuing their claims under 42 U.S.C. §1983, the Americans with Disabilities Act and the Rehabilitation Act.

**Response To Demand for Admission No. 8a:**

Subject to the General Objections, DRNJ admits.

**Demand for Admission No. 8b:**

As to the claims brought pursuant to 42 U.S.C. §1983, the only issue Plaintiff is pursuing concerns the constitutionality of the non-emergent involuntary medication policy, effective June 4, 2012.

**Response To Demand for Admission No. 8b:**

In addition to the General Objections, DRNJ objects to the extent that this Demand calls for legal conclusions. DRNJ also objects to this Demand as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "the only issue Plaintiff is pursuing" is vague and ambiguous.

Subject to these objections, DRNJ admits that it challenges the Constitutionality of the Non-Emergent Involuntary Medication Policy, effective June 4, 2012 (the "New Policy"). Specifically, DRNJ is claiming that the policy does not comport with constitutional due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or

4

from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients.

**Demand for Admission No. 9a:**

As to the claims brought pursuant to 42 U.S.C. §1983, the only issue Plaintiff is pursuing concerns the constitutionality of the non-emergent involuntary medication policy, as it applies to the four (4) State Psychiatric hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Response To Demand for Admission No. 9a:**

In addition to the General Objections, DRNJ objects to the extent that this Demand calls for legal conclusions. DRNJ also objects to this Demand as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "the only issue in dispute" is vague and ambiguous.

Subject to these objections, DRNJ admits that it challenges the Constitutionality of the New Policy and that it understands this policy to be in place at the four State Psychiatric hospitals: Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center. Specifically, DRNJ is claiming that the policy does not comport with constitutional due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients.

5

**Demand for Admission No. 10a:**

Consistent with the terms used by the Hon. Dickinson Debevoise, U.S.S.D.J. in his July 20, 2011 Opinion, as to the claims brought pursuant to 42 U.S.C. §1983, Plaintiff only challenges the State Psychiatric Hospitals' policy concerning the involuntary administration of psychotropic medication, not the practices of psychiatric medicine in the four (4) State Psychiatric hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Response To Demand for Admission No. 10a:**

In addition to the General Objections, DRNJ objects to this Demand because the phrase "Plaintiff only challenges the State Psychiatric Hospitals' policy concerning the involuntary administration of psychotropic medication, not the practices of psychiatric medicine" is vague and ambiguous. Further, DRNJ objects to this Demand as vague and ambiguous because Judge Debevoise's July 20, 2011 Opinion does not define the terms "policy" and "practice."

Subject to these objections, DRNJ admits that it challenges the Constitutionality of the New Policy and that it understands this policy to be in place at the four State Psychiatric hospitals: Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center. Specifically, DRNJ is claiming that the policy does not comport with constitutional due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients.

6

**Demand for Admission No. 11a:**

As to the claims brought pursuant to 42 U.S.C. §1983, Plaintiff does not assert a factual challenge to the involuntary administration of psychotropic medication to patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Response To Demand for Admission No. 11a:**

In addition to the General Objections, DRNJ objects to this Demand because the phrase "does not assert a factual challenge to the involuntary administration of psychotropic medication to patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center" is vague and ambiguous.

Subject to these objections, DRNJ is claiming that the policy does not comport with constitutional due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Demand for Admission No. 11b:**

Consistent with the terms used by the Hon. Dickinson Debevoise, U.S.S.D.J. in his July 20, 2011 Opinion, as to the claims brought pursuant to 42 U.S.C. §1983, Plaintiff does not assert a challenge to the treatment decisions of patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

7

**Response To Demand for Admission No. 11b:**

In addition to the General Objections, DRNJ objects to this Demand because the phrases "treatment decisions of patients" and "the terms used by the Hon. Dickinson Debevoise, U.S.S.D.J. in his July 20, 2011 Opinion" are vague and ambiguous.

Subject to these objections, DRNJ is claiming that the policy does not comport with constitutional due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Demand for Admission No. 11c:**

Consistent with the terms used by the Hon. Dickinson Debevoise, U.S.S.D.J. in his July 20, 2011 Opinion, as to the claims brought pursuant to 42 U.S.C. §1983, Plaintiff does not assert an as applied challenge, that is a challenge to the practice(s) concerning the involuntary administration of psychotropic medicine to involuntary patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Response To Demand for Admission No. 11c:**

In addition to the General Objections, DRNJ objects to this Demand because the phrases "as applied challenge," and "challenge to the practice(s) concerning the involuntary administration of psychotropic medicine to involuntary patients" are vague and ambiguous.

Subject to these objections, DRNJ admits that it challenges the Constitutionality of the New Policy. Specifically, DRNJ is claiming that the policy does not comport with constitutional

8

due process and the First Amendment and deprives patients of their right to counsel and their right to access to the courts. In pursuing this claim, however, DRNJ does not foreclose itself from relying on or presenting evidence concerning Defendants' implementation of their various past, present and future policies relating to the forced medication of involuntary-committed psychiatric patients or from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients in the four (4) State Psychiatric Hospitals, Greystone Park Psychiatric Hospital, Ancora Psychiatric Hospital, Trenton Psychiatric Hospital and Ann Klein Forensic Center.

**Demand for Admission No. 12a:**

At the time of the close of discovery, DRNJ has confirmed that it has no intention of utilizing the certifications or affidavits from any patients who are or have been hospitalized in any of the State Psychiatric hospitals for any purpose in this litigation.

**Response To Demand for Admission No. 12a:**

In addition to the General Objections, DRNJ objects to this Demand as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. Subject to these objections, DRNJ admits.

**Demand for Admission No. 13a:**

At the time of the close of discovery, DRNJ has confirmed that it has no intention of basing any claims on allegations made by individuals referenced in the Complaint or First Amended complaint, including but not limited to those patient identified only by their initials: J.P., S.D., T.B., P.D., A.H., S.L., A.R., N.B. and J.C., for any purpose in this litigation.

**Response To Demand for Admission No. 13a:**

In addition to the General Objections, DRNJ objects to this Demand as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. Subject to these objections, DRNJ admits.

Dated: Newark, New Jersey
         August 14, 2012


s/ William Emmett Dwyer
William Emmett Dwyer
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, NJ 08608
Tel: (609) 292-9742
Fax: (609) 777-0187

Mitra Hormozi *(admitted pro hac vice)*
Melody Wells *(admitted pro hac vice)*
Alexandra P. Kolod *(admitted pro hac vice)*
Jakob T. Sebrow *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

# EXHIBIT C



COLUMBIA UNIVERSITY
MEDICAL CENTER

DEPARTMENT OF
PSYCHIATRY
1051 RIVERSIDE DRIVE
NEW YORK, NY 10032

August 28, 2012

Thomas B. Leyhane, Esq.
Hoagland Longo Moran Dunst & Doukas, LLP
40 Patterson Street
New Brunswick, NJ 08901

Dear Mr. Leyhane,

This report, which was produced at your request in connection with *DRNJ v. Velez*, offers an overview of issues associated with litigation on the rights of involuntarily committed psychiatric patients to refuse treatment with medication. It provides concise reviews of the history of involuntary commitment; the use of psychotropic medication; the origins of litigation on the right to refuse treatment; and the empirical literature on refusal of treatment. The report concludes with my opinions regarding the New Jersey model and the consequences of the competing models for addressing patients' refusal of treatment. All of the opinions in this report are expressed to a reasonable degree of medical certainty.

Qualifications: I am the Elizabeth K. Dollard Professor of Psychiatry, Medicine and Law at the College of Physicians & Surgeons of Columbia University, where I teach, perform research, and see patients. In addition, as an affiliated faculty member at Columbia Law School, I teach mental health law and other courses. A graduate of Columbia College and Harvard Medical School, I completed a residency in psychiatry in 1980 at the Massachusetts Mental Health Center/Harvard Medical School. My career has been spent studying legal and ethical issues in psychiatry and general medicine, including informed consent, decisional capacity, and refusal of treatment, and I have written extensively on these subjects. I conducted the first empirical study of patients who refuse psychiatric treatment,[1] and later coordinated what is still the largest study on the subject.[2] My work has provided a widely used framework for classifying approaches to rights to refuse treatment,[3] and an integrative review of evolution of the issue.[4]

Materials Reviewed: In preparing this report, I reviewed the following materials: plaintiff's first amended complaint; depositions of Joseph B. Young, Judge Robert Killian, Dr. Robert Eilers, and Dr. Patrick Fox; Administrative Bulletin Transmittal Memorandum of June 4, 2012, with Secs. AB 5:04, 504A, and 504B, and related forms; the NJ Patient Bill of Rights; the Opinion of Judge Debevoise dated July 20, 2011; record extracts prepared by defendants for patients named in the complaint; and a mock medication review process transcript and forms. I also received but have not yet reviewed the depositions of Karen Piren; Anthony Haynes; and Lisa Ciaston.

Historical Perspective on Involuntary Hospitalization and Treatment: The first psychiatric hospitalization in what later became the United States occurred in 1752 at Philadelphia's

newly opened Pennsylvania Hospital, the first hospital in the colonies.[5] During the subsequent colonial and federal periods, admission to the small number of hospitals that existed was governed by informal procedures rather than by statute. In general, families made application on behalf of patients too confused or too ill to speak for themselves—whether general medical or psychiatric patients—and physicians certified the appropriateness of hospitalization. Patients who objected but were deemed to require treatment might then be held against their will. This informal system was upheld by the courts in several early challenges in Massachusetts and Pennsylvania.[6] In the great wave of creation of state-operated asylums in the second quarter of the nineteenth century, however, it was recognized that the growing role of the state required enabling legislation, and hence the first commitment statutes began to appear. These new laws generally codified the existing system, conferring discretion on families and physicians to admit patients in need of treatment; although patients could always seek a writ of habeas corpus to challenge their confinement, prospective judicial review was generally confined to paupers who would be hospitalized at public expense, and appeared to be used more as a cost-saving measure than as protection for patients' rights. In the early years of the asylum movement, all admissions were involuntary; only in 1881 did Massachusetts adopt the first voluntary admission provision in its statute governing hospitalization to its asylums.

Judicial review (and sometimes jury trials), along with other procedural rights for respondents, became more common after the Civil War, driven by highly publicized episodes of allegedly unwarranted confinement. In the Progressive Era, just after the turn of the twentieth century, physicians were empowered to effect emergency commitments, so that seriously ill patients did not have to await court proceedings prior to hospitalization. From 1752 until the 1960s, however, the operative standard for involuntary admission remained constant (though the exact wording varied across jurisdictions): in essence, whether patients were in need of care and treatment that could be provided in a hospital. Moreover, during this extended period, the professional literature and case law are essentially devoid of references to committed patients' right to refuse treatment apart from their right to contest the legitimacy of their hospitalizations. It appears to have been assumed that whatever gave the state the right to detain patients also conferred the power to treat, even over their objections.

Introduction and Use of Psychotropic Medication: Effective medications that targeted psychiatric disorders began to be introduced in the 1950s. In particular, chlorpromazine (trade name: Thorazine), which appeared in the U.S. in 1954, was the first medication with specific antipsychotic effects. It was followed by other members of the so-called first generation of antipsychotic medications, and in the 1990s by the second-generation drugs. Antipsychotic medications rapidly became a mainstay of treatment because of their effectiveness in reducing or eliminating psychotic symptoms, including delusions, hallucinations, disordered thinking and speech, and disruptive and aggressive behavior. The medications enhanced patients' abilities to think normally and hence to function autonomously.[7] With a reduction in their psychotic symptoms, patients typically became more functional, and this increased ability to care for themselves, participate in other activities, and control their behavior made it possible for large of numbers of patients

2

who would otherwise have spent their lives in state hospitals to live in the community. The introduction of antipsychotic medications played a major role in the process of deinstitutionalization by which the more than half-a-million patients in state hospitals in 1955 have been reduced to less than one-tenth that number today.[8]

As with all medications, the antipsychotics can produce unwanted side effects. In a recent review, I characterized the side effect profiles and efficacy of first and second-generation medications in this way: "The first generation of antipsychotics, marked by the introduction of chlorpromazine, often caused acute neuromuscular side effects, such as spasms of the muscles, along with a long-term risk of tardive dyskinesia, a condition characterized by involuntary movements of the muscles in the face, trunk, and extremities. A second generation of these medications, introduced in the 1990s with great fanfare, presents lower risks of neuromuscular problems, but several of the most popular members of this group can cause weight gain, along with diabetes, hyperlipidemia, and increased cardiac risk. There does not appear to be a difference in efficacy between the earlier and later medications."[9]  Many antipsychotic medications can also cause sedation, and rarer but potentially lethal side effects such as neuroleptic malignant syndrome. Notwithstanding these risks, however, antipsychotic medications represent the standard of care for treatment of acute psychosis and most cases of chronic psychosis, since without medication to reduce psychotic symptoms, patients with schizophrenia, schizoaffective disorder, and other psychotic illnesses are usually unable to take advantage of other treatments, or to return to or remain in the community.[10] Effective antipsychotic medications enhance patients' abilities to think coherently and engage in rational decision making, thus affording them greater autonomy in their lives. Thus, antipsychotic medications have become integral to what is usually conceptualized as the least restrictive alternative for care of patients with these disorders.

Evolution of Approaches to Patients' Rights to Refuse Treatment: Litigation over patients' right to refuse treatment was intimately linked to changes in civil commitment that began in the 1960s and accelerated in the early 1970s.[11] Increased concern about the procedural rights of patients in commitment proceedings led to the adoption of procedural protections that resembled those in the criminal adjudication process, and questions about the legitimate scope of state power resulted in a redefinition of commitment standards. The historic need-for-treatment standard was criticized as vague and overbroad, with the state's power to involuntarily confine mentally ill persons for their own benefit called into question. Hence, beginning in the District of Columbia in 1964 with the Ervin Act, by the end of the 1970s every jurisdiction in the country had adopted commitment criteria based on dangerousness to oneself or others. The change in criteria appeared to stimulate a rethinking of the basis for involuntary treatment. Although it had previously been assumed that patients who had been committed because they needed treatment could be treated even over their objections, the question now arose as to the basis for the state's treatment power when persons were being committed because they were dangerous. If dangerousness could be controlled by confinement and observation, how could the state's *parens patriae* interest still justify involuntary treatment?

3

By the mid-1970s, litigation began to appear in several states testing the constitutional bases for treatment over objection. In the following decade, two broad models of response had evolved. Some courts held that patients' rights, often based on concepts of substantive due process or equal protection, precluded involuntary treatment unless a patient had been found incompetent to make treatment decisions. I have referred to this as a "rights-driven model."[12] Typically, determinations of incompetence had to be made by courts, although some jurisdictions allowed administrative panels to play this role. Patients were usually recognized as having the right to legal representation in their hearings. A second approach focused more on patients' rights to appropriate treatment, concluding that they could best be protected by leaving the ultimate treatment decision in medical hands. This "treatment-driven model" might apply to all committed patients or only to those who were found to represent a danger to themselves or others. The determination as to the appropriateness of recommended treatment and/or dangerousness might be left to the treating physician, require a second opinion, or be entrusted to a clinical-administrative panel. The U.S. Supreme Court's decision in *Washington v. Harper* accepted this approach, explicitly noting that clinicians were in a superior position to judges to make determinations related to the appropriateness of treatment. Legal representation was generally not guaranteed in treatment-driven approaches, although patients were often offered the assistance of lay advocates. Over time, although a growing number of states have adopted rights-driven approaches, a substantial number retain some variant of a treatment-driven model.

Empirical Studies of Treatment Refusal:  The 1980s and 1990s saw a large number of studies of the consequences of newly enacted rights to refuse treatment, with a smaller number of studies appearing since then.[13] In general, rates of treatment refusal in civil facilities have been under 10% of involuntary admissions, although forensic facilities show higher rates.[14] Most refusing patients ultimately accept treatment, but in the meantime they display higher rates of violence and other behaviors requiring seclusion and physical restraint, and the use of emergency medications.[15] Lengths of stay are also longer for refusers.

Several studies, generally older, have examined the consequences associated with models of response to treatment refusal, especially the rights-driven model. Rights-driven models tend to require substantial amounts of clinician time (estimated at 10 hours in one study[16]), other personnel time (e.g., staff time to transport patients to court for hearings, when they are held off-site), legal time for representation of the state and the respondents, and court time. A widely cited study of the early Massachusetts experience found that the state provided over an 18-month period 10,500 hours of attorneys' time and 3000 hours of paralegals' time.[17] The other category of consequences that has been examined extensively involves the delay associated with formal hearings in court. Hospital days awaiting hearings vary across jurisdictions, with studies from several states, including Massachusetts and New York, suggesting average delays of 1 to 4 months.[18] Prolonged periods during which patients are untreated extend the length of hospitalization and, as noted above, account for higher incidence of violence and other disruptive behaviors. In contrast, a clinically based process for reviewing and overriding objections in Virginia resulted in average lengths of refusal prior to determination of 2.8 days.[19]

4

The outcomes of review procedures have been examined in a large number of states. In general, judicial review has resulted in approval of the vast majority of requests for override of refusal. Rates of approval are generally over 90% and in one large Massachusetts study they exceeded 98%.[20] Interestingly, clinical-administrative review procedures often result in lower rates of approval of involuntary treatment, often in the 60-80% range.[21] Although it is difficult to identify with certainty the reasons for these differences, they may in part result from a greater willingness of clinical reviewers to challenge the conclusions and recommendations of treating psychiatrists. Explicit studies comparing patients' attitudes towards different models of review are lacking, although data on involuntary commitment proceedings suggest that patients—like most people involved in the legal process—particularly value the opportunity to be heard and to have their objections taken seriously, including by their clinicians, even if they disagree with the ultimate outcome of the process.[22] Studies of patient reactions after involuntary treatment indicate that many, but by no means all, patients retrospectively accept that they needed treatment and acknowledge the appropriateness of the interventions;[23] comparisons of rates of acceptance across models have not been made.

Although not explicitly examined in these studies, clinicians also express concerns that a more formal adjudicatory process, with the introduction of legal counsel, can adversarialize the treatment relationship, reducing the inclination of patients to collaborate with their treaters. Indeed, based on my experience, patients subject to a rights-driven process often come to view their psychiatrists as opponents to be defeated in court, reducing trust and willingness to collaborate in treatment. In contrast, a clinical/administrative review process using a treatment-driven model is more likely to sustain a collaborative physician-patient relationship.

New Jersey's AB 5:04B Process: This section of the Administrative Bulletin, effective June 4, 2012, implements a treatment-driven model for involuntary patients who are refusing treatment in non-emergency situations in New Jersey facilities. Refusal triggers a series of procedures that are designed to assess whether the recommended medication regimen is appropriate and the patient meets the prescribed dangerousness criteria for override of refusal. AB 5:04B also offers mechanisms to provide the patient with information about his/her rights and to offer the patient a voice in the process by means of which his/her objections to the proposed treatment can be considered.

When a patient refuses treatment, the treating psychiatrist can initiate the process of review by completing the first section of the Involuntary Medication Administration Report (IMAR), which is then reviewed by the Medical Director. If the form is complete, the Medical Director will appoint a 3-person panel to hear evidence within 5 business days and to determine whether the patient can be medicated over his/her objection. Once the process is underway, AB 5:04B provides for a Client Services Representative (CSR) to advise the patient of his/her rights and to monitor the compliance of the process with procedural norms. At the same time, a Client Service Advocate (CSA), who must be a licensed prescriber or a Master's-level nurse, evaluates the patient and the proposed medication regimen to insure that it is appropriate and the least restrictive alternative.

5

At the hearing, the panel (an independent psychiatrist, an administrator, and another clinician, none of whom are involved in the patient's treatment) hears relevant evidence, including the patient's views about and objections to treatment. The CSA is present at the hearing to support the patient and to assist the patient in presenting evidence if requested. If the panel concludes that the patient meets the diagnostic criteria and presents a likelihood of harm criteria, it can authorize treatment for 14 days so long as the independent psychiatrist is in agreement. Prior to the end of that period, the treating psychiatrist must submit a report, following which a review occurs after which treatment can be authorized for an additional 90 days. The treating psychiatrist is required to submit an update on the patient's treatment every 14 days for as long as involuntary treatment continues. Further reauthorization is required every 90 days. The patient has the right to appeal the panel's decision to the Medical Director and then to the Appellate Division of the Superior Court.

Based on my experience, these procedures are likely to minimize the adverse outcomes associated with refusal of treatment while protecting patients' interests. Scheduling hearings within 5 days will limit the adverse consequences associated with untreated psychosis, including violence and other behavioral disruptions. Consultation with the CSR should ensure that patients are aware of their rights. Affording refusing patients the opportunity to state their objections and to question witnesses, and providing the CSA for support, offers the patient the opportunity for "voice" in the process that studies suggest is the most important factor in patients' perceptions of having been treated fairly. The documentation requirements for the hearing and for on-going treatment, along with the requirement for periodic reauthorization hearings, are well designed to ensure that the treatments being recommended are appropriate and that their administration continues to be indicated. As a whole, New Jersey's treatment-driven model for resolving patients' refusal of treatment appears to benefit from the experience of the field over the last 30 years and to offer a finely-tuned approach to this situation.

Conclusions: Two broad approaches have characterized the mechanisms that have developed since the 1970s for resolving involuntarily committed psychiatric patients' refusal of treatment with antipsychotic medication. Rights-driven approaches require a finding of incompetence, usually in a judicial proceeding. These models have been plagued by lengthy delays in adjudication of individual cases, leading to prolonged periods without treatment, longer hospital stays, and increased rates of violent and other disruptive behaviors. Judicial models of review are costly to patients, the mental health system, and the courts, and infrequently result in rejection of requests to authorize involuntary treatment, perhaps because of the difficulty that judges have in challenging the conclusions of treating psychiatrists.

Treatment-driven approaches, in contrast, are based on clinical or clinical/administrative review of refusals within the facility. All or some patients deemed to be in need of treatment (e.g., those who are dangerous to themselves or others) can be treated over their objections after review. Under the treatment-driven model, cases of refusal are resolved more rapidly and at substantially lower cost. Since untreated psychosis is associated with

increased violent and disruptive behavior, and treatment with antipsychotic medication is essential in most cases, more rapid treatment reduces the incidence of these unwanted consequences and speeds patients' return to the community. In addition, on average with a treatment-driven model more refusals are upheld, as clinical reviewers are more willing than judges to offer second-opinions on treatment recommendations that differ from those of treating psychiatrists. The published data offer no indication that patients are less satisfied with non-judicial review, so long as they are offered an opportunity to voice their positions and their views are treated respectfully. New Jersey's approach embraces the treatment-driven model in a reasonable manner that is likely to protect patients' interests, ensure that they receive appropriate treatment when indicated, and maximize their sense of fairness with the process.

I would be pleased to provide additional references for any of the points addressed in this report.

Sincerely yours,

Paul S. Appelbaum, MD
Elizabeth K. Dollard Professor of Psychiatry, Medicine and Law
Director, Division of Law, Ethics & Psychiatry
Department of Psychiatry
Columbia University College of Physicians and Surgeons

7

[1] Appelbaum PS, Gutheil TG: Drug refusal: a study of psychiatric inpatients. American Journal of Psychiatry 1980; 137:340-346.

[2] Hoge SK, Appelbaum PS, Lawlor T, Beck JC, Litman R, Greer A, Gutheil TG, Kaplan E: A prospective, multi-center study of patients' refusal of antipsychotic medication. Archives of General Psychiatry 1990; 47:949-956.

[3] Appelbaum PS: The right to refuse treatment with antipsychotic medications: retrospect and prospect. American Journal of Psychiatry 1988; 145:413-419.

[4] Appelbaum PS. Almost a Revolution: Mental Health Law and the Limits of Change. Oxford University Press, New York, 1994, Chap. 4.

[5] Comprehensive histories of psychiatric hospitalization in the U.S. can be found in Grob GN, Mental Institutions in America: Social Policy to 1875. Free Press, New York, 1973, and Deutsch A, The Mentally Ill in America: A History of Their Care and Treatment from Colonial Times, 2d ed. Columbia University Press, New York, 1949.

[6] Matter of Josiah Oakes, 8 Law Reporter 122 (Mass. 1845); Hinchman v. Richie, Brightly 143 (C.P. Phila. 1849).

[7] Gutheil TG, Appelbaum PS: "Mind control," "synthetic sanity," "artificial competence," and genuine confusion: legally-relevant effects of antipsychotic medication. Hofstra Law Review 1983; 9:77-120 ; Cassens G, Inglis AK, Appelbaum PS, Gutheil TG: Neuroleptics: effects on neuropsychological function in chronic schizophrenics. Schizophrenia Bulletin 1990; 16:477-499

[8] Fisher WH, Geller JL, Pandiani JA. The changing role of the state psychiatric hospital. Health Affairs 2009;28:676-684

[9] Appelbaum PS. Reference guide to mental health evidence, in Reference Manual on Scientific Evidence, 3rd ed. National Academy of Sciences/Federal Judicial Center, Washington, DC, 2011. See also the references cited therein.

[10] American Psychiatric Association. Practice Guideline for the Treatment of Patients with Schizophrenia, 2d ed. Published as a supplement to the American Journal of Psychiatry, 161 (2), 2004. ("It is recommended that pharmacological treatment be initiated promptly, provided it will not interfere with diagnostic assessment, because acute psychotic exacerbations are associated with emotional distress, disruption to the patient's life and a substantial risk of dangerous behaviors to self, others, or property." p. 4)

[11] Appelbaum, note 4 supra, Chap. 2.

[12] Appelbaum, note 3 supra.

[13] The conclusions of my review of the literature in the references cited in Appelbaum, note 4 supra are still generally valid, and the chapter provides a more detailed discussion of much of the data cited. However, this report is based as well on a supplementary review of the additional studies published since then, including: Greenberg WM, Attia S. Nonemergent forcible medication in an acute hospital. Bulletin of the American Academy of Psychiatry and the Law 1993;21:465-473; Greenberg WM, Moore-Duncan L, Herron R. Patients' attitudes toward having been forcibly medicated. Bulletin of the American Academy of Psychiatry and the Law 1996;24:513-524; Jarrett M, Bopwers L, Simpson A. Coerced medication in psychiatric inpatient care: literature review. Journal of Advanced Nursing 2008;64:538-548; Kasper JA, Hoge SK, Feucht-Haviar T, Cortina J,

Cohen B. Prospective study of patients' refusal of antipsychotic medication under a physician discretion review procedure. American Journal of Psychiatry 1997;154:483-489; Kelly M, Dunbar S, Gray JE, O'Reilly RL. Treatment delays for involuntary psychiatric patients associated with reviews of treatment capacity. Canadian Journal of Psychiatry 2002;47:181-185; Naber D, Kircher T, Hessel K. Schizophrenic patients' retrospective attitudes regarding involuntary psychopharmacological treatment and restraint. European Psychiatry 1996:11:7-11; Owen GS, David AS, Hayward P, Richardson G, Szmukler G, Hotopf M. Retrospective views of psychiatric in-patients regaining mental capacity. British Journal of Psychiatry 2009;195:403-407; Storch DD. First year of Maryland's new CRP statute in one state hospital. Bulletin of the American Academy of Psychiatry and the Law 1993;21:277-280.

[14] See studies summarized in Appelbaum, note 4 supra at 132-135.

[15] See studies summarized in Appelbaum, note 4 supra at 135-136.

[16] Veliz J, James WS. Medicine court: *Rogers* in practice. American Journal of Psychiatry 1987;144:62-67.

[17] Massachusetts Department of Mental Health. Untitled report, draft dated July 7, 1988.

[18] See, for example, Zito JM, Craig RJ, Wanderling J. New York under the *Rivers* decision: an epidemiologic study of drug treatment refusal. American Journal of Psychiatry 1991;148:904-909; Farnsworth MG. The impact of judicial review of patients' refusal to accept antipsychotic medication at the Minnesota Security Hospital. Bulletin of the American Academy of Psychiatry and the Law 1991;19:33-42; Hoge et al., note 2 supra.

[19] Kasper JA, Hoge SK, Feucht-Haviar T, Cortina J, Cohen B. Prospective study of patients' refusal of antipsychotic medication under a physician discretion review procedure. American Journal of Psychiatry 1997;154:483-489.

[20] See generally the discussion in Appelbaum, note 4 supra. For the Massachusetts data, see Massachusetts DMH, note 14 supra.

[21] See studies summarized in Appelbaum, note 4 supra at 144.

[22] Lidz C, Hoge SK, Gardner W, Bennett N, Monahan J, Mulvey EP, Roth LH. Perceived coercion in mental hospital admission: pressures and process. Archives of General Psychiatry 1995;52:1034-1039.

[23] Schwartz HI, Vingiano W, Perez CB. Autonomy and the right to refuse treatment: patients' attitudes after involuntary medication. Hospital & Community Psychiatry 1988;39:1049-54; Greenberg WM, Moore-Duncan L, Herron R. Patients' attitudes toward having been forcibly medicated. Bulletin of the American Academy of Psychiatry and the Law 1996;24:513-524. See also this British study with even stronger findings: Owen GS, David AS, Hayward P, Richardson G, Szmukler G, Hotopf M. Retrospective views of psychiatric in-patients regaining mental capacity. British Journal of Psychiatry 2009;195:403-407.