

CB-LIGHT-4

# EXHIBIT J

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY
10-3950DRD

------------------------------------------------------

DISABILITY RIGHTS NEW JERSEY, INC.,
et al.,

                                    Plaintiffs,

              vs.

JENNIFER VELEZ, in her official capacity as
Commissioner of the New Jersey Department
of Human Services, et al.,

                                    Defendants.

------------------------------------------------------

DEPOSITION OF:
DR. ROBERT EILERS

Monday, March 26, 2012

Reported By:

LISA FORLANO, CCR, CRR, RMR

REF: 7005



1                      DR. ROBERT EILERS

2          A        No, I do not.

3          Q        Did you do anything else other than

4     what you've already described to ensure that the

5     procedure was working?

6          A        If I -- you know, if I found any issues

7     I would do training.  We would discuss -- we would

8     have monthly meetings with the medical staff, the

9     psychiatric staff and we would talk about these

10    issues.

11         Q        You've mentioned trainings a few times.

12    What trainings were conducted, as far as you can

13    recall?

14         A        I think it was mostly with the medical

15    staff.  It was at the monthly meeting of the

16    psychiatry staff.  There were other discussions with

17    the treatment team staff, I remember.  I frequently

18    conducted what we called clinical reviews, which was

19    a meeting with a team regarding particular patients

20    and many of these patients were patients who were on

21    the refusing status, as we have referred to it, and

22    we discussed all the issues around the patient's

23    reason for refusal and what treatment alternatives

24    we could provide.

25         Q        Okay.  So I understand that there

1                    DR. ROBERT EILERS
2    legal, all of those issues and there is a
3    certification, oral exam and written exam, similar
4    to board certification for other subspecialties that
5    you can obtain.  And so I was very interested in the
6    administrative issues at that time and the legal
7    issues.  So I applied for that and I later went on
8    to get the board certification in forensic
9    psychiatry as well.
10        Q    All right.  That's very helpful.  And
11   so you said that you pursued the certification in
12   administrative psychiatry and how, then, did you
13   receive the promotion to Medical Director at DHS?
14        A    Well, I applied for the position.  I
15   was interviewed and was accepted for it.
16        Q    And what are your roles and
17   responsibilities today as the Medical Director at
18   DHS?
19        A    I report to our Assistant Commissioner
20   and basically again oversee the clinical aspects of
21   all inpatient and outpatient treatment program.  By
22   "inpatient" meaning our five-state psychiatric
23   hospitals, and also the services that we contract
24   for in the community with various hospitals and
25   outpatient programs.  I deal with some of the issues

                    DR. ROBERT EILERS

2    mentioned?

3        A      Well, I'd have to think about it, but

4    I'm sure there are.  There are a lot of other

5    issues, but I think I've mentioned the main issues.

6        Q      And you also, I think you anticipated

7    one of my other questions, which is, have your job

8    responsibilities changed at all over the years and I

9    know you mentioned two things, one is the merger

10   with Addiction Services, and I guess upcoming issues

11   with the Medicaid managed care organization, RFPs,

12   et cetera?

13       A      That's correct.

14       Q      Are there any other changes in your

15   responsibilities, large scale changes over the

16   years?

17       A      I could just say in general, because of

18   the increased shifting -- the Olmstead lawsuit and

19   the shift towards community services, we are closing

20   one of our State hospitals, Hagedorn Psychiatric

21   Hospital, as of this June.  And we have been for --

22   ever since I've been at the division, moving towards

23   enhanced and greater services in the community to

24   support people and not -- and reduce the size, the

25   census at the State hospitals, which we have done.

```
 1                    DR. ROBERT EILERS
 2   And also towards a more patient centered recovery
 3   and wellness focus.  Ever since 2007, our former
 4   Assistant Commissioner has put us in the direction
 5   of wellness and recovery transformation initiative
 6   and -- so we're trying to provide much more patient
 7   centered services.
 8        Q     Any other major changes in your
 9   responsibilities other than the ones you've
10   mentioned?
11        A     No, I think that's it.
12        Q     Backing up a little bit.  I know that
13   you mentioned that Karen Piren is one of your direct
14   reports; is that correct?
15        A     That's correct.
16        Q     Do you have any other direct reports?
17        A     Yes.  I have another -- Karen Piren is
18   the psychiatric advanced practice nurse.
19              We have another psychiatric advanced
20   practice nurse, Debbie Klaszky, who is, I mentioned,
21   our older adult person who does the PASR reviews.
22              We have a coordinator for our SSPRC
23   processes and we call that in the central -- in
24   our -- in central office we call it the clinical
25   assessment and review panel, the CARP, and Jack
```

Page 42

1                    DR. ROBERT EILERS

2    other issues around medication practices.  And as I

3    said, we do have -- pharmacists also attend this

4    meeting.  So they have issues to bring up there as

5    well.  We have a chief pharmacist at the Division

6    who meets with us.  She's concerned about cost

7    issues of medications and things like that.  And

8.   that is -- so that's a regular agenda item.  We

9    generally talk about current issues that are of

10   import like right now the merger, the issues around

11   the ASO, but a lot of the issues are specific to the

12   hospitals.  One hospital will have issues that they

13   want put toward.  Staffing is one issue we've talked

14   recently a lot, hiring of psychiatrists, hiring of

15   other clinicians.  Since we're going through this

16   closing of one hospital and this general downsizing

17   and a lot of concerns about having adequate staff,

18   qualified staff, we talked about training --

19   trainings that we're we want to put on together.

20   And usually, or oftentimes, we'll have centralized

21   training with some of the hospitals requesting the

22   training.  We'll have -- we have some staff in the

23   Division presenting to us on issues of their

24   concern.

25                    John Whitenack is the Director of the

Page 44

1                    DR. ROBERT EILERS

2    changes to the policy at the monthly meetings?

3         A     Well, I don't know if you could -- I

4    mean, I don't know if you could be more specific in

5    terms of there have been general discussions about

6    changes in the policy in relation to enhancements

7    that we saw were necessary around the three-step

8    procedure, for example.

9         Q     What else?

10        A     We have talked about some of our --

11   again, I mentioned emergency certification

12   procedures since we had that lawsuit and implemented

13   a change in that procedure, both in terms of the

14   procedure and the documentation and the review

15   process, that was -- that was a discussion.   We

16   talk -- we talk also about medication issues as they

17   relate -- they may relate to the AB:504.

18        Q     What do you mean by that?  Or perhaps

19   give me an example.

20        A     Well, some of the issues of the 504

21   involve -- of course, they involve the involuntary

22   non-consentual use of medication and if a patient

23   refuses, we will have to, at times, for an

24   antipsychotic, utilize an IM, antipsychotic, and

25   we'll talk about the type of IM that might be the

1                DR. ROBERT EILERS

2    appropriate or safest, for example, or how this

3    might be utilized.  And we have a lot of discussions

4    about medication in general, mostly from -- that is

5    given consentually in terms of medication practices.

6        Q     Okay.  So going back to just to

7    conversations about changes to AB:504 as it relates

8    to involuntary medication, you mentioned

9    enhancements to the policy, you mentioned discussing

10   the manner of administering involuntary medications

11   such as IMs.  What else do you recall discussing in

12   terms of potential changes to that policy?

13       A     Well, I mean, I think it's -- we talk

14   about the procedure itself in terms of the three

15   steps, how the steps are carried out through the

16   psychiatrist initially indicating the need for

17   medication, the team meeting, the role of the RENNIE

18   advocate at the hospital, the determination made by

19   the Medical Director or designee and the review of

20   that procedure.  We have, at times, touched on

21   various aspects.

22       Q     What do you mean when you say the

23   review of the procedure that at times you've touched

24   on various aspects?

25       A     I'm saying the review of the procedure

Page 46

1                    DR. ROBERT EILERS

2    by the RENNIE advocate and how that -- you know, how

3    that is consistent with the policy and how we can,

4    from a quality improvement basis, how we can improve

5    that process to ensure that.  As I mentioned, we are

6    moving towards more of a patient focused recovery

7    oriented approach and we want to ensure that -- this

8    is both in all aspects, particularly in regard to

9    treatment planning, all of our hospitals have

10   initiatives around treatment planning and medication

11   is one part of the treatment plan, how the

12   medication can be provided so that the patient's

13   wishes, the patient's concerns are addressed.  And

14   hopefully a treatment plan can be developed that

15   would both meet their treatment needs and also, you

16   know, their goals for recovery.

17        Q     Okay.  And so I think you may have --

18   you may have already addressed that, but I just want

19   to make sure I have it.  When you say patient center

20   recovering wellness, how do you define that?

21        A     Well, we as treaters have a view of

22   patients having a disease and wanting -- having a

23   need for treatment.  But patients themselves are

24   consumers.  We call people mostly in the community,

25   although in the hospital we tend to use both terms.

1                    DR. ROBERT EILERS

2    They have their own goals and their desires for

3    themselves and what a recovery means.  They're not

4    just looking at, you know, getting rid of symptoms

5    or changes in their behavior, they're looking for

6    their goals in their life, what they want for

7    themselves.  And their recovery is specific to their

8    own desires and needs.  So we try to say to them,

9    what are your goals, and we try to align those goals

10   with the treatment goals so that hopefully people

11   don't have to be in the hospital, you know, very

12   long and they can have a productive life in the

13   community.  We try to have that be the focus of

14   treatment, not just, you know, symptoms and

15   behaviors and the usual things that we think about

16   when we think about clinical programs.

17        Q        Thank you.  That's very helpful.

18                  Turning back to the discussions that

19   you've had about potential changes to AB:504, I

20   think one of the things that you mentioned is

21   discussions of enhancements to the policy.  What do

22   you recall discussing about enhancements to the

23   policy?

24        A        Well, one of the enhancements had to do

25   with the process in terms of the three steps,

1                    DR. ROBERT EILERS

2    ensuring that the three steps are -- are completed,

3    as required by the AB, that there be the initial

4    discussion with the psychiatrist, with the patient,

5    that looks at the patient's treatment plan, the

6    patient's own goals for treatment, as I said, and

7    any alternatives that are available are considered.

8    Alternatives of a less restrictive nature, the

9    medications, but if medication is seen as necessary,

10   any alternatives the patients might agree to and

11   consent.

12                    Then the second step we've looked at

13   the involvement of the RENNIE advocate to ensure

14   when the patient meets with the team that the RENNIE

15   advocate has had a chance, at least to talk to the

16   patient, and offer assistance, and be available for

17   that meeting with the team and that that second step

18   not take place until that occurred.  We've also

19   looked at in terms of the Medical Directors and

20   designee issue who is going -- who is doing the

21   reviews and made sure that, you know, we have -- we

22   have had staff that if the Medical Director can't do

23   the review, and the Chief of Psychiatry can't do the

24   review, in those limited times that the other staff

25   would do it are limited to those who are very

1                    DR. ROBERT EILERS

2    knowledgeable of the procedure. And although that

3    was occurring in our hospitals, we just wanted to

4    make sure that that continued to occur, and that

5    there was an understanding that the documentation

6    was very important.

7                We wanted to make sure that the

8    documentation was completed so that anyone looking

9    at that record, particularly the RENNIE advocate's

10   review, would see that the steps were followed

11   completely and that there was full documentation

12   about each of these aspects I mentioned, and then

13   that there would be a good working relationship

14   between the RENNIE advocate and the Medical Director

15   of the facility, that there be frequent

16   communication, there be discussion of the

17   individuals who are on refusing status. There --

18   and that there would be issues in case if we were

19   looking in some instances for an IP, if the RENNIE

20   advocate felt there was a need for an IP, that the

21   Medical Director would assist the RENNIE advocate

22   with that and if necessary, the division would

23   assist in assisting with IPs. We've looked at those

24   issues because of some past difficulties obtaining

25   IPs. So we've looked at all of those aspects,

Page 60

1                    DR. ROBERT EILERS

2          Q      I think a second issue that you

3     mentioned that came up in terms of potential changes

4     to AB:504 was whether the RENNIE advocates had a

5     chance to speak with the patient, I guess in advance

6     of the treatment team meetings; was that correct?

7          A      That's correct.

8          Q      And why was that an issue that came up

9     for discussion?

10         A      Well, I don't remember specifically why

11    that came up for discussion except that in I know my

12    discussions with Karen Piren and the RENNIE

13    advocates themselves, and understanding the

14    requirements of the RENNIE procedure, the whole

15    focus of having a RENNIE advocate is to ensure that

16    those patient preferences are heard and we know

17    there is an imbalance of powers in some ways where

18    the patient and a treatment team, a physician, a

19    person of authority, and we felt that having the

20    RENNIE advocate just as having a family member or

21    someone else that they could have present, would

22    kind of rebalance that.  And so we wanted also to

23    have that early discussion with the RENNIE advocate

24    so that any treatment issues that we needed to be

25    aware of we'd be aware of right away before the

1                    DR. ROBERT EILERS

2     treatment started, rather than just having, you

3     know, the RENNIE advocate involved after -- after

4     those -- the second or third step occurred.  We

5     wanted them to be involved upfront.  We felt it

6     would just be a way of adding, as I said, something

7     to the procedure I think that was not specifically

8     stated, necessarily, in the 504, but was in the

9     spirit of the 504.

10         Q    Okay.  So is it correct, then, that

11    there were times, I guess, before these discussions

12    took place where the RENNIE advocates were only

13    brought into the process either after the second or

14    third step had been completed in AB:504?

15         A    They received notification, but I'm not

16    sure whether they -- in every instance I'm sure they

17    didn't.  They had the opportunity, you know, to see

18    the patient beforehand, before the second or third

19    step took place.

20         Q    Okay.  And again, I'm paraphrasing just

21    a little bit, so tell me if I'm getting any of this

22    wrong.  One of the reasons that you all wanted to

23    bring the RENNIE advocates in earlier, like prior to

24    the treatment team meeting, was so that they could,

25    I guess, help ensure that the patient's goals or

1                    DR. ROBERT EILERS

2      order to establish these meetings in a timely way,

3      may prevent some of the members of the team from

4      being there.  We want this to be as many members of

5      the team as possible and certainly, the

6      psychiatrist, nurse and another member of the team,

7      and then we want the Medical Director's review to --

8      you know, to thoroughly -- to have that face-to-face

9      evaluation and to have the rationale described and

10     clearly written as to why the refusal was

11     overwritten.

12                    We also are, and along with that,

13     instituting a 90-day review of RENNIE procedures.

14     So if someone is on 90 days, that there will be

15     another clinical review by the Medical Director to

16     ensure that, at that point, the patient is still not

17     refusing and the medication is necessary and meets

18     the criteria.

19          Q      Is the 90-day review that you just

20     described, a part of AB:504 or part of a new revised

21     policy?

22          A      Well, it's one of the enhancements of

23     the policy.

24          Q      But is it an enhancement to AB:504 or

25     is it part --

DR. ROBERT EILERS

BY MS. WELLS:

Q Do you recall that remark?

A I'm saying I recall that in discussing the reasons why we're enhancing the process and the due process, hopefully protecting the due process rights of patients, that that discussion said in some instances the due process rights are protected by attorneys and we've had discussions. I mean, I think some of our staff are very knowledgeable and I don't remember specifically, but I'm saying I'm sure the issue came up in a discussion of the RENNIE process and what alternatives exist.

Q Setting aside any conversations that you've had with Miss Sciaston, or other attorneys, are you aware of anyone at DHS who supports the idea of providing counsel?

A No.

Q What's your opinion as to whether or not counsel should be available?

A Well, I'm somewhat aware of what goes on, just from reading, not from any direct knowledge, but my belief is that a clinically-driven process is superior because these are often complex decisions and I don't feel that a clinically-driven

1              DR. ROBERT EILERS
2    process, as long as there is protections as we have
3    in our system and we're going to have even greater
4    in the future, in the near future with this new
5    procedure, I don't think that a legally-driven
6    process with a hearing substantially would change
7    the final determination and I think would add a
8    layer of bureaucracy and potential delay and really
9    take away from the negotiation.  I think the give
10   and take with -- you know, over the treatment plan
11   and the -- as I mentioned, this recovery-oriented
12   focus we're trying to do, I think we want to -- I
13   think it's preferable to be a clinically-driven
14   process, as long as, you know, you have the adequate
15   protections in place, which we feel with our new
16   procedure, more than ever, these will be in place.
17        Q      Have you ever worked in a state where
18   counsel was provided to folks who were going to be
19   involuntarily medicated?
20        A      No.
21        Q      You're aware that patients have counsel
22   present at commitment hearings, correct?
23        A      Yes.
24        Q      Is there a reason that you think it
25   should be different for involuntary medication

1                    DR. ROBERT EILERS

2    hearings or proceedings?

3         A      Yes, I think -- I think one reason I

4    can think of, I mean, obviously a civil commitment,

5    involuntary hospitalization is a, you know, major

6    restrictions on that person's autonomy and I think

7    requires a hearing.  And I think -- I don't think,

8    though, that a legally-driven process where there

9    would be hearings about medications would be -- are

10   necessary if there can be a clinical process that

11   can drive that, as long as there are adequate

12   enhancements.  I think the -- to me it's not just

13   the decision to medicate, it's what happens after

14   the decision.  Whether that person, as I mentioned,

15   who has recovery goals, who has their own

16   preferences about treatment, their own short and

17   long-term goals for recovery, how that is carried

18   out.  And I think a clinically-driven process is

19   superior, rather than to insert another hearing and

20   to involve -- make this a legal issue fully, that as

21   long as the patient's due process rights are

22   protected in that determination, that that is

23   superior.  It won't add to delays and add this layer

24   of bureaucracy that takes the decision out of, you

25   know, out of that discussion between the patient and

1                    DR. ROBERT EILERS

2       the team, which is so critical, that need for

3       engagement is so critical to their eventual recovery

4       and discharge from the hospital.

5                    And I'm not aware of how the

6       legally-driven processes really changes the outcome

7       substantially, but I'm concerned that it could add

8       to these -- these issues, these issues of delay,

9       issues of -- you know, making it more of a legal

10      process than a treatment-driven process.

11          Q       You're familiar with the process for

12      commitment hearings, correct?

13          A       Yes.

14          Q       How long does it take from start to

15      finish for a typical patient who is going to be

16      committed?

17          A       It can vary considerably.  I mean,

18      we've had hearings that can go from just a few

19      minutes, if it's a recommitment, if there's a person

20      has been at the hospital where they've clearly still

21      require a commitment, or it can last much longer,

22      particularly if somebody who has been in the

23      hospital, you know, under -- we have individuals,

24      for example, with characterological disorders who

25      don't -- may not as clearly meet some of the

Page 94

1                    DR. ROBERT EILERS

2          Q     Okay.  Do you think that the use of

3    psychotropic medications on an involuntarily basis

4    restricts the autonomy of a patient?

5               MR. LEYHANE:  Object to form.

6               You can answer.

7               THE WITNESS:  I'm not sure what you

8        mean by "autonomy" in that -- in that

9        question.

10   BY MS. WELLS:

11         Q     Okay.  I was trying to use a word that

12   you used a few minutes ago.

13         A     Okay.

14         Q     And so how did -- what did you mean

15   when you said "autonomy" a few moments ago?

16         A     Well, autonomy is the person's ability

17   to make decisions for themselves, and I think

18   oftentimes medication can improve their autonomy if

19   they can't make decisions for themselves because

20   they're having delusional thinking or they're having

21   frequent hallucinations or, you know, as a result of

22   their behaviors they are being confined or in some

23   cases even, you know, restrained or secluded.  These

24   obviously take away from their autonomy.  So it's

25   hard to say.  Medications do have side effects that

Case 1:10-cv-03950-JBS-JS Document 122-9 Filed 11/28/12 Page 22 of 52 PageID: 2245

1                    DR. ROBERT EILERS

2     they are -- many of them are sedating.  Many of them

3     are -- you know, they have side effects which can

4     restrict their autonomy if they -- if they need

5     treatment for those side effects, they're not

6     necessarily able to fully manage for themselves in

7     an independent setting, if they need that treatment.

8     Usually these are short-term issues.  But I would

9     say -- so it goes both ways, but generally

10    medication improves patients' autonomy.  And I think

11    that's our goal with patients is to have maximal

12    autonomy.

13         Q      Do you think that's also the case when

14    a patient is legally competent to make their own

15    medical decisions?

16              MR. LEYHANE:  I'm sorry, does he think

17         it's the case when?

18              MS. WELLS:  The patient is legally

19         competent to make their own medical decisions.

20              You can answer.

21              THE WITNESS:  I'm sorry, what is the

22         case when they're legally competent?

23    BY MS. WELLS:

24         Q      I'm sorry, so you were describing the

25    pros -- the balancing of the effects of personal

Page 96

```
 1                    DR. ROBERT EILERS
 2    autonomy when psychotropic medication is used.
 3         A      Right.
 4         Q      Is that affected, the balance that you
 5    described, by the fact that a patient is legally
 6    competent to make their own medical decisions?
 7              MR. LEYHANE:  Object to form.  I don't
 8         know that the -- go ahead.
 9              THE WITNESS:  I don't know. That to me
10         is a legal issue and I'm a clinician.
11         Although I have some understanding of the
12         legal issues, I'm -- I'm not clear about the
13         question and how, you know, how I can clarify
14         whether -- whether that person, who is legally
15         competent -- we presume every patient to be
16         legally competent, so -- unless, of course,
17         they have been adjudicated incompetent and
18         they have a guardian, I think this is the way
19         we approach addressing patients, you know, and
20         their autonomy.
21    BY MS. WELLS:
22         Q      So assuming, then, that they're, in
23    your view, legally competent, because that's the
24    assumption, does it limit a patient's autonomy by
25    being forced to take medication that they don't
```

Page 102

1                    DR. ROBERT EILERS

2      a little cumbersome, but yeah, we -- it would

3      probably replace 504. Whether it would be 504 or

4      not, we might want to number it differently so

5      people understand that it's not the 504.

6            Q      Well, for the purposes of the

7      deposition today, will you be comfortable if I refer

8      to it as the new policy or the proposed policy?

9            A      That's fine.

10           Q      Okay. And you'll understand that this

11     is the document, Exhibit 45, that I'm referring to?

12           A      Yes.

13           Q      Because I agree, the full title there

14     might be a little cumbersome for us both. Okay.

15                  So backing up a bit, was there a

16     working group or another group of folks who were

17     involved in drafting this document?

18           A      It was an informal group and consisting

19     of our attorneys. Basically, lead my Miss Sciaston,

20     Lisa Sciaston; the Director of State Hospital

21     Management, who I mentioned earlier since he

22     oversees all the State hospitals.

23           Q      Is that Mr. Whitenack?

24           A      Mr. Whitenack, yeah, John Whitenack;

25     Karen Piren, myself, and also working with our

1                    DR. ROBERT EILERS

2    Attorney General's office.

3         Q       Anyone else?

4         A       Well, we've consulted with others,

5    certainly with the RENNIE advocates.  We've

6    consulted with the managing physicians, as I

7    mentioned.  They have had input, and we've consulted

8    with our hospital CEOs, our Nursing Administrators,

9    basically Directors of Nursing at our hospitals

10   since much of the role falls on the nursing staff.

11   They've all had input, but they weren't in that --

12   the workgroup that met to discuss the issues with

13   the specific formation of the policy.

14        Q       Okay.  So fair to say the RENNIE

15   advocates, the CEOs, the nursing administrators were

16   ad hoc, they were ad hoc participants in the working

17   group?

18        A       That's correct.

19        Q       Okay. And as for the regular

20   participants that you listed, did you all meet on a

21   regular basis?  How did you come together to draft

22   the policy?

23        A       Well, we had meetings, but we also had

24   a lot of discussion between meetings.  I don't think

25   we had regular meetings per se where we established

Page 108

1                    DR. ROBERT EILERS

2    individual who started the process out and said,

3    okay, we should sit down and look at revising this

4    policy or how did it come about?

5        A       I think -- I don't know if there was a

6    specific individual because we had a lot of

7    discussions and I don't know if it came specifically

8    from the legal side -- I assume it came from the

9    legal side because I wasn't -- although I was aware

10   of the process in Corrections from having

11   discussions with them over the years, I didn't know

12   much about it.  And the I believe one of our

13   attorneys, and I don't remember specifically who,

14   talked about this.  We started to look into -- I was

15   -- I said I would look into it.  And as I mentioned,

16   I was in contact with the Department of Corrections

17   and I did eventually make arrangements to actually

18   participate or sit in on one of their medication

19   review hearings to review their policies, to talk to

20   some of their managing psychiatrists, and then to

21   bring that back to your staff.

22       Q       I want to turn to the meetings that you

23   mentioned with the Department of Corrections in just

24   a moment, but going back to your working group, how

25   frequently did you all meet to discuss the policy,

Page 110

1                    DR. ROBERT EILERS

2    say?

3         A    I think some time around there.  I

4    can't remember specifically when we first put the

5    draft together or we started to put this down.  We

6    talked about the issue, for example, with the Client

7    Service Representatives, our RENNIE advocates.

8    We've been talking about this for a while.  That our

9    RENNIE advocates are not clinicians, yet they're

10   given a lot of responsibility in terms of ensuring

11   this process occurs, and we talked about somehow

12   having a clinician, who was -- who was knowledgeable

13   of the medication practices.  And so we have had

14   discussions, Karen Piren is very -- is -- as a

15   psychiatric advanced practice nurse is very familiar

16   with the training and the requirements for the

17   psycho pharm certification for advanced practice

18   nurse, so we talked about the potential for hiring

19   APNs, the staff -- the recruitment issues that would

20   entail versus an RN.  We did have an RN work as a

21   RENNIE advocate at one of our hospitals, at Hagedorn

22   as -- since they did not have a RENNIE advocate.

23   And, you know, the input we got from what we saw out

24   of that process is there were helpful aspects to her

25   role with her background as an APN, so that factored

1              DR. ROBERT EILERS

2    in.  So we started to develop this idea, that maybe

3    as part of this hearing, this medication review

4    hearing, in addition to having an independent panel,

5    we could have these, you know, these

6    semi-independent, APN level nurse practitioners or

7    APNs involved with the setting up and these panels

8    and, you know, working with the RENNIE advocates in

9    terms of these issues.  So that started to, you

10   know, look to us like this would address some of

11   these issues that I mentioned earlier with the

12   RENNIE, you know, with this -- the need for the

13   clinical input and also the imbalance of power,

14   authority because you have the authority of the

15   psychiatrist on one side and independent panel, but

16   then you have the RENNIE advocate and, you know,

17   helping the patient represent their views that we

18   thought that this would certainly address some of

19   that.  So we started talking more seriously about

20   this.

21              We started to say, well, would we have

22   positions.  We do have some APNs in our hospitals,

23   but they don't fully practice as APNs.  We have

24   clinical nurse specialists who have the same

25   training.  So we felt we could -- we could have a

Page 112

1                    DR. ROBERT EILERS
2      Master's level nurse fulfill this role and so we
3      started talking more specifically about we should
4      develop a position for this -- this role and call
5      this -- not to confuse it with Client Service
6      Representative, which we led on the idea of a Client
7      Service Advocate.
8           Q       So going back to the initial, I guess,
9      goal of drafting the policy, was it always the --
10     was it always the intent of the working group that
11     the policy would include what I think you've called
12     a hearing review panel?
13          A       I think we -- that was clearly our
14     goal, to keep it a clinical process, clinically
15     driven.  And if we could have independent experts,
16     the panel led by an independent psychiatrist, and
17     other clinicians.  And we have here clinician and an
18     administrator who are not from the patient's unit,
19     so that would be an independent, objective view, of
20     the issues.  And I think we started to think about
21     the logistics of it, the additional staff, how we
22     would -- I mean, since we've had problems, some
23     issues, as we've talked about over the years of
24     sometimes getting IPs, one of the issues, though,
25     this would be a regular panel, whereas the IPs we

1          DR. ROBERT EILERS

2     have now are just hired as needed.  You know, it's

3     episodic.  But this would be in some ways relatively

4     easier to ensure we could get IPs if we could do

5     this on a more regular basis.  So we factored that

6     in and we started looking at where would we get

7     these independent psychiatrists and how would we

8     incorporate them in this role in the hospitals.

9          Q     Is Exhibit 45 that you have the final

10    version of the new policy or is it still undergoing

11    revision?

12         A     Well, I think it's probably going to

13    undergo revisions.  I think it's a draft we're using

14    for now, but there will be -- as I mentioned, the

15    one reason we want to roll it out incrementally by

16    hospital is to understand what the issues are in the

17    hospitals.  This is -- I don't know if this kind

18    of -- aside from what occurs currently in the

19    Department of Corrections, I don't know of this

20    policy or this specific policy being implemented

21    anywhere, particularly the role of the Client

22    Service Advocates, it's probably something that is

23    unique.  Although it is based -- the policy, the

24    panels themselves are based on -- somewhat on what

25    is occurring in the Department of Corrections.

Page 122

1                    DR. ROBERT EILERS

2     psychiatrists.  Again, I should know his exact title

3     or role, but I met with him when I went to the

4     prison, Trenton, in Trenton here to receive this

5     process.

6          Q      And so that meeting was between

7     Dr. Kaldany; is that right?

8          A      Kaldany, yeah.

9          Q      Kaldany?

10         A      Kaldany, K-A-L-D-A-N-Y, I believe.

11         Q      Thank you.  Was anyone else present

12    besides the two of you?

13         A      Well, there were the people in the unit

14    who were doing the review.  But we had a meeting

15    prior to this, I should say, with Miss Sciaston and

16    Miss Griffin with some of their other staff prior --

17    at Corrections about the procedure before.  We

18    wanted to ask them for their -- to look at their

19    policies.  We wanted to ask them whether we could,

20    in fact, have the direct observation.  And that was

21    a meeting to set that up.  And that was at the

22    Department of Corrections in Trenton.  So we -- we

23    had that initial meeting and then we got the okay to

24    have -- for Miss Griffin and I to individually go

25    and see these -- these hearings take place.

1               DR. ROBERT EILERS

2        Q     Okay.  So the question about whether

3   you could have direct observations was whether you

4   could go and observe at their own medication review

5   hearings?

6        A     That's correct.

7        Q     And was the purpose of the meetings

8   overall with the Department of Corrections to

9   discuss the way that they handle involuntary

10  medication of prisoners?

11       A     To look at their policies to see if are

12  any -- if their are aspects of their policies that

13  would be -- that could be models and to understand

14  how these hearings were held and to see these

15  firsthand, yeah.

16       Q     Did you receive copies of those

17  policies?

18       A     We did.

19       Q     And what -- what issues about how they

20  conducted medication review hearings did you discuss

21  with Dr. Kaldany and his team?

22       A     Well, I was interested to see how the

23  hearings -- who was -- who was on the hearing panel,

24  what notification and what prior activities took

25  place prior to the hearing to develop, you know,

Page 124

1                    DR. ROBERT EILERS

2      the -- to provide the documentation to notify the

3      patient of the hearing, and just how the process

4      was -- was managed, you know, before and after the

5      hearings took place in addition to seeing what the

6      hearings -- what happened at the hearings to see

7      whether -- what kind of clinical issues they were

8      addressing, whether there was similarities with our

9      system and how, you know, what kind of due process,

10     just in general, using that term, procedures took

11     place and whether this was a model that was feasible

12     or preferable in some way to what -- you know, what

13     we've done with our three-step reviews.

14         Q     And as to that last question, whether

15     their model was feasible or preferable as to what

16     DHS has done with its three-step reviews, how did

17     you come out on that question or how did the working

18     group come out on that issue?

19         A     I think from our review of the policies

20     and our observation, we didn't think their model was

21     preferable to our process.  However, we thought that

22     with certain enhancements to that model we could

23     develop a procedure that potentially was preferable

24     to what we have been doing.  It would require a

25     number of changes.  And these are the changes to the

Page 128

1               DR. ROBERT EILERS

2    We were talking about enhancements that the working

3    group thought might work in the context of DHS

4    hearings and I think you mentioned the presence of a

5    RENNIE advocate, the presence of a independent

6    psychiatrist, a panel decision, and well trained

7    staff to participate on that panel.  Did I get them

8    all right?

9         A     That's correct.

10        Q     So the RENNIE advocate, is that a

11   position where there was -- for the Department of

12   Corrections process, is there no RENNIE advocate or

13   equivalent involved?

14        A     That's correct.  There is no -- as I

15   understand it, there is no equivalent.  What they

16   have is staff persons or social workers who may --

17   who give notification to the patient and there's not

18   a representative of a position or a person who is

19   primarily responsible to be the patient advocate in

20   that.  They may have a role in the hearing as an

21   advocate, but they don't have an independent -- you

22   know, a staff member, whether clinician or not,

23   who -- is my understanding, taking on that role.

24   And that's what I felt, if we had that, that would

25   improve the process.

1                    DR. ROBERT EILERS

2           A      Sorry.

3           Q      Are there differences between the CSA

4     and the social worker who is used over on the DOC

5     side, other than clinical training?

6           A      I think there is a difference in that

7     we're talking about a person dedicated to this role

8     who has the Client Service Representative, the

9     RENNIE advocate report to them, so we have two

10    staff, one of whom is responsible for initially

11    meeting with the patient, talking to the patient,

12    educating the patient about the process.  That would

13    be the Client Service Representative or RENNIE

14    advocate.  And a clinician who has a background in

15    understanding of psychopharmacology and who fully

16    understands the clinical issues involved in

17    medicating people with psychotropic medications

18    working together with a panel, an independent panel,

19    to ensure that, you know, the appropriate decision

20    is made that, you know, was in the best interest of

21    the patient and also represents their -- their

22    concerns.  I think that's what we're trying to meld

23    together here.  It's a process that will enhance

24    what we're currently doing.

25          Q      Are there any other changes that DHS

Page 138

 1                    DR. ROBERT EILERS

 2           Q      Do you know or was there any discussion

 3    of how I guess the folks at the psychiatric

 4    hospitals will determine whether there's a

 5    likelihood of serious harm to self, others, or

 6    property without medication?

 7           A      Well, again, this is going to be part

 8    of our training.  We expect that we're going to be

 9    talking using vignettes, using a much more detailed

10    discussion.  We -- the harm, as we understand it, is

11    in the reasonably foreseeable future.  It's not the

12    same standard as the emergency medication standard

13    of imminent or impending danger.  It's in the

14    immediate future.  And it should have been

15    evidenced, as we say in our standard, by some either

16    threat or behavior that suggests the person is

17    placing themselves or others at risk or that their

18    clinical condition is deteriorating to such that

19    they'll be unharmed.  You know, or there is

20    destruction of property, for example.  There has to

21    be -- we'll have -- we'll have to provide details

22    and discussion.  I mean, that's been a concern that

23    we are changing a standard, as well as a process

24    here.  That is a significant change with the policy.

25           Q      You mentioned training materials on

```
1                      DR. ROBERT EILERS

2    this.  Have there been any training materials

3    drafted on this new policy?

4         A      No, there have not.

5         Q      On the standard we were just

6    discussing, serious harm to self, others, or

7    property without medication, can it be based on past

8    behavior of a patient?

9                MR. LEYHANE:  Object to form.

10   BY MS. WELLS:

11        Q      As opposed to current behavior.

12        A      I think the past behavior factors in,

13   but it's not the primary consideration.  It's the

14   current clinical status.  Past behavior is always

15   predictive of future behavior -- future violence.

16   It's a -- you can't remove that factor.

17        Q      Is it fair to say, then, that under

18   this standard it would be appropriate for the

19   treating psychiatrist to review or refer to other

20   incidents in the patient's medical records in making

21   this determination?

22        A      I think it would be fair to say that

23   incidents that are of recent or that current

24   behaviors that are similar to past behaviors where

25   there was violence occurring would be factored in
```

1                    DR. ROBERT EILERS

2    and would be considered in that definition of the

3    criteria for reasonably foreseeable future for a

4    prediction.

5         Q    Is the idea that recent behaviors or

6    current behaviors would be properly factored in and

7    documented in the policy, as opposed to behaviors

8    that could have happened a month ago, or a year ago,

9    or 10 years ago?

10        A    I would think that would be -- that

11   would certainly be a factor, yes.  We would want to

12   see more -- similar to the commitment standard, we

13   would want to see more recent behaviors and again,

14   you know, that's a general rule, but certainly we

15   have individuals who under certain conditions with

16   certain symptoms or behaviors indicate an underlying

17   psychotic process that could be leading to violence,

18   even though they have not demonstrated this

19   outwardly.  There are -- there are situations where

20   that occurs.

21        Q    I think I may have asked an unclear

22   question.  What I was trying to get at is, is that

23   notion that it's appropriate to look at more recent

24   behavior as opposed to older behavior actually

25   written into the policy anywhere?

Page 144

1                    DR. ROBERT EILERS

2    BY MS. WELLS:

3         Q    Okay, Dr. Eilers, welcome back from

4    lunch.

5              Before we took our break, we were

6    discussing the DHS proposed policy that will replace

7    AB:504, which has been marked Exhibit 45.  I think

8    you still have that in front of you; is that right?

9         A    Yes.

10        Q    I'd like to turn to the definition

11   section.  The first defined term is Client Service

12   Advocate. My first question about this is, the

13   definition appears to say that the CSA will report

14   directly to the CEO or Deputy CEO of each hospital

15   and to the Medical Director through the Coordinating

16   Chief of Client Services Advocates.

17             Is that correct?

18        A    That's correct.

19        Q    Okay.  So my first question is, is

20   there a direct reporting relationship to both the

21   hospital staff, the CEO or Deputy CEO, and up

22   through the Coordinating Chief of Client Services or

23   is there a dotted line report to one?

24        A    There's a direct report to the CEO and

25   a dotted line reporting to the Coordinating Chief of

Page 150

                    DR. ROBERT EILERS

 1

 2        A       Well, their responsibilities -- and

 3   again, this is all new, but I think we put in the

 4   policy that they should report these to the Medical

 5   Director.  However, I would also see that they would

 6   address them directly with the treating psychiatrist

 7   and the treatment team.  But they will -- they will

 8   be working closely with the Medical Director and I

 9   suspect the Medical Director would -- as we have --

10   I mentioned here, the biweekly reports coming in

11   from the treating psychiatrists.  They will be

12   working -- they will be looking at these biweekly

13   reports and they will be conferring with the Medical

14   Director with any patient they have concerns about.

15        Q       In the event that there are -- I guess

16   if the CSA observes that the medicine isn't

17   effective or there are side effects, is there any

18   kind of formal review that is triggered by that

19   observation?  Because we're talking right now about

20   patients who have already been involuntarily

21   medicated, correct?

22        A       That's correct.

23        Q       So would there be any review that's

24   triggered by those observations that there are

25   negative side effects from the medicines?

Page 152

                      DR. ROBERT EILERS
 1

 2      would be some kind of formal or official or even

 3      unofficial review, if the CSA observed side effects

 4      or that the medication was ineffective, that's not

 5      written into the policy?

 6          A       That's not written into the policy I

 7      don't believe right now.  Yeah, I would have to

 8      agree with that.

 9          Q       Are CSAs charged with advocating for

10      the express preferences of their patients who were

11      involuntarily medicated or subject to that?

12          A       Again, we talked about this with the

13      RENNIE advocate and I think it's -- it's a similar

14      role.  They're advocating in as far as they want to

15      have the patient's preferences, values, concerns

16      about medication at least expressed to the panel, to

17      the Medical Director.  There is certainly in that a

18      degree of advocacy, but they're also clinicians and

19      so they're going to be evaluating the person's

20      clinical response or clinical needs as well.  But I

21      would say -- I would say because we are calling them

22      Client Service Advocates and that is an aspect of

23      their role, yes.

24          Q       Is it the case that if the observations

25      of the CSA from a clinical perspective is somehow

```
 1                    DR. ROBERT EILERS
 2         Q      -- if he or she is determined that
 3    medication is appropriate?
 4         A      I'm sorry, yes.  You're talking about
 5    before.
 6         Q      So before initiating that procedure, is
 7    there any requirement that there be a meeting with
 8    the patient before the procedure is implemented?
 9         A      I mean, we didn't spell it out here,
10    but I think that's certainly -- that's a
11    requirement, that there always is a requirement that
12    the -- when the psychiatrist is meeting with the
13    patient as part of their -- you know, whatever
14    aspect of the -- where they are in the treatment and
15    they're making a recommendation for a medication and
16    they're explaining the -- why they feel the
17    medication is necessary, why -- what are the risks,
18    what are the side effects, what, if any,
19    alternatives exist, and what would happen should
20    they -- the patient not consent, that they have --
21    they can talk to the RENNIE advocate.  All of that,
22    I would assume, still would exist under this new --
23    under this new procedure.
24         Q      But is it correct that it's your
25    understanding that that's not explicitly stated in
```

1                    DR. ROBERT EILERS

2    the policy?

3         A       I don't see it explicitly stated,

4    that's correct.

5         Q       So, for example, if the treating

6    prescriber was -- had a day off and came back on

7    duty and a nurse or someone else reported that the

8    patient engaged in some kind of behavior that they

9    believed made -- presented a likelihood of serious

10   harm to self, others or property, would the treating

11   physician need to meet with that patient again in

12   order to implement the policy or could they rely on

13   the word of the other doctor, the nurse, or the

14   staff member?

15        A       No, I would expect them, that they

16   would have to meet with the patient.  I think the

17   policy -- we can't -- the engagement of the patient

18   with the treating psychiatrist regarding the

19   medications and the options available, to me is

20   without -- goes without saying, that that has to be

21   part of the policy, and it can't be the decision to

22   refer, complete an IMR should be made based on some

23   information that that subsequent psychiatrist hears

24   or reads in the chart I don't think is appropriate.

25   I think -- I think -- and again, we can flesh out

Page 200

```
 1                    DR. ROBERT EILERS
 2    the details, particularly in completing this IMR.
 3    The IMR, I believe, requires -- it's going to
 4    require a face to face, and it's going to require
 5    that all of these alternatives are discussed with
 6    the patient, that they discussed alternatives. They
 7    discussed less restrictive.  They discussed the
 8    treatment that's proposed, the side effects of the
 9    treatment, any other issues that the patient has a
10    concern, that all would be built into this and I
11    know it doesn't say it here, but I'm positive that
12    with -- that is a requirement here.
13        Q      The next paragraph mentions an
14    involuntary medication administration report.  Do
15    you call that -- what do you guys refer to that as,
16    if anything?  Is there a shorthand -- is it IMAR or
17    is it IMR is what I'm really asking?  Or is it
18    something?
19        A      Well, we're referring to this as the
20    IMAR.  The first section of the report, which goes
21    to the panel with the recommendation from the
22    treating psychiatrist, that's the IMAR.
23        Q      Is there a draft of that form that's
24    been created?
25        A      I believe there is.
```

Page 208

1                    DR. ROBERT EILERS

2    weekend or a holiday somewhere in the middle?

3         A      That's correct.

4         Q      Then it also says that the Client

5    Services Advocate and the patient will be provided

6    with notice of the hearing and the IMAR form at

7    least two business days prior to the hearing date.

8                    Do you see that?

9         A      Yes.

10        Q      Is there a reason that there's a gap --

11   if the hearing is going to take place five days out,

12   is there a reason that the form needs to be -- and

13   the notice needs to be transmitted to the CSA and

14   the patient only two days before?

15        A      You know, I don't remember the reasons

16   for putting the timeframe in here for the two

17   business days and that gap, as you mentioned.  I

18   understand there needs to be an evaluation in that

19   period of time, the CSA has to be involved, and I

20   don't know if that's -- if that's the reason this is

21   put in here, but there needs to be some time in

22   order to -- first there needs to be time to schedule

23   a hearing, that's one issue with the five business

24   days, getting these independent panelists scheduled.

25   And I would hope then the CSA is involved.  But as

1                    DR. ROBERT EILERS

2          words, --

3                    MS. WELLS:  I've heard your objection.

4                    You can answer, Dr. Eilers.

5                    THE WITNESS:  Well, we're saying here

6          that the standard is, you know, dangerousness

7          so far in the reasonably foreseeable future,

8          and again we're not talking about an emergent

9          need for medication.  So that is why hopefully

10         with this procedure in place, patients --

11         there will be a limited -- there will be a

12         time period in which the patient will not

13         necessarily receive medication, unless they

14         meet the standard for the emergent medication.

15     BY MS. WELLS:

16         Q     If you look to paragraph letter I, it

17     says, The medication review hearing shall take place

18     on the patient's unit.

19                    Do you see that?

20         A     Yes.

21         Q     Was there any consideration of doing

22     the hearings in a location other than the patient's

23     unit?

24         A     I don't recall any discussion about

25     doing these hearings elsewhere.  There certainly may

Page 260
```
 1                     DR. ROBERT EILERS
 2   connection with the involuntary medication process,
 3   do you recall generally that discussion?
 4         A     Yes.
 5         Q     You said that one of the concerns that
 6   you had was that it could interfere with the
 7   doctor-patient relationship; is that correct?
 8         A     That's correct.
 9         Q     Is it your understanding that for
10   commitment hearings that the treating physician and
11   potentially other hospital employees will testify at
12   those hearings?
13         A     That's correct.
14         Q     Does that interfere with the
15   doctor-patient relationship?
16         A     It does at times, yes.  In some cases
17   there are hospitals that have individuals doing
18   hearings that are not affiliated with the treatment
19   team to offset that issue.  In our system it's --
20   that's not possible.  We need to have a -- someone
21   present who is knowledgeable of the patient and that
22   is the treating psychiatrist.  But it doesn't -- it
23   does lead to tension and sometimes, you know,
24   interferes with the treatment process when we have
25   someone who is providing their treatment, who they
```

1                    DR. ROBERT EILERS

2     different because of the fact that, at least in our

3     setting, people are admitted -- they're committed to

4     treatment against their will.  Oftentimes the

5     treatment requires them to receive psychiatric

6     medication.  It's a common -- a more common

7     necessity or a practice given the nature of that

8     commitment and their placement in the hospital.  And

9     I think there needs to be a process, for example,

10    such as a special medical guardian for people who --

11    even though we are getting guardians right now for

12    people who are not able to consent for psychotropic

13    medication, as I mentioned earlier, I think there is

14    a very common situation of patients presenting with

15    the likelihood of being dangerous to themselves or

16    others if they are not medicated and I think there

17    has to be in place a process to allow that

18    determination for medication to be made that is

19    more -- you know, is more available, if needed, for

20    staff and the patients in order to provide a safe

21    environment, and meet the patient's treatment needs.

22    So I'm just saying I think it's hard to compare the

23    medication issues for medical issues like diabetes

24    or other kinds of conditions with that of somebody

25    who is -- who is admitted for -- for treatment

1           DR. ROBERT EILERS

2           they're committed there for a psychiatric

3           illness as a result of being deemed dangerous

4           to self or others, they're more likely to need

5           a medical -- a psychiatric treatment on a --

6           as a primary focus of that care and therefore,

7           I think the procedures, comparing one to the

8           other, I was just suggesting there is a

9           different purpose for or -- and frequency of

10          need for a procedure that allows psychotropic

11          medication, non-consentually.

12     BY MS. WELLS:

13          Q     I think --

14          A     I tried to explain that several times,

15     but --

16          Q     I think we may be talking past each

17     other.

18          A     Yeah.

19          Q     We discussed a moment ago that there

20     were -- there were only two circumstances in which

21     someone who needs medical treatment can be forcibly

22     medicated.  And there are more circumstances than

23     just those two under which someone can be

24     involuntarily given psychotropic medicine under

25     AB:504 and under the proposed policy, fair enough?

Page 302

```
 1                    DR. ROBERT EILERS
 2   psychiatric hospital, needs psychiatric treatment,
 3   affects what circumstances someone can be
 4   involuntarily medicated.  In other words, why are
 5   there more circumstances for the psychotropic
 6   involuntary medication?
 7                MR. LEYHANE:  You know, objection to
 8        form.  You've been through this a number of
 9        times.  I don't know how many times he can
10        explain it.  Everybody else is getting it, but
11        I think you want a different answer and you're
12        not getting it.
13                MS. WELLS:  I will respectfully
14        disagree that I don't think this question has
15        not been answered yet and it may be because
16        I'm asking bad questions.
17                THE WITNESS:  I was trying to answer it
18        in that I see a different reason for the
19        person being in the hospital and needing that
20        treatment.  They're not there because they
21        have a -- they're not there because they have
22        a chronic liver condition and therefore need,
23        you know, certain medications or certain
24        tests.  That's secondary.  They're there
25        because their behavior or their symptoms are
```

1           DR. ROBERT EILERS

2        such that they put themselves or others in

3        danger, and that hopefully they're there to

4        receive appropriate treatment, which includes

5        medication and medication is a very common --

6        it's a common treatment for these conditions.

7        It's a primary treatment.  It's part of our

8        treatment plans.  And oftentimes patients who

9        are involuntarily committed do not agree with

10       that commitment or with the treatment.  And I

11       think it's a -- we tend to see this as a more

12       of a -- of an issue that we -- you know, that

13       needs to be addressed from a clinical nature,

14       at least, on a daily basis.  And having a

15       procedure which is clinically driven that can

16       allow medication to be given safely and when

17       it's appropriate in a psychiatric hospital

18       where you don't have to resort to a legal

19       process seems a good idea.  Comparing it --

20       comparing it to our procedures for medical --

21       overriding medical consent is, to me, not a

22       good comparison because, you know, basically

23       we -- we have adequate processes to get that

24       treatment elsewhere or if it needs to be

25       provided in our hospital.  In our hospitals we

Page 304

1                    DR. ROBERT EILERS

2          do have most of the time a means to provide it

3          legally.  The issue we have not dealt with

4          over the years so well is the -- the refusals

5          that occur for more of the non-invasive type

6          treatments that we need that patients refuse

7          that we tend not to provide because they have

8          refused.  But when there is a need to provide

9          a more invasive kinds of treatment because of

10          the seriousness of the consequences we, you

11          know, we can't provide that.

12     BY MS. WELLS:

13          Q     One of the factors that you mentioned

14     earlier was dangerousness to themselves or others.

15                    Do you recall that?

16          A     Yes.

17          Q     Why is that, in your view, a reason

18     that there can be a difference in involuntary

19     medication procedure for psychotropic medication

20     versus medical treatment?

21          A     Well, I think in the case of some

22     individuals with mental illness who have the

23     potential or where there is a likelihood of danger

24     to themselves -- to self, or to others, there

25     occasionally or frequently -- not frequently maybe,