

CB-LIGHT-5

# EXHIBIT K

```
 1            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
 2           CIVIL ACTION NO.: 2:10-cv-03950
 3   DISABILITY RIGHTS NEW         )
     JERSEY, a New Jersey          )
 4   Non-Profit Organization,      )
                                   )
 5            Plaintiff,           )   DEPOSITION UPON
                                   )   ORAL EXAMINATION
 6        vs.                      )        OF
                                   )    LOUAN LUKENS
 7   JENNIFER VELEZ, in her        )
     official capacity as          )
 8   Commissioner, State of        )
     New Jersey Department of      )
 9   Human Services,               )
                                   )
10            Defendant.           )
11                  Friday, March 3, 2012
12        T R A N S C R I P T of the deposition of
13   LOUAN LUKENS called for Oral Examination in the above
14   entitled action, said deposition being taken pursuant
15   to Rules governing Federal Procedure in the State of
16   New Jersey, by and before JEAN E. DOLAN, License No.
17   809, a Notary Public and Certified Court Reporter of
18   the State of New Jersey, at the HOAGLAND, LONGO,
19   MORAN, DUNST & DOUKAS, LLP, 40 Bayard Street, New
20   Brunswick, New Jersey, commencing at 10:03 in the
21   forenoon.
22
               JEAN E. DOLAN ASSOCIATES
23             Certified Court Reporters
                  3 Parlin Drive
24             Parlin, New Jersey  08859
                  (732) 238-7666
25             Fax (732) 613-4666       ORIGINAL
```

```
 1    years ago, fair to say, when you started to monitor

 2    Ann Klein and Greystone?

 3         A     I would say Marilyn has been with us

 4    longer.  I would say it's about three years ago.

 5         Q     Okay.  And would you have a set day

 6    where you would go to Ann Klein now or Greystone,

 7    similar to what you told us before?

 8         A     I think I told you that I don't have a

 9    set day.

10         Q     Not a set day but how many times a week

11    will you go to Greystone or --

12         A     Approximately once a week.

13         Q     How many times a week would you go to

14    Ann Klein or how many times a month?

15         A     Approximately twice a month.

16         Q     So every two weeks, approximately, for

17    Ann Klein?

18         A     Yes.

19         Q     And to your knowledge is the population

20    of patients at Ann Klein Forensic Center different

21    from the population of Greystone?

22               MS. KOLOD: Objection to form.

23         A     I would say yes.

24         Q     Okay.  What's your understanding?

25         A     The patients at Ann Klein are
```

```
 1   forensically involved.

 2        Q      And by that you mean?

 3        A      That they have a -- they have charges

 4   against them or they are -- they have been -- they

 5   have charges against them.

 6        Q      Criminal charges.  Correct?

 7        A      Criminal.

 8        Q      Okay.  Or have been found not guilty by

 9   reason of insanity?

10        A      By reason of insanity, yes.

11        Q      Is there a job description to your

12   knowledge for the position of PAIMI coordinator?  Is

13   there a written job description?

14        A      I think there's a description for

15   program coordinator.

16        Q      Is that a different title from the PAIMI

17   coordinator or is that a similar title?

18        A      Similar title.

19        Q      In your mind is it your understanding

20   that that would cover the position of PAIMI

21   coordinator and other coordinators, then?

22        A      Correct.

23        Q      When you became the PAIMI coordinator

24   was there any additional training provided to you?

25        A      Not formal training.  I initially was
```

```
 1              MS. KOLOD: Objection to form.
 2        A     I have concerns about the word
 3   "watchdog".
 4        Q     Why do you have concerns?
 5        A     I believe that that might have certain
 6   connotations that aren't necessarily correct.
 7        Q     What is your understanding, then, as far
 8   as with regard to identifying client concerns, okay,
 9   your role is to identify those for the state
10   facilities.  Correct?
11        A     Yes.
12        Q     And if you find any concerns or
13   complaints, you will report that to the powers that
14   be, whether it be someone from the state or someone
15   within your facility.  Fair to say?
16              MS. KOLOD: Objection to form.
17        A     Would you repeat that?
18        Q     If you -- if there's a client concern or
19   a complaint lodged, who will you report that to?
20              MS. KOLOD: Objection to form.
21        A     I would -- if it were lodged -- if I
22   would be the one --
23        Q     If you're responsible?
24        A     If I was responsible to the person that
25   had made the complaint to?  That would go to our
```

```
 1         Q      And you indicated you had both.  You
 2   enter information into a database as well?
 3         A      Correct.
 4         Q      But you still maintain a paper file for
 5   complaints you investigated?
 6         A      Correct.
 7         Q      And do the other advocates have access
 8   to the database to see other complaints?  For
 9   instance, you could access Ms. Spensley's information
10   that she inputted into the database?
11         A      Correct.
12         Q      And vice versa, she could access
13   information you put into the database. Correct?
14         A      Correct.
15         Q      Who reviews that information that's put
16   into the database other than the advocates and
17   yourself?  Does Mr. Young review them?  Does someone
18   at DRNJ review them?
19         A      Yes.  Mr. Young reviews them when there
20   is a need to look at a particular file, an issue that
21   we may bring to him.
22         Q      Okay.  The second to last bullet point
23   says:  "Prepares quarterly reports."  I understand
24   this is an advocate's duty as opposed to your title.
25   They prepare quarterly reports to your knowledge
```

```
 1          Q       Are there postings contained in those

 2     hospitals for contacts with DRNJ for the patients to

 3     contact your --

 4          A       Yes.

 5          Q       -- for the patients to contact your

 6     hotline?

 7          A       Yes.

 8          Q       Okay.  And are they dispersed amongst

 9     all the bulletin boards, where they have information

10     there to contact Disability Rights New Jersey?

11                  MS. KOLOD: Objection to form.

12          A       Yes.

13          Q       Have you also seen postings throughout

14     those hospitals for the patients to contact the

15     Rennie Advocate?

16          A       Yes.

17          Q       Are you familiar with that term, the

18     Rennie Advocate?

19          A       Yes.

20          Q       What is your understanding of what that

21     position is, the Rennie Advocate, with the state

22     hospitals?

23          A       The Rennie Advocate is to assist

24     patients who have -- who are going through the

25     three-step process.
```

```
 1          Q       And have you seen the information to

 2    contact the Rennie Advocates contained on the same

 3    bulletin board to contact DRNJ?

 4          A       Yes.

 5          Q       As well as other offices may be on the

 6    bulletin board --

 7                  MS. KOLOD: What bulletin board are you

 8    talking about, Counselor?  There are three different

 9    hospitals.

10          Q       I'll go through each one.  On Greystone

11    there's postings on the bulletin boards?

12          A       Yes.

13          Q       They have information to contact DRNJ as

14    well as the Rennie Advocate.  Correct?

15          A       Yes.

16          Q       They also have information for

17    contacting the office of the public defender or other

18    entities as well have you seen?

19          A       Yes.

20          Q       Same thing for Ann Klein will there be

21    postings on the bulletin boards?

22          A       I do not see the units in Ann Klein.

23          Q       Why is that?

24          A       I visit my clients in an interview room.

25          Q       Okay.  And to your knowledge Ann Klein
```

```
 1   notified of how to contact the Rennie Advocates

 2   through handbooks that are distributed to them upon

 3   admission?

 4        A      I am not.

 5        Q      Are you aware if there's information on

 6   the informed consent forms for patients to contact

 7   the Rennie Advocates?

 8        A      Yes.

 9        Q      Have you seen that before?

10        A      Yes.

11        Q      There is information?

12        A      Yes.

13        Q      I'm just going to show you what is

14   Bates -- I'm going to mark as Exhibit D 31 the PAIMI

15   advisory minutes dated March 3, 2010, Bates stamped

16   DRNJ 715 through 718.  Take a moment to look at that.

17               (D 31 marked for identification.)

18        Q      Did you have an opportunity to look at

19   that document, Ms. Lukens?

20        A      Yes.

21        Q      Have you ever seen that document before?

22        A      Yes.

23        Q      Okay.  The PAIMI advisory meeting date

24   is identified as March 3, 2010.

25        A      Yes.
```

```
 1        Q       You see that.  You're the program
 2   coordinator for this committee.  Correct?
 3        A       Yes.
 4        Q       How often do they meet?
 5        A       Quarterly.
 6        Q       Where are the meetings held?
 7        A       210 South Broad Street.
 8        Q       At DRNJ's office?
 9        A       Yes.
10        Q       Who generally attends the meetings?
11        A       Mr. Young.  I attend meetings and the
12   advisory members.
13        Q       Okay.  I take it that minutes are kept
14   since there's a document in front of you.  Correct?
15        A       Correct.
16        Q       And generally would one of the advocates
17   or yourself keep the minutes?  Who is responsible for
18   keeping the minutes?  Who's responsible for keeping
19   minutes?
20        A       Taking minutes?
21        Q       Taking the minutes.  Correct.
22        A       Typically I would be.
23        Q       And in this document it appears that
24   Rachel Parsio took the minutes?
25        A       Yes.
```

```
 1            Q        You did not attend this meeting?

 2            A        I did not attend this meeting.

 3            Q        Did you ever see these minutes before,

 4     before looking at them today?

 5            A        Yes.

 6            Q        Were they distributed after the meeting,

 7     did you get a copy of them?

 8            A        I got a copy of them, yes.

 9            Q        Okay.  Some time after the meeting,

10     then, I take it?

11            A        Some time after.

12            Q        On page two under the heading Agenda

13     Topic Program Report --

14            A        Uh-huh.

15            Q        -- there is a heading called Involuntary

16     Medication?

17            A        Yes.

18            Q        It says:  "Rachel reported that the DRNJ

19     advocates are continuing to gather personal stories

20     of patients who were involuntarily medicated."  Do

21     you see that?

22            A        Yes.

23            Q        "To date, contact has been made with

24     approximately 60 persons."  Do you see that?

25            A        Yes.
```

1          A      Yes.

2          Q      Were you aware that there was any

3     discussion with the Division of Mental Health

4     Services concerning revisions to the involuntary

5     medication policies?

6          A      Yes.

7          Q      Okay.  How long was that ongoing, to

8     your knowledge?

9          A      To my knowledge it was at least -- at

10    least a year.

11         Q      Okay.  At least a year prior to this

12    meeting?

13         A      No.  I think it would be in total.

14         Q      Okay.  Do you know when the litigation

15    or lawsuit was filed in this case?

16         A      It was filed in the same -- 2010, 2009,

17    2010.

18         Q      When --

19         A      I'm not --

20         Q      You're not certain of the month?

21         A      Yeah.

22         Q      But when you indicated that you were

23    aware that there was a discussion concerning revision

24    of the policy for about a year, that was prior to the

25    lawsuit being filed?

```
 1                    MS. KOLOD: Objection to form.

 2        A      I don't know.

 3        Q      Okay.  But you do know in fact that

 4   there was a discussion about that particular issue

 5   for at least a year?

 6        A      Yes.

 7        Q      Yes?

 8        A      Yes.

 9        Q      Were you involved in any way in

10   discussions concerning the revision of the policy?

11   In other words, did you meet with anyone from the

12   state or meet with Joe Young?

13        A      I met with Joe Young and Karen Piren.

14        Q      Do you know when that was?

15        A      Melanie Griffin.

16        Q      Melanie Griffin.  Do you remember where

17   that was?

18        A      No.

19        Q      Was it in 2009?

20        A      I don't remember.

21        Q      You do recall having a meeting with

22   Karen Piren and Melanie Griffin from the state?

23        A      Yes.

24        Q      And Joe Young was in attendance?

25        A      Yes.
```

```
 1      Q       Anyone else in attendance?

 2      A       Not that I remember.

 3      Q       And at that meeting there was a

 4   discussion about potentially revising the policy

 5   that's referred hereto as the involuntary medication

 6   policy?

 7      A       Yes.

 8      Q       In how many meetings were you involved?

 9      A       Only one meeting.

10      Q       Where did that meeting take place?

11      A       210 South Broad.

12      Q       Your offices?

13      A       Yes.

14      Q       Do you recall what transpired during

15   that meeting, what was discussed?

16      A       I remember that there was discussion

17   about changing the procedure.

18      Q       The procedure for administering

19   involuntary medications?

20      A       Involuntary medications, yes.

21      Q       How long did that meeting take place?

22      A       It was about an hour.

23      Q       Did you keep minutes of the meeting?

24      A       No.

25      Q       Okay.  Anything else that you recall
```

1    any notes at that meeting, whether it was Mr. Young

2    or someone else?

3         A     I am not aware.

4         Q     Okay.  Do you know of any other meetings

5    that were conducted with representatives from the

6    state --

7         A     No.

8         Q     -- concerning the --

9         A     Concerning.

10        Q     -- concerning the potential revisions to

11   that particular policy?

12        A     No.

13        Q     I mean are you aware, for instance, of

14   Mr. Young attending any other meetings that you

15   didn't attend?

16        A     No.

17        Q     Do you know if DRNJ submitted any

18   proposals to the state concerning revisions to that

19   particular policy?

20        A     No.

21        Q     You're not aware of any?

22        A     I'm not aware of any.

23        Q     When we left off, we had marked, I

24   believe, D 33, and that -- those are minutes dated

25   June 6, 2006.  You see that?

```
 1   information.  Correct?

 2         A      Correct.

 3         Q      Okay.  Now, we went through your

 4   qualifications.  I understand you have a Master's

 5   degree in Social Work.  Correct?  You're a licensed

 6   social worker?

 7         A      Yes.

 8         Q      But you're not a clinician.  Fair to

 9   say?

10         A      Correct.

11         Q      So with regard to prescribing medication

12   and specifics of medication, that's not your

13   expertise.  That's fair to say.  Correct?

14         A      Correct.

15         Q      Okay.  Were you familiar with the

16   medication Depakote?

17         A      I am.

18         Q      Okay.  And Deprakine?

19         A      I am.

20         Q      How did you familiarize yourself with

21   these medications?  Was there any journals you read,

22   any trainings you went to?  How did you familiarize

23   yourself with these particular medications,

24   psychotropic medications, in general?

25         A      It's a very common medication that we've
```

1    advising him who the Rennie Advocate was at

2    Greystone, correct, at any time?

3         A     Correct.

4         Q     Paragraph 7 in D 40 says, and that's the

5    current certification we're looking at:   "I

6    understand that I may require medication in order to

7    improve my condition, and I'm willing to take

8    medication to improve my condition."

9              Do you see that?

10        A     Yes.

11        Q     Okay.  And in your experience in dealing

12   with mental health patients medication can certainly

13   improve one's condition.  Can it not?

14             MS. KOLOD: Objection to form.

15        A     It can.

16        Q     Okay.  In paragraph 21:  "My social

17   worker recently informed me that my 74-year-old

18   diabetic mother is discussing my difficulty in

19   acquiring a green card with Federal authorities.   I

20   worry that should my mother die before obtaining my

21   green card, I will remain at Greystone indefinitely."

22             Do you see that statement?

23        A     I do.

24        Q     Then if you look at D 39, paragraph 27,

25   it indicates that "My social worker recently informed

     1        A      Yes.

     2        Q      And then paragraph 28 says:  "I want a

     3   private lawyer to fight for my right to avoid

     4   unwanted injections as a free citizen who is ready to

     5   live and work in the community."  Do you see that

     6   statement?

     7        A      I do.

     8        Q      You weren't present when the meeting

     9   with RG was conducted in July of 2008.  Correct?

    10        A      Correct.

    11        Q      Okay.  And did you -- so it's fair to

    12   say you wouldn't know if the patient told the legal

    13   intern that affirmatively on his own behalf.

    14   Correct?

    15               MS. KOLOD: Objection to form.

    16        A      Correct.

    17               MR. CHABAREK: This will be D 41.  This

    18   is Bates stamped DRNJ-M 453 through 456,

    19   certification of patient DR.

    20               (D 41 marked for identification.)

    21        Q      Have you had an opportunity to look at

    22   what's marked as D 41?

    23        A      Yes.

    24        Q      You know patient DR?

    25        A      I do not.

```
 1        Q       You do not know who that patient is?

 2        A       I do not.

 3        Q       Okay.  The certification is dated

 4   October 16, 2006.  Do you see that?

 5        A       I do.

 6        Q       Okay.  Fair to say if you don't know who

 7   that patient is you don't have a recollection of

 8   being with this patient to obtain that information

 9   that's contained in the document.  Correct?

10        A       Correct.

11        Q       Okay.  Do you know who may have met with

12   that patient?

13        A       It would have -- most likely would have

14   been an intern, legal intern.

15        Q       Have you ever seen the document before

16   that's in front of you?

17        A       No.

18        Q       You've never seen it before then until

19   I'm showing you now.  Fair to say?

20        A       Correct.

21        Q       In paragraph eight it says:  "Some of

22   the noted side effects of Geodon are extrapyramidal

23   symptoms."  You see that?

24        A       Yes.

25        Q       Did to your recollection -- or does that
```

1          A      I was not -- not to the best of my

2      recollection.

3          Q      Were you aware that he threatened to

4      punch and kill a pregnant patient's baby?

5          A      I had heard that.

6          Q      Okay.  How did you hear that?

7          A      My -- I had heard that through a -- a

8      staff member that was on unit at the time.

9          Q      Did you ever hear that he destroyed

10     computer equipment at a nursing station?

11         A      I did not.

12         Q      Did you hear that there may have been

13     over 70 reported incidents of violence reported as to

14     him?

15                MS. KOLOD: Objection to form.

16         Q      Were you aware --

17         A      I did not.  My whole concern were

18     medication records.

19         Q      With regard to this toxicity you believe

20     it involved Lithium.  Correct?

21         A      I believe it involved Lithium.

22         Q      Do you know if he was taken to an

23     outside hospital?

24         A      Yes, he was.

25         Q      Do you know what hospital that was?

```
 1       A       Yes.

 2       Q       Yes?

 3       A       Yes.

 4       Q       Are you aware of him assaulting a peer,

 5   slamming him against the wall?  Are you aware of an

 6   incident involving that?

 7               MS. KOLOD: Objection to form.

 8       A       Yes.

 9       Q       Okay.  Are you aware of other episodes

10   of aggressive assaultive behavior that he's been

11   involved in from reviewing his medical records?

12               MS. KOLOD: Objection to form.

13       A       I don't know of any other assaultive

14   behaviors.

15       Q       Are you aware of any threats to harm

16   staff that he's made?

17       A       No.

18       Q       Have you seen that in the records?

19       A       Yes.

20       Q       Okay.

21       A       I have never seen him actually do it.

22       Q       But you've seen the records?

23       A       Yes.

24       Q       Have you seen the records demonstrate

25   that he was experiencing hallucinations or talking to
```

```
 1    put it in the yearly report?
 2         A      Correct.
 3         Q      And through -- there are instances then
 4    that you are aware of that DRNJ will provide contact
 5    information for the local attorney referral service?
 6         A      Correct.
 7         Q      That's not unusual then.  Right?
 8         A      It is not unusual.
 9         Q      I'm going to have marked as D 57 the
10    report for fiscal year 2008, Bates stamped DRNJ-M
11    00921 through 994.
12               (D 57 marked for identification.)
13         Q      Ms. Lukens, what was marked as D 57
14    appears to be a similar such report for the fiscal
15    year 2008.  Correct?
16         A      Right.
17         Q      And, in fact, on page three you
18    indicated or there's indication that you prepared the
19    report?
20         A      Yes.
21         Q      Although it would have been the same
22    process as previously, you would input certain
23    information, Mr. Young would input certain
24    information.  Fair to say?
25         A      Yes.
```

1    standard to be committed to the state psychiatric

2    hospitals.  Correct?

3              MS. KOLOD: Objection to form.

4         A    That is the standard, yes.

5         Q    You would agree that the state hospital

6    has an obligation to ensure the safety of the

7    visiting staff and the public.  You would agree with

8    that statement?

9              MS. KOLOD: Objection to form.

10        A    I would agree.

11        Q    And are you aware of an attorney with

12   the public advocate by the name of Lorraine Ghormley?

13        A    Yes.

14        Q    Are you aware of an incident where she

15   was involved with a patient at Ancora?

16        A    I am aware.

17        Q    Are you aware of the fact that she was

18   assaulted by that patient who was her client at the

19   time?

20        A    I am aware.

21        Q    How did you become aware of it?

22        A    Rachel is an advocate at Ancora and we

23   had -- I learned through her.  She had been speaking

24   with Ms. Ghormley about the situation.

25        Q    So you learned of that through

1    where you wrote letters to CEOs, have the CEOs

2    responded to your concerns when you raised an

3    objection to them?

4              MS. KOLOD: Objection to form.

5        Q    When you write a letter to the CEO of

6    the hospital, do they respond to your concerns?

7              MS. KOLOD: Objection.

8        A    Yes.

9        Q    And we were earlier discussing side

10   effects of medication, you would agree that all

11   medications have side effects, not just psychotropic

12   medication.  Correct?

13       A    I disagree.

14       Q    Even over-the-counter drugs have side

15   effects?

16       A    Correct.

17       Q    If a patient is looking for legal

18   representation, the DRNJ will refer them, they have

19   legal resources provided to them.  Correct?  They

20   refer them to outside attorneys, if necessary?

21       A    Yes.

22       Q    And in the event of a medication issue

23   or a complaint, you would agree the Rennie Advocate

24   is a source for the patients to contact.  Correct?

25       A    With a --

# EXHIBIT L

WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, NJ 08608
Tel: (609) 292-9742
Fax: (609) 777-0187

ROBERT COHEN, ESQ. *(admitted pro hac vice)*
MELODY WELLS, ESQ. *(admitted pro hac vice)*
ALEXANDRA P. KOLOD, ESQ. *(admitted pro hac vice)*
JAKOB T. SEBROW, ESQ *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DISABILITY RIGHTS NEW JERSEY, INC.,** : <br> a New Jersey non-profit corporation, : <br> : <br> Plaintiff, : <br> : <br> - against - : <br> : <br> **JENNIFER VELEZ**, in her official capacity as : <br> Commissioner, State of New Jersey Department : <br> of Human Services, and : <br> : <br> **STATE OF NEW JERSEY** : <br> : <br> Defendants. | HON. DICKINSON R. DEBEVOISE, <br> U.S.D.J. <br> <br> Civil Action No. 2:10-cv-3950-DRD- <br> MAS |

**PLAINTIFF DISABILITY RIGHTS NEW JERSEY, INC.'S RESPONSES AND**
**OBJECTIONS TO DEFENDANT'S REQUESTS FOR ADMISSION**

Pursuant to the requirements of the Federal Rules of Civil Procedure, and the Local Civil Rules for the District of New Jersey, Plaintiff Disability Rights New Jersey, Inc. ("DRNJ") hereby responds to the Requests for Admission to DRNJ (Defendant's "Requests") propounded by Defendant Jennifer Velez and the State of New Jersey ("Defendants"). DRNJ responds to each Request to the best of its present knowledge. DRNJ reserves the right to further revise, amend, supplement, and correct its Objections and Responses as necessary.

## GENERAL OBJECTIONS

DRNJ makes the following General Objections to and Reservations regarding Defendants' Requests. DRNJ makes these General Objections and Reservations to each separate request in Defendants' Requests and incorporates them by reference into each of DRNJ's Specific Answers and Objections.

1.      DRNJ objects to the Requests to the extent that they fail to comply with, or seek to impose obligations in excess of, the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.      DRNJ objects to the Requests to the extent that they call for disclosure of information that is protected by the attorney-client privilege, the attorney work product privilege, and/or any other privilege or immunity. Nothing contained in these Responses is intended as, or shall in any way be deemed a waiver of, any attorney-client privilege, any work product privilege, or any other applicable privilege, immunity, or protection.

3.      DRNJ objects to the Requests to the extent that they seek information that is neither relevant to the subject matter of this proceeding nor reasonably calculated to lead to the discovery of admissible evidence.

4.      DRNJ objects to the Requests to the extent each is vague and/or ambiguous and/or does not request with sufficient particularity the information sought.

2

5.      DRNJ objects to the Requests that it seeks information that is not within DRNJ's possession, custody or control.

6.      DRNJ objects to each Request to the extent that it is unreasonably cumulative and duplicative.

7.      DRNJ objects to each Request to the extent that it is oppressive, overbroad and unduly burdensome.

8.      DRNJ's investigation is ongoing and continuing. Its responses to the Requests are made to the best of DRNJ's present knowledge, information, and belief based upon information, documents, and/or things currently available to DRNJ, and based upon a reasonable and diligent search for responsive information. Thus, DRNJ's answers to these Requests are at all times subject to such amendments, elaborations and supplementation that further investigation and discovery may warrant and necessitate.

9.      Notwithstanding its answers to the Requests, DRNJ preserves and does not waive any objections or other challenges to the competence, relevance, materiality, privilege, or admissibility of evidence as to any information disclosed, or documents or things produced herein, whether in connection with this or any subsequent proceeding or trial in this or any other action.

10.     DRNJ's Specific Responses and Objections to Defendant's individual Requests incorporate, and do not waive, these General Objections.

3

## SPECIFIC RESPONSES AND OBJECTIONS

**Request for Admission No. 1:**

The State of New Jersey Department of Human Services operates five (5) inpatient psychiatric hospitals: Trenton Psychiatric Hospital, Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Hagedorn Psychiatric Hospital and the Ann Klein Forensic Center.

**Response To Request for Admission No. 1:**

Subject to the General Objections, DRNJ admits that the State of New Jersey Department of Human Services operates five (5) inpatient psychiatric hospitals: Trenton Psychiatric Hospital, Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Hagedorn Psychiatric Hospital and the Ann Klein Forensic Center.

**Request for Admission No. 2:**

Plaintiff's challenge to the constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services, is only directed at the five (5) State Psychiatric Hospitals (consisting of Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Hagedorn Psychiatric Hospital, Trenton Psychiatric Hospital and the Ann Klein Forensic Center).

**Response To Request for Admission No. 2:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "is only directed at" is vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the Constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services, at Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Hagedorn Psychiatric Hospital, Trenton Psychiatric Hospital and the Ann Klein

4

Forensic Center. DRNJ denies to the extent that the Non-Emergent Involuntary Medication

Procedure promulgated by the State of New Jersey Department of Human Services applies to any

other facilities.

**Request for Admission No. 3:**

Plaintiff's challenge to the constitutionality of the Non-Emergent Involuntary Medication
Procedure, promulgated by the State of New Jersey Department of Human Services, is not
directed at nor does this lawsuit address the practices at other psychiatric units and hospitals that
are not operated by the State.

**Response To Request for Admission No. 3:**

     In addition to the General Objections, DRNJ objects to the extent that this Request calls

for legal conclusions. DRNJ also objects to this Request as seeking information about what

evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P.

26(b)(1) and 36. DRNJ also objects that the phrase "is not directed at nor does this lawsuit

address the practices at other psychiatric units and hospitals that are not operated by the State" is

vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the

Constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the

State of New Jersey Department of Human Services in psychiatric units and hospitals that are

operated by the State. DRNJ denies to the extent that the Non-Emergent Involuntary Medication

Procedure, promulgated by the State of New Jersey Department of Human Services applies to

psychiatric units and hospitals that are not operated by the State.

**Request for Admission No. 4:**

Plaintiff's challenge to the constitutionality of the Non-Emergent Involuntary Medication
Procedure, promulgated by the State of New Jersey Department of Human Services, is not
directed at nor does this lawsuit address the practices at other psychiatric units and hospitals that
are independently operated.

**Response To Request for Admission No. 4:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "is not directed at nor does this lawsuit address the practices at other psychiatric units and hospitals that are independently operated" is vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the Constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services in psychiatric units and hospitals that are operated by the State. DRNJ denies to the extent that the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services applies to psychiatric units and hospitals that are independently operated.

**Request for Admission No. 5:**

With the closing of Hagedorn Psychiatric Hospital on or about June 30, 2012, the Plaintiff's challenge to the constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services, will only be directed at the remaining four (4) State Psychiatric Hospitals (consisting of Ancora Psychiatric Hospital, Greystone Park Psychiatric Hospital, Trenton Psychiatric Hospital and the Ann Klein Forensic Center).

**Response To Request for Admission No. 5:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "the Plaintiff's challenge to the constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the

6

State of New Jersey Department of Human Services, will only be directed at the remaining four (4) State Psychiatric Hospitals" is vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the Constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services to the extent the policy is applied at Hagedorn Psychiatric Hospital. DRNJ lacks information sufficient to admit or deny as to the date the Hagedorn facility will close; otherwise, denied to the extent the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services applies to other patients.

**Request for Admission No. 6:**

With the closing of Hagedorn Psychiatric Hospital on or about June 30, 2012, Plaintiff's request for prospective injunctive relief will be moot, as to Hagedorn Psychiatric Hospital.

**Response To Request for Admission No. 6:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects that the phrase "Plaintiff's request for prospective injunctive relief will be moot" is vague and ambiguous. Subject to these objections, DRNJ lacks information sufficient to admit or deny as to the date the Hagedorn facility will close; otherwise, DRNJ admits that it does not seek prospective injunctive relief related to closed facilities.

**Request for Admission No. 7:**

Plaintiff's sole challenge to the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services, is limited to patients who are involuntarily civilly committed and who either are or will be treated at the State psychiatric hospitals.

**Response To Request for Admission No. 7:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what

7

evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "sole challenge" is vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the application of the Non-Emergent Involuntary Medication Procedure promulgated by the State of New Jersey Department of Human Services to patients who are involuntarily civilly committed. DRNJ denies to the extent the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services applies to other patients.

**Request for Admission No. 8:**

The Constitutionality of the Non-Emergent Involuntary Medication Procedure, promulgated by the State of New Jersey Department of Human Services, is the only issue in dispute in this lawsuit.

**Response To Request for Admission No. 8:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "the only issue in dispute" is vague and ambiguous. Subject to these objections, DRNJ admits that it challenges the Constitutionality of the Non-Emergent Involuntary Medication Procedure promulgated by the State of New Jersey Department of Human Services to patients who are involuntarily civilly committed; otherwise denied. For further information DRNJ refers Defendants to the First Amended Complaint, which assert claims for violations of various federal statutes in addition to Constitutional claims.

**Request for Admission No. 9:**

Counsel for the Plaintiff, Melody Wells, Esq., represented during the Status Conference conducted with the Court on April 23, 2012, that the constitutionality of the policy also known as

8

the Non-Emergent Involuntary Medication Procedure promulgated by the State of New Jersey Department of Human Services, is the only issue in dispute.

**Response To Request for Admission No. 9:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. Subject to these objections, DRNJ admits Counsel for the Plaintiff, Melody Wells, Esq., represented during the Status Conference conducted with the Court on April 23, 2012 that DRNJ challenges the constitutionality of the policy also known as the Non-Emergent Involuntary Medication Procedure promulgated by the State of New Jersey Department of Human Services; otherwise denied. For further information DRNJ refers Defendants to the First Amended Complaint.

**Request for Admission No. 10:**

Plaintiff challenges the State Psychiatric Hospitals' policy concerning the involuntary administration of psychotropic medication, but not its practices.

**Response To Request for Admission No. 10:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "challenges the State Psychiatric Hospitals' policy concerning the involuntary administration of psychotropic medication, but not its practices" is vague and ambiguous. Subject to these objections, DRNJ denies. For further information DRNJ refers Defendants to the First Amended Complaint.

**Request for Admission No. 11:**

Plaintiff no longer asserts an as applied challenge to the State Psychiatric Hospitals' policy concerning the involuntary administration of psychotropic medication.

**Response To Request for Admission No. 11:**

In addition to the General Objections, DRNJ objects to the extent that this Request calls for legal conclusions. DRNJ also objects to this Request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ also objects that the phrase "no longer asserts an as applied challenge" is vague and ambiguous. Subject to these objections, DRNJ denies. For further information DRNJ refers Defendants to the First Amended Complaint.

**Request for Admission No. 12:**

Plaintiff will not utilize any Certifications or Affidavits from any patients who are or have been hospitalized in any of the five (5) State hospitals.

**Response To Request for Admission No. 12:**

In addition to the General Objections, DRNJ objects to this request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36.

**Request for Admission No. 13:**

Plaintiff will not be basing any claims on allegations made by individuals referenced in the Complaint or First Amended Complaint, including but not limited to those patients identified only by their initials: J.P., S.D., T.B., P.O., A.H., S.L., A.R., N.B. and J.C.

**Response To Request for Admission No. 13:**

In addition to the General Objections, DRNJ objects to this request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36.

10

**Request for Admission No. 14:**

Plaintiff will not be retaining any expert witnesses in this lawsuit.

**Response To Request for Admission No. 14:**

In addition to the General Objections, DRNJ objects to this request as seeking information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36.

**Request for Admission No. 15:**

Counsel for the Plaintiff, Melody Wells, Esq., represented during the Status Conference conducted with the Court on April 23, 2012, that the Plaintiff would not be retaining any expert witnesses in connection with this matter.

**Response To Request for Admission No. 15:**

In addition to the General Objections, DRNJ objects to this request to the extent it seeks information about what evidence will be presented at trial. Such information is outside the scope of Fed. R. Civ. P. 26(b)(1) and 36. DRNJ further objects that the phrase "retaining any expert witnesses in connection with this matter" is vague and ambiguous. Subject to these objections, DRNJ admits that Melody Wells, Esq., represented during the Status Conference conducted with the Court on April 23, 2012, that the Plaintiff did not, at the time of the status conference, intend to introduce affirmative expert testimony; otherwise, denied.

11

Dated: Newark, New Jersey
      June 15, 2012

s/ William Emmett Dwyer
William Emmett Dwyer                    Robert Cohen *(admitted pro hac vice)*
Disability Rights New Jersey, Inc.      Melody Wells *(admitted pro hac vice)*
210 South Broad Street, Third Floor     Alexandra P. Kolod *(admitted pro hac vice)*
Trenton, NJ 08608                       Jakob T. Sebrow *(admitted pro hac vice)*
Tel: (609) 292-9742                     Kirkland & Ellis LLP
Fax: (609) 777-0187                     601 Lexington Avenue
                                        New York, New York 10022
                                        Tel: (212) 446-4800
                                        Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey, Inc.*

# EXHIBIT M



*New Jersey's Long and Winding Road*
*To*
*Treatment, Wellness and Recovery*

**Governor's Task Force on Mental Health**
**Final Report**

**March 31, 2005**

### The Cost of Continuing the Current Course

A.          State and County Hospitals

Every decision has an associated cost. Thus, a decision to do nothing would have associated costs. Currently, almost 50 percent (1,000 patients) of New Jersey's state hospital patients are clinically ready for discharge but housing, treatment and support services are not available for these patients.

The average cost to maintain one state hospital bed is $146,000 per annually. Almost half of the state's mental health budget or $483 million dollars pays for the cost of caring for an average 3,300 patients in State and County facilities on any given day. Given that almost half of the State hospital patients are clinically ready for discharge, housing them in State hospitals is very expensive. Without a local system of care to coordinate an array of services and supports for persons who are seriously mentally ill, again, if we do nothing, the Task Force finds a significant number of State hospital beds (400) would need to be added given current admission, discharge and average daily population trends Such a use of institutional care would be unfortunate and inappropriate.
The lost potential in human terms is incalculable.   Lives have been lost, spirits broken and families devastated.

B.          Jail and Prisons

The population of prisons and jails in New Jersey and the nation has increased dramatically in the last two decades. Individuals with mental illness are disproportionately represented among the inmate population. It is generally accepted that 16 percent of persons incarcerated are mentally ill. Many are incarcerated for non-violent crimes. The cost to provide treatment in the community is significantly less expensive.

C.          Juvenile Detention

Approximately 20 percent of the children in Juvenile Detention are mentally ill and most are incarcerated on low-level offenses. By and large they are there because they are mentally ill. The cost of not providing appropriate care to these children is moral bankruptcy

D.          Homelessness

The estimated number of persons with mental illness who are chronically homeless in New Jersey is close to 8,000. Often, these individuals find their way into psychiatric and/or medical units of local hospitals after evaluation in an emergency room. These encounters are at significant cost to the healthcare system and ultimately employers and taxpayers. In many cases, the hospitals become the housing option for mentally ill homeless individuals.

**Overview of New Jersey's Mental Health Services**

The New Jersey Department of Human Services (DHS) is responsible for overseeing the State's public system of adult mental health and child behavioral health services. Within the Department, several Divisions work to coordinate these services throughout the State. The Division of Mental Health Services (DMHS) is responsible for adult mental health services while the newly established Office of Children's Services, Division of Child Behavioral Health Services (DCBHS) coordinates the children's behavioral health system.

<u>New Jersey</u>

Small geographically compared with other states, New Jersey is considered the most densely populated State with 1,134 people per square mile and an overall population of 8.4 million people.[7] Despite its density, the State consists of a mixture of urban, suburban and rural areas that present various challenges in delivering services. The State is also experiencing suburban sprawl with population shifts being observed from urbanized northeastern counties to more suburban regions to the south and west. Of the one million new state residents recorded over the past two decades, 700,454 reside in suburban municipalities where growth totaled 23 percent. Rural municipalities grew by 37 percent while urban municipalities grew only by 3 percent.

Other demographics demonstrate the uniqueness of New Jersey. Despite being one of the wealthier States in the country, approximately 8 ½ %, almost 700,000 individuals, in New Jersey live in poverty.[vi] Furthermore, New Jersey ranks as one of the costliest housing markets in the country presenting significant challenges to low and moderate income individuals.[8] The state is increasingly diverse with significant increases in non-Hispanic African Americans, Hispanics and Asians since 1990. Additionally, New Jersey's aging population is projected to see 30 percent growth in people 65 years and older in the decade between 2010 and 2020.

Based upon national figures, approximately 1 in 5 people experience a mental disorder in a course of a year. This means that close to 1.7 million New Jersey residents will experience some level of a mental disorder in a course of a year. In any given year, about 5% to 7% of adults, equating to over 500,000 people in New Jersey, have a serious mental illness, according to several nationally representative studies.[vii] A similar percentage of children — about 5% to 9% — have a serious emotional disturbance.

## Division of Mental Health Services

The stated mission of the New Jersey Division of Mental Health Services is to promote opportunities for adults with serious mental illness and children and adolescents with

---

[7] US Census 2000. www.census.gov
[8] Kessler, R. C., Berglund, P. A., Bruce, M. L., Koch, J. R., Laska, E. M., Leaf, P. J. et al. (2001). The prevalence and correlates of untreated serious mental illness. *Health Services Research, 36,* 987-1007.

emotional and behavioral disturbances to maximize their abilities to live, work, socialize and learn in communities of their choice. The mission is realized by application of the following operating principles:

- Services are to be delivered by means of a comprehensive system of care, which emphasizes the most appropriate, least restrictive settings to promote the highest level of functioning;
- There must be continuity of care and coordination of services within the State and between the public and private sectors;
- The range of services within the system of care must respond to the needs of the individual consumers and to the special populations served;
- The Division must assure appropriate, high quality care for the State's most severely disabled citizens in State psychiatric hospitals and for the less disabled citizens in community programs.

The State primarily bears the burden of funding the public mental health system, but these services are frequently supported by other funding sources, including both Federal and County-based. Services are predominantly based in local communities where private agencies provide a wide variety of programs and services. The DMHS contracts with 120 not-for-profit agencies, which provide over 700 programs of services to over 200,000 adults annually, 140,000 of whom have serious mental illness (SMI). DMHS directly operates five state psychiatric hospitals that provide long-term in-patient care to about 2,300 on a daily basis to people with severe and persistent mental illness.

Outside of the publicly funded system, many people with mental illness receive services from other types of providers, including for-profit agencies and private practitioners (e.g. psychiatrists, psychologists, licensed professional counselors and social workers).

**Community-Based Services:**

DMHS funds and oversees a variety of services to people with mental illness and their families. Depending on a person's particular situation, they may receive one or more of these services at the same time. The following categories of community-based services are available throughout much of New Jersey:

- Programs of Assertive Community Treatment (PACT)
  Outpatient Services
  Integrated Case Management Services (ICMS)
  Intensive Family Support Services (IFSS)
  Systems Advocacy
  Self-Help Centers
  Deaf Enhanced Screening Center

  Residential and Supportive Housing Services
  Designated Screening Centers
  Supported Employment Programs (SEP)
  Partial Care/Partial Hospitalization Services
  Homeless Services (PATH)
  Jail Diversion