

CB-LIGHT-9

# EXHIBIT T

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - -x

DISABILITY RIGHTS NEW JERSEY, INC., et al.,

     Plaintiffs,

   vs.

JENNIFER VELEZ, in her official capacity as

Commissioner of the New Jersey Department of Human

Services, et al.,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF KAREN PIREN

New Brunswick, New Jersey

Monday, January 30, 2012

REPORTED BY:

DANIELLE GRANT

REF #6789



```
 1                      KAREN PIREN
 2        Q    -- is that accurate?  Okay.
 3             And do you recall what -- what was
 4   said about whether or not these team meetings
 5   are taking place in the hospitals?
 6        A    Not specifically.
 7        Q    Okay.  You also mentioned that one
 8   of the topics that you discussed with RENNIE
 9   advocates is that patients don't know about the
10   RENNIE advocates.  Do you recall that testimony?
11        A    Yes.
12        Q    Okay.  What do you recall
13   discussing about that topic?
14        A    Whether or not patients know if
15   there are RENNIE advocates in the state
16   hospitals.
17        Q    And what was said about that issue?
18        A    That we are quite clear that
19   patients all know that there are RENNIE
20   advocates in the state hospitals.
21        Q    And why are you clear that that's
22   the case?
23        A    Patients are hold, there are --
24   there's information plastered all over the
25   hospital about RENNIE advocates.
```

Page 30

    1                    KAREN PIREN
    2          Q    What do you mean, there's
    3    information plastered all over the hospital?
    4          A    There are bulletins, bulletin
    5    boards, there are posters, there are phone
    6    numbers posted by telephones, patients are
    7    informed when they're admitted to the hospital
    8    about RENNIE advocates, patients are given
    9    booklets about their rights and with the RENNIE
   10    advocate phone number in it.  There are many
   11    ways that patients are informed about the
   12    presence of RENNIE advocates in the hospitals.
   13    It's hard to believe that a patient wouldn't
   14    know there's a RENNIE advocate.
   15          Q    Okay.  So I just -- you gave me a
   16    lot of information there and I'd like to just
   17    break it down.  I think one of the ways that you
   18    said that patients are made -- made aware of
   19    RENNIE advocates is through signs in the
   20    hospital; is that correct?
   21          A    Um-hmm.
   22          Q    What are those signs?
   23          A    Bulletin boards, they're posted
   24    bulletin boards with RENNIE advocate information
   25    on them.

```
 1                        KAREN PIREN
 2    responsibilities?
 3            A     My job responsibilities were to
 4    assist the client service reps or RENNIE
 5    advocates in fulfilling their duties at RENNIE
 6    advocates in the state hospitals.
 7            Q     And how did you do that?
 8            A     Frequent visits, meetings.
 9            Q     What did you do when you would
10    visit, do visits with the RENNIE advocates?
11            A     We'd do charge reviews, see
12    patients, review policies and procedures, work
13    out whatever issues any hospital might be
14    having.
15            Q     Did you conduct trainings?
16            A     We had one-on-one trainings all the
17    time, um-hmm.
18            Q     Like on-the-job trainings?
19            A     Um-hmm.
20            Q     Did you do any formal trainings
21    with RENNIE advocates?
22            A     Over the years, over the past ten
23    years, sure, we've had formal trainings.
24            Q     Which ones do you recall?
25            A     Most recently, the last couple
```

Page 48

1                    KAREN PIREN

2    trainings we did were more hospital wide

3    trainings, but we have had meeting and monthly

4    meetings and we have people come in if we need

5    them.  There hasn't been a lot of need for

6    training because not much has changed in the

7    past ten years and we don't have much of a

8    change in the RENNIE advocates either.  They

9    generally are the same RENNIE advocates we've

10   had for a long time.

11        Q    Okay.  So let's -- I just want to

12   focus, though, on your role as the liaison to

13   the RENNIE advocate.  What years did you hold

14   that title?

15        A    It wasn't my title.  My title was

16   quality assurance specialist or something like

17   that.  And the role I had then was basically the

18   same role I have now, as an advisor and a

19   consultant to the RENNIE advocates in the state

20   hospitals.

21        Q    As a quality assurance specialist,

22   is that the right title?

23        A    Um-hmm.

24        Q    Okay.  As a quality assurance

25   specialist you had responsibilities as being a

Page 95

 1                      KAREN PIREN

 2    ensure the protection of patient rights, they

 3    respond to patient families when needed, but

 4    they certainly do not investigate complaints in

 5    the nature that I believe this is intended.

 6         Q    Do RENNIE advocates have any

 7    responsibilities regarding patient complaints?

 8         A    Yes.

 9         Q    What are those responsibilities?

10         A    Well, the RENNIE advocate in regard

11    to patients on refusing status, is that what you

12    are referring to?

13         Q    Sure, let's start there.

14         A    Or are you referring to any kind of

15    complaint?

16         Q    Well, I'm referring to any kind of

17    complaint, but if there is a line that needs to

18    be drawn I'm trying to figure out what the

19    RENNIE advocates do or don't do with regard to

20    patient complaints.

21         A    What the patient advocate has to do

22    in regard -- if a patient calls the RENNIE

23    advocate and says I'm getting medication and I

24    don't want it, I don't want to take this

25    medication.  The RENNIE advocate job is to go to

Page 96

1                        KAREN PIREN

2    the unit, speak with the patient and determine

3    if any other action needs to be taken and to

4    facilitate a process that ensures that the

5    patient's rights are upheld in that regard.  So

6    that might mean that the RENNIE advocate would

7    go to the psychiatrist, speak to the patient's

8    doctor, explain the patient at all times.  The

9    RENNIE advocate would be responsible for

10   explaining to the patient and helping the

11   patient understand what his rights are in that

12   regard.

13        Q    Fair to say that the RENNIE

14   advocates have responsibilities for patient

15   complaints insofar as they relate to medication?

16        A    The RENNIE advocates have the

17   responsibility of ensuring that the patient's

18   rights are upheld as regard to patient

19   complaints.  So that if a patient says I don't

20   like the side affect I have of medication or I'm

21   not, you know I'm getting too high a dose, the

22   RENNIE advocate role is to go to the

23   psychiatrist, go to the team, express -- assist

24   the patient in expressing their complaints.  And

25   in all cases the RENNIE advocates do try to help

Page 124

1                        KAREN PIREN

2          Q    Do folks other than the client

3    service reps attend?

4          A    As needed, yes.

5          Q    Okay.  And who are some of the

6    people who might go to those meetings?

7          A    As I explained Dr. Eilers, the

8    legal people, and if there's any other person we

9    need we -- generally speaking those are the only

10   people who attend.

11         Q    Which legal people?

12         A    Lisa Sciaston, Melanie Griffin, our

13   legal people in central office.

14         Q    How long do the meetings typically

15   last?

16         A    Three, four hours.

17         Q    Are they held on a set day every

18   month?

19         A    Third Wednesday of every month.

20         Q    What is the purpose of the

21   meetings?

22         A    The purpose of the meeting is to

23   review any relevant information, to discuss any

24   particular problems that any hospital or

25   individual patient is brought up, and to

Page 152

```
 1                    KAREN PIREN
 2          A    Yes.  And more importantly we're
 3   aware of -- yes.  This can happen under certain
 4   circumstances though because a person can be put
 5   on CEPP and not be ready for discharge.  They
 6   remain on CEPP and then decompensate and be
 7   actually committable again.  We certainly try to
 8   avoid putting people who are ready for discharge
 9   on refusing status that would indicate that
10   they're really not ready for discharge.  But it
11   can happen, it doesn't happen very often, but it
12   does happen, it can happen.  And we do take a
13   look at that and we try to avoid that and
14   educate teams about that as well.
15          Q    Why is that something that you try
16   to avoid?
17          A    Again, if a person is ready for
18   discharge they shouldn't be on refusing status.
19   A person ready for discharge means that they are
20   ready to go out and function and be in society
21   and take their meds and do what they're suppose
22   to do to stay well.
23          Q    In that way are they similar to
24   voluntary patients?
25          A    No, not at all.
```

Case 1:10-cv-03950-JBS-JS   Document 122-14   Filed 11/28/12   Page 11 of 63 PageID: 2465

```
 1                    KAREN PIREN
 2         Q    Okay, so but is it your
 3    understanding that voluntary patients cannot be
 4    subjected to the three-step process?
 5         A    Correct, unless it's an emergency.
 6         Q    And it's your understanding though
 7    that CEPP patients can be?
 8         A    Correct.
 9         Q    But that that depends on whether
10    they're actually ready for discharge; is that
11    right?
12         A    No, that's not what I said.
13         Q    Okay, so what did I get wrong?
14         A    A person who is CEPP means that
15    they are, technically a judge has declared --
16    it's still a legal status, a judge has declared
17    that they're ready to be discharged or they are
18    ready to begin discharge planning, more
19    appropriately.  But that doesn't necessarily
20    mean that they're absolutely ready to be
21    discharged at that immediate time and what can
22    happen is that while a person is on this status,
23    CEPP status, they become very ill again maybe
24    because they didn't take their medication and it
25    comes a time when the three-step process needs
```

Page 182

1                    KAREN PIREN

2    speak to that.  I don't really support a

3    judicial process?

4         Q    Why not?

5         A    Because I don't think that a judge

6    has any qualifications or -- I do believe

7    somebody needs to be there to uphold the rights

8    of the patient to make sure that the patient

9    is -- is -- is being protected, that their

10   rights are being protected, but I do also

11   believe that the serious nature of the patients

12   we have with mental illness and the very acute

13   states that they -- they are in requires a

14   psychiatrist or a psychiatric advanced practice

15   nurse, since I am one, but requires that kind of

16   clinical intervention and knowledge about a

17   patient illness to make a really good informed

18   decision.

19        Q    Do you think that patients should

20   have access to counsel?

21        A    Of course, yes.

22        Q    Do you think they should have a

23   right to?

24        A    Sure, they have a right to.

25        Q    Do you think that lawyers should be

Case 1:10-cv-03950-JBS-JS Document 122-14 Filed 11/28/12 Page 13 of 63 PageID: 2467

```
 1                      KAREN PIREN
 2   provided to patients when they're being
 3   restepped?
 4             A    I don't believe that's necessary,
 5   no.
 6             Q    Why?
 7             A    For the very reason I just gave
 8   you.  Patients have access to lawyers in terms
 9   of they have, always have access to contact
10   DRNJ.  They have access to the public defender.
11   They can hire their own attorneys, of course,
12   but we do not provide -- we have hospital people
13   who -- available from central office and for --
14   in the hospitals for court hearings and that
15   kind of thing, lawyers are available to
16   patients, but as relate to every three-step
17   process, I don't feel that that would be
18   efficient or a good use of time.
19             Q    Is it your understanding that
20   judges make decisions in civil commitment
21   hearings?
22             A    Yes.
23             Q    Do you think that -- do you
24   disagree with that process?
25                  MR. LEYHANE:  Objection.
```

Page 190

```
 1                    KAREN PIREN
 2   on page, the page ending 800, one of the
 3   definitions of for less restrictive
 4   intervention.  Do you see that?
 5           A    Yes.
 6           Q    Is that a term that you are
 7   familiar with or that's used in your job?
 8           A    Yes.
 9           Q    And what is your understanding of
10   what that means?
11           A    This, as we have progressed through
12   the last number of years in mental health
13   treatment we are changing our system from one of
14   a kind of a paternalistic sort of treatment
15   where, you know, a patient does what you say and
16   that's it, to one of person centered, patient
17   participate of treatment.  In that regard, over
18   the years we have moved towards less restrictive
19   interventions overall, including medication,
20   including seclusion, restraint, including the
21   use of forced medication, including very
22   prescriptive procedures to one where we
23   hopefully are using less restrictive, more
24   person centered treatments so the patient has a
25   right to choose and talk about ahead of time
```

```
 1                    KAREN PIREN
 2   before an incident occurs what interventions
 3   might be helpful to him.  And this is written in
 4   a treatment plan and that is what the teams are
 5   required to do before a person is, say for
 6   example, put in seclusion or put into restraints
 7   or given forceable emergency medication.  So
 8   less restrictive interventions are generally
 9   those selected by the patient.
10        Q    Okay.  So fair to say there's a
11   movement away from, or movement towards using
12   less restrictive intervention when possible?
13        A    Yes, in every hospital nationwide.
14        Q    And have you heard from your RENNIE
15   advocates or otherwise been made aware of
16   situations where a patient requested a less
17   restrictive intervention but was forcibly
18   medicated instead?
19        A    I haven't heard of any specifics in
20   that regard.
21        Q    Are you aware of that happening
22   generally?
23        A    I'm sure it can happen generally.
24   I mean I'm sure that things like that happen.
25        Q    If you wanted to know more about
```

Page 218

```
 1                    KAREN PIREN
 2    whatever is necessary as far as what we already
 3    discussed.  If the RENNIE advocate -- if the
 4    patient requires or asks that the RENNIE
 5    advocate go to the team meeting with the
 6    patient, the RENNIE advocate will do that.  But
 7    the RENNIE advocate is not there really
 8    advocating for the patient's wishes, the RENNIE
 9    advocate is advocating and seeing to it that the
10    process is followed, that the legal process is
11    followed, that the patient's rights are -- the
12    patient is given his due process, the patient is
13    given his opportunity to speak to the treatment
14    team, the patient is given the time to speak to
15    the treatment team.  The patient is explained --
16    the information is given to the patient about
17    the process.
18         Q    So turning back to page, the page
19    ending 806, back on AB:504.  If you look down,
20    there's is a footnote here?
21         A    Yes.
22         Q    Sorry, one minute.
23              If you look at where it says 2A,
24    "Although it is possible to devise a treatment
25    plan that is available at the hospital and will
```

Page 242

1                         KAREN PIREN

2          Q     How often does that happen?

3          A     It happens fairly often.

4          Q     Once a month?

5          A     I can't quantify it that way for

6     five different hospitals, honestly I cannot.

7     But it does happen and it happens fairly often

8     and unfortunately we do not keep data on that

9     which I have asked the RENNIE advocates to begin

10    keeping that data because it does absolutely

11    does happen.

12         Q     Why is that a data point that you

13    would be interested in tracking?

14         A     Because you're asking me the

15    question.

16         Q     Is it fair to say because of the

17    lawsuit?

18         A     Absolutely, we never thought about

19    keeping that information although we know that

20    it does happen.  We just never thought about

21    keeping it.

22         Q     As a matter of percentages could

23    you say how often you think --

24         A     I, honestly, it would be such a

25    random guess it wouldn't be worthwhile for me to

```
 1                    KAREN PIREN
 2   make such an observation.
 3         Q    Do you know if the percentage --
 4   strike that.
 5              In the even that it's a delegate
 6   as opposed to the medical director who
 7   completes step three, does that affect how
 8   frequently they will agree or disagree with the
 9   treating psychiatrist recommendation?
10         A    I couldn't say whether it does or
11   doesn't.  It's very rare that the procedure is
12   delegated though very rare.
13         Q    Fair enough.
14         A    Yes.
15         Q    Are you aware of any circumstances
16   where a patient was involuntarily medicated
17   after step two but without the medical director
18   or his delegate reviewing the patient's record?
19         A    I'm going to say again that I'm
20   certain that can happen, and if it's brought to
21   anyone's attention then steps are taken to
22   rectify the situation.
23         Q    Are you aware of any instances and
24   actually you can turn back to page 807, and you
25   see about middle of the page under step three
```

Page 274

1                              KAREN PIREN

2              A     Yes.

3              Q     So you have the option of either a

4    psychiatrist or an APN?

5              A     We do.

6              Q     Are there any other folks who do

7    independent reviews?

8              A     Not to my knowledge, well, I say

9    that but anyone with a license actually I guess

10   a psychologist could, technically but we are

11   looking at medication issues so you want someone

12   who's medication savvy.

13             Q     When independent reviews do take

14   place, what is involved in that process?

15             A     What's generally involved is an

16   orientation of the psychiatrist doing the

17   independent review, the psychiatrist, generally

18   we'll send them some of the pertinent data of

19   the patient so they have an opportunity to

20   review it prior to coming to the hospital.  They

21   come to the hospital, meet with the patient and

22   the team if necessary, the medical director if

23   necessary, whoever they feel is necessary and

24   they make a determination, give us a written

25   report and leave.

Page 308

1                        KAREN PIREN

2           A     Again, the issue was brought to the

3     managing physician who brings it to the doctors

4     and tells them what they have to do.  It's

5     brought to the physicians by the RENNIE

6     advocate, brought to central office where it's

7     addressed by the -- at managing physicians

8     meetings by Dr. Eilers.  So there are various

9     different levels and then we continue to monitor

10    the situation.

11          Q     Okay.  And do you know if this

12    issue was raised in all five of the psychiatric

13    hospitals to deal with the monthly progress

14    notes?

15          A     It has been raised at one time or

16    another in all the hospitals, yes.

17          Q     Were you part of that process in

18    educating physicians about the issue?

19          A     In the same way that I just

20    referred to in that, for one thing we developed

21    monthly progress note forms that have a

22    particular space that refers to refusing status

23    patients so that the doctors would remember to

24    document and evaluate that process.  That's a

25    number of years ago.

# EXHIBIT U

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - -x

DISABILITY RIGHTS NEW JERSEY, INC., et al.,

                    Plaintiffs,

            vs.

JENNIFER VELEZ, in her official capacity as

Commissioner of the New Jersey Department of Human

Services, et al.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x




                DEPOSITION OF ANTHONY HAYNES

                    Hammonton, New Jersey

                    Tuesday, January 24, 2012




REPORTED BY:

DANIELLE GRANT


REF #6787

Page 18

1                    ANTHONY HAYNES

2         Q    When did you start working at

3    Ancora Psychiatric Hospital?

4         A    It was January the 3rd, 1977.

5         Q    What was your position at that

6    time?

7         A    Human service assistant.

8         Q    What were your responsibilities in

9    that job?

10        A    Caring for the patient, bathing,

11   feeding, taking care of the patient, personal

12   need and supervision.

13        Q    Before that job, did you have any

14   experience in psychiatric hospitals?

15        A    No, but I worked with at some point

16   my life the Chatam County Association for

17   Retarded Citizen.  I can't remember, but that

18   was my first exposure to the mental health

19   field.

20             I believe I had at short stint in

21   Savanna at the Georgia Regional Hospital, which

22   is a psychiatric facility.

23        Q    How long did you work as a human

24   services assistant at Ancora?

25        A    I really can't remember, sir.  I

1                    ANTHONY HAYNES

2    know it was --

3         Q    Was it more than one year?

4         A    For the assistant, let us say

5    within a year, let's say a year.

6         Q    How long have you been a RENNIE

7    advocate at Ancora?

8    .     A    About 14 years.

9         Q    So it's 2012 now, so since

10   approximately 1998, does that sound right?

11        A    Yes.

12        Q    Between 1977 when you started

13   working at Ancora and 1998, what other positions

14   did you hold?

15        A    The first position is a human

16   service assistant, and when the civil service

17   presents the test, you take the test, you pass

18   it, you become a human service technician.

19        Q    And for how long did you have that

20   role?

21        A    Until I had the position as the

22   patient advocate.

23        Q    And when you say patient advocate,

24   do you mean the RENNIE advocate?

25        A    No, sir, I started out as the

Page 32

1                    ANTHONY HAYNES

2         Q    So if a patient doesn't come to you

3    with a complaint, do you ever inform them of

4    their right to withhold consent to treatment?

5         A    Well, the patients are advised of

6    this upon admission and that they can always

7    contact the RENNIE advocate.  And if by chance

8    they contact me, then I go back over those.

9         Q    Who advises the patients upon

10   admission?

11        A    Well, the clinical staff, the

12   admission staff.  They are given booklets and

13   documentation and this information is

14   conspicuously posted throughout the institution.

15        Q    How do patients who bring you

16   complaints know that you work at the hospital?

17             MR. LEYHANE:  I'm sorry, Anthony,

18        wait a minute.

19             That he what does what?  My fault,

20        I lost the last part of the question.

21             (The requested portion of the

22             record was read back.)

23        Q    Do you need me to rephrase the

24   question?

25        A    No, because it's posted.

```
 1                     ANTHONY HAYNES

 2   right?

 3        A    That's correct.

 4        Q    But the policy statement that's on

 5   the page, the first page, the first paragraph of

 6   this document JV49.

 7        A    Yes, sir.

 8        Q    It says that "The RENNIE advocate

 9   will be responsible for insuring that due

10   process procedures are adhered to and patient's

11   right of treatment refusal is protected."

12             Do you see that?

13        A    That is correct.

14        Q    How do you go about insuring that

15   due process procedures are adhered to?

16        A    Because they are the guidelines

17   that states the procedures that have to be

18   followed when medicating a patient against their

19   will and is spelled out.

20        Q    Let's go back to Plaintiff's

21   Exhibit this is.

22        A    3, sir.

23        Q    And this is the 2011 version of

24   AB:504?

25        A    Yes.
```

1                      ANTHONY HAYNES

2    patient," do you see that?

3         A    Um-hmm.

4         Q    What is your understanding of why

5    that sentence is in this document?

6         A    Because of the fact that we're all

7    trying to get the patient to understand what's

8    going on in the process, and I need to hear from

9    the patient.  What is your objections, what are

10   your concerns, what do you want to be able to

11   say.  And then once I have that information, at

12   the meeting I can fully present the patient's

13   side.

14        Q    Have there been situations in the

15   past in which the second step was not, scratch

16   that.

17             Have there been situations in the

18   past in which the second step has been

19   initiated before you as the RENNIE advocate

20   have had a chance to meet with the patient?

21        A    Yes, I was notified at the end of

22   the third step, my notification was at the end

23   of the third step.  But they have changed that

24   now that I am to be notified really before the

25   initiation of the first step.

1                     ANTHONY HAYNES

2          Q    Why is it important for you to meet

3     with the patients before at least the initiation

4     of the second step?

5          A    So I can insure that the patient's

6     story is told.

7          Q    And how do you insure that?

8          A    By speaking with the patient and

9     attempting to negotiate with the physician.  And

10    if that's not good then to the treatment team,

11    make my objection on to the treatment team and

12    if there's not a positive resolution there, make

13    it known to the medical director prior to him

14    signing off on the third step.

15         Q    Do you view your role as to

16    advocate for the expressed preference of the

17    patient?

18         A    I do.

19         Q    Do others on the staff of Ancora

20    view your role that way?

21         A    I can't speak for them I don't

22    know.

23              MR. LEYHANE:  Objection to the

24              form of the question.

25         Q    What is your understanding of how

Page 145

```
 1                    ANTHONY HAYNES
 2        A    Oh, yeah, it went out to them.
 3        Q    Do you think the fact that a weekly
 4   meeting is required between the RENNIE advocate
 5   and the medical director, do you think that fact
 6   will have an influence on the medical director
 7   in terms of being more inclined to listen to the
 8   RENNIE advocate?
 9             MR. LEYHANE:   In terms of Ancora
10             because that is what he has indicated.
11        A    At my Ancora?
12        Q    Yes.
13        A    Well, we know it's there, and we
14   know that it's our hospital but as I said, sir,
15   I have no problem with my medical director.  He
16   maintains an open door for me, you know, I
17   can -- I don't have to like schedule a meeting.
18   I don't do that if I have a problem.
19        Q    Now, the word designee appears in
20   the sentence though I just read, which is the
21   second paragraph on this page; is that right?
22   It says, "The medical director or designee."  Do
23   you see that?
24        A    Yeah.
25        Q    Who might the designee be that you
```

Page 216

```
 1                        ANTHONY HAYNES
 2    patient interviewed regarding his or her
 3    medication or observed for extra pyramidal side
 4    effects?"
 5                 Do you see that?
 6         A    Right.
 7         Q    Is it your practice to interview
 8    patients who have been three stepped?
 9         A    Yes, sir.
10         Q    How long do those interviews last?
11         A    They can last from -- 504 required
12    that I observe the patient.
13         Q    For how long do you typically
14    observe a patient who has been three stepped?
15         A    It depends.  It can be a glance at
16    the patient.
17         Q    How long is a glance?
18         A    It can be just as I look at you and
19    look back at the paper.  I can engage the
20    patient.  It all depends on how the patient is
21    presenting at the time.
22         Q    Okay.  In every instance in which a
23    patient has been three stepped, do you ask the
24    patient directly if they're experiencing side
25    effects?
```

Page 217

1                    ANTHONY HAYNES

2          A     If they will allow my approach.  In

3     the psychiatric business you learn when to

4     approach a patient and when not to.  They have a

5     space and you've got to know when do you go into

6     that space, and you'd best be invited.  If not,

7     you can be harmed.

8          Q     Okay.  Assuming that the patient is

9     approachable, in those instances, do you make it

10    a point to directly ask the patient whether

11    they're experiencing side effects?

12         A     Yes.  I try to engage a

13    conversation with the patient, not going

14    directly to the medication.  You know, what's

15    going on?  How you feeling?  You know.  What are

16    they doing to you?  You know.  I see they put

17    you on a refusing status, what's going on with

18    that?

19         Q     Okay.  But at some point do you

20    specifically address the question that is posed

21    on the review form, whether they are

22    experiencing extra pyramidal side effects?

23         A     Well, that -- well, now -- yeah,

24    when you read the bulletin, it's going to advise

25    you that it's your job to observe the patient.

Page 224

1                           ANTHONY HAYNES

2        whether other components of the treatment plan

3        is being implemented.

4              Q    And do you have any understanding

5        of why that does not happen?

6              A    I don't know whether it happens or

7        not.  But I guess by this new thing that I'm

8        supposed to meet with the medical director

9        weekly, I guess I would be raising that question

10       or ensuring that this is going on.  I think that

11       was another reason that was placed in there.

12             MR. REISMAN:  Why don't we take a

13             break and go off the record?

14             VIDEOGRAPHER:  It's now 4:50.

15             We're going off the record.  This

16             concludes Tape No. 4 of the videotaped

17             deposition of Anthony Haynes.

18             (Whereupon, at 4:50 p.m., a recess

19             was taken to 4:59 p.m.)

20             (The deposition resumed with all

21             parties present.)

22             VIDEOGRAPHER:  Now back on the

23             video record.  The time now is 4:59.

24             This begins tape number five in the

25             videotaped deposition of Mr. Anthony

# EXHIBIT V

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 10-3950-DRD

```
- - - - - - - - - - - - - - -x
DISABILITY RIGHTS NEW          :
JERSEY, INC., a New Jersey     :
non-profit corporation,        :
                               :
                 Plaintiff     :
                               :
        vs.                    :
                               :
JENNIFER VELEZ, in her         :
official capacity as           :
Commissioner, State of New     :
Jersey Department of Human     :
Services, et al.,              :
                               :
                 Defendants    :
- - - - - - - - - - - - - - -x
```

VIDEOTAPED DEPOSITION OF JOHN LUCHKIW

New Brunswick, New Jersey

Thursday, March 15, 2012

REPORTED BY:

STEVEN R. MACK

COPY

REF #7003

1    mental health clinics.

2    Q.          What does the case manager do?

3    A.          Basically social work without the

4    clinical -- clinical aspect to it.  So we'd find

5    housing for people to ensure that they would keep

6    their Section 8 housing, I would try to -- on a very

7    shallow level do some maybe job coaching, things

8    along those things, just to show that people were

9    being able to survive in the community.

10   Q.          And you stated that your current

11   position is a client services representative at

12   Greystone?

13   A.          Yes.  Yes.

14   Q.          And when did you start as a client

15   services representative?

16   A.          It was in the summer of '99.

17   Q.          And how were you hired for that

18   position?

19   A.          Through an interview process.

20   Q.          Did you apply?

21   A.          Yes, I did.

22   Q.          How did you know that the position was

23   available?

24   A.          It was posted.

25   Q.          And --

Page 22

1    Q.          Can you think of anything else besides

2    psychopharmacology, psychotherapy, occupational

3    therapy, music therapy, or art therapy?

4    A.          Well, there's social services, there's

5    whatever.  Nursing, there are nursing programs.

6    Q.          What do you mean by social services?

7    A.          Social work.  There could be like

8    predischarge groups, things along those lines.

9    Q.          And do all the patients at Greystone

10   receive every type of treatment?

11                     MR. CHABAREK:  Objection to form.

12   A.          No.

13   Q.          Do you know how it's determined which

14   modality will be used with the patient?

15   A.          It's -- it's a combination between the

16   treatment team and the patient's preferences also.

17   So the patient has input.

18   Q.          How does the patient make their

19   preferences known?

20   A.          Through dialogue.

21   Q.          And when does the dialogue occur?

22   A.          Usually during the treatment team

23   meeting, or at any time.

24   Q.          The patients don't always go to the

25   treatment team meetings, correct?

Page 28

1    Q.         It was marked in the deposition of

2    Anthony Haynes.

3    A.         Um-hum.

4    Q.         Do you recognize this?

5    A.         Yes.

6    Q.         And what is it?

7    A.         It's the state civil service's job

8    description for client services representative.

9    Q.         And that's your position, correct?

10   A.         Yes, it is.

11   Q.         And do you want to take a look at it and

12   confirm that it's complete?

13   A.         To the best of my knowledge it is.

14   Q.         It's dated 1993.

15   A.         Um-hum.

16   Q.         Do you see that?  Has there been an

17   updated job description?

18   A.         Not that I'm aware of.

19   Q.         Okay.

20   A.         Um-hum.

21   Q.         So the definition of your position it

22   states is "Under general direction of a supervisory

23   officer, promotes and initiates client advocacy,

24   receives, investigates, and makes recommendations

25   concerning client complaints and members of their

1    family to ensure the protection of client's

2    rights -- client rights; does related work as

3    required."

4    A.        Um-hum.

5    Q.        Is that correct?

6    A.        Yes.

7    Q.        That's an accurate description of your

8    job?

9    A.        According to this, yes.

10   Q.        Well, do you agree with it?

11   A.        Generally speaking, yes.

12   Q.        Is there anything that you disagree

13   with?

14   A.        No.

15   Q.        And then under examples of work, the

16   first example is, "Screens all client complaints

17   directed to his/her office, investigates the

18   complaints, and recommends and/or takes necessary

19   actions to resolve complaint to client

20   satisfaction."  Did I read that correctly?

21   A.        Yes.

22   Q.        Have you ever received complaints from

23   patients or families regarding long-term medication?

24   A.        Yes.

25   Q.        How often does that happen?

Page 32

```
 1   A.           Yes, I am.

 2   Q.           And would you agree that Rennie

 3   advocates specifically deal with medication issues?

 4   A.           Amongst other things they deal with

 5   medication issues.

 6   Q.           But not all client services

 7   representatives are Rennie advocates, correct?

 8   A.           Correct.

 9   Q.           But at Greystone both of you are?

10   A.           Yes.

11   Q.           Is there a specific job description for

12   a Rennie advocate, a written one?

13   A.           The only written reference I've ever

14   seen to a Rennie advocate is in A.B. 5:04 where the

15   hospital can appoint an appropriate, what they deem

16   as an appropriate title to the position of Rennie

17   advocate.

18   Q.           Sometimes they're called patient

19   advocates, too, correct?

20   A.           In a generic way, yes.

21                MS. KOLOD:  This should be 18.

22                (Plaintiff Exhibit No. 18 was

23   marked for identification.)

24                MS. KOLOD:  Okay.  The plaintiff

25   has -- the witness has just been handed a document
```

Page 40

1   Q.            -- that -- on Exhibit P-18 that periodic

2   reminders at life -- oh, sorry.  That there are

3   grievance posters posted near public telephones; is

4   that correct?

5   A.            Um-hum.

6                      (Plaintiff Exhibit No. 19 was

7   marked for identification.)

8                      MS. KOLOD:  I'm handing the

9   witness a document marked P-19, which is

10  Bates-stamped JV000113.

11  BY MS. KOLOD:

12  Q.            Is this a grievance poster?

13  A.            It's an example of one.

14  Q.            Are there other kinds of grievance

15  posters?

16  A.            Yeah.  We have some with our names on

17  them, we were asked to put some with our names on

18  them, and we've complied with that.

19  Q.            Are posters like this one, like

20  Exhibit 19, still at the hospital?

21  A.            Yes.

22  Q.            But there are also posters with your

23  names on them?

24  A.            Yes, there are.

25  Q.            With yours and Charles Petty?

```
 1   A.        Yes.

 2   Q.        Do they mention medication on them?

 3   A.        No, not necessarily.

 4   Q.        Do any of them do?

 5   A.        Not that I recall.

 6   Q.        And where are these posted specifically?

 7   A.        On the unit bulletin boards.

 8   Q.        Do all the units have bulletin boards?

 9   A.        Yes.

10   Q.        And are there grievance posters on all

11   the bulletin boards?

12   A.        I'd like to think so, yes.

13   Q.        Do you check?

14   A.        Periodically.

15   Q.        How often?

16   A.        Usually whenever we go to a particular

17   unit for a call.

18   Q.        So how often does that happen?

19   A.        Daily.

20   Q.        Have you ever noticed that there wasn't

21   a grievance poster?

22   A.        Yes.  And we've gotten complaints about

23   there not being grievance posters, so we just print

24   them up and put them up.

25   Q.        How long does it take?
```

Page 42

1  A.          Five minutes.

2  Q.          And that's your phone number on that

3  poster, correct?

4  A.          That is the patient hotline number,

5  toll-free.

6  Q.          So what happens when someone -- who

7  answers when someone calls that number?

8  A.          It is a voice mailbox to assure that it

9  would be called, and then we will check the voice

10  mailbox periodically to -- so we have a date,

11  timestamp, everything, and then we're able to handle

12  the call.

13  Q.          How often do you check the voice mail?

14  A.          At least daily, excluding weekends of

15  course.

16  Q.          Is there an average number of messages

17  you get when you check it?

18  A.          No.  It fluctuates.

19  Q.          Would you be surprised if there were 20

20  messages?

21  A.          Very.

22  Q.          Would you be surprised if there were --

23  there was only one?

24  A.          No.

25  Q.          So what about ten?  Would that surprise

1    that's kept of --

2    A.          Yes.

3    Q.          -- these kinds of complaints?

4                MR. CHABAREK:  Just let her finish

5    the question.

6    A.          Oh, I'm sorry.  I'm sorry.

7    Q.          Would you ever do an incident review

8    form as a result of an involuntary medication

9    complaint?

10   A.          I could.

11   Q.          Have you?

12   A.          No.

13   Q.          Do you know if Charles Petty ever has?

14   A.          I don't know.

15   Q.          Okay.  Now I would like to go back to

16   Px-1, the description of the client services

17   representative job.

18                Okay.  The second example of work

19   is, "When requested, will assist professional staff

20   by explaining to clients the nature of their

21   treatment and the risks involved and informs them of

22   their right to withhold consent to such treatment."

23                Did I read that correctly?

24   A.          Yes.

25   Q.          Do you perform this task as it relates

Page 48

1   to involuntary medication?

2   A.        Yes.

3   Q.        How do you do that?

4   A.        I will meet with the patient and explain

5   to them the -- the A.B. 5:04 and how it can pertain

6   to them.

7   Q.        And what do you tell them about their

8   right to withhold consent?

9   A.        That although they do have a limited

10  right to refuse their medication, the hospital has a

11  co-related responsibility to treat them to the best

12  of our ability, and that may fall under them getting

13  medications, you know, involuntary -- involuntarily

14  or potentially against their will.

15  Q.        Okay.  Now, skip the next three

16  examples.  The sixth one says, "Provides protection

17  for the client from official error, abuse, or

18  neglect and functions as a preventive influence by

19  providing a means by which the patient can ventilate

20  feelings."

21  A.        Um-hum.

22  Q.        Do you do that?

23  A.        I'd like to think I do, yeah.

24  Q.        We already talked about abuse and

25  neglect.  Is there any more, anything else that

Page 52

1   A.          Yeah.

2   Q.          If you saw a three-step form -- you're

3   familiar with three-step forms, correct?

4   A.          Um-hum.

5   Q.          Yes?

6   A.          Yes.  Sorry.

7   Q.          That's okay.  If you saw a three-step

8   form where the justification for medication was the

9   patient said he felt like he wanted to hit somebody,

10  would that be appropriate?

11                   MR. CHABAREK:  Objection to form.

12  A.          No.

13  Q.          That's not good enough?

14  A.          I don't think so, no.

15  Q.          Okay.  The next example of work is,

16  "Visits resident area on a frequent basis and

17  discusses complaints with clients and/or staff and

18  attempts to resolve them by recommendations,

19  negotiations, direct action, or appropriate

20  referral."

21                   Do you do this?

22  A.          Yes.

23  Q.          How frequently do you visit resident

24  areas?

25  A.          Daily.

1    spent related to your position on these committees?

2    A.        Maybe 10 percent.

3    Q.        Do you ever discuss involuntary

4    medication in the Ethics Committee?

5    A.        Not that I recall.

6    Q.        What about the Patient Safety Committee?

7    A.        The nur -- there is -- if there are

8    medication issues, the nursing aspect of that

9    committee brings them up.

10   Q.        Okay. And on the Library and Research

11   Committee, has anyone ever brought up that there

12   should be law books in the patient library?

13   A.        No.

14   Q.        So you advocate for the patients; is

15   that correct?

16   A.        Yes.

17   Q.        Do you consider yourself to be an

18   independent hospital?

19   A.        No.

20   Q.        Why not?

21   A.        In so many words that's who signs my

22   check.

23   Q.        How many patients are at Greystone?  Do

24   you know?

25   A.        475, 500.  We've just had an influx, so

1    Q.          Do you know how many patients are on

2  refusing status now?

3    A.          Offhand I would guess -- I would say

4  about 55.

5    Q.          But you would be able to confirm that

6  number by checking your reports, correct?

7    A.          (Witness nodding head)

8    Q.          Yes?

9    A.          Yes.

10   Q.          And do you know how many functionally

11 incompetent patients there are?

12   A.          I do believe there's eight.

13   Q.          Have you noticed any changes in the

14 number of patients on refusing status lately,

15 whether it's gone up or down?

16   A.          It's gone up a bit.

17   Q.          In what time frame?

18   A.          Over the last couple of months.

19   Q.          Do you know why?

20   A.          No.

21   Q.          Do you have any guesses?

22                   MR. CHABAREK:  Objection.  You're

23 not here -- you're not here to guess but ...

24   Q.          Do you have any theories based on your

25 professional knowledge?

1    yourself?

2    A.          That we're the client services rep

3    patient advocates.  We won't necessarily say Rennie

4    advocates.

5    Q.          Do you think that the patients know what

6    Rennie advocate means, that term?

7                    MR. CHABAREK:  Objection to form.

8    A.          I offhand -- I don't know.

9    Q.          Have you ever introduced yourself to a

10   patient as a Rennie advocate to have them respond,

11   What's that?

12   A.          Yes.

13   Q.          Yes.  About how often does that happen?

14   A.          I couldn't put a number to it.

15   Q.          Because you don't know or because

16   it's -- it happens a lot?

17   A.          It happens frequently.

18   Q.          Do you think the patients at Greystone

19   are dangerous?

20                    MR. CHABAREK:  Objection to form.

21   You can answer.

22   A.          Yeah, a lot of them are.

23   Q.          Most of them?

24                    MR. CHABAREK:  Objection to form.

25   You can answer.

Page 70

1    A.          I think there's an unpredictability out

2    of almost every one of them.

3    Q.          Have you ever been attacked?

4    A.          Yes.

5    Q.          About how many times?

6    A.          Probably half a dozen.

7    Q.          So six times since 1994?

8    A.          Or since '92.

9    Q.          Ninety-two.

10   A.          About six times, yes, since 1992.  Well,

11   without the '97 and '98 when I wasn't there.

12   Q.          Got it.  What was the most severe

13   attack?

14   A.          I was punched in the face.

15   Q.          When did that happen?

16   A.          Maybe five, six years ago.

17   Q.          What were the circumstances surrounding

18   that incident?

19   A.          Basically nothing.

20   Q.          Was the patient on medication?

21   A.          I would think, yeah.  Well, yes, they

22   were on medication.

23   Q.          Do you know what medications the patient

24   was on?

25   A.          No.

1    Q.          The other approximate five times that

2    you were attacked, do you know if those patients

3    were medicated before they attacked you?

4    A.          I couldn't say positively, but I mean --

5    I couldn't say positively.

6    Q.          Did you ask afterwards?

7    A.          No.

8    Q.          Are you afraid of the patients at

9    Greystone?

10   A.          Some.

11   Q.          What makes you afraid of the ones you're

12   afraid of?

13   A.          Again unpredictability.

14   Q.          So how do you know who to be afraid of

15   then?

16   A.          I meet them.

17   Q.          And so would it be the ones who -- whose

18   behavior is generally less predictable, you're more

19   afraid of them?

20   A.          Yes.

21   Q.          And have you ever seen patients attack

22   anybody else?

23   A.          Yes.

24   Q.          About how often does that happen?

25   A.          I couldn't put a number to that.

1                    VIDEOGRAPHER:  This marks the

2     beginning of disk 2 in today's deposition of John

3     Luchkiw.  The time is 11:43 a.m., and we are on the

4     record.

5     BY MS. KOLOD:

6     Q.          I just want to remind you, Mr. Luchkiw,

7     that you're still under oath --

8     A.          Yes.

9     Q.          -- and you will be for the entirety of

10    the deposition?

11    A.          Yes.

12    Q.          I would like to turn back to Exhibit 18.

13    A.          This?  Okay.

14    Q.          Yes.  Which is the grievance policy,

15    correct?

16    A.          Yes.

17    Q.          Turn to the page that's marked at the

18    bottom JV016722.

19                    MR. CHABAREK:  You see it?

20    A.          Yeah.  This one.  Okay.

21    Q.          Do you recognize that?

22    A.          Yes.

23    Q.          And what is it?

24    A.          The patient's bill of rights

25    acknowledgment form.

Page 74

1    Q.        So patients sign this when they're

2    admitted?

3    A.        Yes.

4    Q.        Okay.  And the patients -- and that it

5    shows that they have read and understood the patient

6    bill of rights, if they sign it?

7    A.        Yes.

8    Q.        And the patient bill of rights is a

9    document that starts on the next page, correct?

10   A.        Yes.

11   Q.        So who makes sure that the patients sign

12   the acknowledgment?

13   A.        That is done upon admissions.

14   Q.        Are you involved in that process?

15   A.        No.

16   Q.        Do you know if they check to make sure

17   the patients understand before signing?

18   A.        I don't know.  I'm not a part of that

19   process.

20   Q.        You don't know anything about it?

21   A.        No.  All I know is that it's given to

22   them upon admission.

23   Q.        Okay.  Do you know what happens to this

24   acknowledgment form once it's signed?

25   A.        It's to be placed in the clinical

Page 76

1    Q.          Any setting.  But yeah, a class or a

2    training.

3    A.          Nothing formal that I'm aware of.

4    Q.          Is there any requirement that anybody go

5    over the patient's bill of rights with the patients

6    on a yearly basis just to make sure that they still

7    understand?

8                          MR. CHABAREK:  Objection to form.

9    You can answer.

10   A.          Not that I'm aware of.

11   Q.          Has the patient bill of rights changed

12   at all since you started at Greystone?

13   A.          The only one that I'm really aware of is

14   changing NJP&A to DRNJ on it.

15   Q.          And do you know if there was -- anything

16   was done to alert the patients of the change, the

17   patients who already -- who had already acknowledged

18   the patient bill of rights?

19   A.          No.  But we -- when the name change was

20   done it was -- it was noted through the DRNJ

21   advocates, and if people asked us we would tell them

22   that there was the name change.

23   Q.          And am I correct that you testified that

24   there are not trainings or classes held for patients

25   on the patient's bill of rights?

Page 90

1   Q.          Okay.

2                       MR. CHABAREK:  Is that a yes?

3                       THE WITNESS:  Yes.

4                       MR. CHABAREK:  Okay.

5   Q.          Okay.  On No. 21, a conditional right

6   again.  "To petition a court to review whether you

7   are being legally detained, parenthetical, file a

8   writ of habeas corpus, or to enforce any other right

9   through a civil action, whether stated in this

10  notice or otherwise available by law."

11                      Do you -- have you ever received

12  any complaints related to the denial of that right?

13  A.          Yes, but it was -- there's actually a

14  recent one where the patient didn't realize that the

15  fact of us having court on the premises is -- him

16  appearing in that court is his habeas corpus.

17                      He was expecting it to be

18  immediate.  As soon as he wrote the letter

19  requesting it, he wanted to go in and see the judge

20  right away.  But we had to explain to him that the

21  fact that when he goes in on his court date, that is

22  his habeas corpus.

23  Q.          And is that -- is that a review of the

24  commitment decision or what -- what was the

25  circumstances, why was there a habeas corpus

1   Q.          Anybody else?

2   A.          Not that I recall.

3   Q.          Were there any handouts given?

4   A.          The, the -- the changes, yeah, the --

5   there was the physical, you know, the bulletin I

6   guess in and of itself, there was that and the new

7   form that we were using.

8   Q.          The new 72-hour form?

9   A.          Yes.

10  Q.          Was there a PowerPoint presentation,

11  anything like that?

12  A.          No.

13  Q.          It was just Piren speaking?

14  A.          Yes.

15  Q.          Okay.  Are there any regularly scheduled

16  trainings that you have to attend?

17  A.          Regularly scheduled trainings?  No.

18  Aside from your basic hospital trainings that are

19  required by law.

20  Q.          What are those?

21  A.          So we have like there -- I don't know

22  exactly what they all -- all of them, but we have

23  what we call an Oktoberfest, training thing in

24  October.  Yeah.  So, and all mandatory hospital

25  trainings are done that year, all the ones that have

Page 112

1    to be updated annually.

2    Q.          And are they done on a hospital basis or

3    does the central office conduct them?

4    A.          This is hospital.

5    Q.          But the 72-hour training was central

6    office?

7    A.          Yes.

8    Q.          Yeah.  Okay.  Did you receive any

9    training on the Rennie decision, the factual case,

10   the court case?

11   A.          The --

12                   MR. CHABAREK:  Objection to form.

13   You can answer.

14   A.          The original 5:04?

15   Q.          Well, the -- the legal opinion that led

16   to it --

17   A.          Yes.

18   Q.          -- that -- yes.

19                   (Plaintiff Exhibit No. 20 was

20   marked for identification.)

21                   MS. KOLOD:  I've handed the

22   witness a document marked Exhibit 20, Plaintiff

23   Exhibit 20, which is Bates-stamped JV000291 to 296.

24   BY MS. KOLOD:

25   Q.          Have you seen this before?

```
 1   A.          Correct.

 2   Q.          It was Ancora?

 3   A.          I don't know where it happened.

 4   Q.          Okay.  Let's turn to page 4 of the new

 5   policy, A.B. 5:04 --

 6   A.          Um-hum.

 7   Q.          -- which is Bates-stamped JV015802.  And

 8   it says at the top "Patient Advocates."  Does that

 9   also mean Rennie advocates?

10   A.          Not necessarily.

11   Q.          What else could it mean?

12   A.          Well, it says each facility -- it could

13   be -- Rennie advocate is a component of a patient

14   advocate's office.  It doesn't necessarily have to

15   be.  We have patient advocates who aren't Rennie

16   advocates.

17   Q.          Got it.  It says, "Patient advocates

18   working for the Department of Human Services shall

19   be engaged in assisting patients with respect to

20   medication issues."

21                       Do you agree that that's part of

22   your responsibilities?

23   A.          Yes.

24   Q.          Okay.  As a Rennie advocate now how do

25   you assist?  I mean what do you do?
```

Page 126

1    A.          How would I assist in this process as

2    with -- regarding medication issues?

3    Q.          Yes.

4    A.          Where a patient has a particular concern

5    about their medication, will listen to, you know,

6    what the concern is and potentially hope to address

7    it in a satisfactory manner.

8    Q.          Okay.  Then turn to page 8.  And page 8

9    starts "Patients who Refuse Psychotropic

10   Medication," correct?

11   A.          Yes.

12   Q.          And then it goes through the first step.

13   So the first step is the physician's meeting with

14   the patient?

15   A.          Yes.

16   Q.          So you're aware of meetings between

17   physicians and patients --

18   A.          Yes.

19   Q.          -- of the first step?  Yes.

20               And do you know if doctors express

21   concerns about medications to patients?

22               MR. CHABAREK:  Objection to form.

23   You can answer if you can.

24   A.          Yeah.

25   Q.          And they say things like this medication

Page 214

1    A.        Well, we review the -- we review the

2    chart as soon as possible after receiving it,

3    basically to see whether the complace -- the process

4    has been complete.  I don't know.  I mean maybe I

5    was speaking out of order as far as expressing the

6    appropriateness of the treatment.  I'm not -- I'm

7    not really sure on that part of it.

8    Q.        That sounds like something a doctor

9    would do?

10   A.        Yeah.

11   Q.        Yeah.

12   A.        That would be more -- what I would view

13   more as the step 3.

14   Q.        What the medical director does?

15   A.        Yeah, as far as we're concerned at

16   Greystone.

17   Q.        Okay.  When you do the review forms, do

18   you check to make sure that the maximum doses on

19   Exhibit 21 are not exceeded?  We can go back and

20   look at it.  That's the training packet that --

21   A.        Right, right, right, right.  No, I got

22   it.  No, I know what that -- I know which one it is.

23   Do I personally check that?  No, not necessarily.

24   Q.        Does anybody do you know?

25   A.        I don't know offhand.  I know as a part

1    of justification for medication if you are going

2    above prescribed therapeutic levels, I do believe

3    there has to be a review by the chief of psychiatry.

4                    And we also have two independent

5    pharmacies on the grounds of the hospital, so if

6    there is something irregular, I'm sure that they

7    would be able to catch it.  We have a distribution

8    pharmacy is one agency, and the second agency is a

9    QA pharmacy; so it's like double and triple

10   checking.

11   Q.          I see.

12   A.          So I would hope something like that

13   would be caught.

14   Q.          So they keep track of what's being

15   prescribed to whom and at what levels?

16   A.          Meaning who?  The --

17   Q.          The pharmacies.

18   A.          Oh, yeah.  They have to.

19   Q.          Yeah.  And so it would, you know, send

20   up a red flag if the dose, the daily dose was double

21   the maximum?

22   A.          I would hope so.  Unless there was, like

23   I said, there was a review to determine that that

24   was appropriate if something was outside of

25   therapeutic range.

Page 265

```
 1    it.
 2    Q.          And yet you have no opinion as to
 3    whether it was medication-related?
 4    A.          I don't know.  I don't know the facts in
 5    the case.
 6    Q.          And it's your understanding that
 7    patients refusing medication currently do not have a
 8    right to an independent judicial hearing prior to
 9    being medicated, correct?
10    A.          In the state of New Jersey --
11    Q.          In New Jersey.
12    A.          -- yes.
13    Q.          Have patients requested this?
14    A.          I don't know.  I don't recall anybody
15    requesting that.
16    Q.          Do you think -- and do you think this
17    would improve the process for patients potentially
18    subject to involuntary medication?
19    A.          Improve the process?
20    Q.          (Nodding head)
21    A.          How -- I don't understand.  How do you
22    mean improve the process?
23    Q.          Do you think there are problems with the
24    three-step process?
25                     MR. CHABAREK:  Objection to form.
```

Page 266

 1   A.          I think there's potentially problems

 2   with every process.

 3   Q.          So --

 4   A.          With -- with a judicial process it might

 5   potentially take a longer period of time.

 6   Q.          What would take a longer period of time?

 7   A.          Getting a judicial review.

 8   Q.          And do you think that that's a good

 9   thing or bad thing?

10   A.          Potentially a bad thing.

11   Q.          Is it possible that it could be a good

12   thing?

13                      MR. CHABAREK:  Objection to form.

14   A.          I mean I'm basing my -- my other answer

15   on sort of conjecture, so I mean I guess you can say

16   either side.

17   Q.          But you said that you think every

18   process has its problems, correct?

19   A.          I think so.

20   Q.          So what are the problems with the

21   three-step process?

22   A.          Globally --

23   Q.          Anything.

24   A.          -- the whole thing?

25                      Okay.  I think that you pointed

1    opinion of what could make either the three-step

2    process -- well, I'll start with the three-step

3    process.  Has anyone ever asked your opinion on what

4    can make the three-step process better, anyone with

5    the power to change it?

6    A.          I'm trying to think of a specifically.

7    Because what -- I know there was a -- they were

8    doing a rewrite of the administrative bulletin, and

9    we were asked our opinions on different segments of

10   it.  I can't think of anything specifically about it

11   because we were doing it over the course of time,

12   but we were ask -- our opinions were asked of it.

13   Q.          When was this?

14   A.          It was like a couple of years period

15   almost, like two-thous -- I think it might have

16   started in 2004, 2005.

17   Q.          Did the bulletin change as a result?

18   A.          I don't recall.  I don't think it did.

19   Q.          Do you remember what you said when

20   asked?

21   A.          No, not -- not specifically.  I just

22   remember that we went through that process.

23   Q.          Do you have any notes or anything

24   related to that -- that process, those discussions?

25   A.          I may.