

CB-LIGHT-10

# EXHIBIT W

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY
10-3950DRD

------------------------------------------------
DISABILITY RIGHTS NEW JERSEY, INC.,
et al.,


                              Plaintiffs,

          vs.

JENNIFER VELEZ, in her official capacity as
Commissioner of the New Jersey Department
of Human Services, et al.,

                              Defendants.
------------------------------------------------




DEPOSITION OF:
KIM EVANS-MALLORY


Tuesday, March 20, 2012






Reported By:

LISA FORLANO, CCR, CRR, RMR

REF: 7004



```
 1                   KIM EVANS-MALLORY
 2              What degree did you receive from
 3    Fairleigh Dickinson?
 4         A     A degree in sociology.
 5         Q     And in what year?
 6         A     1979.
 7         Q     Other than FDU, do you have any other
 8    post-high school education?
 9         A     No.
10         Q     Any other professionals -- do you have
11    any professional certifications aside from your FDU
12    degree?
13         A     No.
14         Q     After -- after you graduated Fairleigh
15    Dickinson, did you begin working immediately after?
16         A     Yes, I did.
17         Q     Where did you work?
18         A     At the Arthur Brisbane Child Treatment
19    Center in Wall Township, New Jersey.
20         Q     Okay.  And when did you finish working
21    at the Arthur Brisbane Center?
22         A     December 2005.
23         Q     And after you ended work there, did you
24    work elsewhere?
25         A     Trenton Psychiatric Hospital in
```

Page 12

1                    KIM EVANS-MALLORY

2      Trenton, New Jersey.

3            Q      Okay.  Is that when you began as a

4      Client Service Representative --

5            A      No.

6            Q      -- or is that in a different capacity?

7            A      No.  I had been a Client Service

8      Representative at Arthur Brisbane Child Treatment

9      Center.  I was transferred to Trenton Psychiatric

10     when the hospital, Arthur Brisbane closed.

11           Q      Okay.  So when you began at Trenton

12     Psychiatric, what position did you hold?

13           A      Still the Civil Service title of Client

14     Service Representative, RENNIE advocate.

15           Q      And when you were in Arthur Brisbane,

16     you were just the Client Services Representative?

17           A      No, prior to that I was the Program

18     Development Specialist.

19           Q      Okay.  And what were your

20     responsibilities at the Arthur Brisbane Center?

21           A      In -- at both job titles?

22           Q      I guess start with the first job title

23     you had after graduating.

24           A      The first job title I helped discharge

25     planning for the clients.

 1                    KIM EVANS-MALLORY

 2        Q     Oh.  Is there any way in which it's not

 3   a description?

 4        A     No.  No.

 5        Q     Okay.  Have you ever made a

 6   recommendation for changes to involuntary medication

 7   process?

 8        A     Yes.  Yes.

 9        Q     And when was this?

10        A     During one of our RENNIE meetings.  I

11   don't -- I can't give you the exact date.  We've

12   always discussed different things, policies and

13   procedures in our meetings.

14        Q     Okay.  So when you've made

15   recommendations for changes to the involuntary

16   medication process, did you make only one

17   recommendation or more than one?

18        A     We've made many over the years.  It's

19   difficult to pinpoint.

20        Q     Sure.  And when you say "we," who

21   exactly are you talking about?

22        A     The group of RENNIE advocates as a

23   whole.

24        Q     Okay.  So when was the most recent

25   instance in which you or other RENNIE advocates --

Page 44

1                          KIM EVANS-MALLORY

2    sorry, strike that.

3                    When is the most recent instance in

4    which you have made a recommendation for a change in

5    the involuntary medication process?

6         A       When we were discussing doctors'

7    monthly progress notes.

8         Q       And do you recall when that happened?

9         A       No, I don't.  Like I said, we meet

10   monthly, so it's very difficult to pinpoint.

11        Q       Sure.

12        A       I mean, I've been going to these

13   meetings for almost 20 years.

14        Q       I understand that.  Do you have an idea

15   of what year it was in?

16        A       Maybe two years ago, approximately,

17   maybe.  I'm not positive.

18        Q       Okay.  And you said the topic of that

19   meeting in which you made that -- the most recent

20   recommendation, the topic was monthly progress

21   notes?

22        A       Yes.

23        Q       Was the recommendation for a change

24   that you made at that time, was that related to the

25   monthly progress notes?

1          KIM EVANS-MALLORY

2     A     It was -- we discussed it at our

3  meeting and Karen Piren who works -- who was our

4  liaison to central office brought it to the

5  attention of central office.

6     Q     What exactly did she bring to the

7  attention of the central office?

8     A     That we felt that maybe the doctors

9  needed some type of a form where it would be unified

10  throughout the hospitals on how they did their

11  monthly progress notes.

12     Q     Okay.  So you recommended -- I'm trying

13  to understand this.  You recommended a separate form

14  that was related to the monthly progress note that

15  would be in addition to the monthly progress notes?

16     A     No.  We recommended some type of a form

17  that could be used that would be generic to all the

18  hospitals.

19     Q     Okay.  So taking a step back,

20  psychiatrists in the hospitals fill out monthly

21  progress notes?

22     A     Yes.

23     Q     And they're required to fill these out?

24     A     Yes.

25     Q     And when you recommended a change

1                    KIM EVANS-MALLORY

2          Q      Okay.

3          A      So this would help alleviate that

4     problem with all the other documentations that

5     they're doing in the chart.

6          Q      Okay.

7                 MR. LEYHANE:  It's like EZ Pass.  Okay?

8     BY MR. SEBROW:

9          Q      Do you keep copies of these -- of

10    the -- well, let me step back.

11                Was this recommendation ever

12    implemented?

13         A      Yes.

14         Q      Okay.  And so that form that we were

15    just discussing that's in addition to the monthly

16    progress note --

17         A      It's not in addition to, it is the

18    monthly progress note.

19         Q      It is the monthly progress note?

20         A      Yes.

21         Q      Okay.  So the monthly progress note was

22    changed somewhat in response to the recommendation?

23         A      Somewhat, yes.

24         Q      To the recommendation that you made?

25         A      Yes.

Page 60
1                    KIM EVANS-MALLORY

2        Q     Okay.  And when you bring it to their

3    attention, are you -- are you saying that -- do

4    you -- strike that.

5              When you bring these issues to the

6    treating psychiatrist or the treatment team, do you

7    just tell them the facts that this patient is

8    refusing or do you advocate for the patient's

9    wishes, for example, by saying I want, you know, I

10   think the patient is right, for example?  I think

11   the patient should not have to take their

12   medication?

13       A     No.  I bring the patient's -- what they

14   have told me to the treatment team.  It is up to the

15   treatment team and the treating physician to

16   determine what is best for the patient at that time.

17       Q     Okay.  So you don't try to convince the

18   treating team or the treating psychiatrist to take

19   one action or another?

20       A     No.

21       Q     Is that because you don't feel

22   qualified to do that or is it because you don't

23   think it's part of your job or both?

24       A     I'm not qualified to do that because

25   I'm not a clinician or a physician.  I am qualified

1                    KIM EVANS-MALLORY

2    as an advocate to speak on behalf of my patient to

3    the treatment team and hope that they can come to a

4    happy medium.

5        Q    Okay.  Do you try to convince the

6    treatment team to come to a happy medium?

7        A    I'm not there to convince the treatment

8    team.  I'm just there to bring the patient's wishes

9    and desires known to the team.

10       Q    So if a patient expresses his or her

11   desires to you and then you bring that to the

12   treatment team and then let's say the treating

13   psychiatrist says, I disagree, I'm going to take

14   action contrary to the patient's wishes, at that

15   point do you try to change the treating

16   psychiatrist's mind?

17       A    No.

18            MR. SEBROW:  I think we can take a

19       break at this point.

20            MR. LEYHANE:  Okay.

21            VIDEO OPERATOR:  The time is 11:14 a.m.

22       and we are off the record.

23            (Brief recess.)

24            VIDEO OPERATOR:  The time is 11:39 a.m.

25       and we are back on the record.

1                    KIM EVANS-MALLORY

2    Psychiatry.  And his decision would be final.

3         Q     Okay.  So with the grievance, the first

4    step is for the patient to fill out a form?

5         A     Yes.

6         Q     Are you involved in that step?

7         A     No, not necessarily.  Unless the

8    patient requested my assistance.

9         Q     Okay.  And then the form gets sent to

10   the treatment team?

11        A     The form would be given to the

12   treatment team, yes.

13        Q     How does the patient send the form to

14   the treatment team?

15        A     They would give it to the program

16   coordinator or their social worker on their team.

17        Q     Okay.  And how would a patient know how

18   to fill out that form?

19        A     They're informed on admission.

20        Q     Is there any other information that

21   they're given at any time about the forms?

22        A     They get a patient orientation

23   handbook.  They have an orientation class and by

24   posting on the walls, on the bulletin boards at the

25   hospital.

Page 96

1                    KIM EVANS-MALLORY

2        A      Yes, I do.

3        Q      And can you tell me what it is, please?

4        A      Yes, it's the revised AB:504.

5        Q      And when you say it's revised, it was

6   revised on September 1, 2011; is that your

7   understanding?

8        A      Yes, it is.

9        Q      And do you know what the revisions

10  involved?

11       A      The revisions were in reference to the

12  administration of emergency medication on a 72-hour

13  basis.

14       Q      Okay.  But the revisions did not change

15  any procedure regarding the administration of

16  psychotropic drugs involuntarily to patients, right?

17       A      To my knowledge, that is correct.

18       Q      So this is the most current version of

19  the three-step process?

20       A      Yes, it is.

21       Q      And can you just go over with me,

22  please, what the role of the RENNIE advocate is in

23  the three-step process?

24       A      The role of the RENNIE advocate in the

25  three-step process is to meet with the patients

1                    KIM EVANS-MALLORY

2    prior to the team meeting to discuss and make the

3    patients aware of what their rights are in regards

4    to involuntary medication.

5          Q     Okay.  So you make the patient aware of

6    what their rights are?

7          A     Yes.

8          Q     And you attend a treatment team

9    meeting?

10         A     If the patient requests my attendance,

11   yes.

12         Q     Is there any other way that you're

13   involved in the three-step process?

14         A     No.

15         Q     Okay.  And how do you make a patient

16   aware of what his or her rights are?

17         A     By explaining to them that they have a

18   right to be free from excessive medication and that

19   they also can be medicated against their will if the

20   treating physician feels it is necessary.

21         Q     Is that the only way you make a patient

22   aware of what their rights are?

23         A     No.  They have the Bill of Rights, as

24   well.

25         Q     Do you read them the Bill of Rights?

Page 98

1                    KIM EVANS-MALLORY

2        A     On occasion.

3        Q     Do they have copies of the Bill of

4   Rights?

5        A     I believe they do.   There's copies on

6   all of our units and they sign for the Bill of

7   Rights on admission.

8        Q     Besides making the patients aware of

9   what their rights are and attending a treatment team

10  meeting --

11       A     If requested.

12       Q     If requested, there are no other ways

13  that you're involved in the RENNIE process?

14       A     No.

15       Q     So it's not your job to make sure that

16  the three-step process is completed satisfactorily?

17       A     At the end, yes, it is.

18       Q     So part of your responsibilities

19  relating to the RENNIE process as described in

20  AB:504 is making sure that the process is completed

21  appropriately?

22       A     I review to make sure that the process

23  has been completed.

24       Q     Do you make sure the forms are

25  completed properly?

1           KIM EVANS-MALLORY

2       A      I make sure that the form is complete

3  and if it's done properly, then I will inform the

4  treating physician, the team and the Chief of

5  Psychiatry.

6       Q      Okay.  So besides making a patient

7  aware of what their rights are, --

8       A      Uh-huh.

9       Q      And attending a treatment team meeting,

10 if requested.

11      A      Yes.

12      Q      And making sure that the process is

13 completed properly, which includes making sure --

14      A      I review the process to see that it was

15 completed.

16      Q      Sorry.  And reviewing the process to

17 make sure it is completed properly.

18      A      I review to make sure the process was

19 completed.  If it was not done properly, then I

20 would bring it to the necessary -- attention to the

21 necessary people.

22      Q      Okay.  So besides for those three

23 issues, are there any other ways that you're

24 involved in the RENNIE process?

25      A      I do a monthly review once the process

Case 1:10-cv-03950-JBS-JS Document 122-15 Filed 11/28/12 Page 16 of 66 PageID: 2533

 1                    KIM EVANS-MALLORY

 2              MR. SEBROW:  That's why I asked it.

 3              MR. LEYHANE:  Do you want to listen to

 4         your question?  Or do you want to explain what

 5         the problem is?  Melody says, no.  Sorry.

 6              MS. WELLS:  I didn't say anything.

 7    BY MR. SEBROW:

 8         Q    Have you received any complaints from

 9    patients that they have not been made aware of the

10    existence or the assistance of a RENNIE advocate?

11         A    No, I have not.

12         Q    Do you know of -- you have no knowledge

13    of any complaints like that?

14         A    Do I have knowledge of complaints like

15    that or have I been made aware of complaints or --

16    because you --

17         Q    Sure.  Sorry.  Let me rephrase it.

18         A    Okay.

19         Q    Do you have any knowledge of complaints

20    made by patients that they were not advised of the

21    potential assistance of a RENNIE advocate?

22         A    Yes.

23         Q    Can you describe for me each instance

24    that you know of?

25         A    Excuse me, if I'm not mistaken, your

Case 1:10-cv-03950-JBS-JS Document 122-15 Filed 11/28/12 Page 17 of 66 PageID: 2534

1                    KIM EVANS-MALLORY

2        Q      How often was that the case?

3        A      I would say the majority of the time.

4        Q      Okay.  And in those cases, is it your

5   understanding that the patient could have been

6   forcibly medicated under the three-step process

7   before you ended up receiving these forms?

8        A      Yes.

9        Q      Okay.  And once you received those

10  forms, what did you do?

11       A      I did a medication review form -- a

12  review.  I did a chart review.

13       Q      And what did this review consist of?

14       A      It consisted of reviewing the chart,

15  looking at the doctor's notes, observing the

16  patient.

17       Q      When you say "observing the patient,"

18  what do you mean by that?

19       A      Just looking at the patient to see if

20  there were any, I guess, EPS symptoms,

21  extrapyramidal symptoms.

22       Q      Okay.  Can you describe what are

23  "extrapryamidal symptoms"?

24       A      Maybe drooling, drowsiness.

25       Q      Anything else that you would observe

Page 196

 1                    KIM EVANS-MALLORY

 2    become a voluntary patient and he wants to go to

 3    court.  But other than that, to my knowledge, no.

 4         Q      And in that instance that you just

 5    mentioned, was that -- did that involve a treatment

 6    decision pursuant to the three-step process or was

 7    it something different?

 8         A      I believe it was something different.

 9         Q      Okay.  Have patients ever asked for

10    attorneys to help them with issues relating to the

11    three-step process?

12         A      No.

13         Q      Do you know whether patients have

14    access to attorneys?

15         A      Yes.

16         Q      And how do they have access to

17    attorneys?

18         A      Through the Public Defender, which

19    represents them in court.  They can seek the help of

20    the NJR, which provides attorneys or they can hire

21    their own private attorney.

22         Q      Okay.  Does the hospital help them get

23    an attorney, if they want?

24         A      Their social worker can guide them in

25    that direction.

Case 1:10-cv-03950-JBS-JS Document 122-15 Filed 11/28/12 Page 19 of 66 PageID: 2536

1                    KIM EVANS-MALLORY

2    that meeting, of the proposed policy, have you told

3    me everything that you can recall that was

4    discussed?

5         A     Yes.  Yes, I have.

6         Q     Is it your understanding that patients

7    refusing medication currently do not have a right to

8    an independent judicial hearing before they're

9    involuntarily medicated?

10        A     Yes.

11        Q     And has any patient ever requested

12   this?

13        A     No.

14        Q     Do you think that an independent

15   judicial hearing would improve the process for

16   patients?

17        A     No, I do not.

18        Q     And why not?

19        A     Right now the patients have three

20   opportunities to voice their opinion before they're

21   medicated.  At the very first step, or when the

22   doctor discusses medication and possibly putting

23   them on involuntary medication, again, at the

24   treatment team meeting level, and then when they

25   meet with the Medical Director before he signs off

Page 210

1                    KIM EVANS-MALLORY

2    on it.  It also would hold up medicating a patient

3    if they have to wait to go before a judge, which

4    could tie up their discharge or their -- if

5    medication is what they need to stabilize them and

6    to get them discharged quicker, and it would also,

7    on the opposite end, increase our population.

8        Q       How would it increase your population?

9        A       Because if it's going to take longer to

10   see the judge before a patient can get medicated and

11   stabilized and get discharged and we continue to get

12   admissions.

13       Q       Okay.  Do you know how long it would

14   take for a judicial process to take place?

15       A       No, I do not.

16       Q       So when you say that you think that it

17   would take a long time, what's your basis for saying

18   that?

19       A       That's just -- I know courts do not

20   convene -- I mean, they may convene frequently, but

21   not necessarily for your case.

22       Q       Are there any judicial -- are there any

23   judicial hearings that take place in Trenton

24   Psychiatric Hospital for any reason?

25       A       Yes, there is.

Page 212

1                    KIM EVANS-MALLORY

2    judicial hearing for involuntary medication would

3    take?

4               MR. LEYHANE:   Objection.

5               THE WITNESS:   It would not.

6    BY MR. SEBROW:

7         Q    You also mentioned that one concern

8    about judicial hearings was that it would lead to

9    patients not being discharged?

10        A    Possibly, yes.

11        Q    Okay.  Do you have any basis for that

12   opinion?

13        A    If a doctor is putting a patient on

14   involuntary medication because he or she feels they

15   needed to help stabilize their -- or clear up their

16   clinical picture at this time, then how can we

17   discharge someone that's not stable back into the

18   community?

19        Q    Okay.  But you understand that an

20   independent judicial hearing wouldn't involve

21   discharging the patient, it would only involve

22   bringing them before a judge?

23        A    But if you have to wait a period of

24   time to get that hearing scheduled and set or take

25   the patient to the court hearing, it could be a

Case 1:10-cv-03950-JBS-JS Document 122-15 Filed 11/28/12 Page 22 of 66 PageID: 2539

```
 1                    KIM EVANS-MALLORY
 2    independent judicial hearing for involuntary
 3    medication purposes, that those hearings in other
 4    states took place very quickly, would that change
 5    your opinion about whether independent judicial
 6    hearings would be a problem for -- in New Jersey?
 7          A     No, it would not.
 8          Q     Okay.  If a patient is refusing to take
 9    medication -- non-psychotropic medication such as
10    antibiotics --
11          A     Yes.
12          Q     -- can that patient be three-stepped?
13          A     No.
14          Q     That patient has a right to refuse that
15    medication?
16          A     I believe they do, yes.
17          Q     And they can't be forced to take that
18    medication?
19          A     No.
20          Q     And is it your experience that no one
21    has forced patients to take medications like that?
22          A     Medical medications?
23          Q     Yes.
24          A     To my knowledge.  Unless there's a
25    guardian in place or it's a matter of life and death
```

# EXHIBIT X



## DO YOU HAVE A COMPLAINT OR GRIEVANCE?

### Patient Complaint and Grievance Procedure

SERVICES REPRESENTATIVE

Anthony Hayes    1-800-413-3516

# Admissions Unit/Waiting Room





**DO YOU HAVE A COMPLAINT OR GRIEVANCE?**

**Patient Complaint and Grievance Procedure**

Patient Advocate — Anthony Harris   1-800-613-5516

¿TIENE USTED UN PROBLEMA O UNA QUEJA?
QUE HACER COMO HACER

Representante de Pacientes — Anthony Harris   1-800-613-5516

# DO YOU HAVE A COMPLAINT OR GRIEVANCE?

## PATIENT COMPLAINT AND GRIEVANCE PROCEDURE

All staff at Ancora Psychiatric Hospital are expected to serve as advocates for patients' welfare. If patients or family members believe their rights have been violated, or they wish to express concerns/complaints about their aspects of care, they may do so in the following ways/manner:

- Through Life Management Meetings, which are held on each unit to address complaints, resolve conflicts, announce upcoming events, schedule changes and elicit suggestions and opinions of patients on a variety of issues pertaining to the unit community.
- Through patient delegates who are selected to attend monthly Client Council meetings as a forum for patient's hospital-wide.
- In a meeting with a member of the Treatment Team or Program Coordinator/Team Leader.
- In a meeting with the Unit Administrator/Section Chief.
- In a meeting with the Patient Advocate/Client Services Representative, who is located on the hospital grounds, and may be reached at 800-613-3516.
- By filing a formal grievance using the Patient/Family Grievance Form. (See details on the hospital's grievance process posted on the unit and in the visitors' room or see your Program Coordinator/Team Leader.)

In the event that a patient or family member is not satisfied with the response, he/she may contact any of the following:

---

If you have concerns regarding your medication, you may talk to the **Medication Advocate or "Rennie Advocate": Mr. Anthony Haynes** .................1-800-613-3516

For problems of a general nature, you may talk to the **Client Services Representative or "Patient Advocate": Ms. Diane McKenzie** .............................1-800-613-3516

In the event that a patient or family member is not satisfied with the response he/she may contact any of the following:

- Patient Services Compliance Unit, DMHS:.........................1-888-490-8413
- New Jersey Protection & Advocacy, Inc.:.........................1-800-922-7233
- Division of Mental Health Services Information & Complaints:
  ....................................................................1-800-382-6717
- Public Defender:..................................................1-609-292-1750
- Ombudsman for the Elderly Hotline:...............................1-877-582-6995
- New Jersey Alliance for the Mentally Ill: (Local Chapters):......1-732-940-0991
- Federal Office of Civil Rights:..................................1-212-264-3313
- The Joint Commission:............................................1-800-994-6610
  or .............................................(e-mail: complaint@jointcommission.org)

---

Drug Hotline — 4299

# M 3 Bulletin Boards







## DO YOU HAVE A COMPLAINT OR GRIEVANCE?

### Patient Complaint and Grievance Procedure

## ¿TIENE USTED UN PROBLEMA O UNA QUEJA?

## ¿TIENE USTED UN PROBLEMA O UNA QUEJA?

## QUE TIENE QUE HACER.

1. Hable con cualquier miembro de su Personal de Tratamiento. Ejemplos: Enfermera, Ayudantes de Enfermería o el Administrador del Edificio.

2. Si tiene un problema o una queja en tu piso que no sea personal, la puede discutir o hablar en la reunion que se celebra todas las mañanas (Life Management).

3. Si todavía no estas satisfecho con las respuestas que a recibido, tu puedes pedir a cualquier empleado el documento que se llama, La Queja de el Paciente. Y solícitor ayuda si no lo entiendes para llenarlo. Deacuerdo con la Poliza de Ancora.

---

Si usted tiene alguna duda con sus medicinas, usted puede hablar con el **Representante de Medicinas** o el **Defensor de Rennie**.

El nombre:: **Anthony Haynes**          **1-800-613-3516**

Para cualquier otro problema o queja que tengas, usted puede hablar al **Representante de Servicios de Cliente** o **Defensor del Paciente**.

El nombre:  Diane McKenzie          **1-800-613-3516**

Si usted todavía no esta satisfecho despues de pedir que le resuelvan su queja en este Hospital, usted puede llamar tambien a los siguientes departamentos:

La Oficina del Defensor Publico ................................. 856-346-8020
La Proteccion de Nueva Jersey Advocacy S.A. ...... 1-800-922-7233
Ombudsman para el Envejeciente ......................... 1-877-582-6995
La Oficina Federal de Derechos Civiles ................... 212-264-3313

# EXHIBIT Y

Page 1

1           UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
2           CIVIL ACTION NO.: 2:10-cv-03950
3  DISABILITY RIGHTS NEW      )
   JERSEY, a New Jersey       )
4  Non-Profit Organization,   )
                              )
5          Plaintiff,         )   DEPOSITION UPON
                              )   ORAL EXAMINATION
6      vs.                    )        OF
                              )   RACHEL M. PARSIO
7  JENNIFER VELEZ, in her     )
   official capacity as       )
8  Commissioner, State of     )
   New Jersey Department of   )
9  Human Services,            )
                              )
10         Defendant.         )
11          Tuesday February 21, 2012
12     T R A N S C R I P T of the deposition of
13  RACHEL M. PARSIO called for Oral Examination in the
14  above entitled action, said deposition being taken
15  pursuant to Rules governing Federal Procedure in the
16  State of New Jersey, by and before JEAN E. DOLAN,
17  License No. 809, a Notary Public and Certified Court
18  Reporter of the State of New Jersey, at the HOAGLAND,
19  LONGO, MORAN, DUNST & DOUKAS, LLP, 40 Bayard Street,
20  New Brunswick, New Jersey, commencing at 10:15 in the
21  forenoon.
22
             JEAN E. DOLAN ASSOCIATES
23           Certified Court Reporters
                3 Parlin Drive
24           Parlin, New Jersey  08859
                (732) 238-7666
25           Fax (732) 613-4666        ORIGINAL

```
 1        Q       In the -- under Essential Duties and
 2   Responsibilities, the first bullet point, there's an
 3   indication that you interview clients, identify
 4   client concerns.  You see that on the document?
 5        A       Right, yes.
 6        Q       Does that entail interviewing patients
 7   in the state hospitals currently?
 8        A       Yes.
 9        Q       And address -- identifying and/or
10   addressing their concerns?
11        A       Yes.
12        Q       And do you consider Disability Rights
13   New Jersey to be a, quote unquote, independent
14   watchdog over the state hospitals in that regard?
15               MS. KOLOD: I object to form.
16        A       Is it okay if I don't use your term as a
17   watchdog?  Is that okay?
18        Q       Okay.
19        A       We are -- we respond to the complaints
20   and if we see other system issues, we address those
21   also.
22        Q       So if you identify a concern or
23   complaint, how do you address them?
24        A       I bring the issue back to our
25   coordinator.
```

1    you go there when there are patients milling about

2    and indicate where you're from, who you are, does

3    anyone want to speak to you, anything of that nature?

4          A     Yes.

5          Q     You do do that?

6          A     Yes.

7          Q     What do you say to the patients that you

8    see?

9          A     To the patients?  That I would ask them

10   -- a lot of them know me, so they will come up to me.

11   I would ask them if they have any issues that we

12   could provide assistance to them.  I will take that

13   information back to the agency and provide it to the

14   intake department.

15         Q     Will you indicate when you arrived who

16   you are, where you're from?

17         A     Yes.

18         Q     Indicate does anyone want to speak with

19   me, something to that effect?

20         A     Yes.

21         Q     And if you go on a weekly basis, do you

22   generally make that announcement on a weekly basis

23   when you arrive?

24         A     Yes.

25         Q     You indicated that patients know you or

1   know who you are?

2        A      I have been assigned there for so many

3   years a lot of the patients do know who I am and will

4   come up to me.

5        Q      Okay.  And do they also know how to

6   contact the Disability Rights New Jersey by phone?

7        A      Yes.

8        Q      Are there postings throughout the

9   hospital that indicate the Disability Rights New

10  Jersey phone number, for instance?

11       A      Yes.

12       Q      Are they posted throughout the hospital

13  at various locations on bulletin boards?

14       A      Yes.

15              MR. CHABAREK: I'm going to mark this as

16  Exhibit D 13.

17              (D 13 marked for identification.)

18       Q      Just take a look at the document which

19  we identified as D 13.

20       A      Okay.

21       Q      Okay.  Ms. Parsio, have you seen a

22  posting in that regard on the bulletin board at

23  Ancora as reflected in Exhibit D 13?

24       A      Yes.

25       Q      And there's a number of phone numbers

1    indicated at the bottom, and included there is

2    the -- the Rennie Advocate or Anthony Haynes.  You

3    see that?

4          A     Yes.

5          Q     It's an 800 number.  Do you know who

6    Anthony Haynes is?

7          A     Yes.

8          Q     And on the bottom it indicates:  "If you

9    are still not satisfied after attempting to resolve

10   your problems at the hospital level, you may also

11   call the following", and there are a number of phone

12   numbers identified there?

13         A     Yes.

14         Q     And included in there is the New Jersey

15   Protection Advocacy?

16         A     Yes.

17         Q     With an 800 number?

18         A     Yes.

19         Q     And you see a posting in that regard or

20   similar to that at Ancora on the bulletin board?

21         A     Yes.  But it may not be on every

22   bulletin board.  You know, I haven't checked every

23   bulletin board but definitely, yes.

24               MR. CHABAREK: I'm going to mark Exhibit

25   D 14, which is the actual posting.

1      A      He's the Rennie Advocate.

2      Q      Do you know what his job function is?

3      A      Yes.

4      Q      What is his job function?

5      A      Parts of his job.  I don't know

6   everything that he does.

7      Q      Part of it.

8      A      I know that he reviews the patients that

9   are refusing and non-refusing status on a monthly

10  basis.

11     Q      Okay.

12     A      And prepares the reports for the

13  administration of the hospital.  He also meets with

14  patients as part of the three-step process to discuss

15  their issues with medications.  Also handles the

16  voting process to make sure that patients are aware

17  of how to vote if they want to and handles that.

18  That can change.

19     Q      Okay.

20     A      I'm not sure of any other procedures

21  that he would do.

22     Q      Is he visible throughout the hospital?

23     A      Yes.

24     Q      Patients know who he is?

25     A      Yes.  Most of the time I would say they

1   remember this statement.  We may have discussed it

2   but I don't remember how it came about.  You had said

3   did he -- did he say this on his own or did we have a

4   conversation with him about this.

5        Q      Yes.  My question was did he tell you

6   that spontaneously on his own without any prompting?

7        A      I can't remember.  I can't remember

8   exactly how it came about.

9        Q      In the mental health field you always

10  worked in the State of New Jersey.  Correct?

11       A      Yes.

12       Q      You never worked in any other states?

13       A      No.

14       Q      Okay.  So you understand the state of

15  law in New Jersey does not require that there be

16  judicial hearings before medication be involved or

17  administered currently.  Correct?

18       A      Correct.

19       Q      Do you have any experience with such

20  judicial hearings in other states?

21       A      Only that I do know that other states do

22  have that process.

23       Q      Other than knowing that, do you

24  know -- have you ever had any experience dealing with

25  that process from other states?

```
 1        A     No.
 2        Q     In paragraph 29 it states:  "I am aware
 3   that the Disability Rights New Jersey may file a
 4   lawsuit regarding involuntary administration
 5   psychotropic medication in New Jersey hospitals.  I
 6   make this certification in support of DRNJ's lawsuit.
 7   I am aware that I may be called upon to testify in
 8   connection with the DRNJ's lawsuit and am willing to
 9   do so."
10              You see that statement?
11        A     Yes.
12        Q     Is there anywhere in that statement
13   where the patient certifies that the statements he
14   set forth are true?  Is there anything in that
15   paragraph where he indicates that?
16        A     In this paragraph you're saying is there
17   anything that --
18        Q     Is there any language in that paragraph
19   where the patient attests to the truth of the
20   statements contained throughout?
21        A     I'm sorry.  I don't understand the
22   question.
23        Q     Does that paragraph contain any language
24   wherein PD represents that everything he stated was
25   true?
```

```
 1        Q       Do you have any knowledge if another
 2    advocate from the Disability Rights New Jersey ever
 3    met with this patient WF to compile this information?
 4        A       Not that I know of.  There might have
 5    been -- I know at one point we had interns doing some
 6    work in Ancora, but I do not remember this.
 7        Q       Do you remember the names of those
 8    interns who were doing --
 9        A       No.
10        Q       Let me finish the question.  Do you
11    remember the names of those interns who were going to
12    Ancora?
13        A       No.
14        Q       Was their purpose to secure information
15    as well?
16                MS. KOLOD: Objection to form.
17        Q       As contained in the certification?
18        A       Yes.
19        Q       Also, as you sit here today you have no
20    recollection of patient WF or the contents of the
21    certification and don't -- you never met with this
22    patient?
23        A       I don't remember.
24                MR. CHABAREK: Okay.  I'm going to have
25    marked as Exhibit D 18, a Certification in Support of
```

1      Q      Do you know an individual by the name of

2   Lorraine Ghormley?

3      A      Yes.

4      Q      And who is she?

5      A      She's an attorney or she was, I'm sure

6   she's -- I'm not sure if she's still there with the

7   public advocate's office.

8      Q      Are you aware of an incident she had

9   been involved in while at Ancora Psychiatric Hospital

10  while meeting with a patient?

11     A      Yes.

12     Q      What are you aware of?

13     A      I'm aware that she was interviewing a

14  patient and I don't know who the patient was but I'm

15  aware she was interviewing a patient.  She asked the

16  patient a question and during the interim of her

17  interview the patient knocked her to the floor and

18  assaulted her.

19     Q      Were you present at the facility when

20  this occurred?

21     A      No.

22     Q      How did you learn of it?

23     A      She told me.

24     Q      Ms. Ghormley told you?

25     A      Yes.

1          Q       Have you ever felt threatened by a

2     patient in your career?

3                  MS. KOLOD: Objection to form.

4          A       No.

5          Q       So never in -- going on almost 20 years

6     you never felt threatened?

7          A       There have been times when I've been

8     cautious, but I never felt threatened -- actually,

9     the patients would try to protect me at certain

10    times.  If someone would come up to me and say they

11    wanted to talk to me, they would say I'm talking to

12    her now, you know, leave us alone.  I've never felt

13    threatened.

14         Q       And that would be for both in your

15    capacity at both employers, whether it be  Disability

16    Rights New Jersey, DRNJ, or the prior employer?

17         A       You mean --

18         Q       The New Jersey Alliance?

19         A       No, never felt threatened.

20         Q       Are you aware what the standard is for a

21    patient to be involuntarily committed to the state

22    psychiatric hospitals?

23         A       Yes.

24         Q       What is it in your mind is the standard?

25         A       They have to be judged as a danger to

1       A       Yes.

2       Q       What his role is?

3       A       Yes.

4       Q       Would it be fair to say that you're both

5    quite active in bringing patient concerns to people

6    at the hospital?

7               MS. KOLOD: Objection to form.

8       A       Yes.

9       Q       And do you work with Anthony Haynes at

10   times, do you work in conjunction with him to address

11   concerns?

12      A       Yes.

13      Q       You have a good working relationship

14   with him?

15              MS. KOLOD: Objection to form.

16      A       I would say a very good working

17   relationship with him.  I usually meet with him

18   several times a month when I go there.

19      Q       Is it your understanding that he deals

20   with patient complaints that are geared towards

21   medication related issues?

22      A       Yes.

23      Q       Earlier when we talked about patient SD

24   who there was an allegation from the mother who

25   contacted you that he almost died as a result of some

1         Q       We previously spoke about you have a

2    working or your working relationship with Anthony

3    Haynes?

4         A       Yes.

5         Q       And you mentioned his role, you

6    mentioned your role.  Do your duties in some way

7    overlap?

8                 MS. KOLOD: Objection to form.

9         Q       In other words, does your role and his

10   role towards the patient overlap in some case in

11   terms of medication?

12                MS. KOLOD: Yes.

13        A       Yes, somewhat.

14        Q       And you meet with him frequently, as you

15   indicated, to address patient concerns?

16        A       Yes.

17        Q       Okay.  I'm just going to show you what

18   was previously provided Bates stamped DRNJ M-00685

19   through 688, which is a fax addressed to Ms. Parsio

20   from Anthony Haynes dated May 9, 2001.

21                (D 20 marked for identification.)

22        Q       I'm going to provide to you what's

23   marked as Exhibit 20, and I ask you to take a look at

24   the document.  It's a four-page document.

25                Have you ever seen that document before

1   keep up on medications.

2        Q      But you wouldn't profess to have an

3   expertise in what type of medications to be

4   administered or doses or anything like that?

5        A      No.

6        Q      That's up to the clinician or the

7   physician?

8        A      Yes.

9        Q      What knowledge do you have with respect

10  to psychotropic medications?  For instance, side

11  effects, do you read journals?  What do you do to

12  learn about that?

13       A      I read, I go to certain workshops.  I

14  know several of the antipsychotic drugs and

15  psychotropic drugs and also am aware of tardive

16  dyskinesia and akinesia.  That's the way you

17  pronounce that.  They are forms of side effects from

18  psychotropic drugs.

19       Q      What knowledge do you have about those

20  side effects?

21       A      That they can be life threatening.

22       Q      Okay.

23       A      That they -- a certain antipsychotic

24  like Flurazine and Haldol if used over a long period

25  of time they can create side effects as rigidity

1   where you can't swallow, and I've even experienced

2   seeing a patient that couldn't swallow, shuffling of

3   feet, not being able to stand in one place, drooling

4   of the mouth, really very very serious side effects.

5   It would be life debilitating.  I've done a lot of

6   reading and research.  I've also attended a lot of

7   research conferences in Washington when I would go to

8   the conferences for the New Jersey Alliance For the

9   Mentally Ill.

10          Q       And but you wouldn't profess to be an

11   expert on side effects.  That's up to the clinicians.

12   Correct?

13          A       Yes.

14          Q       If a patient tells you they are having a

15   specific side effect, do you know anything to verify

16   that side effect or do you take them at their word?

17              MS. KOLOD: Objection to form.

18          A       You can observe it at times from my one

19   case.  He was drooling at the mouth.  He couldn't

20   even raise his head.  Tried to speak to me.  He could

21   not even raise his head up off the chair.  He was

22   taken to the chair by two aides.  He couldn't walk.

23   He was wetting himself.  And another staff member

24   told me in the elevator that she was very concerned

25   about him because she thought that they were

1      Q      And you would have conveyed that to her

2   prior to when you had a discussion with her about her

3   deposition?

4      A      No.  It was a long time ago.

5      Q      You recall having that specific

6   conversation with her about her deposition about

7   looking at the website or pulling out documents?

8      A      No, no, no.

9      Q      And when we looked at the postings on

10  the bulletin board before we talked about the fact

11  that the Rennie Advocate is identified, the

12  Disability Rights New Jersey is identified.  Correct?

13     A      Yes.

14     Q      You indicated that Anthony Haynes is

15  visible throughout the hospital?

16     A      Yes.

17     Q      Throughout the Ancora Psychiatric

18  Hospital?

19     A      Yes.

20     Q      So that the patient knows who the Rennie

21  Advocate is?

22     A      I don't know if all the patients know,

23  but some of them know.  I'll often say to them if you

24  have a medication issue, did you discuss this with

25  Anthony.

# EXHIBIT Z

Page 1

1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2
    DISABILITY RIGHTS NEW )HON. DICKINSON R. DEBEVOISE
3   JERSEY, INC., a New    )U.S.D.J.
    Jersey non-profit      )
4   organization,          )   Civil Action No.
                           )   2:10-cv-03950
5           Plaintiff,     )   DHD-MAS
                           )       DEPOSITION UPON
6           vs.            )       ORAL EXAMINATION
                           )
7   JENNIFER VELEZ, in her)          OF
    official capacity as  )
8   Commissioner, State of)      MARILYN SPENSLEY
    New Jersey Department )
9   of Human Services,     )
                           )
10          Defendant.     )
11   _____
12              Thursday, February 2, 2012
13       T R A N S C R I P T  of the deposition of
14   MARILYN SPENSLEY, called for Oral Examination in
15   the above-entitled action, said deposition being
16   taken pursuant to Rules governing Civil Practice
17   in the Courts of New Jersey, by and before BARBARA
18   DE VICO, a Notary Public and Certified Court
19   Reporter of the State of New Jersey, at the
20   offices of HOAGLAND, LONGO, MORAN, DUNST & DOUKAS,
21   LLP, 40 Paterson Street, New Brunswick, New
22   Jersey, commencing at 10:10 in the morning.
23              JEAN E. DOLAN ASSOCIATES
                3 Parlin Drive, Unit C
24              Parlin, New Jersey 08859
                   (732) 238-7666
25              Fax (732) 613-4666          ORIGINAL

```
 1   the years -- and I don't mean that in the

 2   derogatory fashion because I couldn't because I'm

 3   sitting here with too many years behind me -- but

 4   has it been your experience over the years that

 5   medications when properly utilized can effect an

 6   improvement in the disease process in an

 7   individual patient?

 8        A.        When properly utilized, yes.

 9        Q.        And indeed medications can play a

10   major role in enabling, ultimately, an individual

11   to get better to the point where they can return

12   in some fashion to society and be gainfully

13   employed and having a much happier life; fair

14   enough?

15             MS. WELLS:   Objection to the

16   form.

17        A.        I wouldn't say a major role.   I

18   would say --

19        Q.        Okay.   Is there something out

20   there, some treatment modality that you would say

21   has the major role in enabling patients to leave

22   an inpatient setting and be successful in the

23   community?

24        A.        No.   I think there's a variety of

25   modalities.
```

1    them down.

2          Q.          And what evidence do you have for

3    that?

4          A.          Patients have reported that to me.

5          Q.          Okay.  Patients take them down?

6          A.          Staff will say that the patients

7    have taken them down, and then --

8          Q.          Okay.  But you haven't -- first of

9    all, there's the mechanism of rather prominent

10   announcements or information on bulletin boards at

11   the hospital saying DRNJ, whatever it says, that's

12   a mechanism that you know that patients use to get

13   in touch with you; right?

14         A.          Right.

15         Q.          Okay.  And then there is also the

16   fact that you are in the institutions on a regular

17   basis?

18         A.          Yes.

19         Q.          And how frequently are you -- you

20   said -- I should ask you this:  You mentioned that

21   TPH and Hagedorn are your primary institutions.

22   Are they still your primary institutions?

23         A.          Yes.

24         Q.          So how is your schedule put

25   together?

1         Q.         And here is a closeup of the

2    plaque, and on the back of this, D-3, is also

3    another bulletin board.  These are all from TPH?

4         A.         Yes.

5         Q.         And here is a blowup of the

6    plaque.  What does that plaque tell patients

7    about?

8         A.         It tells patients that the patient

9    advocate is for general complaints and grievances

10   and gives their tollfree number.  And then it

11   gives a patient advocate for medication complaints

12   and grievances and also gives a tollfree number.

13        Q.         Okay.  And indeed, on the bulletin

14   board are you aware that there are other notices

15   that are posted about the ability of patients to

16   contact an advocate with respect to medications?

17        A.         I think there are -- yes.  I think

18   they have some kind of indication on there that

19   there's, there may be a ready advocate available

20   to them.

21        Q.         And for the purposes of the

22   record, the Rennie advocate is the individual who

23   is assigned as a client service rep, but he or she

24   specifically deals with complaints having to do

25   with medication dosing, involuntarily medicating

 1   different things.

 2        Q.        Okay.  So when you are given

 3   copies of patient charts or portions of patient

 4   charts, do you sometimes take them from the

 5   facility to Trenton or even perhaps home to work

 6   on?

 7        A.        No.  I don't -- our protocol is

 8   that if we want to request copies of records, we

 9   send out requests through the head of the

10   hospital, the chief executive officer, who in turn

11   disseminates that request to whomever to respond

12   and provide either a response and/or the records

13   that have been requested.

14        Q.        Okay.  But my question was when

15   you get the records, I presume they are given to

16   you at the facility?

17        A.        No.  They come by courier.

18        Q.        Okay.  They come by courier to the

19   main office in Trenton?

20        A.        Yes.

21        Q.        And then you have them there to

22   review and prepare whatever you're going to

23   prepare based upon those records?

24        A.        Yes.

25        Q.        Okay.  And if you find that you've

1   their medication issues?

2          A.         From time to time, yes.

3          Q.         Okay.  That may indeed, that

4   activity may indeed overlap with your activities;

5   right?

6                     MS. WELLS:  Objection to the

7   form.

8          A.         At times, yes.

9          Q.         In other words, a patient may have

10  a complaint -- I'll do it this way:  Have you seen

11  instances where patients have complaints that are

12  medication-related and they've not only gotten a

13  hold of you but they've gotten a hold of the

14  Rennie advocate?

15         A.         Yes.  As a general rule I will ask

16  patients as a general issue have you talked with

17  the Rennie advocate about this.

18         Q.         And they will either answer you

19  No, I haven't or Yes, I have, because your

20  authority is wholly separate from the Rennie

21  advocate; right?

22         A.         Yes.

23         Q.         Okay.  What I've just handed you,

24  D-1, -2 and -3, I guess, the Rennie advocates and

25  their numbers, how patients contact them, pretty

```
 1   much have the same currency, that is they're on
 2   the billboard just like you are; right?
 3        A.      Yes.
 4        Q.      And indeed, they have an extra
 5   thing because you're looking at the plaque, at
 6   least at TPH there's a big old plaque right above
 7   the phone; right?
 8        A.      Uh-huh.
 9        Q.      And if you look at the phone, you
10   can't miss seeing the plaque, can you?
11              MS. WELLS:  Objection to the
12   form.
13        A.      If you're short you can.  And if
14   your eyes aren't blurred you can read it also.
15        Q.      Okay.  And if your eyes aren't
16   blurred or you're too short or you're too tall you
17   can read the DRNJ paper; is that correct?
18        A.      Yes.
19        Q.      It's also true, is it not, that
20   upon admission patients to TPH and Hagedorn -- I'm
21   staying with the hospitals that you're most
22   familiar with -- that they are given a number of
23   written materials including a handbook or a
24   guidebook, whatever you want to call it, that
25   lists you or lists your services to DRNJ and lists
```

1   the Rennie advocate; right?

2         A.        Yes.

3         Q.        Have you seen instances or

4   experienced instances where patients will contact

5   you because they read about you in the guidebook?

6         A.        I don't recall any instances where

7   they have gotten our number from the guidebook.

8   Generally they disappear shortly after their

9   admission.

10        Q.        What do you mean, "they

11  disappear"?

12        A.        They disappear.  Either clients

13  throw them away, staff throw them away.  I have

14  asked clients don't you have your information that

15  you received on admission, and it doesn't exist.

16        Q.        Okay.  Which makes --

17        A.        Unfortunately.

18        Q.        -- it frustrating for you, I

19  assume, here or there; right?

20        A.        Absolutely.

21        Q.        Okay.  Now, as part of your duties

22  as an advocate for DRNJ, are there circumstances

23  where you feel it would be acceptable to lie to

24  the staff or administration of a hospital?

25        A.        Where --

```
 1        A.        Only some of them.
 2        Q.        Okay.  So, however, you are
 3   certainly familiar that a number of these
 4   certifications were prepared; right?
 5        A.        Yes.
 6        Q.        Was the effort here to obtain
 7   information from patients and put it into some
 8   kind of a format which you see in front of you to
 9   be possibly used in litigation?
10               MS. WELLS:  I just want to
11   caution Ms. Spensley not to reveal any legal
12   advice that she sought or received from counsel,
13   either internal or external.
14               But if you can answer that question
15   otherwise, please do.
16        A.        Please ask the question again.
17        Q.        I forgot it.  I think.
18               (Pending question was read by the
19   Reporter.)
20        A.        Yes.
21        Q.        Okay.  Indeed, the effort here, I
22   assume, was to get the statements from patients in
23   order for them to be used in some way in this
24   litigation that had the pleasurable side effect of
25   you and I meeting?
```

1    complaints or statements as part of your function

2    with DRNJ, irrespective of any litigation;

3    correct?

4         A.        That's correct.

5         Q.        But then there came a time when

6    you went to patients not just for the purpose of

7    checking in on them and obtaining the usual data

8    you wanted for your job, but that you were to

9    obtain some kind of information that might be

10   useful in litigation; correct?

11                  MS. WELLS:   Objection to the

12   form.

13             Go ahead.

14        Q.        And let me make sure.  You look --

15   the witness looks befuddled, and I don't blame

16   her.

17                  Part of your job is to go around

18   and sit with patients as their advocate and take

19   information that is pertinent to your job

20   function; is that correct?

21        A.        Yes.

22        Q.        And at some point, however, you

23   went and sat down with patients, not just for that

24   purpose but also as you understood it to get

25   certain kinds of information in connection with

1    illness other than medication.

2          Q.      Okay.   Are there people who you've

3    encountered in the hospitals that are prone to

4    violence?

5                  MS. WELLS:   Objection to the

6    form.

7          A.      There are, yes, there are.

8          Q.      Okay.   There are people that you

9    have not particularly wanted to see or have been

10   able to see at particular points in time because

11   they are at that time prone to violence or

12   aggression or assault or have threatened that;

13   correct?

14                 MS. WELLS:   Objection to the

15   form.

16         A.      No.   That's not correct.

17         Q.      Okay.   What do you envision the

18   hospital doing with a patient who is assaultive,

19   who is threatening to kill another patient while

20   they are waiting for the judge?

21                 MS. WELLS:   Objection to the

22   form.

23         A.      Hospitals do have emergency

24   procedures where they can thereby medicate a

25   person under certain criteria for a 72-hour

```
 1   period.
 2        Q.       All right.  And if it takes longer
 3   than 72 hours for informed counsel to get
 4   involved -- after all, they have to review
 5   everything -- and for a judicial hearing to be
 6   scheduled for that particular patient, do we do
 7   another 72-hour certificate if that patient is
 8   still showing signs of assaultive or violent
 9   tendencies?
10                 MS. WELLS:  Objection to the
11   form.
12        A.       In the current system I don't
13   believe they are actually allowed to do
14   back-to-back 72-hour certifications.  They would
15   have to implement a three-step procedure.
16        Q.       Okay.  Well, in your scenario,
17   which you've told me about from your experience
18   and wisdom on the ground where we have a
19   judge-type procedure with counsel and all these
20   things, they can do one 72-hour procedure, but
21   what would happen in your system when the patient
22   is still assaultive and has violent tendencies and
23   is still, as in one instance that you may know
24   about, threatening to kill another patient who
25   happened to be pregnant?
```

 1              MS. WELLS:  Objection to the

 2    form.

 3         Q.        What do we do now?

 4         A.        Hospitals put people on one-to-one

 5    levels of supervision where they have an

 6    individual staff person that goes right alongside

 7    that person.  They have historically,

 8    unfortunately, also used seclusion restraints for

 9    people.  The medications have somewhat replaced

10    those as chemical restraints.  And there are,

11    again, there are a variety of other interventions

12    that can be utilized other than giving someone

13    medication until it's been judicially authorized.

14         Q.        Okay.  So what you're saying is

15    under your system after the first 72 hours if the

16    patient is still displaying the same symptoms and

17    is assaultive and is violent or whatever, that you

18    would say Well, they could be put on one-on-one;

19    correct?

20              MS. WELLS:  Objection to the

21    form.

22         A.        Yes.

23         Q.        Or under your system we would

24    restrain them physically?

25              MS. WELLS:  Objection to the

```
 1   form.
 2            Q.       Is that right?
 3            A.       That's an alternative available.
 4            Q.       Okay.  Now, a patient in that
 5   state, a patient who is verbally abusive, is
 6   threatening people, is showing signs of
 7   aggression, who is perhaps destroying property or
 8   trying to destroy property or who is attempting to
 9   hurt themselves, those people are suffering,
10   aren't they?
11                     MS. WELLS:  Objection.
12            A.       That would be an opinion.
13            Q.       Well, you know --
14            A.       It's not my opinion.
15            Q.       Well, now, wait a minute.  People
16   with mental illnesses, these illnesses cause
17   suffering in these people, don't they?
18                     MS. WELLS:  Objection to the
19   form.
20            A.       Depends on your definition of
21   "suffering," sir.
22            Q.       Well, do you think from all your
23   experience in the years in the mental health field
24   that a person who is experiencing a mental
25   illness -- and maybe not all of them, but many of
```

1           MS. WELLS:   Objection to the

2    form.

3           A.      My experience, what I have been

4    told by patients and clients over the years is

5    their suffering is caused by the treatment

6    conditions and the drugs that they are forced to

7    take, not as much as their illness causes them

8    suffering.  Their illness may cause their family

9    suffering, which is unfortunate.

10          However, my experience in my countless

11   hours of talking and being with and conversing

12   with individuals is what it is.  I believe that

13   there's more suffering induced upon them than

14   their illness has already caused.

15          Q.      So the last part of that was an

16   acceptance that the illness can cause suffering

17   standing on its own?

18          MS. WELLS:   Objection to the

19   form.

20          A.      Yes.

21          Q.      Have you encountered at least one

22   patient in all these years that was suffering with

23   their illness, was given medication and got

24   better?

25          A.      Yes, I have.

1    patients who are at the moment you encounter them

2    dangerous.  They may be dangerous to themselves or

3    others, haven't you?

4        A.        That have been categorized as

5    dangerous, yes.

6        Q.        But whether they have been

7    categorized by somebody or not, you have met

8    patients who you felt at the time or assessed as

9    being at risk to harm themselves or others,

10   haven't you?

11       A.        Very rarely, actually.

12       Q.        Okay.  All right.  Have you

13   encountered patients that you felt uncomfortable

14   being with because you were afraid for your own

15   safety?

16       A.        I can honestly say, telling the

17   truth, probably a couple of times in my entire

18   career where I felt threatened by any patient.

19       Q.        Okay.  Are you aware, however, as

20   a general matter from your readings and from your

21   conferences you go to, talking with other people

22   in the field, that there are patients out there

23   who are, who have a capacity to do harm to others,

24   unfortunately because of their illness?  You're

25   aware of that; right?

Page 256

```
 1                      MS. WELLS:  That's all I have.
 2    REDIRECT EXAMINATION BY MR. LEYHANE:
 3          Q.      So in other words, to the extent
 4    they need it, the patients would have available
 5    legal counsel through you and DRNJ; correct?
 6                      MS. WELLS:  Objection to the
 7    form.
 8          Q.      Based on what you just told us;
 9    right?
10          A.      They would have, yes, they would
11    have available that entity at some point.
12          Q.      Sure.  Okay.
13                      MR. LEYHANE:  That's all I have;
14    again, thank you for your patience.
15                      --------------
16                      (Witness excused.)
17                      (Whereupon at 5:24 PM the
18    deposition proceedings were concluded.)
19
20
21
22
23
24
25
```