WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey
210 South Broad Street, 3rd Floor
Trenton, NJ 08608
Tel: (609) 292-9742

MITRA HORMOZI, ESQ. *(admitted pro hac vice)*
MELODY WELLS, ESQ. *(admitted pro hac vice)*
ALEXANDRA P. KOLOD, ESQ. *(admitted pro hac vice)*
T. JAKOB SEBROW, ESQ. *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DISABILITY RIGHTS NEW JERSEY**, a New Jersey non-profit corporation, | : : : : |
| Plaintiff, | : : |
| - against - | : Civil Action No.: 3:10-cv-3950-DRD-PS |
| **JENNIFER VELEZ**, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and | : ECF Case : : **ORAL ARGUMENT REQUESTED** |
| **STATE OF NEW JERSEY** | : : |
| Defendants. | : : |

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...............................................................................................5

SUMMARY OF ARGUMENT .........................................................................12

ARGUMENT....................................................................................................13

    I.    A.B. 5:04B VIOLATES THE ADA AND REHABILITATION ACT. ................13

        A.    Involuntarily-Committed Patients Are Qualified Individuals With Disabilities. ...............................................................16

        B.    Involuntarily-Committed Patients Are Denied The Benefit Of Refusing Unwanted Medication. .............................................17

        C.    Defendants Discriminate Against Patients Solely On The Basis Of Their Mental Illness. .......................................................20

    II.    A.B. 5:04B VIOLATES PATIENTS' RIGHT OF ACCESS TO THE COURTS AND COUNSEL.......................................................25

        A.    A.B. 5:04B Denies Patients The Right to Counsel. .................................25

        B.    A.B. 5:04B Denies Psychiatric Patients Their Constitutional Right of Access to the Courts. ........................................................28

    III.    A.B. 5:04B VIOLATES PATIENTS' PROCEDURAL DUE PROCESS RIGHTS. ...................................................................30

        A.    Patients Have A Liberty Interest In Being Free From Unwanted Medication. ...............................................................32

        B.    Medication Review Hearings Erroneously Deprive Patients Of Their Right To Be Free From Unwanted Medication.................................34

        C.    Defendants Have No Legitimate Interest In Denying Patients Judicial Hearings And Counsel.................................................39

CONCLUSION ................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Addington v. Texas*,
   441 U.S. 418 (1979) ...................................................................................... 35, 36

*Allan v. Ashcroft*,
   122 F. App'x 543 (3d Cir. 2004) ................................................................... 38, 39

*Bee v. Greaves*,
   744 F. 2d 1387 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214 (1985) ............... 30, 34

*Bou v. New Jersey*,
   Civil Action No. 11–6356, 2012 WL 1600444 (D.N.J., May 7, 2012).................... 16

*Bounds v. Smith*,
   430 U.S. 817 (1977) ...................................................................... 27, 28, 30

*Chavez-Rivas v. Olsen*,
   207 F. Supp. 2d 326 (D.N.J. 2002) ...................................................................... 26

*City of Newark v. J.S.*,
   279 N.J. Super. 178 (Law Div. 1993) .................................................... 19, 22, 23

*Cruzan v. Director, Mo. Dep't of Health*,
   497 U.S. 261 (1990) .............................................................................................. 32

*Davis v. Hubbard*,
   506 F. Supp. 915 (N.D. Ohio 1980) .................................................................... 34

*Dee v. Borough of Dunmore*,
   549 F.3d 225 (3d Cir. 2008).......................................................................... 34, 39

*Disability Rights New Jersey, Inc. v. Velez*,
   No. 10–3950, 2011 WL 2976849 (D.N.J., July 20, 2011) .................... 17, 25, 28, 30

*Doe v Colautti*,
   454 F Supp 621 (E.D. Pa., 1978), *aff'd*, 592 F2d 704 (3d Cir. 1979)..................... 17

*Edward W. v. Lamkins*,
   122 Cal. Rptr. 2d 1 (Ct. App. 2002) .................................................................... 33

*Foucha v. Louisiana*,
   504 U.S. 71 (1992) ................................................................................................ 37

*Gallo v. Hamilton Twp. Police Dept.*,
   No. 06-1549, 2006 WL 2000135 (D.N.J. July 17, 2006)........................................ 15

*Hargrave v. Vermont*,
   340 F.3d 27 (2d Cir., 2003)................................................................ 18, 20, 24, 25

*Harris v. Lanigan*,
   No. 11–1321, 2012 WL 983749 (D.N.J. Mar. 22, 2012) ...................................... 16

*Helen L. v. DiDario*,
   46 F.3d 325 (3rd Cir. 1995)............................................................................... 14, 15

*Heryford v. Parker*,
   396 F.2d 393 (10th Cir. 1968) ................................................................................ 26

*In re J.M.*,
   416 N.J.Super. 222 (Ch. Div. 20111250-0) ..................................................... 18, 19

*Jerrytone v. Musto*,
   167 F. App'x 295 (3d Cir. 2006).............................................................................. 31

*Kiman v. New Hampshire Dept. of Corr.*,
   451 F.3d 274 (1st Cir. 2006) ................................................................................... 17

*Livingstone v. N. Belle Vernon Borough*,
   91 F.3d 515 (3d Cir. 1996)...................................................................................... 35

*Lovell v. Chandler*,
   303 F.3d 1039 (9th Cir. 2002) ................................................................................ 17

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ..................................................................................... 30, 34, 39

*Matter of Conroy*,
   98 N.J. 321, 486 A.2d 1209 (1985) ..................................................... 8, 19, 22, 24

*McCarthy v. Kelner, Pecoraro & Kelner, P.C.*,
   No. 10-6559, 2012 WL 833018 (D.N.J. Mar. 12, 2012)........................................ 16

*McDonald v. Com. of Pa., Dept. of Public Welfare, Polk Center*,
   62 F.3d 92 (3d Cir. 1995)........................................................................................ 15

*Millington v. Temple Univ. Sch. of Dentistry*,
   261 Fed. App'x. 363 (3d Cir. 2008)........................................................................ 16

*Mills v. Rogers*,
   457 U.S. 291 (1982) ................................................................................. 11, 30, 34

*Montanez v. Beard*,
   344 Fed. Appx. 833 (3d Cir. 2009) ......................................................................... 34

*Muhammad v. Court of Common Pleas of Allegheny County, Pa.*,
   No. 11-3669, 2012 WL 1681861 (3d Cir. May 15, 2012) ...................................... 16

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999) ................................................................................................. 20

*Olson v. General Elec. Astrospace*,
   966 F.Supp. 312 (D.N.J. 1997) ............................................................................... 17

*Pembroke v. Wood County, Tex.*,
   981 F.2d 225 (5th Cir. 1993)................................................................................... 28

*People v. Medina*,
   705 P.2d 961 (Colo. 1985) ...................................................................................... 26

*Project Release v. Prevost*,
    722 F.2d 960 (2d Cir. 1983) ........................................................................... 26

*Riggins v. Nevada*,
    504 U.S. 127 (1992) ............................................................................... passim

*Rivers v. Katz*,
    67 N.Y.2d 485 (1986) ............................................................................. 26, 33

*Rogers v. Okin*,
    478 F.Supp. 1342 (D.Mass. 1979) .................................................................. 34

*Schweiker v. McClure*,
    456 U.S. 188 (1982) ...................................................................................... 38

*Seibert v. Lutron Electronics*,
    No. 08-5139, 2009 WL 4281474 (E.D. Pa. Nov. 30, 2009).................................. 16

*Sell v. US*,
    5369 U.S. 166 (2003) ..................................................................................... 10

*Soto v. City of Newark*,
    72 F.Supp.2d 489 (1999) ................................................................................ 18

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ...................................................................................... 34

*State ex rel. Jones v. Gerhardstein*,
    416 N.W.2d 883 (Wis. 1987) .......................................................................... 33

*State v. Pelham*,
    176 N.J. 448 (2003) ................................................................................. 18, 19

*Steele v. Hamilton County Cmty. Mental Health Bd.*,
    736 N.E.2d 10 (Ohio 2000) ............................................................................ 33

*Streicher v. Prescott*,
    663 F. Supp. 335 (D.D.C. 1987) ................................................................ 27, 30

*United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn &*
    *McDonnell, Inc.*,
    787 F.2d 128 (3d Cir. 1986) ........................................................................... 38

*United States v. Budell*,
    187 F.3d 1137 (9th Cir. 1999) ........................................................................ 26

*United States v. Georgia*,
    546 U.S. 151 (2006) ...................................................................................... 17

*Vitek v. Jones*,
    445 U.S. 480 (1980) ...................................................................................... 27

*Ward v. Kort*,
    762 F.2d 856 (10th Cir. 1985) ........................................................................ 28

*Washington v. Harper*,
    494 U.S. 210 (1990) ............................................................................... passim

*Winston v. Lee,*
    470 U.S. 753 (1985) ........................................................................... 32

*Winters v. Miller,*
    446 F.2d 65 (2d Cir. 1971) ............................................................... 33

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ........................................................................... 28

*Yeskey v. Pennsylvania Dep't of Corrections,*
    118 F.3d 168 (3d Cir.1997) ............................................................... 18

*Youngberg v. Romero,*
    457 U.S. 307 (1982) ........................................................................... 32

**Statutes**

29 U.S.C. § 705 (20) ................................................................................ 15

29 U.S.C. § 794 .............................................................................. 15, 17

29 U.S.C. § 794(a) ......................................................................... 15, 16

29 U.S.C.A. § 701 ................................................................................... 14

42 U.S.C. § 12101(a)(3) ........................................................................ 14

42 U.S.C. § 12102(4)(A) ....................................................................... 16

42 U.S.C. § 12131(1) ............................................................................. 15

42 U.S.C. § 12132 ................................................................................... 15

42 U.S.C. §12101(a)(2) .......................................................................... 14

42 U.S.C.A. § 12102(1)(A) ................................................................... 16

42 U.S.C.A. § 12102(1)(B) ................................................................... 16

Alaska Stat. § 47.30.839(c) ................................................................... 26

Mass. Gen. Laws Ann. ch. 123 § 5 ...................................................... 26

Minn. Stat. Ann. § 253B.092(8)(b) ...................................................... 26

N.D. Cent. Code § 25-03.1-13 .............................................................. 26

N.D. Cent. Code § 25-03.1-18.1 ........................................................... 26

N.J Rule of Court 4:74-7(h)(1) ........................................................ 8, 37

N.J Rule of Court 4:74-7(h)(2) ............................................................... 8

N.J. Admin. Code § 8:39-4.1(a)(4) ................................................. 18, 19

N.J. Admin. Code § 8:42C-5.1 (b)(11) ............................................ 18, 19

N.J. Admin. Code § 8:43-14.2(3) .................................................... 18, 19

N.J. Admin. Code § 8:43F-4.2(a)(4) ............................................... 18, 19

N.J. Admin. Code § 8:43G-4.1(a)(8) ............................................... 18, 19

N.J. Stat. Ann. § 26:2H-53 .................................................................................... 24

N.J. Stat. Ann. § 30:4-24.2 ................................................................................... 18

N.J. Stat. Ann. § 30:4-24.2(c) .............................................................................. 32

N.J. Stat. Ann. § 30:4-24.2.d(2) ........................................................................... 19

N.J. Stat. Ann. § 30:4-27.10 ................................................................................. 33

N.J. Stat. Ann. § 30:4-27.11c(c) ........................................................................... 33

N.J. Stat. Ann. § 30:4-27.2(ee) ............................................................................. 21

N.J. Stat. Ann. § 30:4-27.2(m) .............................................................................. 21

N.J. Stat. Ann. § 30:4-27.2(r) ............................................................................... 27

N.J. Stat. Ann. §§ 3B:12-25 .................................................................................. 23

N.J. Stat. Ann. §§ 3B:12-57 .................................................................................. 23

N.M. Stat. Ann. § 43-1-15(c) ................................................................................ 26

Tex. Health & Safety Code Ann. § 574.105 .......................................................... 26

Va. Code Ann. § 37.2-1101(c) ............................................................................... 26

Vt. Stat. Ann. tit. 18 § 7613 .................................................................................. 26

Vt. Stat. Ann. tit. 18 § 7625 .................................................................................. 26

Wis. Stat. § 51.20(5) ............................................................................................. 26

Wis. Stat. § 51.61(1)(g)(2) .................................................................................... 26

## **Regulations**

28 C.F.R. § 35.130 ................................................................................................ 20

## PRELIMINARY STATEMENT

This case is about Defendants' ongoing denial of the fundamental rights of patients in New Jersey psychiatric hospitals. For decades, New Jersey has undermined the dignity and rights of the people in its care by forcibly administering mind-altering psychotropic drugs to legally competent patients. However, no other group of people within the state can be forcibly medicated without having access to a court hearing. This blatant discrimination against involuntarily-committed patients with mental illness violates both the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1972 ("Rehabilitation Act" or "RA"). Defendants' forcible medication practices also violate the well-established rights of those in the custody of the state to have adequate, effective and meaningful access to the courts. Further, due process requires that before patients can be deprived of their liberty interest in remaining free from unwanted medication, they must have the opportunity to defend themselves in court, with the aid of counsel.

Defendants' long-standing and discriminatory practice of forcibly medicating patients without providing counsel or a fair hearing before a judge was recently codified in the policy titled "A.B. 5:04B."  But the problems with A.B. 5:04B go beyond the letter of the policy. Defendants have a long history of failing to properly implement their involuntary medication procedures. For nearly 30 years, Defendants were legally obligated to follow the "Three-Step Process" mandated by

*Rennie v. Klein*. But undisputed evidence shows that doctors and the patient advocates failed to follow the policy by, *inter alia*, routinely failing to give patients notice of hearings and failing to obtain proper authorizations from doctors. (SOUF ¶¶ 30-40.)

In June 2012 – in the midst of this litigation – Defendants implemented a new involuntary medication policy. It is undisputed that this policy does not provide access to counsel and does not provide a court hearing before a patient can be medicated against her will. Though the policy is only a few months old, already, the minimal rights afforded to patients on paper are being abridged in practice. Patients who sought to make statements at their Medication Review Hearings have been cut off and told to leave before concluding their remarks. (SOUF ¶ 94.) And the Client Service Advocates ("CSAs") and Client Service Representatives ("CSRs") charged with advocating for patients have provided misleading or false information regarding A.B. 5:04B's requirements to patients.

In New Jersey, patients with any other medical conditions, including life-threatening or highly contagious diseases, are permitted to refuse medical treatment, and their decision may only be overridden after a judicial hearing. Patients in New Jersey's psychiatric hospitals do not have this right. Such institutionalized stigmatization and discrimination against the mentally ill violates the ADA and the Rehabilitation Act, and must not be permitted to continue.

Defendants' practices are all the more disturbing because psychotropic drugs are – quite literally – mind-altering. They affect cognition and even personality, and can cause painful, disabling, and permanent side effects. To forcibly modify a person's mind and personality is as significant a deprivation as confinement of their physical body. Whatever powers the state may have, involuntary mind control must not be one of them, absent extraordinary circumstances. Yet while New Jersey provides counsel and a judicial hearing for involuntary physical commitment, patients are denied these due process protections for analogous treatment affecting their minds.

Moreover, A.B. 5:04B employs a vague "likelihood" of harm standard, provides no standard of proof to guide decision-making, fails to require that hearings be transcribed or recorded, and includes no prohibition on the introduction of unreliable evidence. Given the significant interest each patient has in being free from unnecessary invasions into her body and mind, the minimal procedure afforded to patients under A.B. 5:04B is clearly inadequate to guard against erroneous application.

There is an easily-accomplished solution to both the deficiencies inherent in Defendants' policy and the apparent failures in its implementation. Since 2006, ***well over 50,000*** weekly or biweekly civil commitment hearings have taken place on site in New Jersey's state psychiatric hospitals. (SOUF ¶¶ 98-99.) State court judges

preside and individuals subject to commitment are appointed counsel. (SOUF ¶ 104.) Further, the hearings are recorded by court reporters and result in a written court order. (SOUF ¶ 100.)

Given the numerous judicial hearings ***already taking place*** within New Jersey's state psychiatric hospitals, there is no legitimate reason to disallow DRNJ constituents potentially subject to forced medication from accessing these resources. In September 2012, fewer than 35 Medication Review Hearings were held in Defendants' psychiatric hospitals. (SOUF ¶ 81, Pl. Ex. 79 (compilation of All September 2012 Hearing Outcome Reports).) With the necessary facilities, judges, and lawyers readily available, the cost and burden of providing adequate due process to the relatively small number of patients subject to involuntary medication would be *de minimis*.

Simply put, Defendants' inadequate, discriminatory practices cannot pass muster under the Constitution or federal anti-discrimination laws. Forcing powerful psychotropic drugs on competent patients who have declined to give informed consent is a tremendous invasion of patients' rights and should not occur without oversight from a court and without the assistance of counsel.

## BACKGROUND

### The "Three-Step" Process

For nearly thirty years, New Jersey Psychiatric hospitals employed the "Three-Step Process" for involuntarily medicating patients with powerful psychotropic drugs. This so-called "peer review" procedure was set forth in Department of Human Services Administrative Bulletin 5:04 ("A.B. 5:04"). (SOUF ¶ 20, Pl. Ex. 29 (A.B. 5:04).) Under this process, legally competent psychiatric patients in New Jersey could be medicated against their will but were not provided legal representation, a judicial hearing, legal resources of any kind, or any meaningful ability to appeal. (SOUF ¶ 22, Pl. Ex. 29.) Even as written, this policy failed to provide the most basic protections to ensure that patients' rights were respected. In practice, Defendants' culture of circumventing the requirements of A.B. 5:04 was so pervasive that defendants' own witnesses stated that it was "nothing more than a rubber stamp." (SOUF ¶ 38; *see also* ¶¶ 29-40.)

### Defendants' New Involuntary Medication Policy: A.B. 5:04B

On February 15, 2012, Defendants moved this Court to vacate the consent order mandating the use of A.B. 5:04. (D.E. 81.) In doing so, they conceded that the Three-Step Process did not pass constitutional muster, noting that "the consent order requires [Defendant] to permanently comply with procedures that have been undermined by subsequent Supreme Court case rulings." (D.E. 81-1 at 2; *see also*

*id*. at 14-21). Defendants' new involuntary medication policy, A.B. 5:04B which became effective on June 4, 2012, does little if anything to improve upon the failings of the Three-Step Process. A.B. 5:04B permits long-term forcible medication after an administrative "Medication Review Hearing." But like the old regime, A.B. 5:04B overrides the decisions of legally competent patients, without providing counsel, a judicial hearing, or any access to legal resources that would allow patients to challenge the conditions of their confinement. (*Compare* Pl. Ex. 29 (A.B. 5:04) and Pl. Ex. 56 (A.B. 5:04B).)

A.B. 5:04A, Defendants Emergency Medication procedure, allows for involuntary medication where patients "present[] a risk of imminent or reasonably impending harm or danger to self or others" and was implemented concurrent with A.B. 5:04B. (SOUF ¶ 43, Pl. Ex. 57 (A.B. 5:04A) at JV251480.) For authorization of emergency medication, the "harm" need not be "certain or immediate," but there must be an identifiable danger that is reasonably likely to happen in such a short time that "no other less restrictive alternative method available for either protecting the consumer or others or gaining the consumer's consent to the administration of medication or obtaining substituted consent is feasible." (*Id*. at JV251480-81.) DRNJ is not challenging A.B. 5:04A.

Unlike its emergency counterpart, A.B. 5:04B authorizes forcible administration of psychotropic drugs on a long-term, rather than emergency, basis.

And whereas the standard for authorizing emergency medication under A.B. 5:04A is "a risk of imminent or reasonably impending harm," A.B.5:04B applies where the patient merely poses a "***likelihood*** of serious harm to self, others or property without medication." (SOUF ¶ 54, Pl. Ex. 56 at JV251491.) "Likelihood" is defined as sometime "within the reasonably foreseeable future." (*Id*.) Such an open-ended definition invites abuse and overreaching, particularly Defendants' long history of violating their own involuntary medication policies and where emergency medication procedures are readily available. (SOUF ¶¶ 30-40.) In addition, A.B. 5:04B sets no time restrictions on how far back psychiatric hospitals can reach to marshal so-called "evidence" of a patient's "likelihood" of harm. Nor is there a standard of proof or minimal amount of evidence that the prescribing psychiatrist must demonstrate at the Medication Review Hearing. (SOUF ¶ 56.) The vague and highly subjective involuntary medication standard set forth in A.B. 5:04B creates a risk that patients will be erroneously deprived of their constitutionally based right to refuse medication. Such an injury would be significant because, unlike the emergency procedures which allows patients to be medicated for only 72 hours, A.B. 5:04B permits long term medication, (*See* SOUF ¶ 74, Pl. Ex. 56 at JV251498), resulting in long-lasting injury to the patient.

Just as troubling as A.B. 5:04B's vague standards, is its application to ***legally competent*** patients. In New Jersey, legally competent patients with conditions other

7

than mental illness have a right to refuse treatment. This is true even when they have contagious diseases that pose a danger to themselves or others. Only a court order may override their decisions. *See Matter of Conroy*, 98 N.J. 321, 382, 486 A.2d 1209, 1241 (1985). While civil commitment is not equivalent to a finding of legal incompetence, (*see* Section III.A, *infra*) patients with mental illness can nonetheless have their decision-making overridden by an administrative panel. Defendants offer no explanation as to how such disparate treatment can be justified.

Worse still, the policy also applies to patients who have been placed on CEPP status, which requires a finding that the patient is eligible for discharge and is ***no longer a danger to themselves or others***. (N.J Rule of Court 4:74-7(h)(1)-(2).) Defendants' own expert witness has even agreed that such a policy is unjust. (SOUF ¶ 53, Pl. Ex. 15, Appelbaum Tr. 104:20-105:17.) The policy also applies where a patient has an advance directive in place or where a designated mental health representative or guardian has been appointed by a court – thus overriding that legally-designated person's decision to refuse medication for the patient. (SOUF ¶ 49.)

The failings of A.B. 5:04B are not limited to the policy as written. Records from Medication Review Hearings demonstrate that, in practice, the review process set forth in A.B. 5:04B remains a rubber stamp on the prescribing psychiatrist's recommendation. In each of the thirty-one medication hearings in which a

Medication Review Panel rendered a decision, they authorized forcible medication. (SOUF ¶ 81.) The decisions were frequently justified only by conclusory statements or sometimes not explained at all. (SOUF ¶ 88 (citing examples).) Of those thirty-one hearings, fourteen patients appealed to their hospital's Medical Director. In each case the Medical Director affirmed the Panel's decision (SOUF ¶ 81), often repeating the Panel's conclusory or non-existent reasoning, and rarely acknowledging any objections raised by the patient. (SOUF ¶ 89 (citing examples).)

Absent any genuine review, it is no wonder patients often believe their participation in the review process will not affect the outcome. (*See, e.g.*, SOUF ¶ 81 (14 of 31 patients appealed decision of medication panel; all 14 panel decisions were affirmed on appeal); SOUF ¶89, Pl. Ex. 66 (J.W. Trenton Psychiatric), JV252286-302 at 295 (appeal form stating, "The doctor didn't hear me out!!!"); SOUF ¶ 94, Pl. Ex. 60 (Spensley Aff.) ¶¶ 5, 15, 20 (reporting that patients at Medication Review Hearings were "cut off by the panelists before they could finish speaking, and have been told to leave before concluding their arguments").) When patients did not attend the Medication Review Hearings, the records are silent as to how the patients' interests were represented and protected at the hearing. (*See, e.g.*, SOUF ¶ 93, Pl. Ex. 61 (C.C. Ancora), JV251930-44 at 34 (neither patient, CSA nor CSR attended medication hearing), Pl. Ex. 68, (A.B. Ann Klein), JV251951-66 at 55 (same), Pl. Ex. 13, Piren Tr. 231:7-16 ("Q: How are the patient's interests

9

represented [at a treatment hearing] if neither the patient nor the *Rennie* advocate attend? A: "That's problematic.").)

The Hearing Outcome Reports also suggest that in many cases, the panels operated as though the patient was not even present at the hearing. Only a few patients called witnesses or presented documentary evidence. (SOUF ¶ 93.) And when patients did not attend Medication Review Hearings, the Hearing Outcome Reports often fail to include a summary of the patients' positions, as required by A.B. 5:04B. (SOUF ¶ 90.) Finally, while CSAs are theoretically obligated to assist patients in preparing appeal papers, many appeals included only one or two sentences in support of the patient's position, indicating little effort or participation by the "advocates" in this process. (SOUF ¶ 93.)

## Consequences of the Use of Psychotropic Medications

Psychotropic medication significantly alters the bodies and minds of the people who use them. The goal of such medication is to change the way its user thinks. *See, e.g.*, *Sell v. US*, 5369 U.S. 166, 174 (2003) (stating that lower court found that antipsychotics "represent the only viable hope of rendering defendant competent to stand trial"). As Defendants' acknowledge, psychotropic drugs act "direct[ly] [] on the central nervous system and [] can modify emotion, cognition, and behavior." (SOUF ¶ 10, Pl. Ex. 11 (Prescribing Psychotropic Medication at Trenton Psychiatric) at JV250945.) The mind-altering effects of psychotropic drugs

10

have been repeatedly recognized by the Supreme Court and other courts. *Riggins v. Nevada*, 504 U.S. 127, 134 (drugs "alter the chemical balance in a patient's brain, leading to changes . . . in his or her cognitive processes."); *Mills*, 457 U.S. at 293 n.1 ("It is not disputed that [antipsychotic] drugs are 'mind-altering.' Their effectiveness resides in their capacity to achieve such effects.")

There is no dispute that these drugs frequently cause severe and debilitating side effects. *See Harper*, 494 U.S. at 229 (antipsychotic drugs "can have serious, even fatal, side effects"). Defendants' own documents and testimony confirm that side effects include, *inter alia*, muscle cramps, uncontrollable tremors, shakiness, restlessness, disturbances in walking, constipation, dizziness, and dryness of mouth. (SOUF ¶ 12, Pl. Ex. 17 (Greystone *Rennie* Procedures Training Packet) at JV000183.) Another side effect is a condition called tardive dyskinesia, which results in "involuntary movement of the mouth, jaw, tongue, face or limbs" (*id*.; *see also* SOUF ¶ 13, Pl. Ex. 19 (AIMS+EPS Examination Procedure ) at JV016013) and may become permanent if not diagnosed and treated. (SOUF ¶ 13.) Indeed, Defendants' own pharmacology guidelines acknowledge that patients in long-term treatment with various antipsychotic drugs have "high prevalence rates for parkinsonism, akathisia, and tardive dyskinesia." (SOUF ¶ 14, Pl. Ex. 14 (N.J. Division on Mental Health Services Pharmacological Practice Guidelines for the Treatment of Schizophrenia) at JV015993.) Such fundamental and devastating

11

alterations to a person's mind and personality must not be allowed without adequate procedures to protect the patient's interests.

## SUMMARY OF ARGUMENT

<u>A.B. 5:04B Unlawfully Discriminates Against Involuntarily-Committed Patients</u>. The Rehabilitation Act and ADA both prohibit discrimination against individuals with disabilities. Here, there is no credible dispute that patients who have been involuntarily committed to Defendants' psychiatric hospitals are disabled. Moreover, the undisputed facts demonstrate that these patients are discriminated against solely on the basis of their disability. Patients in Defendants' medical facilities other than psychiatric hospitals have a right to refuse unwanted medication that can be overridden only by court order, while patients in psychiatric hospitals do not. The only difference between the populations who are permitted to refuse treatment and those who are not is involuntary commitment on the basis of mental illness. This type of marginalization is precisely what the ADA and Rehabilitation Act were designed to prevent, and such discrimination must not be countenanced.

<u>A.B. 5:04B Violates Patients' Rights of Access to Courts and Counsel</u>. Involuntarily-committed patients have no access whatsoever to courts or counsel to contest the decision to administer unwanted drugs or to assist in seeking judicial relief from the involuntary administration of medication. These practices violate well-established precedent holding that all individuals in the custody of the state

have a right to challenge the conditions of their confinement in the courts and that people whose liberty interests are at risk have a right to counsel.

A.B. 5:04B Violates Patients' Procedural Due Process Rights. The fundamental right to refuse unwanted psychotropic medication must not be infringed except in the most extraordinary circumstances. But A.B. 5:04B does not provide adequate procedural protections of this right. The decision to authorize forcible medication turns on a "likelihood" of harm standard that is overly broad, poorly defined, and requires no standard of proof. Here, Defendants policy also overrides the decisions of CEPP patients (who have been adjudicated to longer meet civil commitment standards), decisions by legally-appointed guardians, and patients' medical elections contained in advance directives. But in each instance, Defendants are illegally overriding a court decision or legally-binding document. Finally, Defendants have no legitimate interest in withholding access to the robust infrastructure already in place for civil commitment hearings from patients subject to involuntary medication.

## ARGUMENT

## I.    A.B. 5:04B VIOLATES THE ADA AND REHABILITATION ACT.

Defendants' new policy, A.B. 5:04B, discriminates against involuntarily-committed patients in the care and custody of state psychiatric hospitals on the basis of nothing more than their mental health status. Any patient in a New Jersey state

hospital who is competent to give or refuse informed consent may refuse medical treatment. (Section I.B. *infra*; SOUF ¶ 45.) However, that right to refuse to consent to a course of treatment involving mind-altering and potentially disabling psychotropic medications is denied to patients who have been committed to psychiatric hospitals in New Jersey.

It is just this type of disparate treatment that the ADA and the Rehabilitation Act are meant to prevent. In passing the ADA and Rehabilitation Act, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities" and "discrimination against individuals with disabilities persists in such critical areas as ... institutionalization." 42 U.S.C. §§ 12101(a)(2)-(3) and 29 U.S.C.A. § 701. This discrimination "continue[s] to be a serious and pervasive social problem." *Id.*; *see also* 29 U.S.C.A. § 701 ("individuals with disabilities constitute one of the most disadvantaged groups in society"). Thus the ADA and Rehabilitation Act are meant to "insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them." *Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995).

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity." 42 U.S.C. § 12132.[1] Section 504 of the RA

similarly states, "No otherwise qualified individual with a disability in the United

States, as defined in section 705 (20)  of this title, shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal

financial assistance...." 29 U.S.C. § 794(a).  The substantive standards for

determining liability under Title II of the ADA are identical to those of Section 504

of the Rehabilitation Act. *See Helen L. v. DiDario*, 46 F.3d at 330 ("The law

developed under section 504 of the Rehabilitation Act is applicable to Title II of the

ADA."); *McDonald v. Com. of Pa., Dept. of Public Welfare, Polk Center*, 62 F.3d

92, 95 (3d Cir. 1995) ("[T]he substantive standards for determining liability are the

same" under the ADA and RA).

To establish a violation of the ADA or RA, a plaintiff must demonstrate that

(1) he is a qualified individual with a disability; (2) he was either excluded from

participation in or denied the benefits of some public entity's services, programs, or

activities; and (3) such exclusion, denial of benefits, or discrimination was by

---

[1]The State of New Jersey and its Department of Human Services, of which
Defendant Velez is the Commissioner, are "public entities" covered under the ADA
and RA as they are the state government and departments within a state government
respectively. *See*, *Gallo v. Hamilton Twp. Police Dept.*, No. 06-1549, 2006 WL
2000135 at *4 (D.N.J. July 17, 2006); 42 U.S.C. § 12131(1) ("public entity"
includes any (1) "State or local government," and (2) "agency" or "other
instrumentality of a State...").

reason of his disability. *Muhammad v. Court of Common Pleas of Allegheny County, Pa.*, No. 11-3669, 2012 WL 1681861 at *3 (3d Cir. May 15, 2012); *see also Millington v. Temple Univ. Sch. of Dentistry*, 261 Fed. App'x. 363, 365 (3d Cir. 2008); *Bou v. New Jersey*, Civil Action No. 11–6356, 2012 WL 1600444 at *3 (D.N.J., May 7, 2012).[2]

### A.   Involuntarily-Committed Patients Are Qualified Individuals With Disabilities.

Under the ADA and RA, "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," or "a record of such an impairment," *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x at 365; 42 U.S.C.A. §§ 12102(1)(A) -(B). This definition of disability is to be construed "in favor of broad coverage of individuals." *McCarthy v. Kelner, Pecoraro & Kelner, P.C.*, No. 10-6559, 2012 WL 833018 at *5 (D.N.J. Mar. 12, 2012) (quoting 42 U.S.C. § 12102(4)(A)). For the purposes of the ADA, an "impairment" includes "[a]ny mental or psychological disorder, ***such as ... emotional or mental illness***." *Seibert v. Lutron Electronics*, No. 08-5139, 2009 WL 4281474 (E.D. Pa. Nov. 30, 2009) (emphasis added).

---

[2]The RA also requires that the allegedly discriminating public entity be a recipient of federal funding. *See* 29 U.S.C. § 794(a); *Harris v. Lanigan*, No. 11–1321, 2012 WL 983749 at *4 (D.N.J. Mar. 22, 2012). It is undisputed that Defendant New Jersey receives federal funding to support, *inter alia*, the Department of Human Services' Division of Mental Health Services. (SOUF ¶ 7.)

A.B. 5:04B applies to individuals who have been involuntarily committed to one of Defendants' state psychiatric hospitals on the basis of their mental illness. (SOUF ¶46.) Courts routinely hold that individuals with mental illness and individuals residing in psychiatric institutions are disabled under the terms of the ADA and Rehabilitation Act. *Doe v Colautti*, 454 F Supp 621, 626 (E.D. Pa., 1978), *aff'd*, 592 F2d 704 (3d Cir. 1979) (patient in a psychiatric hospital was a "handicapped individual" under § 504 of the RA); *Olson v. General Elec. Astrospace*, 966 F.Supp. 312, 316 (D.N.J. 1997) (depression is a disability under the ADA). Indeed, as this court has stated, "[n]either party seriously contests that many of Plaintiff's constituents are disabled." *Disability Rights New Jersey, Inc. v. Velez*, No. 10–3950, 2011 WL 2976849, at *17 (D.N.J., July 20, 2011). Because mental illness is a covered disability, involuntarily committed patients are qualified individuals with disabilities under the ADA and RA.

## B.  Involuntarily-Committed Patients Are Denied The Benefit Of Refusing Unwanted Medication.

Medical care is one of the "services, programs, or activities of a public entity" covered by the ADA and Rehabilitation Act. *Kiman v. New Hampshire Dept. of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006); *see Lovell v. Chandler*, 303 F.3d 1039, 1054-1053 (9th Cir. 2002); *United States v. Georgia*, 546 U.S. 151, 157 (2006). Thus, Defendants' provision of a wide range of medical services for disabled and non-disabled individuals (*see* SOUF ¶¶ 8-9), including treatment of

17

mentally ill patients (SOUF ¶¶ 5-6), is properly considered a "service" under Title II of the ADA.

As part of its provision of medical services, New Jersey affords most patients a broad right to refuse all medical treatment.[3] Thus, the right to refuse medication afforded by New Jersey to most competent individuals, like the provision of medical services, is itself a governmental "service" or "program." *See*, *Soto v. City of Newark*, 72 F.Supp.2d 489, 493-494 (1999); (ADA's Title II is "intended to apply to *anything* a public entity does.") (quoting *Yeskey v. Pennsylvania Dep't of Corrections*, 118 F.3d 168, 171 (3d Cir.1997)); *Hargrave v. Vermont*, 340 F.3d 27, 38 (2d Cir., 2003) (affirming finding of ADA and RA violations where the relevant "service" was a "statutorily created opportunity to execute a power of attorney for health care and ***the right to have it recognized and followed***.") (emphasis added).

---

[3]*See In re J.M.*, 416 N.J.Super. 222, 231-32 (Ch. Div. 20111250-0) (recognizing a right to refuse medical treatment under the "United States Constitution and the common-law right of self-determination); *State v. Pelham*, 176 N.J. 448, 456-457 ("C]ompetent persons have the right to refuse life-sustaining treatment"); (N.J. Stat. Ann. § 30:4-24.2.) (hospitalized patients have the right "[t]o refuse treatment to the extent permitted by law."); N.J. Admin. Code § 8:43G-4.1(a)(8)(applying to patients in "every New Jersey hospital"); N.J. Admin. Code § 8:43-14.2(3)(applying to patients in residential health care facilities); N.J. Admin. Code § 8:39-4.1(a)(4)(applying to long-term care facility patients); N.J. Admin. Code § 8:42C-5.1 (b)(11)(applying to hospice patients); NJ ADC 8:43F-4.2(a)(4) (applying to adult day health services facility patients.). (*See also* SOUF ¶ 9, Pl. Ex. 95, April 21, 2004 Department of Human Services, Division of Developmental Disabilities Circular #21, at Section VI (B)(1) (applying to patients in "developmental centers."); *id*. Pl. Ex. 77 (December 12, 2003 Department of Human Services, Division of Developmental Disabilities Circular #41) at Section IV(E) (same.).)

In New Jersey, this right of refusal may be exercised by a legally competent patient "for any reason." *In re J.M.*, 416 N.J.Super. at 232 (Ch. Div. 2010). And "the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death." *Matter of Conroy*, 98 N.J. 321, 353 (1985). Thus, to the extent that right of self-determination is ever overridden, it is the result of a court order, not the decision of an administrative panel. *See, e.g. id.*; N.J Stat. Ann. § 30:4-24.2.d(2) (prohibiting shock treatment, psychosurgery, sterilization and experimental research if the patient objects and requiring a court hearing and counsel to overrule an incompetent patient's objection); *City of Newark v. J.S.*, 279 N.J. Super. 178, 185-86 (Law Div. 1993). (*See also* SOUF ¶ 45.)

In contrast to the broad right to refuse unwanted medication granted to every other person in the care or custody of hospitals and medical facilities in the state of New Jersey, DRNJ constituents who are involuntarily committed are uniquely subject to the provisions of A.B. 5:04B, which robs patients of their right to refuse medication otherwise guaranteed under New Jersey state law, *see e.g.*, *State v. Pelham*, 176 N.J. 448, 456-457 (2003); N.J. Admin. Code § 8:43G-4.1(a)(8); N.J. Admin. Code § 8:43-14.2(3); N.J. Admin. Code § 8:39-4.1(a)(4); N.J. Admin. Code § 8:42C-5.1 (b)(11); N.J. Admin. Code § 8:43F-4.2(a)(4)), and fails to provide a court hearing in connection with the decision to infringe upon that right. (SOUF ¶

19

95.) As such, A.B. 5:04B deprives DRNJ constituents of a "right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(vii)(emphasis added); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) (finding discrimination on the basis of mental illness where only institutionalized mentally ill patients were affected); *Hargrave v. Vermont*, 340 F.3d 27 (2d. Cir. 2003) (finding discrimination on the basis of mental illness where only civilly-committed mentally ill patients found to be incompetent were affected).

### C.   Defendants Discriminate Against Patients Solely On The Basis Of Their Mental Illness.

The only factor that triggers the applicability of A.B. 5:04B – and thus subjects a person to forcible medication with unwanted psychotropic medication – is his or her status as a patient with mental illness who has been involuntarily committed to a New Jersey psychiatric hospital. Defendants' discrimination manifests in several ways. First, A.B. 5:04B discriminates between involuntarily committed patients and other patients receiving medical services in New Jersey medical facilities. A.B. 5:04B applies only to involuntarily-committed patients in Defendants' state psychiatric hospitals (SOUF ¶¶ 46-48), but New Jersey simultaneously allows ***all*** other recipients of state-sponsored medical care who are competent to make medical decisions to refuse treatment of any kind. (*See*, *supra*, Section I.B.)

Second, Defendants discriminate between involuntarily-committed patients and voluntary patients residing in state psychiatric hospitals. A.B. 5:04B authorizes the forcible administration of psychotropic medication to involuntarily-committed patients residing in DHS psychiatric hospitals (SOUF ¶ 46-48), but does not apply to voluntary patients. (SOUF ¶ 44). The only distinction between these classes of patients is that a voluntary patient "is willing to be admitted to a facility voluntarily for care," whereas an involuntary patient is not. But in order to fit either category, the patient must be an "adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property." *Compare* N.J Stat. Ann. § 30:4-27.2(m) *with* (ee).)

Third, Defendants discriminate against patients on CEPP status. These patients were initially involuntarily committed to DHS psychiatric hospitals, but have since been adjudicated to no longer constitute a danger to themselves or others and therefore are entitled to discharge. They only remain in Defendants' hospitals because of a lack of suitable community placement. (SOUF ¶ 51.) By forcibly medicating patients who do not meet the criteria of involuntary commitment, Defendants both discriminate against CEPP patients and illegally override the court's determination of their status. Tellingly, even Defendants' own expert witness, Dr. Appelbaum, has agreed that such patients should not be subject to involuntary medication without additional proceedings in court. (SOUF ¶ 53.)

In applying A.B. 5:04B, Defendants engage in the kind of substitute decision-making that requires a court hearing in every other setting. Indeed, New Jersey courts apply stringent standards before allowing another person to make decisions for patients. For example, in the event that a person seeks a guardianship for an allegedly incompetent patient, they must present "medical evidence … furnished to a court by at least two doctors with expertise in relevant fields who have personally examined the patient." *Matter of Conroy*, 98 N.J. 321, 382 (1985). The proof offered to the court "must be clear and convincing that the patient does not have and will not regain the capability of making the decision for himself." *Id*. The decision in *City of Newark v. J.S.,* 279 N.J. Super. 178, 185-86, (Law Div. 1993) is instructive. There, the forty-year-old male defendant suffered from two contagious diseases: active tuberculosis and HIV. *Id*. J.S. had a "history of disappearances and of releases against medical advice, only to return via the emergency room when his health deteriorated" and allegedly "failed to follow proper infection control guidelines or take proper medication when in the hospital and failed to complete treatment regimens following his release." *Id*. Because J.S. refused treatment, the City of Newark sought a court order to quarantine him and to forcibly administer medication. *Id*. at 185, 186. Applying a "clear and convincing evidence" standard, the court found that J.S. posed a danger because of his contagious condition and held that quarantine was warranted. *Id*. at 192, 204. However, the court denied

Newark's request that J.S. be forced to "provide sputum samples and take his medication as prescribed," basing its decision on the broad right to refuse medical treatment, even if such refusal was "medically unwise" and would likely prolong J.S.'s detention. *Id*. at 205-206.

Unlike patients like J.S., who are not involuntarily-committed, patients committed to Defendants' psychiatric hospitals are not provided court hearings but instead are subject to the overly broad and ambiguous "likelihood of serious harm to self, others, or property" standard. (*See* Section III.B, *infra* (A.B. 5:04B contains no standard of proof).) Moreover, the Medication Review Hearings have none of the safeguards (*e.g.* rules of evidence or procedure (SOUF ¶ 57) that protect patients' rights in court. Thus, the right to refuse medication granted to competent patients involuntarily committed to state psychiatric hospitals diverges significantly in breadth and quality from the right of refusal accorded to all other competent individuals under New Jersey law. Forcibly medicating those patients without a court order is a discriminatory and unjustified deprivation of their right to refuse medication.

Finally, Defendants discriminate against patients with legally-appointed guardians and advance directives. New Jersey law permits the appointment of a guardian for individuals who do not have capacity to make their own medical decisions. N.J. Stat. Ann. §§ 3B:12-25, 12-57.  As noted above, guardianships are

approved by a court only after a stringent standard of proof has been met. *Matter of Conroy*, 98 N.J. 321, 382 (1985). New Jersey law also permits individuals to create advance directives authorizing a designated health care representative to make health care decisions on their behalf, or providing instructions which would govern their medical care should they become incapacitated. N.J. Stat. Ann. § 26:2H-53 *et seq*. A.B. 5:04B's forcible medication provision expressly applies to patients with legally-appointed guardians and patients with advance directives, and thus subjects those decisions to the override of an administrative panel. (SOUF ¶ 49.) As a result, while guardianships and advance directives are generally available to patients in New Jersey, mentally disabled individuals who are involuntarily committed to psychiatric hospitals cannot exercise these legal options to the same extent as other individuals in New Jersey.

The Second Circuit invalidated a nearly identical policy in *Hargrave v. Vermont*, 340 F.3d 27 (2d. Cir. 2003). In *Hargrave*, the plaintiff designated a guardian in the event of incapacity, and her power of attorney instructed that psychotropic drugs should be refused. *Id.* at 32. However, a Vermont statute allowed medical professionals to petition a family court to override a durable power of attorney in order to involuntarily medicate a patient, like plaintiff, who had been civilly committed. *Id.* at 31-32. The court held that the statute discriminated against mentally ill persons on the basis of disability, within the meaning of Title II of the

ADA and the Rehabilitation Act because it "establishe[d] a procedure whereby **only mentally ill patients** who have been found to be incompetent may have their treatment preferences as expressed in their DPOAs overridden in family court." *Id*. at 37 (emphasis original). This situation is no different: **only** mentally ill patients may have their legally-valid guardianships and advanced directives overridden under A.B. 5:04B. Worse, in *Hargrave*, Defendants were at least required to petition a Court before they could administer the unwanted drugs. *Id*. at 31. Here, Defendants rely only on an administrative panel to undo lawful advance directives and the decisions of legally-authorized guardians. (SOUF ¶ 49.) These discriminatory practices violate both the ADA and Rehabilitation Act and should not be permitted to continue. *Hargrave*, 340 F.3d at 38 (invalidating state statute for discrimination on the basis of mental illness).

## II.   A.B. 5:04B VIOLATES PATIENTS' RIGHT OF ACCESS TO THE COURTS AND COUNSEL.

### A.   A.B. 5:04B Denies Patients The Right to Counsel.

It is well-settled that patients "possess[] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Disability Rights New Jersey, Inc. v. Velez*, CIV. 10-3950 DRD, 2011 WL 2976849 (D.N.J. July 20, 2011) (quoting *Washington v. Harper*, 494 U.S. 210, 221–222 (1990). And only an "essential" or "overriding" state interest can overcome this well-established liberty

interest. *Riggins v. Nevada*, 504 U.S., at 135, 138. Further, where a state "undertakes to act in *parens patriae*," it has an "inescapable duty to vouchsafe due process" by ensuring that persons in its care have the opportunity for legal counsel at proceedings which could result in a serious curtailment of their liberty interests. *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968) (recognizing a right to counsel in civil commitment proceedings); *Project Release v. Prevost*, 722 F.2d 960, 976 (2d Cir. 1983) (noting that "a right to counsel exists where an individual's physical liberty is threatened by the state's action"); *United States v. Budell*, 187 F.3d 1137, 1141-43 (9th Cir. 1999) (right to counsel for patients seeking discharge from mental hospital); *Chavez-Rivas v. Olsen*, 207 F. Supp. 2d 326, 338 (D.N.J. 2002) ("The right to counsel is a fundamental protection … in many [] civil detention schemes.").[4]

However, New Jersey does not provide psychiatric patients with legal counsel either before or after forcibly administering psychotropic drugs. (SOUF ¶ 96.) This process does not square with well-established case law stating that where a person is subject to a "massive curtailment of liberty," *Vitek v. Jones*, 445 U.S.

---

[4]Consistent with this precedent, several states have already recognized the right to counsel in advance of involuntary medication. *See e.g., Rivers v. Katz*, 67 N.Y.2d 485, 497 (1986); *People v. Medina*, 705 P.2d 961, 972 (Colo. 1985); Mass. Gen. Laws Ann. ch. 123 § 5; Va. Code Ann. § 37.2-1101(c); Tex. Health & Safety Code Ann. § 574.105; Alaska Stat. § 47.30.839(c);Minn. Stat. Ann. § 253B.092(8)(b); N.M. Stat. Ann. § 43-1-15(c); N.D. Cent. Code. §§ 25-03.1-13, 25-03.1-18.1; Vt. Stat. Ann. tit. 18 §§ 7613, 7625; Wis. Stat. §§ 51.61(1)(g)(2) , 51.20(5).

480, 491-92 (1980), it is imperative that they be provided counsel as "the first line of defense against constitutional violations." *Bounds v. Smith*, 430 U.S. 817, 822-823, 828 (1977).

Moreover, the refusal to provide counsel ignores the special needs of patients in psychiatric hospitals. As noted in Section I.A, Defendants' patients are disabled. As a result of their mental illness, defined by New Jersey as "a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality," (N.J. Stat. Ann. § 30:4-27.2(r)), they are more likely to need assistance in order to articulate their objections to forced medication. *See Vitek v. Jones*, 445 U.S. at 496-97 (counsel should be provided to mentally ill prisoners because "such a prisoner is more likely to be unable to understand or exercise his rights."); *Streicher v. Prescott*, 663 F. Supp. 335, 343 (D.D.C. 1987) (describing the "tremendous obstacles" the average psychiatric patient faces, which limit the patient's ability to "utilize review procedures and assert his or her rights").

This situation is easily remedied if patients are provided with counsel to assist them in involuntary medication proceedings. And as noted in Section III.C *infra*, counsel knowledgeable about mental health law are already practicing in Defendants' hospitals and participate in weekly or biweekly hearings. For these reasons, New Jersey should be required to provide counsel to patients who are

subject to involuntary medication. *See, e.g.*, *Bounds v. Smith*, 430 U.S. 817, 822; *Pembroke v. Wood County, Tex.*, 981 F.2d 225, 229 (5th Cir. 1993).

**B.     A.B. 5:04B Denies Psychiatric Patients Their Constitutional Right of Access to the Courts.**

"The right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974). This right applies no less stringently to institutionalized persons, such as patients in state psychiatric hospitals. *See Ward v. Kort*, 762 F.2d 856, 858 (10th Cir. 1985) (holding that "a person under a mental commitment… is entitled to protection of his right of access to the courts"). And the court access provided must be adequate, effective and meaningful. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). As this court has already held, this "requires that the state provide persons in its care 'adequate law libraries or adequate assistance from persons trained in the law.'" *Disability Rights New Jersey, Inc. v. Velez*, Civ. No. 10-3950 DRD, 2011 WL 2976849 *14 (D.N.J. July 20, 2011) (quoting *Bounds*, 430 U.S. at 828).

Ignoring these basic Constitutional rights, New Jersey systematically fails to provide psychiatric patients in its care ***any*** access to the courts to challenge the conditions of their confinement, let alone meaningful access. Undisputed facts demonstrate that patients in New Jersey psychiatric hospitals do not have access to

courts, counsel, law libraries or indeed any legal information at all to aid them in challenging the administration of powerful psychotropic drugs. (SOUF ¶¶ 95-97.) This is especially troubling because when individuals are confined, as they are in Defendants' hospitals, their environment is controlled and restricted by the state. (*E.g.*, SOUF ¶ 97, Pl. Ex. 13, Piren Tr. 295:18-23 (patients need approval from the treatment team to obtain computer and Internet access).) As a result, they have no ability to seek out resources on their own.

Not only do Defendants fail to give psychiatric patients the right to seek judicial review before the forced administration of medication, they are actually *precluded* from doing so until after they have exhausted the administrative process outlined in A.B. 5:04B and appealed to the Medical Director. (SOUF ¶ 95; Pl. Ex. 56 at JV251 495-500.) Worse, if the Medical Director denies the patient's appeal, she can then be forcibly medicated immediately – there is no stay pending the patient's petition to a court. (SOUF ¶ 72.) By involuntarily medicating a patient before she has access to the courts, Defendants render already resource-less patients even less capable of challenging the conditions of their confinement meaningfully, as these drugs have physical and cognitive side effects that can impair the patients' abilities to pursue any review or challenges. *See, e.g.*, *Riggins v. Nevada*, 504 U.S. 127, 137 (1992) (it is "clearly possible" that side effects of psychotropic medication impacted "not just Riggins' outward appearance, but also the content of his

testimony on direct or cross examination, the ability to follow the proceedings, or the substance of his communication with counsel."); *see also Streicher v. Prescott*, 663 F. Supp. 335, 343 (D.D.C. 1987) ("[T]he debilitating effects of the drugs routinely administered at mental institutions, present tremendous obstacles which limit the patients' abilities to utilize [] review procedures and assert his or her rights."); *Harper*, 494 U.S. at 229-230; *Mills v. Rogers*, 457 U.S. 291, 293-294 n.1 (1982); *Bee v. Greaves*, 744 F. 2d 1387, 1394 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214 (1985)  ("Antipsychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and communicate."). Defendants therefore violate patients' rights by failing to provide them with access to courts, counsel, law libraries or other legal resources, either before medication is forcibly administered or afterwards. *See Disability Rights New Jersey, Inc. v. Velez*, Civ. No. 10-3950 DRD, 2011 WL 2976849 *14 (D.N.J. July 20, 2011) (quoting *Bounds*, 430 U.S. at 828).

## III.   A.B. 5:04B VIOLATES PATIENTS' PROCEDURAL DUE PROCESS RIGHTS.

In evaluating whether adequate safeguards exist to ensure procedural due process, courts invoke the balancing test of *Mathews v. Eldridge,* 424 U.S. 319 (1976). Due process does not require a fixed set of procedures in all circumstances. Rather, pursuant to *Mathews*, courts must balance: (1) the private interest that is affected, (2) the risk of erroneous deprivation under current procedures, and the

probable value, if any, of additional procedural safeguards, and (3) the government's interest in expediency and the burden of additional procedural safeguards. *Jerrytone v. Musto*, 167 F. App'x 295, 301 (3d Cir. 2006).

Here, there is no dispute that patients have a "significant" liberty interest in avoiding unwanted medication. *Washington v. Harper*, 494 U.S. 210, 221-222 (1990). In addition, the risk of patients being erroneously deprived of their rights under the current procedures embodied in A.B. 5:04B is considerable. The decision to disregard a legally competent person's decision to refuse mind-altering drugs plainly involves their ***legal*** right to refuse medication. But A.B. 5:04B does not require a judge to assess these legal rights; instead, an administrative panel evaluates patients under a vague and open-ended "likelihood" of harm standard (Pl. Ex. 56 at JV251494) that invites abuse and overreaching.

Finally, Defendants have no interest in preventing patients from having access to a judicial hearing and counsel. ***Thousands*** of civil commitment hearings are already held every year on site in the same New Jersey psychiatric hospitals that administer A.B. 5:04B. (SOUF ¶ 98.) In contrast, there were only 31 Medication Review Panel decisions in September 2012 in these same hospitals. Providing counsel and hearings for these few patients would require Defendants to allocate only minimal additional resources.

**A.   Patients Have A Liberty Interest In Being Free From Unwanted Medication.**

It is well-settled that the patients in Defendants' psychiatric hospitals have a constitutionally protected liberty interest in remaining free from unwanted medication. After considering the side effects and bodily intrusion involved with involuntary administration of psychotropic medication, the Supreme Court has made clear that "[t]he forcible injection of medication into a non-consenting person's body … represents a substantial interference with that person's liberty." *Riggins v. Nevada*, 504 U.S. 127,134 (1992) (quoting *Harper*, 494 U.S. at 229) (pre-trial detainee retains liberty interest in freedom from antipsychotic drugs administered for purpose of restoring competency to stand trial); *Winston v. Lee*, 470 U.S. 753, 759 (1985) ("compelled surgical intrusion into an individual's body... implicates expectations of privacy and security"); *see also Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990) (assuming liberty interest in terminating unwanted life-saving medical treatment); *Youngberg v. Romero*, 457 U.S. 307, 316 (1982) (the "right to freedom from bodily restraint" must "survive involuntary commitment.").

Patients retain this significant liberty interest upon entering Defendants' psychiatric hospitals. New Jersey law is clear that "[n]o patient may be presumed to be incompetent because he has been examined or treated for mental illness." N.J. Stat. Ann. § 30:4-24.2(c). Nor does the New Jersey involuntary commitment statute

require a finding of legal incompetence. *E.g.*, N.J. Stat. Ann. § 30:4-27.10 (involuntary commitment procedures generally); N.J. Stat. Ann. § 30:4-27.11c(c) ("A patient shall not be presumed to be incompetent solely because he has been examined or treated for mental illness."). And other state and federal courts evaluating this question have reached the same conclusion. *Winters v. Miller*, 446 F.2d 65, 68 (2d Cir. 1971) (finding a patient mentally ill does not create a presumption that he is incompetent to make decisions); *Edward W. v. Lamkins*, 122 Cal. Rptr. 2d 1, 14 (Ct. App. 2002) ("psychiatric patients may not be presumed incompetent solely on the basis of their hospitalization"); *Steele v. Hamilton County Cmty. Mental Health Bd.*, 736 N.E.2d 10, 20 (Ohio 2000) ("mental illness and incompetence are not one and the same"); *Rivers v. Katz*, 495 N.E.2d 337, 342 (N.Y. 1986) (There has been a "nearly unanimous modern trend in the courts … to recognize that there is no significant relationship between the need for hospitalization of mentally ill patients and their ability to make treatment decisions."); *State ex rel. Jones v. Gerhardstein*, 416 N.W.2d 883, 892, 895 (Wis. 1987) (striking down statute allowing forced medication of committed individuals as unconstitutional; finding "no corollary" between "dangerousness and mental incompetence to make decisions regarding drug therapy"). Defendants' own witnesses have testified that this is the case. (SOUF ¶ 47, Pl. Ex. 15, Appelbaum Tr. 137:23-138:4; *id.* Pl. Ex. 32, Eilers Tr. 96:15-16 ("[W]e presume every patient to be

legally competent…").) Thus, patients in Defendants' psychiatric hospitals plainly possess the same "significant" liberty interest in remaining free of unwanted medication that all other legally competent individuals do.[5]

## B. Medication Review Hearings Erroneously Deprive Patients Of Their Right To Be Free From Unwanted Medication.

The second factor considered under *Mathews* is "the risk of an erroneous deprivation of such interest through the procedures used" as well as "the value of additional or substitute procedural safeguards." *Montanez v. Beard*, 344 Fed. Appx. 833, 836n4 (3d Cir. 2009); *Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008) (same). The procedures employed by Defendants – both as written and in practice – are likely to erroneously deprive patients of the right to be free from unwanted medication.

Because competent patients have a significant liberty interest in remaining free from unwanted medication, a finding of legal incompetence should be a prerequisite for denial of that right, and the finding should be made by a judge after a hearing in which the patient was represented by counsel. But the standards for involuntary medication under A.B. 5:04B do not require that the Medication

---

[5]Because psychotropic drugs can severely and even permanently affect an individual's ability to think and communicate, *see Bee v. Greaves*, 744 F.2d 1387, 1393 (10th Cir. 1984); *Davis v. Hubbard*, 506 F. Supp. 915, 927-29 (N.D. Ohio 1980)), A.B. 5:04B also denies patients their rights under the First Amendment, which protects the communication of, and capacity to produce ideas. See *Rogers v. Okin*, 478 F.Supp. 1342, 1366-67 (D.Mass. 1979) (partially overruled on other grounds); *Stanley v. Georgia*, 394 U.S. 557, 565-566 (1969)).

Review Panel form any opinion whatsoever as to whether or not the patient is capable of providing informed consent for the medication – legal capacity is not even a factor in a decision to forcibly medicate. (SOUF ¶ 54.) Instead, Medication Review Panels apply a vague "likelihood" of harm standard. (*Id*. at 494.) This standard has no time limit, allowing doctors to cite purported instances of violence dating back weeks, months, or even years, as well as activity that predates a patient's admission, in support of involuntary medication. (SOUF ¶ 57.)

Equally troubling, Medication Review Panels are not required to determine the "likelihood" of harm by any standard of proof. As a result, treating psychiatrists have frequently reported only the most conclusory statements (*e.g.*, patients are "assaultive" or "intrusive"), without further specifics, in support of their request for involuntary medication. (SOUF ¶ 82.) And the Medication Review Panels agree with these conclusory allegations with great frequency. (SOUF ¶ 81, Ex. 79.)

The function of any standard of proof is to "instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Livingstone v. N. Belle Vernon Borough*, 91 F.3d 515, 534-35 (3d Cir. 1996) (quoting *Addington v. Texas*, 441 U.S. 418, 423 (1979)). The Supreme Court has required the "clear and convincing" standard where the individual interests at stake are both "'particularly important'" and "'***more substantial than mere loss of money***.'" *Id*.

35

This standard applies in the analogous context of civil commitment proceedings. For example, in *Addington*, 441 U.S. at 427, 433, the Court held that a state must show clear and convincing evidence that its interest in commitment outweighs the individual's interest in continued liberty. The Court reasoned that in these proceedings, which threaten individuals with a substantial loss of liberty, the risk of an erroneous determination should fall on society. *Id*. at 427. That logic applies with full force here. The "significant" interest in avoiding unwanted, personality changing drugs that affect the very function of a person's mind is much greater than the "mere loss of money" and is no less than the interest in avoiding physical detention.

A.B. 5:04B also fails to specify rules of evidence (SOUF ¶ 57), or to require that Medication Review Hearings be recorded or transcribed (SOUF ¶ 73), making it nearly impossible for a patient, or Medical Director on appeal, to credibly review the evidence considered by the Medication Review Panel. And with the cards already stacked against them, patients are further deprived of adequate representation in these hearings, and as result are not able to voice their objections and lay out the reasons that they have refused medication or provide information refuting the testimony of the prescribing psychiatrist. (*See* SOUF ¶ 94.)

The likelihood of erroneous deprivation is even greater for patients on CEPP status because they have been adjudicated to ***no longer be a danger to themselves***

*or others*, and thus do not meet the commitment standards in New Jersey. (N.J Rule of Court 4:74-7(h)(1)-(2)). The U.S. Supreme Court has found similar procedures to violate due process in *Foucha v. Louisiana*, 504 U.S. 71, 75-75, 81-82 (1992) (continued confinement of insanity acquittee on the basis of his "antisocial personality," after hospital review committee had reported no evidence of mental illness and recommended conditional discharge, violated due process). Here, Defendants' practices similarly violate due process because by subjecting CEPP patients to A.B. 5:04B, Defendants are effectively overturning the decision of a court, without a hearing and without counsel. Medication Review Panels likewise overturn decisions of legally appointed guardians and the patient's elections in advance directives (SOUF ¶ 49), but do so without the necessary legal authority.

Finally, and in direct contrast to the representations by Defendants and the language of the draft policy presented to this Court in support of the Motion to Vacate the *Rennie* Consent Order, A.B. 5:04B does not require any independent decision makers to participate in Medication Review Hearings. (*See generally* Pl. Ex. 56, JV251491-517.) In support of their motion Defendants claimed that the Medication Review Panels would be chaired by an "independent psychiatrist," who "will not be an employee of the hospital or the Department of Human Services." (D.E. 81-1, at 7-8.) Instead, Defendants implemented a different version that allows Medication Review Panels to be made up entirely of employees at the hospital

37

seeking to involuntarily medicate the patients. (Pl. Ex. 56, JV251491-517.) This ignores the principle that due process "demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Allan v. Ashcroft*, 122 F. App'x 543, 551 (3d Cir. 2004) (internal quotation omitted); *see also Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (same); *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 138 (3d Cir. 1986) (denial of an impartial hearing is a denial of due process "regardless of the magnitude of the individual and state interest at stake, the risk of error and the likely value of additional safeguards."). Because A.B. 5:04B does not require that independent decision-makers participate in Medication Review Hearings (Pl. Ex. 56 at JV251496), there is a strong likelihood of bias by the Panel. As Defendants' witnesses have already admitted, employees are inherently not independent of their employer. (SOUF ¶ 27, Pl. Ex. 27 Luchkiw Tr. 63:17-22 (stating that he is not independent from the hospital where he works because "that's who signs [his] check."); SOUF ¶ 27, Pl. Ex. 26, Haynes Tr. 85:15-16.) Moreover, Panel members may be pressured into authorizing medication prescribed by their colleagues or may agree to authorize medication prescribed by colleagues in return for like treatment. Thus, even if A.B. 5:04B's procedural safeguards were sufficient to protect patients from any risk of error, and they clearly are not, the policy fails to

satisfy due process because the Medical Review Panels are not impartial. *See Allan v. Ashcroft*, 122 F. App'x 543, 551 (3d Cir. 2004).

### C.   Defendants Have No Legitimate Interest In Denying Patients Judicial Hearings And Counsel.

For the third prong of the *Mathews* test, courts weigh "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)). In cases implicating a patient's right to be free from unwanted medication, this must be an "essential" or "overriding" state interest. *Riggins*, 504 U.S. 127, 135, 138 (1992).

Here Defendants have no credible interest in depriving patients of judicial hearings. ***Thousands*** of judicial hearings take place weekly or biweekly in Defendants' psychiatric hospitals each year. (SOUF ¶¶ 98-99.) Judges, counsel, and court reporters are present. (SOUF ¶¶ 100-102.) And doctors and witnesses present evidence related to a potential patient's dangerousness to herself or others. These resources and individuals are perfectly adapted to evaluate a patients competence, and if relevant, potential for harm.

In addition, Defendants have failed to demonstrate any need for a ***second*** involuntary medication policy based on a "likelihood" of harm. A.B. 5:04A's emergency procedure permits forcible medication in situations where patients

presents an "imminent" risk of harm and thus offers ample protection to other patients, staff, and property. (SOUF ¶ 43.) A.B. 5:04B adds nothing to the hospitals' abilities to reduce risk of harm and instead grants vast power to Defendants to revoke patients' rights in a manner that is not meaningfully checked by reliable standards or the review of any court. Without it, Defendants would remain well-equipped to deal with any exigent circumstances.

## CONCLUSION

As set forth above, Defendants' policy fails to provide legally mandated safeguards to mentally ill patients, a group who is "vulnerable to abuse." This failing is made worse by the fact that it only applies to this vulnerable group. Provision of a judicial hearing and counsel, which would cost defendants very little given that the infrastructure is already in place, would rectify this wrong. (*See* SOUF ¶ 94.) For all the foregoing reasons, the Court should find in favor of Plaintiff on all counts.

Dated: November 28, 2012

Newark, New Jersey

Respectfully submitted,

s/ William Emmett Dwyer

William Emmett Dwyer
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, NJ 08608
Tel: (609) 292-9742
Fax: (609) 777-0187

Mitra Hormozi *(admitted pro hac vice)*
Melody Wells *(admitted pro hac vice)*
Alexandra P. Kolod *(admitted pro hac vice)*
T. Jakob Sebrow *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights
New Jersey, Inc.*