WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey
210 South Broad Street, 3rd Floor
Trenton, NJ 08608
Tel: (609) 292-9742

MITRA HORMOZI, ESQ. *(admitted pro hac vice)*
MELODY WELLS, ESQ. *(admitted pro hac vice)*
ALEXANDRA P. KOLOD, ESQ. *(admitted pro hac vice)*
T. JAKOB SEBROW, ESQ. *(admitted pro hac vice)*
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460

*Attorneys for Plaintiff Disability Rights New Jersey*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DISABILITY RIGHTS NEW JERSEY**, a New Jersey non-profit corporation,<br><br>Plaintiff,<br><br>- against -<br><br>**JENNIFER VELEZ**, in her official capacity as Commissioner, State of New Jersey Department of Human Services, and<br><br>**STATE OF NEW JERSEY**<br><br>Defendants. | Civil Action No.: 3:10-cv-3950-DRD-PS<br><br>ECF Case<br><br>**ORAL ARGUMENT REQUESTED** |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DISABILITY RIGHTS NEW JERSEY'S MOTION FOR SUMMARY JUDGMENT

**The Parties**

<u>Disability Rights New Jersey</u>

1.      Plaintiff Disability Rights New Jersey, Inc. ("DRNJ" or "Plaintiff"), a non-profit corporation, is the federally funded agency incorporated in 1994 and later designated to serve as New Jersey's protection and advocacy system for people with disabilities. (*See* Pl. Ex. 1, About DRNJ, DRNJ, http://www.drnj.org/aboutdrnj.htm (last visited Nov. 13, 2012).)

2.      DRNJ serves as the agency to implement, on behalf of the State of New Jersey, the Protection and Advocacy System for Individuals with Mental Illness. *See* 42 U.S.C. §§ 10801-10807 (1991). (*See also* Pl. Ex. 1.)

3.      DRNJ has statutory authority to pursue legal, administrative and other appropriate remedies to ensure the protection of individuals with mental illness who are or will be receiving care and treatment in New Jersey pursuant to the Protection and Advocacy for Individuals with Mental Illness Act. *See* 42 U.S.C. § 10801 *et seq.* (*See also* Pl. Ex. 1.)

<u>Defendants</u>

4.      Defendant Jennifer Velez is Commissioner of the Department of Human Services of New Jersey ("DHS"). (Pl. Ex. 2, *About the Commissioner*, DHS, www.state.nj.us/humanservices/staff/about/ (last visited Nov. 26, 2012).)

5.      Defendant Velez's DHS operates four inpatient psychiatric hospitals in New Jersey, the so-called "State" or "DHS" hospitals: (a) Ancora Psychiatric Hospital ("Ancora") in Winslow Township, which serves a general adult population, elderly and forensic patients, and people who have been dually diagnosed to have both a developmental disability and a mental illness; (b) Greystone Park Psychiatric Hospital ("Greystone") in Morris Plains, which serves adults; (c) Trenton Psychiatric Hospital ("Trenton

Psychiatric") in Trenton, which serves adults; and (d) Ann Klein Forensic Center ("Ann Klein") in Trenton, which serves people who have been adjudicated to be not guilty by reason of insanity or incompetent to stand trial, or who require special security measures due to the nature of their illness.[1] (*See* Pl. Ex. 3, *State Hospitals*, DHS, Division of Mental Health Services, www.state.nj.us/humanservices/ dmhs/services/statehosp/ (last visited November 25, 2012).)

6.    In addition to treatment for their psychiatric illnesses, patients in DHS psychiatric hospitals also receive care to prevent and treat medical illnesses. (Pl. Ex. 4, Ancora Patient/Family Handbook, JV000057-86, at 64; Pl. Ex. 5, Greystone Family Orientation Booklet, JV000114-44, at 40; Pl. Ex. 6, Ann Klein Patient and Family Guide, JV016625-68, at 30, 40; Pl. Ex. 7, Trenton Psychiatric Patient and Family Orientation Guide, JV000263-90, at 71, 73.)

7.    Defendant State of New Jersey accepts federal funds to support, *inter alia*, the DHS' Division of Mental Health Services (Pl. Ex. 8, February 22, 2011 Governor's FY 2012 Budget, N.J, Dep't of the Treasury, Office of Mgmt. & Budget, pp. D-168-170, http://www.state.nj.us/treasury/omb/publications/12budget/pdf/ Budget_All.pdf (last visited November 28, 2012).)

8.    Defendant State of New Jersey provides medical services to prison inmates in the custody of its Department of Corrections. N.J. Admin. Code § 10A:16-2.1 ("Medical services shall be provided for the following: 1. Emergency and life threatening/limb threatening conditions; 2. Accidental or traumatic injuries occurring while incarcerated; 3. Acute

---

[1] The Department of Human Services operated a fifth psychiatric hospital, Senator Garrett W. Hagedorn Psychiatric Hospital ("Hagedorn"), which closed on June 30, 2012. (*See* Pl. Ex. 9, Hagedorn Psychiatric Hospital Closure Updates, http://www.state.nj.us/humanservices/dmhs/home/hph_closure_pg.html (last visited November 28, 2012).)

illness; 4. Chronic conditions that are considered life threatening or if untreated would likely lead to a significant loss of function; and 5. Any other medical condition that the treating physician believes will cause deterioration of the inmate's health or uncontrolled suffering.").

9.    Defendant State of New Jersey provides medical services to developmentally-disabled individuals residing in the DHS' seven "developmental centers." (*See* Pl. Ex. 10, *N.J.'s Residential Developmental Centers for Individuals with Developmental Disabilities*, DHS, www.state.nj.us/humanservices/ ddd/home/centers (last visited Nov. 26, 2012).) Defendant expressly affords these developmentally-disabled residents the right to refuse psychotropic and non-psychotropic medications. (Pl. Ex. 95, April 21, 2004 DHS, Division of Developmental Disabilities Circular #21, at VI(B)(1) (except in emergencies, informed written consent must be obtained prior to the use of psychotropic medication); Pl. Ex. 77, December 12, 2003 DHS, Division of Developmental Disabilities, Circular #41, at IV(E) (a competent individual has the right to refuse medical, psychiatric and behavioral treatment).)

**Side Effects of Psychotropic Medication**

10.    "Psychotropic drugs" are medications that have "a direct effect on the central nervous system and which can modify emotion, cognition, and behavior." (Pl. Ex. 11, Prescribing Psychotropic Medication at Trenton Psychiatric, JV250945-58 at 45.) Examples of psychotropic drugs include antipsychotics, antidepressants, mood stabilizers, anxiolytics, sedative-hypnotics, and stimulants. (*Id.*)

11.    Since January 1, 2006, the following brand name psychotropic drugs, along with their generic counterparts, have been administered involuntarily to patients in DHS hospitals: Clozaril, Haldol, Navane, Prolixin, Risperdal, Seroquel, Thorazine, Zyprexa, Geodon,

4

Abilify, Atarax, Vistaril, Ativan, Elavil, Endep, Cymbalta, Celexa, Lexapro, Eskalith, Lithane, Cogentin, Depakene, Klonopin, Neurontin, and Trileptal. (Pl. Ex. 12, November 14, 2011 Defendants' Response to Plaintiff's Second Set of Interrogatories.)

12.   There are numerous known side effects associated with the use of psychotropic drugs. (*See, e.g.*, Pl. Ex. 11 at JV250945, Pl. Ex. 13, Piren Tr. 316:23-318:21; Pl. Ex. 14, N.J. Division on Mental Health Services Pharmacological Practice Guidelines for the Treatment of Schizophrenia, JV015914-016011 at 946-52; Pl. Ex. 15, Appelbaum Tr. 141:2-142:5; Pl. Ex. 16, October 8, 2012 Rebuttal Expert Report of Matthew P. Dumont, M.D. at 7-9.) These side effects include muscle cramps, uncontrollable tremors, shakiness, restlessness, disturbances in walking, constipation, dizziness, and dryness of mouth. (Pl. Ex. 17, Greystone *Rennie* Procedures Training Packet, JV000148-216 at 183.) Patients prescribed such medication often speak of feeling "stiff," "sleepy," "foggy," being "unable to think clearly," or "losing interest in things." (Pl. Ex. 16 at 7.)

13.   Another potential side effect is a condition called tardive dyskinesia, which can occur after long-term use and results in "involuntary movement of the mouth, jaw, tongue, face or limbs." (Pl. Ex. 17 at JV000183; *see also* Pl. Ex. 14 at JV015946; Pl. Ex. 13, Piren Tr. 316:23-317:19; Pl. Ex. 18, Parsio Tr. 164:09-166:01; Pl. Ex. 19, AIMS+EPS Examination Procedure, JV016012-13 at 13 (tardive dyskinesia symptom checklist); Pl. Ex. 20, Dumont Tr. 99:7-13 (tardive dyskinesia is a "late manifestation of long-standing, regular use [of] high doses of antipsychotic medications.").) Defendant DHS has acknowledged that tardive dyskinesia is a "serious" side effect of psychotropic medication that may become permanent if not diagnosed and treated. (Pl. Ex. 21, January 5, 1995, *Rennie versus Klein* Update, JV000297-305 at 304; *see also* Pl. Ex. 13, Piren Tr.

317:16-19.) Moreover, the use of multiple psychotropic drugs at once increases the risk of adverse drug effects. (Pl. Ex. 22, Hagedorn Memo re Prescribing Psychotropic Medication, JV015846-54 at 46; Pl. Ex. 23, July 23, 2010 N.J. Division of Mental Health and Addiction Services Polypharmacy Report, JV016144-54 at 44.)

14.   According to DHS's psychopharmacology guidelines, a survey of patients in long-term treatment with various antipsychotic drugs found "high prevalence rates for parkinsonism, akathisia, and tardive dyskinesia, or T.D.," and "a comparison of such prevalence rates with those of past decades suggests that these problems persist, despite the advent of newer [drugs]…." (Pl. Ex. 14 at JV015993.) For example, 10-20% of patients taking Prolixin experience side effects, such as akathisia, akinesia, dyskinesia, worm-like movements, dystonia, or tardive dyskinesia. (Pl. Ex. 24, Presentation re *Rennie versus Klein*, JV000291-96 at 92.)

15.   The parkinsonian symptoms of mask-like expression, muscle stiffness, "pill rolling," resting tremor of the hands, and forwardly propulsive gait are associated with an increased risk of falling, which is particularly a problem among the elderly. (Pl. Ex. 16 at 9.) These symptoms may also result in difficulty swallowing and the attendant risk of choking. (Pl. Ex. 16 at 9.)

16.   Psychotropic medications, particularly the newer group of "atypical" antipsychotics, can also cause metabolic syndrome, which may in turn lead to weight gain, diabetes, hypertension, and elevated blood fat levels. (Pl. Ex. 13, Piren Tr. 317:20-318:17; Pl. Ex. 16 at 8.)

17.   Newer atypical antipsychotic medications are significantly more dangerous that the earlier ones due to the metabolic syndrome described above. (Pl. Ex. 16 at 9.)

18.   Since 2006, one of DHS's psychiatric hospitals has reported that patients have presented with "neuroleptic-induced Parkinson's," fatigue, hypotension, rigidity, gait instability, loss of consciousness, altered mental status, "incessant pacing," tremors, akathesia, "sweating and palpitations," and many other side effects. (Pl. Ex. 25, Ann Klein 2001 Suspected Adverse Drug Reactions Summary, JV016155-66.) In addition, various employees of DHS have observed side effects related to psychotropic medication use. Anthony Haynes, a Client Services Representative at Ancora, has observed tremors, involuntary movement, and confusion. (Pl. Ex. 26, Haynes Tr. 10:14-22, 46:24-47:6.) John Luchkiw, a Client Services Representative at Greystone, has observed or heard complaints concerning patients exhibiting rigidity or difficulty moving, muscle spasms, tremors, anxiety, drowsiness, dizziness, rashes, weight gain, involuntary movements in the face and mouth, and sexual dysfunction. (Pl. Ex. 27, Luchkiw Tr. 99:5-100:19, 101:18-102:12, 103:6-11, 104:14-16, 105:16-18, 106:1-16, 107:14-108:10.)

19.   In addition to these "troublesome" side effects, some patients may experience allergic or toxic reactions to psychotropic drugs. (Pl. Ex. 28, Trenton Psychiatric Guidelines for Prescription and Use of Psychotropic Medication, JV015777-79 at 79.)

### *Rennie v. Klein* and AB 5:04

20.   Pursuant to an August 20, 1984 consent order entered in the United States District Court for the District of New Jersey in *Rennie v. Klein*, Civil Action No. 77-2624, Defendants were enjoined to comply with an administrative policy governing the forced administration of psychotropic medication to non-consenting patients, known as Administrative Bulletin 5:04 ( "A.B. 5:04"). (Ex. A to Defendants' Motion to Vacate the *Rennie* Consent Order Pursuant to Fed. R. Civ. P. 60(b) (August 20, 1984 *Rennie* Consent Order) (D.E. 81-3); *see also* Pl. Ex. 29, A.B. 5:04, JV015798-811.)

21.     Under A.B. 5:04, DHS psychiatric hospitals were required to follow a "Three-Step"
        administrative process before they could forcibly administer psychotropic medication to
        involuntarily-committed non-consenting patients. (Pl. Ex. 29 at JV015806-07.) Step One
        required the treating physician to meet with the patient to attempt to respond to the
        patient's concerns about the medication. (*Id.* at JV015806.) If the patient still refused, the
        physician was to meet with the patient's treatment team and invite the patient to attend.
        (*Id.*) In Step Two, the treatment team was then supposed to meet to discuss the doctor's
        recommendation and the patient's response. (*Id.*) If the patient was present, they were to
        formulate a plan that was acceptable to the patient and the team. (*Id.* at JV015806-07.)
        Finally, if the patient continued to refuse medication, under Step Three, the hospital's
        Medical Director was to personally examine the patient and review the patient's chart.
        (*Id.* at JV015807.) If the Medical Director agreed that medication was a necessary part of
        the patient's treatment plan, then the patient could be forcibly medicated. (*Id.*)

22.     Under A.B. 5:04, patients could be forcibly medicated with psychotropic drugs without
        the benefit of judicial hearings. (Pl. Ex. 29; Pl. Ex. 30, Evans-Mallory Tr. 209:6-10; Pl.
        Ex. 26, Haynes Tr. 257:15-19; *see also* Pl. Ex. 31, Lukens Tr. 66:11-17.) Similarly, A.B.
        5:04 did not provide a right to counsel for non-consenting patients subject to the forced
        administration of medication. (Pl. Ex. 29.) This policy also failed to provide patients with
        access to legal resources such as a law library. (Pl. Ex. 29; *see also* Pl. Ex. 32, Eilers Tr.
        235:7-15 (stating that he doesn't believe psychiatric patients have access to legal
        information and that he was sure the hospitals don't have legal books).)

23.     Under A.B. 5:04, certain Client Service Representatives ("CSRs") had the responsibility
        to ensure the hospitals' compliance with the Three-Step Process contained in A.B. 5:04.

8

(Pl. Ex. 29 at JV015801.) These CSRs were commonly referred to as "*Rennie* Advocates." (*Id.*; Pl. Ex. 27, Luchkiw Tr. 32:2-17, 123:11-17; Pl. Ex. 30, Evans-Mallory Tr. 13:24-14:7, 15:18-23.)

24.    *Rennie* Advocates' responsibilities did not include advocating for the expressed wishes of the patients, but, rather, to see to it that "the legal process is followed." (Pl. Ex. 13, Piren Tr. 218:6-17.) One of the *Rennie* Advocates, Kim Evans-Mallory, testified that, when she is made aware of a patient's refusal of psychotropic medication, she does not advocate for the patient's wishes or try to convince the patient's treatment team or psychiatrist to take one action or another. (Pl. Ex. 30, Evans-Mallory Tr. 60:5-25; *see also id.* 61:7-17.)

25.    As a matter of practice, *Rennie* Advocates did not question or challenge decisions made by prescribing physicians, explain risks of medications to patients, or identify potential side effects that patients were experiencing. (Pl. Ex. 26, Haynes Tr. 108:17-19, 109:3-7 (Mr. Haynes did not assess the appropriateness of the treatment of patients at Ancora or whether the medication prescribed is necessary.); Pl. Ex. 30, Evans-Mallory Tr. 32:5-11 (Ms. Evans-Mallory's responsibilities do not include explaining to patients the risks involved in taking psychotropic medication).) Indeed, *Rennie* Advocates did not receive any information or training about how to observe whether a patient is experiencing side effects from psychotropic medication. (Pl. Ex. 13, Piren Tr. 318:21-24.)

26.    In addition, Dr. Eilers admitted that CSRs were limited in their ability to challenge a decision to forcibly administer psychotropic medication to non-consenting patients. He testified that *Rennie* Advocates might refrain from making strong objections with respect to involuntary medication decisions because they are not clinicians. (Pl. Ex. 32, Eilers Tr. 70:25-71:14.)

27.   Mr. Haynes testified that *Rennie* Advocates lacked independence from Defendants. (Pl. Ex. 26, Haynes Tr. 85:15-16; *see also* Pl. Ex. 27, Luchkiw Tr. 63:14-22 (While Mr. Luchkiw advocates for patients, he is not independent of the hospital where he works because "that's who signs [his] check.").) Indeed, the salaries of the *Rennie* Advocates were paid by the Defendant State of New Jersey. (Pl. Ex. 30, Evans-Mallory Tr. 24:4-5.)

28.   Mr. Haynes testified that patients at Ancora desire an independent advocate. (Pl. Ex. 26, Haynes Tr. 85:7-14.)

29.   Dr. Eilers testified that "there is an imbalance of powers in some ways [between] the patient and a treatment team, a physician, a person of authority." (Pl. Ex. 32, Eilers Tr. at 60:16-19.) Mr. Haynes' testimony was consistent with this view. He noted that, in response to his input regarding patients' views concerning medication, hospital psychiatrists would sometimes point out that "they're the clinician and they know what's best." (Pl. Ex. 26, Haynes Tr. 136:12-22.) He also testified that clinicians at Ancora "don't wish to be overruled." (Pl. Ex. 26, Haynes Tr. 137:10-16.)

**Defendants Failed To Properly Administer A.B. 5:04**

30.   Defendants' witnesses testified to various failures to comply with the original A.B. 5:04. For example, Mr. Haynes acknowledged that there have been "deviations from policies and procedures" with regard to the application of Defendants' prior forced medication policy. (Pl. Ex. 26, Haynes Tr. 42:12-43:14; *see also* Pl. Ex. 30, Evans-Mallory Tr. 153:8-16 (testifying that she has heard complaints that some sections of the forms required under A.B. 5:04, especially the sections corresponding with Step Two of the Three-Step Process, were not completed); Pl. Ex. 27, Luchkiw Tr. 206:10-18 (stating that he has seen charts that lacked a current justification on monthly progress notes).)

31.    There were occasions when whole steps of the Three-Step Process were skipped or not adequately documented. (Pl. Ex. 30, Evans-Mallory Tr. 142:19-23 (stating that Step Two treatment meetings were sometimes skipped); *see also id.* 55:13-56:2 (noting "problem" that the second part of Three-Step Forms, documenting the treatment team meeting, sometimes only had one signature thought it should have had at least three or more); Pl. Ex. 32, Eilers Tr. 26: 4-16 (noting that documentation of Steps One and Two was not thorough enough); Pl. Ex. 26, Haynes Tr. 36:24-37:2 (stating that he has seen forms that were missing required signatures).) Indeed, Three-Step Forms produced by Defendants in this litigation confirm this testimony. (*See*, *e.g.*, Pl. Ex. 33, JV015229, Pl. Ex. 34, JV015252, Pl. Ex. 35, JV015253 (Three-Step Forms with section for Step Two left completely blank); Pl. Ex. 36, JV015235 (Three-Step Form with section for Step Three left completely blank); Pl. Ex. 37, JV015256, Pl. Ex. 38, JV015260, Pl. Ex. 39, JV015273 (Three-Step Forms with only one signature in the section for Step Two); Pl. Ex. 40, JV015264 (Three-Step Form that does not provide any reason for treatment team's conclusion in Step Two).)

32.    Ms. Piren testified that the Three-Step Forms, required to be completed under A.B. 5:04, sometimes did not include information regarding the dosages of medications prescribed to non-consenting patients, and that this was concerning because medication dosage is important in determining the safety of the prescribed medication. (Pl. Ex. 13, Piren Tr. 148:21-149:24, 219:19-21; *and see, e.g.*, Pl. Ex. 41, JV000483 (Three-Step Form without dosages); Pl. Ex. 42, JV000524 (same); Pl. Ex. 43, JV000610 (same); Pl. Ex. 44, JV000655 (same).)

33.     In addition, on some occasions, patients subject to forced medication were not invited to the treatment team meeting required by Step Two of A.B. 5:04. (Pl. Ex. 30, Evans-Mallory Tr. 110:6-21; Pl. Ex. 13, Piren Tr. 209:14-17.) At other times, the Steps One and Two were rushed and incomplete. (*See, e.g.*, Pl. Ex. 32, Eilers Tr. 253:17-255:11 (recounting times when the Step Two was "shortchanged" and done "quickly without the full [treatment] team"); Pl. Ex. 13, Piren Tr. 200:5-15 ("Sometimes the process gets rushed through and the physician goes right to step two without having done the proper notification and the medical director signs off even").) And in other instances, while the original A.B. 5:04 required the *Rennie* Advocates be notified prior to the commencement of the treatment team meeting under Step Two, they were not always notified. (Pl. Ex. 13, Piren Tr. 199:21-200:13.)

34.     In addition, while the policy required each DHS hospital's Medical Director to review involuntary patients' forced medication statuses once per week (Pl. Ex. 29 at JV015 811), Mr. Haynes stated that, to his knowledge, such reviews did not occur. (Pl. Ex. 26, Haynes Tr. 223:7-13.)

35.     The original A.B. 5:04 required the completion of a Medication Review Form documenting the medication status of each patient subject to medication via the Three-Step Process. (Pl. Ex. 29 at JV015807.) However, numerous Medication Review Forms produced by Defendants reveal incomplete documentation. (*See, e.g.*, Pl. Ex. 45, JV000469 (Medication Review Form missing signature of reviewing psychiatrist); Pl. Ex. 46, JV000471 (same); Pl. Ex. 47, JV000482 (same); Pl. Ex. 48, JV000522 (same); Pl. Ex. 49, JV000528 (same); Pl. Ex. 50, JV000555 (same); Pl. Ex. 51, JV000560 (same); Pl. Ex. 52, JV000561 (same); Pl. Ex. 53, JV000563 (same); *see also* Pl. Ex. 26, Haynes Tr.

222:3-11 (stating that he had noticed that some review forms were missing psychiatrists' signatures).)

36.   Ms. Piren testified that the failure of psychiatrists to file monthly "progress notes" for non-consenting patients subject to forced medication, as required under A.B. 5:04, is an issue that has "come up generally many times throughout the years." (Pl. Ex. 13, Piren Tr. 306:20-307:12.)

37.   Dr. Robert Eilers testified that sometimes Defendant DHS' staff did not fully document forced medication procedures as required under A.B. 5:04 because of time limitations or other constraints. (Pl. Ex. 32, Eilers Tr. 80:11-14.)

38.   Moreover, multiple *Rennie* Advocates testified that the Three-Step Process was a "rubber stamp" on the prescribing doctor's requests. For example, Anthony Haynes testified that State psychiatric hospitals have engaged in rubber stamping of medication decisions during Steps Two and Three. (Pl. Ex. 26, Haynes Tr. 112:25-113:21, 213:4-11.) Mr. Haynes also testified that in his 14-year experience as a *Rennie* Advocate at Ancora there has never been an instance in which a patient's treatment team, when engaging in Step Two of the Three-Step Process, has disagreed with the medication order of the patient's treating psychiatrist under Step One. (Pl. Ex. 26, Haynes Tr. 213:4-11, 215:5-17.) In addition, Mr. Luchkiw testified that a previous Medical Director at Greystone engaged in frequent rubber stamping of the treatment team medication decisions under Step Two of A.B. 5:04. (Pl. Ex. 27, Luchkiw Tr. 270:17-272:19.)

39.   While A.B. 5:04 provided an option for an independent psychiatrist to review decisions to forcibly medicate patients (Pl. Ex. 29 at JV015810), in practice Defendants engaged in only nine such independent reviews of forced medication decisions since 2006. (Pl. Ex.

54, October 3, 2011 Defendants' Responses to Plaintiff's First Set of Interrogatories at 7.)
In her experience as a *Rennie* Advocate, Ms. Evans-Mallory has never been granted a
request for an independent review pursuant to A.B. 5:04 and is not aware of any
independent reviews ever taking place at Trenton Psychiatric during her employment
there. (Pl. Ex. 30, Evans-Mallory Tr. 189:16-18, 194:8-11.) Moreover, in 14 years as a
*Rennie* Advocate at Ancora, Mr. Haynes has requested only one independent review of a
patient. (Pl. Ex. 26, Haynes Tr. 174:10-15), and is only aware of one independent review
actually taking place at Ancora during his employment there. (Pl. Ex. 26, Haynes Tr.
225:9-14.)

40.   Defendants' employees have also testified that patients were threatened with forced
injection if they did not agree to take medication orally. (Pl. Ex. 26, Haynes Tr.
98:17-99:6, 99:14-21; Pl. Ex. 27, Luchkiw Tr. 133:14-19.) At least one document
produced by Plaintiff confirms this testimony. (Pl. Ex. 55, DRNJ-M00175-78 at 77-78
(psychotropic medication consent form in which patient wrote next to her signature that
she consented "only under the condition of threat of forced injection").)

### Defendants' Creation of the New Forcible Medication Policies

41.   On February 15, 2012, Defendants filed a Motion to Vacate the *Rennie* Consent Order in
the United States District Court for the District of New Jersey. Defendants sought
approval to implement a new policy providing for the forced administration of
psychotropic medication to non-consenting patients. (February 15, 2012 Notice of
Motion to Vacate the *Rennie* Consent Order Pursuant to Fed. R. Civ. P. 60(b), and
attached exhibits (D.E. 81).) This motion was granted on March 19, 2012. (March 19,
2012 Order (D.E. 91).)

42.     Defendants have since implemented separate stand-alone policies governing Non-Emergent Involuntary Medication ("A.B. 5:04B") and Emergency Medication ("A.B. 5:04A"). (Pl. Ex. 56, A.B. 5:04B, JV251491-517; Pl. Ex. 57, A.B. 5:04A, JV251478-90; *see also* Pl. Ex. 58, June 1, 2012, Memo from Assistant Commissioner of Division of Mental Health and Addiction Services to Chief Executive Officers re A.B. 5:05A and A.B. 5:04B, JV251476-77; Pl. Ex. 59, Ciaston Tr. 137:18-138:3, 139:22-140:2).)

43.     The Emergency Medication Policy, A.B. 5:04A, applies to voluntarily committed patients and patients on Condition Extension Pending Placement ("CEPP") status (see ¶ 51, *infra*), as well as to patients who have been involuntarily committed to DHS psychiatric hospitals. (Pl. Ex. 57 at JV251478.) This policy provides that medication may be administered to any patient when, "in the professional opinion of the prescriber, a situation exists in which a consumer presents a risk of imminent or reasonably impending harm or danger to self or others." (*Id.* at JV251480.) Under this policy, "imminent or reasonably impending harm" means there is a substantial likelihood that serious harm will occur if no intervention is undertaken. (*Id.*) The harm need not be "certain or immediate," but there must be an identifiable danger that is reasonably likely to happen in such a short time that "no other less restrictive alternative method available for either protecting the consumer or others or gaining the consumer's consent to the administration of medication or obtaining substituted consent is feasible." (*Id.* at JV251480-81.) Orders for emergency medication are valid for 72 hours, but may be extended for another 24 hours under certain circumstances. (*Id.* at JV251482-83.)

44.     A separate policy, A.B. 5:04B, governs the "Non-Emergent Administration of Psychotropic Medication to Non-Consenting Involuntary Patients (Non-Emergent Involuntary Medication Procedure)." (Pl. Ex. 56 at JV251491 491.) This policy became effective on June 4, 2012 in DHS hospitals. (*Id.*; Pl. Ex. 58 at JV251477.)

45.     These policies are in contrast to the administration of *non-psychotropic medication* in DHS hospitals. In instances where a doctor wishes to prescribe medication other than psychotropic drugs, patients may only be medicated without their consent in instances of "grave emergency" or where the relevant patient is legally incompetent. (Pl. Ex. 32, Eilers Tr. 276:19-277:19.) Outside of those situations, the hospital must follow legal procedures in order to administer non-psychotropic medication to a non-consenting patient. (Pl. Ex. 32, Eilers Tr. 284:9-285:5.)

**A.B. 5:04B Applies To Legally Competent, Non-Consenting Involuntary Patients**

46.     A.B. 5:04B applies to all non-consenting, involuntarily-committed patients, including those who have the legal capacity to make decisions and those who do not. (Pl. Ex. 56 at JV251491; Pl. Ex. 59, Ciaston Tr. 153:2-8.) A.B. 5:04B does not require any adjudication that a patient is legally incompetent before forcible medication can be administered. (Pl. Ex. 32, Eilers Tr. 285:8-12; *see also id.* 96:15-16 ("[W]e presume every patient to be legally competent…").)

47.     Defendants' own expert agreed that just because a patient refuses to consent to a particular treatment does not mean that the patient lacks competence to make medical decisions. (Pl. Ex. 15, Appelbaum Tr. 137:23-138:4.)

48.     By its plain language, A.B. 5:04B does not apply to voluntarily-committed patients residing in DHS psychiatric hospitals. (Pl. Ex. 56 at JV251491.) The only distinction between these classes of patients is that a voluntary patient "is willing to be admitted to a

16

facility voluntarily for care," whereas an involuntary patient is not; in order to fit either category, the patient must be an "adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property." *Compare* N.J. Stat. Ann. § 30:4-27.2(m) *with* § 30:4-27.2(ee).

49.     Where a patient has a designated mental health representative, guardian, or health care advance directive in place, A.B. 5:04B allows Defendants to override the representative or guardian's decisions regarding whether the patient should be given psychotropic medication. (Pl. Ex. 56 at JV251495-99; *see also* Pl. Ex. 32, Eilers Tr. at 177:24-178:6, 180:2-5; Pl. Ex. 27, Luchkiw Tr. 208:8-209:6.)

50.     Dr. Appelbaum, Defendants' expert witness, testified that there should be a different process for hospitals to override a legally-appointed guardian's decision that the patient should not be medicated. (Pl. Ex. 15, Appelbaum Tr. 106:9-25.)

51.     A.B. 5:04B also applies to non-consenting patients who have been placed on Conditional Extension Pending Placement ("CEPP") status. (Pl. Ex. 56 at JV251494 (definition of involuntary patients).) *See also* N.J. R. 4:74-7(h)(2). CEPP patients are individuals who had been initially involuntarily committed to DHS hospitals, but have since been determined by the New Jersey Superior Court to no longer constitute a danger to themselves or others and therefore are entitled to discharge. N.J. Rule of Court 4:74-7(h)(2). (*See also* Pl. Ex. 15, Appelbaum Tr. 104:8-14; Pl. Ex. 32, Eilers Tr. 176:6-10.) However, because of a lack of suitable placement, these patients cannot be discharged from DHS psychiatric hospitals. (Pl. Ex. 32, Eilers Tr. 175:25-176:10, 177:11-15.) N.J. Rule of Court 4:74-7(h)(2).

52.     While voluntary patients are not subject to A.B. 5:04B, (Pl. Ex. 56 at JV251491; Pl. Ex. 59, Ciaston Tr. 157:14-17), CEPP patients are not permitted to convert to voluntary status. (Pl. Ex. 59, Ciaston Tr. 156:20-157:13.)

53.     Defendants' expert witness, Dr. Appelbaum, testified that AB 5:04B should not apply to CEPP patients. (Pl. Ex. 15, Appelbaum Tr. 104:20-105:22.)

### A.B. 5:04B's Standards for Forcibly Medicating Patients

54.     Two preliminary conditions must be met before A.B. 5:04B can be used to forcibly medicate a patient. First, the patient must be diagnosed with a mental illness; and pose a "likelihood of serious harm to self, others, or property without medication." (Pl. Ex. 56 at JV251491.) Second, it must be determined that the patient either will not or cannot provide informed consent to the administration of psychotropic medication. (*Id*.) DHS hospitals are not required to weigh the patient's decision-making capacity as a factor under 5:04B. (*See generally* Pl. Ex. 56.) Thus A.B. 5:04B authorizes the forced medication of patients who have the capacity to give informed consent but refuse to give such consent to the administration of psychotropic medication. (*Id.*)

55.     Under A.B. 5:04B, "likelihood of serious harm or dangerousness" means that "within the reasonably foreseeable future either:

(a)     a substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide, or to inflict physical harm on one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health or safety; ***or***

(b)     a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; *or*

(c)     a substantial risk that physical harm will be inflicted by an individual upon property as evidenced by behavior which has caused substantial loss or damage to property."

(Pl. Ex. 56 at JV251494.)

56.     A.B. 5:04B does not provide a standard of review applicable to the hospital's determination of "likelihood of serious harm." (Pl. Ex. 32, Eilers Tr. 219:6-19; *see generally* Pl. Ex. 56.) The policy also fails to establish a burden of proof applicable to this determination. (Pl. Ex. 59, Ciaston Tr. 240:11-241:2, 242:4-10; *see generally* Pl. Ex. 56.)

57.     A.B. 5:04B does not specify any rules of evidence for the Medication Review Panel's determination that a patient presents a likelihood of serious harm. (*See* Pl. Ex. 56; Pl. Ex. 59, Ciaston Tr. 204:14-205:4 (stating that there are no evidentiary rules prohibiting hearsay or barring evidence that is more prejudicial than probative).) In fact, the policy contemplates that, in determining whether a specific patient poses a "likelihood of serious harm," the Medication Review Panel may consider both the patient's past and current behavior. (Pl. Ex. 32, Eilers Tr. 139:5-16.) The policy does not place any time limits on what previous behavior or incidents can be considered. (*See generally* Pl. Ex. 56; Pl. Ex. 59, Ciaston Tr. 99:22-100:15.) Thus, DHS hospitals are free under A.B. 5:04B to consider alleged behavior and incidents occurring months or years before the involuntary medication process was initiated in their determination of whether the patient presents a

19

likelihood of harm. (*See, e.g.*, Pl. Ex. 59, Ciaston Tr. 99:22-100:15; Pl. Ex. 60, November 16, 2012 Affidavit of Marilyn Spensley ¶13 (treating psychiatrist relied on alleged but unproven "stalking activity that predated the patient's hospital admission over two years prior); *see also* Pl. Ex. 61, Involuntary Medication Forms for C.C. Ancora, JV251930-44 at 36 (prescribing psychiatrist relied on evidence that patient was evicted from her apartment for "yelling" and "screaming"); Pl. Ex. 62, Involuntary Medication Forms for P.A. Greystone, JV252120-30 at 22 (in an Involuntary Medication Administration Report completed on September 6, 2012, prescribing psychiatrist noted that patient "refused to speak with his psychiatrist on several occasions - 6/25/12, 7/31/12."); Pl. Ex. 63, Involuntary Medication Forms for N.D. Ancora JV251885-99 at 90 (prescribing psychiatrist relied on evidence that prior to patient's transfer from prison to psychiatric hospital, patient had "violated restraining order and went to her daughter's school", allegedly attacked another inmate, and was deemed incompetent by a prison psychologist).)

58.   A.B. 5:04B does not define "reasonably foreseeable future." (Pl. Ex. 56 at JV251493-95.) However, the phrase "reasonably foreseeable future" as used in A.B. 5:04B does not have the same meaning as the phrase "imminent or impending danger" contained in Defendants' emergency medication policy, A.B. 5:04A. (Pl. Ex. 32, Eilers Tr. 138:2-14.)

**Process for Forcibly Medicating Patients under A.B. 5:04B**

59.   If a patient will not or cannot provide consent to the administration of psychotropic medication, and the patient's prescriber finds that the patient has a mental illness and poses a "likelihood of serious harm to self, others or property without medication," the prescriber is required to complete the first section of an Involuntary Medication

Administration Report ("IMAR"). (Pl. Ex. 56 at JV251495; *see also* Pl. Ex. 56 at JV251 501-02.) This section requires the prescriber to document, among other things: (1) "the rationale for the [medication] recommendation (including an explanation of the patient's likelihood of serious harm to self or others or property due to non-compliance)," (2) "the formulations and dosage ranges of the proposed medication(s)," and (3) "less restrictive alternatives attempted or ruled out." (Pl. Ex. 56 at JV251495-96.) However, A.B. 5:04B does not require the prescriber to include any minimum amount of information in support of her belief that there is a "likelihood of serious harm" or regarding the "less restrictive alternatives attempted or ruled out." (*See generally id.*; *see also* Pl. Ex. 32, Eilers Tr. 201:2-16.)

60.    After completing the first section of the IMAR, the patient's prescriber must submit the IMAR to the hospital's Medical Director, who reviews the form "for completeness." (Pl. Ex. 56 at JV251496.)

61.    When the IMAR is complete, the Medical Director is required to appoint a three-person panel (the "Medication Review Panel") to conduct a Medication Review Hearing. The Medication Review Panel is explicitly composed of two hospital staff members — one "clinician" and one "administrator" — as well as one "non-treating psychiatrist" who will chair the Medication Review Hearing. (Pl. Ex. 56 at JV251496; *see also* Pl. Ex. 32, Eilers Tr. at 192:15-193:22.) Nothing in A.B. 5:04B bars the selection of a hospital staff member from serving as the non-treating psychiatrist. (Pl. Ex. 56.)

62.    The purpose of the Medication Review Hearing is for the Medication Review Panel to "hear relevant evidence" and to "determine whether the patient may be medicated without consent." (Pl. Ex. 56 at JV251496.) Having heard the relevant evidence, the

21

Medication Review Panel must determine by a majority vote that the patient has a mental illness and that without psychotropic medication the patient poses a "likelihood of serious harm to self, others, or property." (Pl. Ex. 56 at JV251497.) If the Medication Review Panel makes such a determination, the patient's refusal to give informed consent may be overridden and she may be forcibly medicated. (Pl. Ex. 56 at JV251497.) Additionally, the Medication Review Panel must document its determination in a Hearing Outcome Report. (*Id.*)

63.    A.B. 5:04B does not require the Medication Review Panel to determine whether "less restrictive interventions" are not appropriate or available prior to authorizing the forced medication of non-consenting patients. (*See* Pl. Ex. 56, JV251495-99.)

64.    A.B. 5:04B also fails to provide that patients may take a certain medication voluntarily if that medication is similar in effect to the medication authorized by the Medication Review Panel. (*See generally* Pl. Ex. 56.)

65.    A.B. 5:04B states that the members of the Medication Review Panel may not be *currently* involved in the treatment of the patient under review, but the policy does not prohibit participation on the Panel by individuals who were *previously* involved in the treatment of the patient. (Pl. Ex. 56 at JV251496; Pl. Ex. 59, Ciaston Tr. 201:10-202:12, 203:2-8.) In addition, the non-treating psychiatrist may be employed by Defendants and may have other duties at DHS Psychiatric Hospitals. (Pl. Ex. 56 at JV251496; Pl. Ex. 32, Eilers Tr. 188:8-17.) Dr. Eilers admitted that a non-treating psychiatrist's other duties at DHS hospitals could conflict with her responsibilities as a member of Medication Review Panel under A.B. 5:04B. (Pl. Ex. 32, Eilers Tr. 202:16-22.)

66.     A.B. 5:04B requires that the patient's clinical records shall be made available to the Panel and a Client Services Advocate prior to the Medication Review Hearing. (Pl. Ex. 56 at JV251497.) However, A.B. 5:04B does not make these records available to the patient. (Pl. Ex. 32, Eilers Tr. 216:10-16.)

67.     Dr. Eilers testified that, under A.B. 5:04B, the review panelists, as opposed to the patient or her representative, will call witnesses and take testimony. (Pl. Ex. 32, Eilers Tr. 212:14-24.)

68.     There is no mechanism under A.B. 5:04B for a patient to obtain a stay of the Medication Review Hearing in order to obtain documentation necessary to present his or her case at the hearing. For example, A.B. 5:04B does not contain provisions allowing patients time to obtain independent expert reports prior to the Medication Review Hearing. (Pl. Ex. 59, Ciaston Tr. 229:3-230:22; *see generally* Pl. Ex. 56.)

69.     Under A.B. 5:04B, it would take a minimum of four days from the initiation of the IMAR until medication could be forcibly administered to a non-consenting patient. (Pl. Ex. 59, Ciaston Tr. 256:14-258:18.) However, A.B. 5:04B also states that the Medication Review Hearing must take place within a maximum of five business days following the Medical Director's receipt of a completed IMAR form. (Pl. Ex. 56 at JV251497.)

**Appeals Under A.B. 5:04B**

70.     Under A.B. 5:04B, a patient has 24 hours to appeal the decision of the Medication Review Panel to the Medical Director of the State psychiatric hospital where she is committed. (Pl. Ex. 56 at JV251499.) If an appeal is taken, the Medical Director or her designee is required to review the patient's appeal, the IMAR, and the Hearing Outcome Report issued by the Medication Review Panel. (*Id.*) In determining the outcome of a patient's appeal, the Medical Director or her designee is not required to meet with the

23

patient or the Client Services Advocate ("CSA"). (Pl. Ex. 32, Eilers Tr. 227:9-228:10; Pl. Ex. 56 at JV251499.)

71.   If the Medical Director or her designee concludes that the Panel followed the procedures outlined in A.B. 5:04B and that its conclusions of fact were supported by the evidence presented and that the medications authorized are within the current standard of care, the Medical Director will affirm the Panel's decision in writing. (Pl. Ex. 56 at JV2514919.)

72.   A.B. 5:04B provides that any further appeal beyond the hospital's Medical Director shall be to the New Jersey Superior Court. (Pl. Ex. 56 at JV251499.) However, there is no stay of a patient's forced medication pending the patient's petition to a court. (Pl. Ex. 56 at JV251499; Pl. Ex. 32, Eilers Tr. 228:14-17; Pl. Ex. 59, Ciaston Tr. 261:25-262:6.) As a result, in instances where a patient takes such appeal, the forced administration of medication can occur while the appeal is pending. (Pl. Ex. 32, Eilers Tr. 228:14-22.) Thus, a non-consenting patient does not have a right to appeal to someone independent of the State psychiatric hospital prior to being forcibly medicated under A.B. 5:04B. (Pl. Ex. 59, Ciaston Tr. 261:25-262:6.)

73.   A.B. 5:04B does not require that Medication Review Hearings be recorded or transcribed. (*See generally* Pl. Ex. 56.)

**Post-Decision Review Procedures**

74.   Under A.B. 5:04B, the Medication Review Panel's medication decision, if not reversed by the hospital's Medical Director, is effective for 14 days after such decision is made. Within 14 days of first forcible administration of medication, a subsequent review must be conducted to authorize the medication for up to 90 additional days. (Pl. Ex. 56 at JV251498.) This 14-day review procedure may be conducted by a different Panel than the one that originally authorized the medication. (Pl. Ex. 32, Eilers Tr. 226: 6-22.) The

review procedure does not involve a hearing and the patient is not given an opportunity to appear. (Pl. Ex. 59, Ciaston Tr. 251:10-252:8.) Despite this, the Panel can authorize forcible medication for up to 90 additional days. (Pl. Ex. 56 at JV251499.)

75.    A.B. 5:04B does not address the substantive standard by which the reviewing Panel can authorize continued forced medication pursuant to the 14-day review procedure. (*See* Pl. Ex. 56 at JV251499.)

76.    If the patient is forcibly medicated, the prescribing psychiatrist must then fill out biweekly report forms, beginning with an initial report within 12 days of the Medication Review Hearing and continuing reports thereafter. (Pl. Ex. 56 at JV251498; *see also id*. at JV251511.) For the duration of the involuntary treatment, the prescribing psychiatrist must describe on these biweekly reports "the patient's progress and the justification for continued involuntary treatment." (*Id*. at JV251498.)

77.    A.B. 5:04B does not provide for any mechanism or standard by which the hospital staff will attempt to move the patient off of non-consenting status. (*See generally* Pl. Ex. 56; Pl. Ex. 32, Eilers Tr. at 161:16-22.)

**Role of Client Services Representative and Client Services Advocate under A.B. 5:04B**

78.    Under A.B. 5:04B, the role of Client Services Representative ("CSR") (formerly known as *Rennie* Advocates) remains essentially the same as that under the original A.B. 5:04, and CSRs continue to be employed by their respective State psychiatric hospitals. (Pl. Ex. 32, Eilers Tr. 136:2-7, 167:17-25; Pl. Ex. 59, Ciaston Tr. 126:8-23, 128:3-6; *see also* Pl. Ex. 56 at JV251493.)

79.    A.B. 5:04B creates a new position of Client Services Advocate ("CSA"). (Pl. Ex. 58 at JV251477.) CSAs are employed directly by Defendant DHS and will report directly to the CEO or Deputy CEO of each State psychiatric hospital. (Pl. Ex. 56 at JV251491,

JV251493; Pl. Ex. 32, Eilers Tr. 146:16-23, 147:6-8; Pl. Ex. 59, Ciaston Tr. 109:23-110:2.) The CSAs are primarily responsible for evaluating individuals receiving forced medication with psychotropic medication and are also charged with "participation in the Medication Review Hearings process." (Pl. Ex. 56 at JV251493.) However, the CSAs are not charged with advocating for the express preferences of the patients. (*See generally* Pl. Ex. 56.)

80.     The CSAs also engage in individual patient assessment, consultation with the patient's treatment team, participation in the Medication Review Hearings, and ensuring the continued need for forced medication by ongoing assessment and oversight. (Pl. Ex. 56 at JV251493.) Under A.B. 5:04B, the "advocacy" function of CSAs will be similar in nature to that of the *Rennie* Advocates under the original A.B. 5:04. (Pl. Ex. 32, Eilers Tr. 152:9-20.)

### Implementation of A.B. 5:04B

81.     In September 2012, over 30 hearings pursuant to A.B. 5:04B took place at Ancora, Ann Klein, Greystone and Trenton Psychiatric. (Pl. Ex. 79, Compilation of All Hearing Outcome Reports from September 2012.) In none of these instances did the Medical Director find that the evidence of dangerousness documented by the prescribing psychiatrist in Section I of the IMAR was insufficient to proceed further in the forced medication process. (*See, e.g.*, Pl. Ex. 64, Involuntary Medication Forms for J.V., Greystone, JV252181-93 at 83-84; Pl. Ex. 65, Involuntary Medication Forms for J.B. Ann Klein, JV252011-25 at 13-14.) In each of the 31 hearings in which a decision was rendered, the Medication Review Panel decided to medicate the patient. (*See* Pl. Ex. 79.) From those 31 decisions, 14 patients appealed to the Medical Directors of their respective hospitals. (*See, e.g.*, Pl. Ex. 66, Involuntary Medication Forms for J.W. Trenton

Psychiatric, JV252286-302 at 295-96; Pl. Ex. 67, Involuntary Medication Forms for C.V. Greystone, JV252131-45 at 40-41; Pl. Ex. 68, Involuntary Medication Forms for A.B. Ann Klein, JV251951-66 at 60-61.) The Medical Directors affirmed the Panels' decisions to authorize forced medication in all 14 appeals. (*Id.*)

82.    In numerous IMARs, prescribing psychiatrists cited conclusory observations about patient behavior, such as "aggression" and "assaultive behavior," as the rationale for recommending forced medication but did not include descriptions of specific incidents or when they occurred. (*See, e.g.*, Pl. Ex. 65 at JV252013 ("Aggressive, assaultive, sexually inappropriate behaviors."); Pl. Ex. 69, Involuntary Medication Forms for W.R. Ann Klein, JV252026-36 at 28 ("Patient continues to be threatening, assaultive & self-injurious."); Pl. Ex. 70, Involuntary Medication Forms for D.R. Trenton Psychiatric, JV252271-85 at 73 (""[D.R.] is extremely delusional, paranoid, intrusive. She has episodes of agitation and assaultive behavior.").)

83.    When specific incidents were described in IMARs and Hearing Outcome Reports, the descriptions sometimes reflected infractions such as pushing a chair or banging on furniture, and often did not include a particular date on which the incident took place. (*See, e.g.*, Pl. Ex. 64 at JV252183 (IMAR stating "Patient . . . throws chair, goes into others rooms . . ."); *id.* at JV252186 (prescribing psychiatrist's testimony at hearing described "[O]utbursts that include banging on furniture/walls"); Pl. Ex. 61 at JV251936 (Panel noting that prior to admission, patient was evicted from her apartment "due to screaming [and] slamming doors based on delusional thinking" and has a "history of threatening others and slapping others.").)

84.    On several IMARs and during Medication Review Hearings, prescribing psychiatrists have pointed to a patient's "intrusive behavior" as evidence that the patient presented a danger to herself or to others, on the grounds that such behavior has resulted in others assaulting the patient. (*See, e.g.*, Pl. Ex. 64 at JV252183 ("Patient . . . has been assaulted because of intrusive behavior."); Pl. Ex. 71, Involuntary Medication Forms for J.B. Greystone, JV252209-21 at 14 ("Her intrusiveness has resulted in being assaulted by peers."); Pl. Ex. 70 at JV252276 ("[D.R.] was assaulted by other patients due to her intrusiveness."); Pl. Ex. 60 ¶ 11 (describing J.K.'s IMAR); *see also* Pl. Ex. 72, Involuntary Medication Forms for A.L. Greystone, JV252104-119 at 106 (treating psychiatrist wrote on IMAR that "[p]eer hit her because she was yelling."); Pl. Ex. 73, Involuntary Medication Forms for S.L. Greystone, JV252222-36 at 24 ("Pt is agitated, screaming, yelling and is at risk of hurting others or others hurting him.").)

85.    Sometimes the sole rationale for involuntary medication was that the patient's behavior had improved since forcible medication was administered pursuant to a prior Medication Review Hearing decision. (*See* Pl. Ex. 65 at JV252017 (Panel's decision: "Patient has been noticeably less aggressive, less assaultive, less sexually inappropriate and more re-directable since being medicated from prior hearing."); Pl. Ex. 74, Involuntary Medication Forms for S.A. Ann Klein, JV252065-77 at 71 (Panel's decision: "Patient has been noted to be less of a danger to others since having been on forced medication since his last hearing."); Pl. Ex. 75, Involuntary Medication Forms for M.G. Trenton Psychiatric, JV252303-15 at 9 (Panel's decision: "Pt since receiving medications from her first hearing pt [sic] has had fewer episodes of assaultive behavior and intrusiveness."); Pl. Ex. 62 at JV252126 (Panel's decision: "[s]ince the last hearing when

it was determined require[d] forced medication he has been less threatening and dangerous to others."); *see also* Pl. Ex. 76, Involuntary Medication Forms for R.J. Greystone, JV252093-103 at 98 (treating psychiatrist testified at hearing that "[s]ince the last hearing, when it was determined patient required forced medication . . . With medications patient has not had any episode or assaultive behavior or damage to property.").)

86.     In some instances, prescribing psychiatrists have initiated the forced medication process without citing any information related to likelihood of harm, instead referring to symptoms of the patient's illness or the patient's refusal to participate in the treatment process. (*See* Pl. Ex. 62 at JV252122 (prescribing psychiatrist's rationale on IMAR for recommending involuntary medication: "Patient continues to be extremely paranoid with minimal interaction with staff and peers. Patient continues to refuse to attend treatment team meetings. Patient refused to speak with his psychiatrist on several occasions - 6/25/12, 7/31/12."); *see also* Pl. Ex. 76 at JV2520935 ("Patient doesn't want to sign consent. Says he will take Invega Systenna only on certain days (26th of each month). Delusional about 'radiation in his room.'").)

87.     Medication Review Panels and treating psychiatrists often supported their recommendations to forcibly medicate with evidence of revoked consent. (*See, e.g.*, Pl. Ex. 68 at JV251957 (summary of evidence supporting involuntary medication included "[Patient] has pattern of consenting then refusing psych meds.").) A patient's lack of insight into his illness was also a factor that doctors and panelists felt weighed in favor of medication. (*See, e.g.*, Pl. Ex. 78, Involuntary Medication Forms for L.V. Ann Klein, JV251981-95 at 87 (Panel's decision stated that "when [patient] was compliant with the

current medication . . . [he] had improved insight into his illness."); Pl. Ex. 74 at JV252067 (prescribing psychiatrist noted on IMAR that patient had "no insight into illness."); Pl. Ex. 80, Involuntary Medication Forms for E.S. Ancora, JV251900-14 at 10 (in affirming Panel's decision, Medical Director wrote that patient's "lack of insight into the process, their [sic] illness or the requirements of the state to provide care . . . is due to illness . . .").)

88.     In numerous instances, Medication Review Panels have supported their decisions to authorize forced medication with short statements, and occasionally have not provided any conclusions at all. (*See, e.g.*, Pl. Ex. 61 at JV251936 (Panel's decision simply states "Yes" regarding the Panel's finding with respect to the "dangerousness" of the patient ); Pl. Ex. 81, Involuntary Medication Forms for L.S. Greystone, JV252165-80 at 71 (same); Pl. Ex. 82, Involuntary Medication Forms for M.P. Ancora, JV251915-29 at 21 ("The panel finds it is likely that the patient will be less dangerous if his mental illness is treated with medication."); Pl. Ex. 68 at JV251957 ("Pt's aggression and dangerousness decreases when on meds in the past. Pt's compliance [with] medical RX and ADL's improved when on meds in the past."); Pl. Ex. 78 at JV2519817 ("When pt was compliant with the current medication … he was less of a danger to self and others and had improved insight into his illness.").)

89.     In reviewing patients' appeals of decisions by the Medication Review Panels, hospital Medical Directors provided very short explanations for their decision to affirm. (*See, e.g.*, Pl. Ex. 61 at JV251940 ("The treatment team was clearly able to demonstrate the need of this patient for medication during the panel process."); Pl. Ex. 63 at JV251895 ("[T]reatment team proved adequately to panel this patient's need for medications."); Pl.

Ex. 72 at JV252114-119 ("The use of Clozapine may be the only way for [patient] to recover and be discharged.").) Sometimes, the Medical Directors did not acknowledge or address any of the patients' specific objections as set forth in their appeal papers. For example, one patient wrote in his appeal papers: "The doctor didn't hear me out!!!"; "I don't want any meds just need time to clear my head by going to groups, etc."; "I don't want to be on meds because it hurts my body; and "When I was medicated I had a bad day." In responding to this appeal, however, the Medical Director checked the box to indicate the Medication Review Panel's decision was upheld, but did not provide any rationale. (Pl. Ex. 66 at JV252295-96; *see also* Pl. Ex. 67 at JV252140-41 (Patient wrote in appeal form that he did not want three of the drugs ordered by the Panel but would take "the rest of the medication," and Medical Director affirmed Panel decision in whole, without any reasoning); Pl. Ex. 83, Involuntary Medication Forms for P.M. Ann Klein JV252037-51 at 46-47 (Patient stated in appeal form that he is "not sick, [he] is not crazy." Medical director affirmed the Panel's decision and stated only: "Panel followed the procedure and approved medications … is within standard of care.").)

90.     When patients did not attend their Medication Review Hearings, Hearing Outcome Reports often did not contain a "summary of the patient's position and objections to the proposed medication," as expressly required by A.B. 5:04B (Pl. Ex. 56 at JV251498). (*See, e.g.*, Pl. Ex. 74 at JV252070-71 (report does not summarize patient's position and objections to the proposed medication); Pl. Ex. 61 at JV251936 (same); Pl. Ex. 76 at JV252098-99 (same); Pl. Ex. 62 at JV252125-26 (same); Pl. Ex. 64 at JV252186-87 (same).) In fact, these same Hearing Outcome Reports did not describe *any* evidence weighing against forced medication that was presented at the hearing. For example, while

the Hearing Outcome Reports provide space in Section III for the Panel to summarize "oral and written evidence that the patient should not be medicated without consent," this section was regularly left blank. (*See* Pl. Ex. 74 at JV252070-71, Pl. Ex. 76 at JV252098-99; Pl. Ex. 62 at JV252125-26; Pl. Ex. 64 at JV252186-87; Pl. Ex. 61 at JV251936 (stating "no testimony presented").)

91.   On biweekly report forms, many prescribing psychiatrists proffered only brief justifications, or none at all, for why the continued forcible administration of the authorized medication is warranted. (*See, e.g.*, Pl. Ex. 68 at JV2519562 (stating continued administration is justified because "pt will decompensate"); Pl. Ex. 78 at JV251992-95 (providing no justification at all on two biweekly reports); Pl. Ex. 84, Involuntary Medication Forms for T.W. Trenton Psychiatric, JV252255-70 at 67 (noting in another section of biweekly report that patient "is calmer and more cooperative [and] has not shown physical aggression" but concluding that involuntary medication is still justified because "patient has a recent history of aggressive behavior.").) In one biweekly report, the prescribing psychiatrist wrote only that continued administration was justified because the patient "refused to sign consent" and "expressed desire to refuse [medications] to RN staff." (Pl. Ex. 64 at JV252190.)

92.   Other deviations from the requirements of A.B. 5:04B are apparent from the records of Medication Review Hearings. For example, A.B. 5:04B requires that the patient's prescribing psychiatrist attend the Medication Review Hearing. (Pl. Ex. 56 at JV251497.) However, in more than one case, the patient's prescribing psychiatrist did not attend the hearing. (*See* Pl. Ex. 85, Involuntary Medication Forms for A.M. Trenton Psychiatric, JV252237-54 at 41; *see also* Pl. Ex. 60 ¶ 9.) Additionally, A.B. 5:04B requires that the

patient's prescribing psychiatrist consider "less restrictive interventions" prior to initiating the involuntary medication procedure. (Pl. Ex. 56 at JV251495.) However, alternatives to involuntary medication were not always considered by prescribing psychiatrists. (*See* Pl. Ex. 84 at JV252258 (IMAR Section I stating "No" after the prompt asking the treating psychiatrist to list which less restrictive treatments were considered or attempted before involuntary medication was considered).)

93.     Several hearings took place with neither the patient nor a CSA in attendance. (*See, e.g.*, Pl. Ex. 61 at JV251934 (Hearing Outcome Report indicating that neither patient nor CSA attended the hearing); Pl. Ex. 68 at JV25195 55 (same); s*ee also* Pl. Ex. 13, Piren Tr. 231:7-16 ("Q: How are the patient's interests represented [at a treatment hearing] if neither the patient nor the Rennie advocate attend? A: "That's problematic.").) Moreover, while CSAs are obligated to assist patients in preparing appeal papers, some appeals included only one or two sentences in support of the patient's position. (*See, e.g.*, Pl. Ex. 68 at JV251960-61.) Based on the information documented in the Hearing Outcome Reports, only a few patients at Medication Review Hearings in September 2012 called witnesses or presented documentary evidence at the hearings. (*See, e.g.*, Pl. Ex. 84 at JV252261; Pl. Ex. 65 at JV252016.**)** At most of the hearings, patients did not call witnesses. (*See, e.g.*, Pl. Ex. 61 at JV251935 (Hearing Outcome Report stating "no witnesses" under section describing testimony given at hearing).)

94.     Since the implementation of Defendants' new policy A.B. 5:04B, Marilyn Spensley, a senior staff advocate at DRNJ, attended three Medication Review Hearings with clients. (Pl. Ex. 60.) In Ms. Spensley's presence, a CSR told a patient that she could only submit a maximum of three pages of documentary evidence to the panelists at the patient's

Medication Review Hearing. (*Id.* ¶ 10.) Ms. Spensley observed that patients who sought to make statements at their Medication Review Hearings were cut off by the panelists before they could finish speaking, and have been told to leave before concluding their arguments. (*Id.* ¶¶ 5, 15, 20.) At one hearing, the testifying psychiatrist testified regarding alleged but unproven "stalking" activity that predated patient J.K.'s hospital admission as evidence of dangerousness. (*Id.* ¶ 12-13.) As another example of dangerousness, the psychiatrist testified that J.K.'s behavior can annoy other patients and as a result, patients have assaulted J.K. (*Id.* ¶ 12.) In Ms. Spensley's presence, a CSA told a patient that in appellate reviews, the Medical Director only reviews a Panel's decision to determine whether the process was followed, and does not evaluate the substance of the Panel's decision. (*Id.* ¶ 7.) The same patient tried to file a judicial appeal, but was unsuccessful because her papers were not received by the court and her appeal was never docketed. (*Id.* ¶ 8.)

**Neither Judicial Hearings nor Counsel Are Provided To Forcibly Medicated Patients**

95.   A.B. 5:04B does not provide for judicial hearings or prior judicial authorization for the forced administration of psychotropic medication to non-consenting patients. (Pl. Ex. 32, Eilers Tr. 233:25-234:5; *see also* Pl. Ex. 59, Ciaston Tr. 55:9-22 (policy employs a "clinical" not "judicial" model); *see generally* Pl. Ex. 56.) Indeed, the drafters of A.B. 5:04B did not even consider the incorporation of judicial hearings. (Pl. Ex. 32, Eilers Tr. 234: 14-18.)

96.   A.B. 5:04B does not provide counsel to assist or represent patients in the Medication Review Hearings. (Pl. Ex. 56 at JV251496-97; Pl. Ex. 32, Eilers Tr. 158:20-159:10; Pl. Ex. 26, Haynes Tr. 256:16-19; Pl. Ex. 59, Ciaston Tr. 263:19-23.) In fact, the drafters of the policy did not consider including a right to counsel. (Pl. Ex. 32, Eilers Tr.

234:19-235:5.) While patients are apparently free to retain counsel at their own expense, (Pl. Ex. 56 at JV251496), the majority of patients at State psychiatric hospitals are indigent and retaining counsel at their own expense would constitute a hardship. (Pl. Ex. 32, Eilers Tr. 207:7-14.)

97.  Involuntarily-committed patients residing in State psychiatric hospitals do not have access to a law library or other legal resources (Pl. Ex. 32, Eilers Tr. 235:7-15; Pl. Ex. 26, Haynes Tr. 256:10-15; Pl. Ex. 27, Luchkiw Tr. 62:16-17), and A.B. 5:04B does not provide for patient access to such legal resources. (*See generally* Pl. Ex. 56.) Additionally, patients cannot gain access to computers or the Internet without their treatment team's approval. (Pl. Ex. 13, Piren Tr. 295:18-23.)

**DHS Hospitals Host Over 8,000 Civil Commitment Hearings Each Year**

98.  From 2006 through the end of March 2012, New Jersey State psychiatric hospitals held over 61,000 civil commitment hearings. These included at least: 11,142 hearings in 2006; 10,996 hearings in 2007; 10,169 hearings in 2008; 9,130 hearings in 2009; 8,812 hearings in 2010; 8,636 hearings in 2011; and 2,384 hearings through March 2012.[2] (Pl. Ex. 86, Civil Commitment Hearings Chart; Pl. Ex. 87, April 20, 2012 Letter from S. O'Connor to M. Wells re Pl. Ex. 86.)

99.  In New Jersey, State judges hold civil commitment hearings to determine if a patient should be involuntarily committed to a State psychiatric hospital, to review the status of a patient's ongoing commitment, to determine CEPP status, and to review the status of voluntarily-committed patients. (Pl. Ex. 88, Bennett Tr. 61:18-62:3, 76:3-9, 77:12-17,

---

[2] These numbers were provided by Defendants and do not include any hearings held after March 31, 2012. The totals provided above include hearings held at Hagedorn, which closed on June 30, 2012. (Pl. Ex. 9.) There were a total of 8,821 hearings held at Hagedorn between 2006 and March 2012. (Pl. Ex. 86; Pl. Ex. 87.)

90:2-91:4.) At Greystone, Trenton Psychiatric and Ann Klein, civil commitment hearings are held twice per week. (Pl. Ex. 88, Bennett Tr. 51:17-52:4, 53:6-8.) At Ancora, civil commitment hearings are held once per week. (Pl. Ex. 88, Bennett Tr. 55:20-21.) The facilities used for civil commitment hearings have been in place since at least 2006 in four of the psychiatric hospitals operated by Defendants. (Pl. Ex. 88, Bennett Tr. 59:16-20; *see also* Pl. Ex. 88, Bennett Tr. 59:21-60:18 (estimating that Greystone's courtroom location changed around 2007, when the hospital changed from a campus to a single facility, but that the only other difference between the courtroom facilities was that the old waiting area was not separated between staff and patients).)

100.   These hearings have all the hallmarks of hearings held in traditional courthouses. Court reporters are present during all civil commitment proceedings in all State psychiatric hospitals (Pl. Ex. 88, Bennett Tr. 49:23-50:2), and all civil commitment hearings result in a written order. (Pl. Ex. 88, Bennett Tr. 106:8-14.)

101.   The hearings are typically held in rooms in the State psychiatric hospitals that are "turned into courtrooms." (Pl. Ex. 88, Bennett Tr. 36:23-24, 39:3-6.) For example, at Greystone, civil commitment hearings take place in a partitioned room set up according to standards provided by the State's Administrative Office of the Courts. The courtroom includes a counsel's table, seating for observers, and seating for the judge in the front of the room. The judge also has separate chambers. (Pl. Ex. 88, Bennett Tr. 39:16-40:20; s*ee also id.* 49:4-18, 50:17-51:16 (describing the setup and location of courtrooms at Trenton Psychiatric), 52:5-54:19 (describing the courtrooms at Ann Klein), 54:23-56:22 (describing the courtrooms at Ancora).).

102.    Participants in civil commitment hearings typically include the State's attorney, the attorney representing the individual being considered for commitment, the individual being considered for commitment, a psychiatrist and a judge. (Pl. Ex. 88, Bennett Tr. 90:2-12, 101:19-23.)

103.    At initial civil commitment hearings, doctors and witnesses present evidence relating to a potential patient's dangerousness to herself or others. *See* N.J. Stat. Ann. § 30:4-27.2(m); N.J. Stat. Ann. § 30:4-27.14; (Pl. Ex. 88, Bennett Tr. 62:18-63:3.) To be involuntarily committed, dangerousness must be proven by clear and convincing evidence. N.J. Stat. Ann. § 30:4-27.15(a).

104.    At all four types of civil commitment hearings — initial commitment hearings, review hearings, CEPP hearings, and voluntary commitment hearings — judges serve as the decision-makers and patients are afforded counsel. (Pl. Ex. 88, Bennett Tr. 76:3-10.) In advance of each hearing, patients are given notice of the hearing, and their counsel is given the opportunity to meet with witnesses that will be called to testify. (Pl. Ex. 88, Bennett Tr. 83:21-84:14, 86:16-19.) A judge's determination in a civil commitment hearing results in a written order. (Pl. Ex. 88, Bennett Tr. 106:3-19.)

105.    A typical, uncontested, initial commitment hearing would take "somewhere between 10 [and] 20 minutes." (Pl. Ex. 88, Bennett Tr. 102:6-21.) And Michaela Bennett, a Legal Specialist in Defendant DHS's Division of Mental Health Services who is knowledgeable concerning the nature of civil commitment proceedings in the State of New Jersey, is not aware of any initial commitment hearing taking longer than three hours. (Pl. Ex. 88, Bennett Tr. 21:16-20, 102:3-21.)

106.    Individual parties to civil commitment hearings in New Jersey are afforded counsel to represent them in such hearings. (Pl. Ex. 32, Eilers Tr. 89: 21-23; Pl. Ex. 88, Bennett Tr. 76: 3-10.) Patients' appointed counsel can access the patient's medical records and charts, and can meet with the patient as frequently as desired. (Pl. Ex. 88, Bennett Tr. 86:2-15; *see also id.* 83:2-5.) In addition, patients subject to civil commitment are afforded the opportunity to appeal commitment decisions and counsel is appointed for these appeals. (Pl. Ex. 88, Bennett Tr. 106:20-107:5.)

### Numbers of Patients Refusing Medication in DHS Hospitals

107.    As of February 2012, there were 48 patients at Ancora on "refusing" status and thus subject to forced medication pursuant to Defendants' original forced medication policy, A.B. 5:04. (Pl. Ex. 26, Haynes Tr. 43:15-44:4, 76:18-20.) Some of these patients have been on refusing status for over two years. (Pl. Ex. 26, Haynes Tr. 259:25-260:6.) As of January 2012, there were 44 patients on refusing status at Greystone. (Pl. Ex. 89, January 2012 Greystone *Rennie* Advocate Monthly Report, JV250004-5.) As of August 2011, there were 29 patients on refusing status at Ann Klein and 13 patients deemed to be functionally incompetent. (Pl. Ex. 90, August 2011 Ann Klein *Rennie* Advocate Monthly Report, JV244526.) As of August 2011, there were 36 patients on refusing status at Hagedorn and 4 patients deemed to be functionally incompetent. (Pl. Ex. 91, August 2011 Hagedorn *Rennie* Advocate Monthly Report, JV244835-36.) As of August 2011, there were 36 patients on refusing status at Trenton Psychiatric. (Pl. Ex. 92 August 2011, Trenton Psychiatric *Rennie* Advocate Monthly Report, JV244904.)

### Connecticut's Procedures for Involuntary Medication

108.    The state of Connecticut authorizes two processes for forced administration of psychotropic medication to non-consenting patients — one administrative, and the other

judicial. (Pl. Ex. 93, Fox Tr. 41:16-25; Pl. Ex. 94, Killian Tr. 44:8-46:2) *See also* Conn. Gen. Stat. Ann. § 17a-543(d), (f).

109.   Connecticut's judicial process for authorizing forced administration of psychotropic medication to non-consenting patients is effectuated through the Connecticut probate court. (Pl. Ex. 93, Fox Tr. 41:16-25.) *See also* Conn. Gen. Stat. Ann. § 17a-543(f).

110.   Connecticut's administrative process for authorizing the forced administration of psychotropic medication to non-consenting patients, if effectuated, is only effective for 30 days. After that, a hospital must obtain authorization from the probate court before continuing to forcibly administer medication. (Pl. Ex. 93, Fox Tr. 64:10-25; Pl. Ex. 94, Killian Tr. 48:2-18.) *See also* Conn. Gen. Stat. Ann. § 17a-543(d), (f)(1).

111.   In Connecticut, when a psychiatric hospital seeks to forcibly medicate a non-consenting patient through a judicial hearing, the following steps are taken: (1) the hospital puts into evidence two documents — a report of the hospital's independent consultant and the treating physician's report as to why medication is necessary; (2) the patient's treating physician will testify and be cross-examined by the patient's lawyer; and (3) the court will hear evidence and testimony from other appropriate parties, potentially including outpatient clinicians, social workers, and family members. (Pl. Ex. 94, Killian Tr. 84:24-87:10, 100:9-101:16.)

112.   The independent consultant whose report is filed by the hospital is typically a psychiatrist who is not on staff at the hospital. (Pl. Ex. 94, Killian Tr. 101:20-24.)

113.   Judicial hearings by the probate court regarding forced administration of medication are physically conducted in Connecticut's psychiatric hospitals, rather than in the probate court. (Pl. Ex. 94, Killian Tr. 109:2-5.)

114.     The statutory standard utilized by Connecticut probate judges to determine whether to authorize forced medication for non-consenting patients is whether it has been shown, by "clear and convincing evidence, that (i) the patient is capable of giving informed consent but refuses to consent to medication for treatment of the patient's psychiatric disabilities, (ii) there is no less intrusive beneficial treatment, and (iii) without medication, the psychiatric disabilities with which the patient has been diagnosed will continue unabated and place the patient or others in direct threat of harm." Conn. Gen. Stat. Ann. § 17a-543(f)(1). (*See also* Pl. Ex. 94, Killian Tr. 109:13-110:2; 195:9-21 (describing the burden of proof in an involuntary medication hearing in Connecticut).)

115.     In forced medication hearings in Connecticut, the party seeking to forcibly medicate a patient bears the burden of proof. (Pl. Ex. 94, Killian Tr. 195:9-13.)

116.     The probate court is authorized to issue a medication order for up to 120 days in duration, after which the hospital may file for an extension of the medication for an additional 120 days. Conn. Gen. Stat. Ann. § 17a-543 (f)(2). (Pl. Ex. 94, Killian Tr. 96: 9-12; 98:9-15.)

117.     Patients who are respondents in judicial hearings to authorize forced medication in the state of Connecticut are provided counsel to assist them in such hearings. Such counsel is funded by the state of Connecticut, pursuant a statutory budget allocation. (Pl. Ex. 94, Killian Tr. 90:18-92:10; Pl. Ex. 93, Fox Tr. 48:16-49:7.)

118.     Judge Robert Killian has been a sitting judge in the Connecticut probate court since 1983. (Pl. Ex. 94, Killian Tr. 5:17-21, 9:5-11.) In this capacity, he hears and decides cases regarding forced medication of non-consenting patients in Connecticut's state psychiatric hospitals. (Pl. Ex. 94, Killian Tr. 18:9-19:9.)

119.    Judge Killian testified that, to his knowledge, state psychiatric hospitals in Connecticut do not use the state's administrative process for medicating non-consenting patients, and instead have elected to use the judicial process via the Connecticut probate court. (Pl. Ex. 94, Killian Tr. 50:23-51:22, 52:4-21.)

120.    In 2011, Judge Killian presided over 29 cases in which the state of Connecticut applied for either a court appointment of a conservator to approve psychotropic medication for a non-capable state psychiatric patient, or a court order authorizing the forced medication of a capable state psychiatric patient. Judge Killian granted the state's application in 22 of these 29 cases. (Pl. Ex. 94, Killian Tr. 57:14-58:4.)

121.    In some instances in which Judge Killian did not authorize the forced administration of medication, he found that "the doctor had overreached and was seeking to medicate somebody who just didn't need it." (Pl. Ex. 94, Killian Tr. 110:7-23.)

122.    Judge Killian testified that, in determining whether to authorize forced medication under Connecticut statutes, he relies on "the effective counsel of the lawyer that was appointed to represent the patient." (Pl. Ex. 94, Killian Tr. 106:23-108:7.)

123.    According to Judge Killian, none of the criteria he uses to determine whether to authorize forced medication are "medical criteria." Rather, he regards the criteria he uses — including "dangerousness" and whether the patient has a "grave disability" — as "legal criteria." (Pl. Ex. 94, Killian Tr. 111:15-20.)

124.    Similarly, Judge Killian regards the decision he is called on to make in medication hearings as a legal, rather than a medical, decision, and "no different than virtually everything else" he does as a probate judge. (Pl. Ex. 94, Killian Tr. 193:18-194:9.)

125. In Connecticut, judicial hearings to authorize forced administration of medication last for a half-hour on average, and it takes Judge Killian less than 24 hours to render a decision. (Pl. Ex. 94, Killian Tr. 87:14-16, 94:8-12.)

126. After rendering a decision in a medication hearing, Judge Killian provides a written decision documenting the disposition of the hearing. Where applicable, the decision identifies the specific medication authorized. (Pl. Ex. 94, Killian Tr. 94:16-95:4.)

127. Dr. Patrick Fox is a former Assistant Professor of Psychiatry at Yale University, and until recently was the Director of the Whiting Forensic Division of Connecticut Valley Hospital, a 243-bed forensic hospital in Connecticut. While at Whiting, Dr. Fox supervised 12 attending psychiatrists, three medical directors, and additional physicians. (Pl. Ex. 93, Fox Tr. 15:19-16:16, 70:19-71:21.)

128. During his time as Director of Whiting Forensic Division, Dr. Fox would review cases relating to forced medication and provide treatment and procedural recommendations to attending psychiatrists and treatment teams relating to the possibility of forcibly administering medication to non-consenting patients. (Pl. Ex. 93, Fox Tr. 77:11-78:5.)

129. In Dr. Fox's five years as Director of the Whiting Forensic Division, the hospital had never used Connecticut's administrative process for authorizing the forced administration of medication, but, rather, always preferred to utilize the probate court. (Pl. Ex. 93, Fox Tr. 41:15-42:7.) This preference was based, in part, on the fact that the judicial proceedings "afforded the patients what we felt were adequate due process protections and didn't unduly burden the hospital in any way." (Pl. Ex. 93, Fox Tr. 71:22-72:17.)

130. Dr. Fox did not find Connecticut's judicial process for authorizing forced administration of psychotropic medication to be onerous and, in some ways, found it to be "preferable." (Pl. Ex. 93, Fox Tr. 41:15-42:7.)

131. Dr. Fox did not find that utilizing the Connecticut probate court to authorize forced administration of psychotropic medication caused any undue delay in the initiation of therapies. (Pl. Ex. 93, Fox Tr. 62:21-63:9.)

132. In Dr. Fox's experience, Connecticut probate court hearings relating to forced medication occur once a week, and the Court is "readily available" to hear such cases "in fairly short order." (Pl. Ex. 93, Fox Tr. 64:19-25.)

133. In Dr. Fox's experience, utilizing the Connecticut probate court for forced administration of psychotropic medication promoted the relationship that the patients had with their treatment teams. (Pl. Ex. 93, Fox Tr. 62:21-63:9.)

134. In Dr. Fox's experience, the ability of patients in Connecticut to seek relief from the probate court in the context of forced administration of psychotropic medication is "an important facet of patient rights." (Pl. Ex. 93, Fox Tr. 51:21-52:1.)

135. In Dr. Fox's experience, utilizing a judicial procedure to authorize forced administration of medication "puts the decision in the hands of the court rather than in the hands of the hospital to maintain a therapeutic alliance to some extent." (Pl. Ex. 93, Fox Tr. 72:18-73:1.)

**Massachusetts' Procedures for Involuntary Medication**

136. In a state psychiatric hospital in Massachusetts, when a patient refuses to take antipsychotic medication, a psychiatric hospital can petition for what is called "substituted judgment," or a *Rogers* Guardianship. (Pl. Ex. 16 at 3.) *See also* Mass. Gen. Laws Ann. ch. 123, § 8B.

43

137.  This arrangement is called a *Rogers* Guardianship because of *Rogers v. Commissioner of the Mental Health Department*, 458 N.E.2d 308 (Mass. 1983), wherein the Massachusetts Supreme Judicial Court affirmed the right of hospitalized psychiatric patients to refuse antipsychotic medications in non-emergency situations. (Pl. Ex. 16 at 3, n.1.)

138.  Under Massachusetts law, only antipsychotic medications can be forcibly administered; other psychotropic medications, such as antidepressants, cannot. (Pl. Ex. 16 at 2.)

139.  Pursuant to Massachusetts law, in order for antipsychotic medication to be involuntarily administered, a court must "(i) specifically find[] that the person is incapable of making informed decisions concerning the proposed medical treatment, (ii) upon application of the legal substituted judgment standard, specifically find[] that the patient would accept such treatment if competent, and (iii) specifically approve[] and authorize[] a written substituted judgment treatment plan." (Pl. Ex. 16 at 3.) *See also* Mass. Gen. Laws Ann. ch. 123, § 8B(d).

140.  Antipsychotics cannot be administered involuntarily until such a finding is made, except to the extent that chemical restraints are necessary in an emergency situation. (Pl. Ex. 16 at 3.)

141.  The first step in this process, once a hospital decides to petition for a *Rogers* guardianship, is that the patient is notified of his right to counsel. The Massachusetts Committee for Public Counsel Services has a Mental Health Litigation Unit that provides free-of-charge counsel for *Rogers* Guardianship hearings. (Pl. Ex. 16 at 3.)

142.  The next step is for the patient's assigned attorney to interview the patient regarding the petition. If the patient is not satisfied with the assigned attorney, the patient can request another assignment. (Pl. Ex. 16 at 3.)

143.   Once the patient is satisfied with an assigned attorney, the attorney may request an independent medical evaluator, or "IME," from a roster of experts. These experts are also provided to the patient free-of-charge and are paid by the state. (Pl. Ex. 16 at 3-4.)

144.   Matthew P. Dumont, MD, has been a licensed psychiatrist in the Commonwealth of Massachusetts since 1961. He has nearly twenty-five years of experience with Massachusetts' legal procedures for the involuntary administration of antipsychotic medication. He served as an expert witness in Massachusetts' judicial involuntary medication process during thirteen years as an attending psychiatrist in a state hospital and a subsequent decade as an IME for the Mental Health Litigation Unit of the Committee for Public Counsel Services. (Pl. Ex. 16 at 2.)

145.   When Dr. Dumont serves as an IME, he interviews the patient for about an hour and a half and reviews the patient's records. (Pl. Ex. 16 at 4.)

146.   In Dr. Dumont's decade of experience as an IME, he has found that in about one-third of the time, he agrees with the hospital both that medication is necessary and that the patient is incompetent. In those cases, he does not testify at the *Rogers* Guardianship hearing. (Pl. Ex. 16 at 4.)

147.   In Dr. Dumont's decade of experience as an IME, he has found that in about one-third of the time, he disagrees with the hospital and recommends against a *Rogers* Guardianship at the hearing. (Pl. Ex. 16 at 4.)

148.   In Dr. Dumont's decade of experience as an IME, he has found that in about one-third of the time, he is able to broker negotiations between a doctor and a patient such that the patient is willing to give informed consent and the hearing does not have to go forward.

These negotiations generally occur when patients are willing to take medication of a different type or dosage from what the hospital wants to administer. (Pl. Ex. 16 at 4.)

149.  In Massachusetts, *Rogers* Guardianship hearings are held at the district courthouse, the probate court, or at the hospital. (Pl. Ex. 16 at 4.)

150.  The judges presiding over *Rogers* Guardianship hearings do not have any special expertise in the area of mental health, but in Dr. Dumont's opinion, this does not inhibit their ability to accurately and fairly decide these kinds of cases. (Pl. Ex. 16 at 4.)

151.  At the *Rogers* Guardianship hearing, which generally takes place within two weeks from the time the petition is filed and the patient is notified, and rarely more than a month afterward, the judge reviews the evidence presented by the attorneys of the petitioner (hospital) and respondent (patient). (Pl. Ex. 16 at 5.)

152.  Testimony is taken from the hospital's expert as well as the IME, if there is one. The patient has a right to testify, but often does not. Sometimes the patient's family testifies as well. (Pl. Ex. 16 at 5.)

153.  The testimony at these hearings is recorded and transcripts are available on request. (Pl. Ex. 16 at 5.)

154.  As with all district court hearings in Massachusetts, there are rules of evidence in place. For example, the attorneys may make hearsay and relevance objections. (Pl. Ex. 16 at 5.)

155.  If the judge at the *Rogers* Guardianship hearing determines that the hospital has met its burden, then substituted judgment is put in place in the form of a treatment plan, though the hearing is not over until the treatment plan, which specifies the medication(s) that may be administered as well as dosage range and frequency of administration, is finalized. (Pl. Ex. 16 at 5.)

46

156. In Massachusetts, if the court orders a *Rogers* Guardianship, but the patient's attorney does not believe that the treatment plan is in the patient's best interests, he can request that the treatment plan be reviewed by the district or probate court within a few weeks. If the attorney makes no such request, the judge can set the timeline for review, which is usually six months later. (Pl. Ex. 16 at 5.)

157. Under Massachusetts law, patients may also seek appellate review of a substituted judgment decision at the superior court level. (Pl. Ex. 16 at 6.) *See also* Mass. Gen. Laws Ann. ch. 123, § 9(a).


DATED this 28th day of November, 2012

BY:   s/ William Emmett Dwyer
      William Emmett Dwyer
      Disability Rights New Jersey
      210 South Broad, 3rd Floor
      Trenton, NJ 08608