FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DISABILITY RIGHTS NEW JERSEY, INC.,<br>                              Plaintiff, | Civ. No. 10-3950(DRD) |
| v. | **O P I N I O N** |
| JENNIFER VELEZ, in her official capacity as<br>Commissioner, State of New Jersey Department<br>of Human Services, and | |
| STATE OF NEW JERSEY<br>                              Defendants. | |

*Appearances by:*

WILLIAM EMMETT DWYER, ESQ.
Disability Rights New Jersey, Inc.
210 South Broad Street, Third Floor
Trenton, New Jersey 08608

ALEXANDRA P. KOLOD, ESQ.
KIRLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

        *Attorneys for Plaintiff*

SUSAN K. O'CONNOR, ESQ.
HOAGLAND, LONGO, MORAN, DUNST & DOUKAS
40 Paterson Street
PO Box 480
New Brunswick, New Jersey 08903

        *Attorney for Defendant*

**DEBEVOISE, Senior District Judge**

        The Court is presented with cross-motions for summary judgment filed by Plaintiff

Disability Rights New Jersey Inc ("DRNJ") and by Defendants the State of New Jersey and

Jennifer Velez in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"). DHS is an umbrella organization for several state divisions, including the Division of Mental Health and Addiction Services (DMHAS). DMHAS is the state mental health authority that oversees the State's public system of adult mental health services, including the four state psychiatric hospitals at issue.

DRNJ represents psychiatric patients who either are or will be treated at the state's psychiatric hospitals. DRNJ argues that the state's policy which governs the involuntary administration of psychotropic drugs in non-emergency circumstances, Administrative Bulletin 5:04B, is both constitutionally infirm and routinely violated in New Jersey hospitals. As a result, DRNJ contends that psychiatric patients are forced to consume psychotropic drugs against their will in violation of the Federal Constitution, the Americans with Disabilities Act, 42 U.S.C. 12131, *et seq.* (hereinafter "ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794(a) (hereinafter "RA").

For the reasons set forth below, the Court finds in favor of DRNJ's motion for summary judgment with respect to the Fourteenth Amendment due process challenge on substantive and procedural grounds as to the CEPP status patients only. As to the remaining class, the Court finds in favor of Defendants with respect to the substantive and procedural challenge, and the related First Amendment, right to counsel, and access to the courts claims. Next, the Court finds that A.B. 5:04B is in violation of the ADA and the RA with respect to the CEPP status patients only, and not the remaining class. In short, the Court finds that A.B. 5:04B violates the substantive and procedural due process rights of CEPP patients, and is discriminatory in violation of the ADA and the RA with regard to these individuals. However, A.B. 5:04B is valid

as to the remaining class.  The motions for summary judgment are therefore granted in part and denied in part.

## I.     BACKGROUND

### A.  Procedural History

DRNJ filed its original complaint on August 3, 2010.  The complaint set forth seven counts against Jennifer Velez, in her official capacity as Commissioner of the State of New Jersey Department of Human Services and Poonam Alaigh, in her official capacity as Commissioner of the State of New Jersey Department of Health and Human Services[1] for violations of:  the Due Process Clause of the Fourteenth Amendment (count one); the right of access to the Courts (count two); violations of the right to counsel (count three); the Equal Protection Clause of the Fourteenth Amendment (count four); the First Amendment (count five); the ADA (count six); and the RA (count seven).

On July 20, 2011, this Court denied DHS's motion to dismiss this action in part, finding that "[t]here can be no doubt that all patients in New Jersey, including patients with severe mental illness or injury, have the right to participate meaningfully in the course of their treatment, to be free from unnecessary or unwanted medication, and to have their rights to personal autonomy and bodily integrity respected by agents of the state."  (July 20, 2011 Op. at 5.)  The Court found that DRNJ had presented "a panoply of serious allegations concerning the practice of psychiatric medicine in New Jersey hospitals" including practices that plainly violate existing New Jersey law.  (Id. at 9.)  Consequently, the Court refused to dismiss DHS from this case.  However, the claims against Defendant O'Dowd in her official capacity as Acting Commissioner of the DHSS were dismissed in their entirety because the operative statute, the

---

[1]     Effective April 2, 2011, Commissioner Alaigh resigned from her position, and the Court on April 27, 2011 consequently substituted Acting Mary O'Dowd as a party to this action in her official capacity, pursuant to Fed. R. Civ. P. 25(d).

Health Care Facilities Planning Act of 1971, N.J.S.A. 26:2H-1 *et seq.*, does not establish DHSS's authority to promulgate specific procedures concerning the administration of psychotropic drugs, and the Court reasoned that it would have been inappropriate to order it to do so.

Notably, the Court granted dismissal of count four, DRNJ's equal protection claim. DRNJ argued that under A.B. 5:04, its constituents are afforded fewer legal protections than other patients with respect to their medical treatment. In particular, DRNJ noted that prisoners with mental illness and individuals with developmental disabilities in addition to mental illness are entitled to hearings before they may be forcibly medicated. DRNJ contended that this disparate treatment of like-individuals was without rational basis and irreconcilable with the equal protection clause of the Fourteenth Amendment. (See id. at 27.) The Court found that any differential treatment between psychiatric patients and prisoners withstood rational basis scrutiny. For example, the Court reasoned that the state might grant prisoners additional opportunities to challenge treatment in recognition of a limited ability of the prison psychiatric system to internally review and prevent mistakes, and that the state could reasonably believe that hospitals, populated by doctors rather than guards and expressly non-punitive by nature, would be less in need of this oversight. (Id. at 29-30.) Thus, the Court dismissed Plaintiff's equal protection claim. However, the Court denied the motion to dismiss the ADA and RA claims, finding that the analysis of discriminatory treatment under these Acts is different than the rational basis scrutiny pursuant to the Fourteenth Amendment.

DHS filed its answer on August 4, 2011. On August 25, 2011, DRNJ filed a motion to strike thirty-three of DHS's defenses, arguing them to be frivolous, irrelevant, and/or legally insufficient. The Court granted DRNJ's motion to strike, finding the defenses to be "boilerplate", "highly repetitive and containing almost no factual specificity." (See Sept. 23,

2011 Op. at 4.)  For example, the Court found with respect to the defenses related to damages, that "[c]ontrary to the ex-post justifications by Defendant, it is clear what happened here. Defendant's counsel appears to have carelessly copy-pasted boilerplate personal injury defenses into the answer despite their inapplicability."  (Id. at 7.)

On February 15, 2012, DHS moved to vacate a Consent Order in an earlier case governing New Jersey's procedure for non-consensual administration of antipsychotic drugs by involuntarily-committed mentally ill patients.  See Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983) ("Rennie Consent Order"). [2]  In support of its motion, DHS admitted that the involuntary medication procedures in place were undermined by a subsequent Supreme Court ruling in Washington v. Harper, 494 U.S. 210 (1990) and its progeny.  In consideration of the unopposed motion, on March 19, 2012, the Court entered an order vacating the Rennie Consent Order.  The Three-step Rennie procedure was thereafter replaced on June 4, 2012 with the policy that is now at issue.[3]

---

[2]    The Three-Step Rennie procedure first required the treating physician to meet with the patient to attempt to respond to the patient's concerns about medication.  If the patient still refused, the physician was to meet with the patient's treatment team and invite the patient to attend.  Second, the treatment team was then supposed to meet to discuss the doctor's recommendation and the patient's response.  If the patient was present, they were to formulate a plan that was acceptable to the patient and the team.  Finally, if the patient continued to refuse medication, under Step Three, the hospital's Medical Director was to personally examine the patient and review the patient's chart.  If the Medical Director agreed that medication was a necessary part of the treatment plan, then the patient could be forcibly medicated.  Under the old A.B. 5:04, Client Service Representatives ("CSRs" or "Rennie Advocates") had the responsibility to ensure the hospital's compliance with the Three-Step Process.

[3]    Effective June 4, 2012, the state replaced the previous A.B. 78-3 dated October 1, 1982; A.B. 5:04 dated September 15, 1983; and A.B. 5:04 dated September 1, 2011.  Three separate, discrete, stand-alone policies were established:  AB 5:04 (informed consent policy); AB 5:04A (the policy that creates the protocols for involuntary emergency administration of psychotropic medication for 72 hours); AB 5:04B (policy that creates the protocols for the administration of non-emergent involuntary administration of psychotropic medication).  The relevant policy, AB 5:04B, is set forth in full below.

On March 23, 2012, the Court granted and denied in part a motion to file a First Amended Complaint. The only substantive difference from the original Complaint was the addition of the State of New Jersey as a party to the action on to two counts – count six, for violations of the ADA, and count seven for violations of the RA. The Court allowed for the addition of the State of New Jersey as a party on the ADA claim, but denied the motion on the RA claim due to futility.

Curiously, the Amended Complaint filed thereafter on March 27, 2012 repeats the same claims against Defendant Alaigh in her official capacity as Commissioner of DHSS, despite the prior substitution and dismissal of all claims brought against the appropriate officer of DHSS. Additionally, the Amended Complaint includes count four, for violation of the Equal Protection Clause of the Fourteenth Amendment, which was also dismissed pursuant to court order on July 20, 2011. The State of New Jersey was properly included as a party to count six, for violations of the ADA.

Thus, the outstanding claims and corresponding Defendants are as follows: violations of substantive and procedural due process pursuant to the Due Process Clause of the Fourteenth Amendment (count one); violations of the right of access to the Courts due to failure to require a judicial hearing and appointment of counsel (count two); violations of the right to counsel pursuant to the Due Process Clause of the Fourteenth Amendment (count three); violations of the First Amendment due to infringement of the right to freely communication and produce ideas (count five); violations of the Americans with Disabilities Act (count six); and violations of the Rehabilitation Act (count seven). All claims are lodged against Commissioner Velez. Additionally, count six includes the State of New Jersey. These remaining claims are the subject of the cross-motions for summary judgment currently before the Court.

**B. Factual History**

    **a. A.B. 5:04B**

New Jersey State Hospitals are authorized to accept persons subject to involuntary patient commitment under N.J.S.A. 30:4-27.1 *et seq.* To be involuntarily committed, the patient must pose a dangerousness to self, others, or property, proven by clear and convincing evidence. After an order of temporary commitment, a civil commitment hearing is held within 20 days of admission. The civil commitment hearing is presided over by a judge and typically includes participation by a state attorney, an attorney appointed to represent the individual in question, the individual, and a psychiatrist. A typical uncontested initial commitment hearing takes between ten to twenty minutes, and takes place on-site on a weekly or biweekly basis. The presiding judge reviews the statutory requirements for dangerousness, the presence of mental illness that causes the dangerousness, whether the need for involuntary commitment is present, and whether or not a less restrict alternative is available. Following the initial commitment hearing and the entry of a final order of commitment, the patient is entitled to periodic review of the commitment. In 2011, a total of 8,636 civil commitment hearings took place.

A.B. 5:04B outlines the procedures to be followed in situations in which "(1) an involuntarily committed consumer has been diagnosed with a mental illness, and, as a result of mental illness, poses a likelihood of serious harm to self, others, or property if psychotropic medication is not administered;[4] and (2) the consumer will not or cannot provide informed consent to the administration of psychotropic medication recommended by the prescriber."

---

[4] "Likelihood of serious harm or dangerous" is defined by the policy to mean that within the reasonably foreseeable future, either:

        (a) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or

Patients subject to A.B. 5:04B are those placed by DHS at a state psychiatric hospital or the Ann Klein Forensic Center who are already civilly committed by a court pursuant to N.J. Ct. R. 4:74-7 (civil commitment due to mental illness which leads individual to be a danger to self, others, or property) or N.J. Ct. R. 4:74-7(h)(2) (Conditional Extension Pending Placement ("CEPP") status patients). CEPP patients are those who were initially involuntarily committed, but have since been determined to no longer constitute a danger to themselves or others, and are therefore found by the New Jersey Superior Court to be entitled to discharge. CEPP status patients are not immediately discharged due to the unavailability of an appropriate placement.

Thus, following an initial civil commitment based on a judicial finding of dangerousness to self, others, or property, A.B. 5:04B sets forth an additional administrative vehicle by which patients may be forcibly administered psychotropic medication upon a subsequent determination of "likelihood of serious harm or dangerous."

A.B. 5:04B does not apply to patients who voluntarily commit and reside in DHS psychiatric hospitals. Such individuals implicitly enter the facility without a judicial civil commitment hearing, and have the right to refuse psychotropic medication outside of an emergency. If the voluntarily-committed exhibit dangerousness, however, they are then processed to determine if medications can be administered despite their lack of consent pursuant

_____

attempts to commit suicide, or to inflict physical harm on one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health or safety; or (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (c) a substantial risk that physical harm will be inflicted by an individual upon property as evidenced by behavior which has caused substantial loss or damage to property.

to A.B. 5:04B.  Nor does A.B. 5:04B apply in emergent situations governed by A.B. 5:04A.  If less restrictive alternatives are not feasible in an emergency situation, A.B. 5:04A allows for a 72-hour period of forced medication for each emergency, with reassessments every 24-hours to determine if the situation remains emergent.

As of December 31, 2011, the population at the state hospitals operated by DMHAS was 1,569, excluding the 200-bed Ann Klein Forensic Center.  Of these 1,569 patients, 526 were on CEPP status, 803 were involuntarily committed, 13 were judicially designated as incompetent to stand trial, 15 were criminally committed for an Incompetency to Stand Trial evaluation, 183 were judicially adjudged not guilty by reason of insanity, and 29 were voluntarily committed.

### i.    Procedure

The substance and process of A.B. 5:04B being at issue, it is necessary to delve into the procedure in some detail.  First, a prescriber who is professional licensed to prescribe or renew a prescription for psychotropic medication completes the first section of the Involuntary Medication Administration Report ("IMAR") and documents:  the patient's name and hospital number; diagnosis; specific medications and co-medications to address side effects; any testing required because of the administration of the specific psychotropic medication being recommended; the rationale for the recommendation, including an explanation of the patient's likelihood of serious harm to self or others or property due to non-compliance; the formulations and dosage ranges of the proposed medication(s); less restrictive alternatives attempted to rule out; the efforts made to explain the need for the medication to the patient; and the objections, if

any, expressed by the patient to the medication(s). The prescriber then submits the IMAR to the Hospital Medical Director[5] who reviews it for completeness.

When the IMAR is complete, the Medical Director appoints a three-person panel to conduct a Medication Review Hearing. The purpose of the hearing is for the panel to hear relevant evidence, including but not limited to the treating prescriber's recommendation and the patient's objections, and to determine whether the patient may be medicated without consent in accordance with the policy. Additionally, when the IMAR is complete, the Medical Director notifies the hospital's Client Services Advocate ("CSA") to participate in the hearing and to support the patient in presenting his or her objections to taking the proposed medication. The CSA is to consult with the patient within one business day of being assigned to the patient, if such consultation has not already occurred.

The CSA is a licensed prescriber or Master's-prepared psychiatric nurse who directly reports to the CEO or Deputy CEO of each hospital and has a reporting relationship to the DMHAS Medical Director through the Coordinating Chief of CSAs, and whose primary responsibility is to evaluate individuals receiving treatment with psychotropic medication. The CSA accomplishes this by individual patient assessment, consultation with the treatment team, and participation in the Medical Review Hearings process. The CSA provides ongoing assessment and oversight to ensure that medication is only continued if it is the least restrictive alternative and appropriately approved. The CSA also develops and provides orientation and training programs on these procedures for staff and patients. The CSA may delegate non-clinical

---

[5] Each State psychiatric hospital has its own Medical Director. When the policy references the Medical Director, it allows for that individual or hospital CEO to appoint a clinical designee at the Director or Supervisory level to perform functions where appropriate.

monitoring and patient communication and education activities to appropriate staff including Client Services Representatives.

The Medical Director schedules the Medical Review Hearing to take place no later than five days after receiving the completed IMAR and provides the patient and the CSA with a Notice of Hearing and the IMAR at least two business days prior to the hearing. A copy of the Notice of Hearing and IMAR is also provided to the treating prescriber and the three panel members. The Notice of Hearing provides the date, time and location of the hearing and advises the patient of the right to consult with the CSA, to have the CSA assist the patient at the hearing, to testify, to present witnesses and documentary evidence and to question witnesses. The patient also has the right at his/her own expense to have another mental health professional or counsel present at the hearing. If the patient cannot consent the CSA must be at the hearing to assist the patient in all circumstances.

The composition of the panel includes a non-treating psychiatrist who acts as chairperson of the committee. The non-treating psychiatrist may have other duties at the hospital or Division, but is not to be currently involved in the treatment of the patient who is challenging the administration of medication. In addition, the panel consists of an administrator (Unit Director or above), and another clinician, again none of whom is currently involved in the patient's treatment or diagnosis. Any Unit Director assigned is not to be from the patient's unit. The Medical Director is to utilize a list created in accordance with the policy to select all panel members, and the administrators and clinicians assigned to sit are selected on a rotating basis.

In addition to receiving the IMAR and Notice of Hearing, the panel members are provided with copies of any documentation the patient submits prior to the hearing. The

patient's clinical records are also made available to the panel members and to the CSA prior to the hearing.  The chairperson is to review the patient's clinical record prior to the hearing.

The Medication Review Hearing takes place on the patient's unit.  The treating prescriber is present, as is the patient, his/her guardian or mental health care representative if applicable, and any other mental health professional or representative retained by the patient, and any other witness, if available, called by the patient.  The patient has the right to attend and present testimony and documentary evidence, and to question witnesses and question documents during the hearing.  Testimony is to be taken concerning the diagnosis, the specific medication(s) and co-medications to address side effects as well as any testing required because of the administration of the specific psychotropic medication being recommended for the patient, the rationale for the recommendation (including an explanation of the patient's likelihood of serious harm to self or others or property due to non-compliance), the formulations and dosage ranges of the proposed medication(s), less restrictive alternatives attempted or ruled out and the objections, if any, expressed by the patient to the medication(s).  The CSA shall be present at the hearing in order to support the patient and may assist the patient in presenting evidence if requested.

After all witnesses have been heard, the members of the panel convene out of the presence of the patient and other hearing participants to discuss the matter.  If the panelists determine by a majority vote, with the non-treating psychiatrist in the majority, that the patient has a mental illness, and as a result of that mental illness poses a likelihood of serious harm to self, others or property without psychotropic medication, the patient may be medicated without his or her consent.  However, if the chairperson/non-treating psychiatrist is not in the majority, or votes against the involuntary medication, the proposed medication is not authorized.

The panel records its decision and completes the required information on the Hearing Outcome Form, which is provided to the CSA, the patient, and the prescriber by the end of the business day on which the hearing is held.[6] If medication has been authorized, the CSA provides the patient verbal and written notice of his or her appeal rights. A copy of the Hearing Outcome Form is sent to the Medical Director and a copy is placed in the patient's chart. If the involuntary administration of psychotropic medication is not authorized by the panel, the patient's treatment team will convene to adjust the treatment plan to reflect the absence of the proposed psychotropic medication. If a different medication is part of the new treatment plan, and the patient subsequently refuses the medication, the Involuntary Medication Administration process must be repeated before the revised medication can be administered on a nonemergency basis.

The patient may submit an appeal to the Hospital Medical Director within twenty-four hours after notice of the panel's initial decision. The CSA must offer to assist the patient in filing an administrative appeal. Notably, while an administrative appeal is pending, only emergency medication may be administered to the patient without his or her consent. The patient may continue to refuse medication, and medication is not to be administered in accordance with the panel decision until the time in which to appeal has passed.

---

[6] The Hearing Outcome Form contains the following information: 1) The disposition; 2) The names of the witnesses presented; 3) A list of evidence presented; 4) A summary of the patient's position and objections to the proposed medication; 5) If the medication of the patient was not authorized, what alternative treatments the panel believes should be attempted, if any; 6) If medication was authorized over the objection of the patient, why the medication is necessary to treat the patient and to avoid the likelihood of dangerousness or harm to self, others or property and as such is essential to the current treatment plan; 7) Whether or not the patient has requested any modifications or will consent to other types of medication; 8) Authorization for the treating prescriber to administer medication for up to 14 days; 9) The formulation and dosage of the medication(s) authorized by the panel.

The Hospital Medical Director, or if absent a designee, reviews the patient's appeal of the panel decision, in addition to the Involuntary Medication Administration Report and the Hearing Outcome Form. If s/he concludes that the Panel followed the Involuntary Medication Procedures in A.B. 5:04B, that its conclusions of fact were supported by the evidence presented, and that the medications authorized are within the current standard of care, s/he will affirm the decision in writing. However, if the policy was not adhered to procedurally, the panel's decision to medicate will be vacated by the Medical Director. The Medical Director issues a decision within twenty-four hours of receipt of the appeal, and arranges for the delivery of the decision to the patient, the CSA's office, and the prescriber. Any further appeal is made to the Appellate Division of the Superior Court pursuant to N.J. R. Ct. 2:2-3(a) (2). The Administrative Bulletin does not speak to forced medication pending appeal to the appellate division. However, the Statement of Undisputed Facts submitted jointly by the parties confirms that if the Medical Director denies the patient's appeal, the patient can be forcibly medicated immediately – i.e., there is no stay pending the patient's petition to a court. (SOUF ¶ 72.)

If the patient is medicated without his or her consent through the Non-Emergent Involuntary Medication Procedure, the CSA meets with the patient as soon as possible, and reviews the patient's chart at that time and once every month thereafter. The CSA documents the review on a Medication Review Form, signs the original and notifies the prescriber by email or writing of the results of the review. The prescriber then acknowledges receipt of the notification, by email or in writing, and reports the results of any discrepancies noted during the review to the CSA.

Unless a shorter time is approved by the panel or the biweekly review or consent ends the authorization, an Involuntary Medication Administration Report expires 90 days from the date

the medication is first administered under the process for patients who do not or cannot consent to medication. If the patient continues not to provide consent for medication at the time of expiration, a new Involuntary Medication Report is completed, and the Medication Review Hearing procedures are followed. At the time any second or subsequent Involuntary Medication Administration is initiated, the prescriber is to consider alternative medications and interventions, indicate his or her opinion as to why the medication has not improved the patient's clinical condition and encouraged his/her voluntary adherence, and is to document the reason for the patient's continued rejection of alternatives.

The CSA maintains files on every patient receiving an Involuntary Medication Administration review. In addition to containing copies of the Involuntary Medication Administration Report and the Hearing Outcome Report, the file also contains copies of the Medication Review forms, although originals are maintained in the patient's medical record. Last, the Medical Director maintains a log of all patients receiving involuntary medication.

### ii. Implementation

Between June and December 2012, approximately 255 Medical Review Panel hearings took place. In all but six of these hearings, the Medication Review Panel voted in favor of administration of medication. In 56 cases, patients appealed the Medication Review Panel's decision, and the Medical Director affirmed the Panel's decision in 55 of these 56 cases. In the 199 cases where the patient did not appeal the Panel's decision, it was not because the patient had a change of mind and consented, s/he simply did not continue to challenge the drug administration. The one time that the Medical Director ruled in favor of an appellant's contest, it was because the patient was not given notice that the time of the hearing had changed.

In support of its argument that Defendants routinely fail to comply with the policy outlined in A.B. 5:04B, DRNJ points to specific patients' experiences with the process, although DRNJ does not directly challenge the individual dispositions. Indeed, the individual dispositions raise questions of fact which are not appropriate for summary judgment review. For completeness, the Court briefly addresses these contentions, although the focus of the opinion herein concerns the facial challenge of the policy.

DRNJ maintains that the required reports are deficient in description. For example, DRNJ explains that prescribing psychiatrists cited observations of behavior such as "aggression" and "assaultive behavior" as rationale for recommending forced medication but did not include descriptions of specific incidents or when they occurred. According to DRNJ, in some cases the sole rationale for involuntary medication was that the patient's behavior had improved since the forced administration of medication. Further, DRNJ maintains that in some instances prescribing psychiatrists initiated the forced medication process without citing any information related to likelihood of harm, instead referring to symptoms of the patient's illness or the patient's general refusal to participate in the treatment process.

DRNJ also takes issue with the appeals process in place. According to DRNJ, in several instances, patients whose medication was authorized by the Panel were forcibly medicated before the 24-hour time limit on an appeal had expired, in express violation of A.B. 5:04B. Second, although CSAs are obligated to assist patients in preparing appeal papers, some appeals included only one or two sentences in support of the patient's position.

Additionally, DRNJ submits that the appeals decisions are also deficient in description and that the Medical Director simply provided a short explanation for their affirmation of the panel's decision, sometimes without acknowledgement of the patient's specific objections.

Patients wrote on appeal papers: "The doctor didn't hear me out!!!"; "I don't want any meds just need time to clear my head by going to groups, etc."; "I don't want to be on meds because it hurts my body"; and "When I was medicated I had a bad day." In responding to the appeal, however, the Medical Director checked the box to indicate affirmation, but left blank the portion of the review form describing the Director's rationale.

**C. Side Effects of Psychotropic Medication**

Psychotropic drugs are medications that have a direct effect on the central nervous system and which can modify emotion, cognition, and behavior. Examples of psychotropic drugs include antipsychotics, antidepressants, mood stabilizers, anxiolytics, sedative-hypnotics, and stimulants. Known side effects which may be associated with the use of psychotropic drugs, are muscle cramps, uncontrollable tremors, shakiness, restlessness, disturbances in walking, constipation, dizziness, and dryness of mouth. See also Harper, 494 U.S. at 229 ([A]ntipsychotic drugs "can have serious, even fatal, side effects.").

Another side effect is a condition called tardive dyskinesia, "irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.") Id.; (See also SOUF ¶ 13, Pl. Ex. 19 (AIMS+EPS Examination Procedure) at JV016013. Tardive dyskinesia may become permanent if not diagnosed and treated. (SOUF ¶ 13.) The state's pharmacology guidelines acknowledge that patients in long-term treatment with various antipsychotic drugs have "high prevalence rates for parkinsonism, akathisia, and tardive dyskinesia." (SOUF ¶ 14, Pl. Ex. 14 (N.J. Division on Mental Health Services Pharmacological Practice Guidelines for the Treatment of Schizophrenia) at JV015993.) In addition to these side effects, some patients may experience allergic reactions to psychotropic drugs.

The goal of such medication is to change the way its user thinks.  See, e.g., Sell v. U.S., 538 U.S. 166, 174 (2003). The mind-altering effects of psychotropic drugs have been repeatedly recognized by the Supreme Court and other courts.  Riggins v. Nevada, 504 U.S. 127, 134 ("The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes."); Mills v. Rogers, 457 U.S. 291, 293 n. 1 (1982) ("It is not disputed that [antipsychotic] drugs are 'mind-altering.' Their effectiveness resides in their capacity to achieve such effects.").

As indicated above, A.B. 5:04B provides for the monitoring of patients for evidence of side effects.  For example, this monitoring established that of all patients receiving medication at Ann Klein, there were 14 Adverse Drug Reaction (ADR) reports in 2008, 10 ADRs in 2009, 4 ADRs in 2010, and 3 ADRs in 2011.  A.B. 5:04B also requires the introduction of co-medications to control side effects, regular periodic testing for side effects, and semi-monthly reports of a treating psychiatrist's evaluation and monitoring of potential medication issues.

## II.     DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact. Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999). See also Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party

> waives judicial consideration and determination whether genuine
> issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing

Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). If review of cross-motions for

summary judgment reveals no genuine issue of material fact, then judgment may be entered in

favor of the party deserving of judgment in light of the law and undisputed facts. See Iberia

Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown &

Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

Moreover, the nonmoving party must show by competent evidence that factual disputes

regarding material issues of fact exist. "[O]nly evidence which is admissible at trial may be

considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers

Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995).

**B. Analysis**

**1. Whether A.B. 5:04B violates the Due Process Clause of the Fourteenth Amendment.**

In consideration of the present substantive and procedural due process challenges, the

Court is informed by the reasoning set forth by the United States Supreme Court in Washington

v. Harper, 494 U.S. 210 (1990), the seminal involuntary medication case, and its progeny.

In Harper, the Supreme Court considered the question whether and under what

circumstances a state could forcibly administer antipsychotic drugs to a prisoner. The "central

question" addressed was "whether a judicial hearing is required before the State may treat a

mentally ill prisoner with antipsychotic drugs against his will." Id. at 213. The prisoner therein

challenged the forced administration of antipsychotic drugs after a committee determined that he

was a danger to others as a result of his mental illness, pursuant to a policy established by the

state of Washington.  Harper brought a challenge asserting violation of the Due Process, Equal Protection, and Free Speech Clauses of the Federal and State Constitutions.

The Washington Supreme Court found that "the State could administer antipsychotic medication to a competent, nonconsenting inmate only if, in a judicial hearing at which the inmate had the full panoply of adversarial procedural protections, the State proved by 'clear, cogent, and convincing' evidence that the administration of antipsychotic medication was both necessary and effective for furthering a compelling state interest." Id. at 218.

However, the Supreme Court reversed the decision based on consideration of the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment.  "[T]he substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient." Id. at 221.

On substantive due process, Harper instructs that there is "no doubt that, in addition to the liberty interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 222 (internal reference omitted).  Consistently, "[t]he extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement." Id.  Harper reasoned:

> The Policy under review requires the State to establish, by a medical finding, that a mental disorder exists which is likely to cause harm if not treated.  Moreover, the fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the

legitimate needs of his institutional confinement.  These standards,
which recognize both the prisoner's medical interests and the
State's interests, meet the demands of the Due Process Clause.

Id. at 222-223.

Harper went on to explain that "[t]he legitimacy, and the necessity, of considering the

State's interests in prison safety and security are well established by our cases."  Id. at 223.  The

proper standard for determining the validity of the prison regulation claimed to infringe on an

inmate's constitutional rights is "whether the regulation is 'reasonably related to legitimate

penological interests.'"  Id. at 224 (relying on the test set forth in Turner v. Safely, 482 U.S. 78

(1987)).  The Court applied three of the Turner reasonableness factors:

"First, there must be a 'valid, rational connection' between the
prison regulation and the legitimate governmental interest put
forward to justify it." Second, a court must consider "the impact
accommodation of the asserted constitutional right will have on
guards and other inmates, and on the allocation of prison resources
generally." Third, "the absence of ready alternatives is evidence of
the reasonableness of a prison regulation," but this does not mean
that prison officials "have to set up and then shoot down every
conceivable alternative method of accommodating the claimant's
constitutional complaint."

 Applying these factors to the regulation before us, we conclude
that the Policy comports with constitutional requirements. There
can be little doubt as to both the legitimacy and the importance of
the governmental interest presented here. There are few cases in
which the State's interest in combating the danger posed by a
person to both himself and others is greater than in a prison
environment, which, "by definition," is made up of persons with "a
demonstrated proclivity for antisocial criminal, and often violent,
conduct."  We confront here the State's obligations, not just its
interests. The State has undertaken the obligation to provide
prisoners with medical treatment consistent not only with their
own medical interests, but also with the needs of the institution.
Prison administrators have not only an interest in ensuring the
safety of prison staffs and administrative personnel, but the duty to
take reasonable measures for the prisoners' own safety.  These
concerns have added weight when a penal institution . . . is
restricted to inmates with mental illnesses. *Where an inmate's*

*mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness.*

[The challenged policy] is a rational means of furthering the State's legitimate objectives. Its exclusive application is to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others. The drugs may be administered for no purpose other than treatment, and only under the direction of a licensed psychiatrist. There is considerable debate over the potential side effects of antipsychotic medications, but there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior.

Id. at 224-26 (citations and footnote omitted) (emphasis added).

Thus, Harper found that

given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. Policy 600.30 comports with these requirements; we therefore reject respondent's contention that its substantive standards are deficient under the Constitution.

Id. at 227.

Next, Harper held that the state's administrative hearing procedures comported with the procedural protections of the Due Process Clause, and that the Washington Supreme Court erred in requiring a judicial hearing as a prerequisite for the involuntary treatment of prison inmates. Id. at 228. The Supreme Court relied on the Mathews v. Eldridge balancing test, which takes into consideration "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due

23

under the Fourteenth Amendment." Id. at 229 (relying on Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

Harper took note of the prisoner's substantial interest in avoiding forcible medication and the significant side effects of antipsychotic medication. "Notwithstanding the risks that are involved," the Court concluded that "an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. The Due Process Clause 'has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer.' Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms." Id. at 231 (internal reference omitted).

> 'Although we acknowledge the fallibility of medical and psychiatric diagnoses, see *O'Connor v. Donaldson, 442 U.S. 563, 584 (1975)* (concurring opinion), we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.' *Parham, 442 U.S., at 607-609.*

Id. at 232.

In reaching its conclusion that the procedures comported with due process, the Supreme Court primarily looked to the facts that the recommendation was made by a licensed psychiatrist; that the decisionmakers were not involved in the prisoner's daily care; and that administration of antipsychotic drugs was at all times consistent with the degree of care, skill, and learning

expected of a reasonably prudent psychiatrist in the state acting in the same or similar circumstances. See id. at 233. In addition, the Court noted the inmate's right to notice of the adversary hearing, right to be present at an adversary hearing, right to present and cross-examine witnesses, and right to judicial review of the hearing committee's decision. See id. at 235.

Notably, Harper specifically disagreed with the contention that due process mandates assignment of counsel:

> "It is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgments." Given the nature of the decision to be made, we conclude that the provision of an independent law adviser who understands the psychiatric issues involved is sufficient protection.
>
> Id. at 236 (citation omitted).

In conclusion, Harper held that there was no violation of substantive or procedural due process rights where there is "an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interest in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself and others. The Due Process Clause does require certain essential procedural protections," all of which were provided for by the policy therein. Id. at 236.

The Ninth Circuit Court of Appeals recently applied the Harper standard with respect to a pretrial detainee. U.S. v. Loughner, 672 F.3d 731, 752 (9th Cir. 2012) ("[W]hen the government seeks to medicate a detainee – whether pretrial or post-conviction – on the grounds that he is a danger to himself or others, the government must satisfy the standard set forth in *Harper*.") Coextensively, Loughner followed the Harper analysis on procedural rights, including a nearly identical challenge of his right to counsel and a judicial hearing regarding his forced administration of psychotropic medication.

Last, Loughner examined the pretrial detainee's as-applied challenge to his "Harper Hearing," and found that the committee's conclusion was not arbitrary. Of note, Loughner examined the role of the staff representative therein:

> Here, Getchell's failure to present any affirmative evidence or question any of the evidence in support of involuntary medication may indicate that his representation was unqualified or procedurally defective. See *Morgan*, 193 F.3d at 265-66 (noting that the staff representative's lack of "meaningful participation" during the administrative hearing supported the inference that the staff representative lacked "sufficient education and experience" as required by the regulations); *United States v. Humphreys*, 148 F. Supp. 2d 949, 953 (D.S.D. 2001) (finding that the staff representative did not meet the requirements of due process because she presented no evidence; testified against the defendant, stating that she believed he had a mental illness; and may have filed a disciplinary report against the defendant when he first arrived at FMC-Rochester). Or, it may simply indicate that Getchell had nothing to say because the evidence was overwhelming that Loughner required medication and that his prescriptions were standard protocol. We cannot determine the answers to these questions from this record. If we were deciding this matter based on the *Harper* III hearing alone, we might well send the case back for further proceedings or a new *Harper* hearing.

> Id. at 764.

Similarly, the Second Circuit Court of Appeals recently extended the "Harper dangerousness test" to dangerous pre-trial criminal detainees. See U.S. v. Hardy, 2013 U.S. App. LEXIS 15942 (2d Cir. Aug. 2, 2013). The appeals court found that "[t]he [district] court properly set out the standard established by Harper, that there must be a showing that the inmate has a serious mental illness, that he poses a danger to himself or others, and that the proposed treatment is in the inmate's medical interest." Id. at *47.

Having set forth the foundational cases which have considered the issue, the Court now turns the arguments submitted by the parties.

### i. Substantive Due Process

DRNJ argues that the failure to assign counsel "does not square with well-established case law stating that where a person is subject to a 'massive curtailment of liberty,' *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980), it is imperative that they be provided counsel as 'the first line of defense against constitutional violations.' *Bonds v. Smith*, 430 U.S. 817, 822-823, 828 (1977)." (Pl.'s MSJ Br. at 26-27.) DRNJ maintains that "the refusal to provide counsel ignores the special needs of patients in psychiatric hospitals." (Id.) DRNJ submits that the situation is "easily remedied if patients are provided with counsel to assist them in involuntary medication proceedings" since "counsel knowledgeable about mental health law are already practicing in Defendants' hospitals and participate in weekly or biweekly [psychiatric civil commitment] hearings." (Id.) Second, DRNJ argues that psychiatric patients are being denied their substantive due process right to access to the courts to challenge their conditions of confinement. Specifically, DRNJ challenges the failure to provide: a judicial hearing prior to nonconsensual administration of psychotropic drugs, counsel, and law libraries or other legal resources.

Defendants counter that Harper applies with equal force to individuals committed to state psychiatric hospitals. First, Defendants argue that the safety and treatment concerns at correctional facilities are equally present at psychiatric hospitals, where the majority of patients have been civilly committed by a court because they have a documented history of mental illness, are a danger to themselves or others, and have demonstrated the need for psychiatric treatment. Thus, the threat of violent and aggressive behaviors is present in the State hospitals. "This proclivity for antisocial and often violent conduct is more frightening for its unpredictability and suddenness. Deposition testimony of Judge Killian, Dr. Fox, and other Plaintiff's witnesses confirms that the use of psychotropic medication is often an essential

component in the treatment of psychiatric patients to effectively manage dangerousness." (Def. MSJ Br. at 9.)

Second, Defendants point the Court to a persuasive decision arising from the Tenth Circuit Court of Appeals, Jurasek v. Utah State Hospital, 158 F.3d 506 (10th Cir. 1998). The relevant premise of Jurasek is that the mentally institutionalized are not entitled to greater protections than prisoners when it comes to forced administration of psychotropic drugs, because involuntary medication is not a form of punishment, but rather a form of treatment. Id. at 511. Jurasek reasons:

> If [treatment with psychotropic drugs] was considered punitive, involuntarily-committed mental patients would undoubtedly be entitled to greater due process rights before being forcibly treated. See *Youngberg v. Romeo*, 457 U.S. 307, 321-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). The lack of punishment in the context of forced medication, however, removes any need to provide involuntarily-committed patients with greater due process protection than prisoners.
>
> Id.

"The touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998). Substantive due process protects individuals from government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (internal references omitted). It does not protect "against government action that is incorrect or ill-advised" but against those circumstances in which "government action

might be so arbitrary that it violates substantive due process regardless of the fairness of the procedures used." Id. (internal references omitted).[7]

With respect to the substantive due process issues, the Court follows Harper and its progeny. It is well established that an individual has a liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Fourteenth Amendment. Psychotropic drugs alter the chemical balance in a patient's brain and can produce serious, even fatal, side effects. See Harper, 494 U.S. at 229. However, where the individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in preventing the individual from harming himself or others residing or working in the institution. Here, patients have already been civilly committed based on a finding of dangerousness to self, others, or property, before a judge in a court of law in a process which includes assignment of counsel. A subsequent administrative hearing is provided before a committee without the assignment of counsel, for the purposes of administration of psychotropic drugs upon a finding of likelihood of serious harm to self, others, or property. This subsequent hearing does not violate due process rights where a competent advocate is assigned to assist the patient in the process. The decision to involuntarily administer psychotropic drugs is a medical decision reached by independent

_____

[7] "When the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide him for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the . . . Due Process Clause."

County of Sacramento v. Lewis, 523 U.S. 831, 851 (1998) (quoting DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. at 199-200 (citation and footnote omitted)).

medical professionals based on a finding of dangerousness.  At its heart, this is a medical

decision reached by competent medical professionals, and cannot be said to be arbitrary,

conscience-shocking, or oppressive in a constitutional sense.

However, this holding does not extend to New Jersey psychiatric patients on Conditional

Extension Pending Placement ("CEPP") status.   These CEPP status patients were initially

involuntarily committed to inpatient DHS hospitals, but have since been determined by the New

Jersey Superior Court to no longer constitute a danger to themselves or others and therefore are

entitled to discharge.  The sole reason for CEPP patients' continued commitment is temporary

unavailability of an appropriate placement.  Accordingly, no legitimate government objective

exists as to the forced medicating of CEPP status patients, and the continued medication of these

individuals falls within the paradigm of state action which is arbitrary, conscience-shocking and

oppressive in a constitutional sense.  The Court therefore grants DRNJ's request for injunctive

relief, in part, as to CEPP status patients.

### ii.  Procedural Due Process

The next issue is whether the process set forth in A.B. 5:04B violates patients' procedural

due process rights.  The procedural question concerns the minimum process required by the

Constitution.  See Mills v. Rogers, 457 U.S. 291, 299 (1982).  Procedural due process involves

ascertaining "whether the State's nonjudicial mechanisms used to determine the facts in a

particular case are sufficient."  Harper, 494 U.S. at 220.

"The fundamental requirement of due process is the opportunity to be heard at a

meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

However, "due process, unlike some legal rules, is not a technical conception with a fixed

content unrelated to time, place and circumstances.  Due process is flexible and calls for such

procedural protections as the particular situation demands." Id. at 334 (internal reference omitted). The balancing test set forth in Mathews v. Eldridge, provides that the court must consider (1) the private interest at stake; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id. at 335. The private interest at stake is clear, and is delineated at length above. In short, it is well-established that patients have a constitutionally-protected substantial liberty interest in remaining free from unwanted medication.

With respect to the second Mathews v. Eldridge prong, DRNJ argues that a risk of an erroneous deprivation of such interest exists through the procedures used, and that additional or substitute procedural safeguards would add probable value in avoiding such infringement. First, DRNJ argues that the Medication Review Panels apply a vague "likelihood" of harm standard, which includes no time limit, allowing doctors to cite purported instances of violence dating back weeks, month, or even years, as well as activity that predates a patient's admission, in support of involuntary medication. Further, DRNJ takes issue that the Medical Review Panels are not required to determine the "likelihood" of harm by any standard of proof. DRNJ argues that as a result, treating psychiatrists have frequently reported only the most conclusory statements, such as that patients are "assaultive" or "intrusive." DRNJ contends that Medication Review Panels agree with these conclusory allegations with great frequency.

DRNJ also points to A.B. 5:04B's failure to specify rules of evidence, or require that the Medication Review Hearings be recorded or transcribed, "making it nearly impossible for a patient, or Medical Director on appeal, to credibly review the evidence considered by the

Medication Review Panel. And with the cards already stacked against them, patients are further deprived of adequate representation in these hearings, and as a result are not able to voice their objections and lay out the reasons that they have refused medication or provide information refuting the testimony of the prescribing psychiatrist. (See SOUF ¶ 94.)" (Pl.'s MSJ Br. at 36.) DRNJ contends that the likelihood of erroneous deprivation is even greater for patients on CEPP status because they have already been adjudicated to no longer constitute a danger to themselves or others.

Further, DRNJ challenges A.B. 5:04B on the basis that it does not require any independent decision makers to participate in Medication Review Hearings. (Pl.'s MSJ Br. at 37, citing generally Pl. Ex. 56, JV251491-517.) DRNJ submits that the make-up of the panel of entirely hospital employees

> ignores the principle that due process 'demands impartiality on the part of those who function in judicial or quasi-judicial capacities.' *Allan v. Ashcroft*, 122 F. App'x 543, 551 (3d Cir. 2004) (internal quotation omitted); *see also Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (same); *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 138 (3d Cir. 1986) (denial of an impartial hearing is a denial of due process 'regardless of the magnitude of the individual and state interest at stake, the risk of error and the likely value of additional safeguards.'). Because A.B. 5:04B does not require that independent decision-makers participate in Medication Review Hearings (Pl. Ex. 56 at JV251496), there is a strong likelihood of bias by the Panel. As Defendants' witnesses have already admitted, employees are inherently not independent of their employer. (SOUF ¶ 27, Pl. Ex. Luchkiw Tr. 63:17-22 (stating that he is not independent from the hospital where he works because 'that's who signs [his] check."); SOUF ¶ 27, Pl. Ex. 26, Haynes Tr. 85:15-16.) Moreover, Panel members may be pressured into authorizing medication prescribed by their colleagues or may agree to authorize medication prescribed by colleagues in return for like treatment. Thus, even if A.B. 5:04B's procedural safeguards were sufficient to protect patients from any risk of error, and they clearly are not, the policy fails to satisfy due process because the Medical Review Panels are

not impartial.  *See Allan v. Ashcroft*, 122 F. App'x 543, 551 (3d Cir. 2004).

(Pl.'s MSJ Br. at 37-39.)

Last, looking to the third prong of the <u>Mathews v. Eldridge</u> balancing test, DRNJ contends that the state has no interest in preventing patients from having access to a judicial hearing and counsel.  DRNJ points out that "*[t]housands* of civil commitment hearings are already held every year on site in the same New Jersey psychiatric hospitals that administer A.B. 5:04B.  (SOUF ¶ 98.)  In contrast, there were only 31 Medication Review Panel decisions in September 2012 in these same hospitals.  Providing counsel and hearings for these few patients would require Defendants to allocate only minimal additional resources." (Pl.'s MSJ Br. at 31) (emphasis in original).

In <u>Harper</u>, the Supreme Court found it sufficient that the decision makers were not involved in the prisoner's daily care and consisted of a psychiatrist, psychologist and the center's Associate Superintendent; that the administration was at all times consistent with the degree of care, skill, and learning expected from a reasonably prudent psychiatrist; that the inmate had a right to notice of and presence at the adversary hearing; that the inmate had a right to present and cross-examine witnesses; and that the inmate had a right to judicial review of the hearing committee's decisions.  494 U.S. at 229, 235.

A.B. 5:04B provides similar safeguards.  The panel consists of a chair who is a non-treating psychiatrist who may have other duties at the hospital or Division, an administrator (Unit Director or above), and another clinician.  None of the panel members may be currently involved in the patient's treatment or diagnosis, and any Unit Director assigned is not to be from the patient's unit.  The patient similarly has a right to notice and to be present at the hearing, a right to present and cross-examine witnesses, and a second right of appeal to the Superior Court

Appellate Division.  The panel's decision is recorded on a Hearing Outcome Form, which lists: 1) the disposition; 2) the names of witnesses present; 3) a list of evidence presented; 4) a summary of the patient's position and objections to the proposed medication; 5) if medication of the patient was not authorized, what alternative treatments the panel believes should be attempted, if any; 6) if medication was authorized over the objection of the patient, why the medication is necessary to treat the patient and to avoid the likelihood of danger or harm to self, others, or property and as such is essential to the current treatment plan; 7) whether or not the patient has requested any modifications or will consent to other types of medication; 8) authorization for the treating prescriber to administer medication for up to 14 days; and the formulation and dosage of the medication(s) authorized by the panel.

After the initial hearing, involuntary medication can continue only with periodic review, with a 14 day hearing to be held to determine whether further involuntary medication will be authorized, up to a period of 90 days.  The authorization for involuntary medication expires 90 days from the date the medication is first administered, at which time the prescriber considers alternative medications and interventions, indicates his or her opinion as to why the medication has not improved the patient's clinical condition and encouraged the patient's voluntary adherence, and documents the reason for the patient's continued rejection of alternatives.  If the patient continues to refuse consent for medication, a new Involuntary Medication Report is completed via the Medication Review Hearing procedures.

With respect to DRNJ"s contention that the vagueness of the "likelihood of serious harm or danger" standard set forth by A.B. 5:04B, and repeated again here for ease, it is defined by the policy to mean that within a reasonably foreseeable future, either:

> (a) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or

attempts to commit suicide, or to inflict physical harm on one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health or safety; or (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (c) a substantial risk that physical harm will be inflicted by an individual upon property as evidenced by behavior which has caused substantial loss or damage to property.

Essentially, DRNJ argues that due to the vagueness of the definition, treating psychiatrists report only conclusory statements which are rubber-stamped by the Medication Review Panel, and due to the definition's failure to specify time limits to rely on purported instances of violence, the definition set forth is void for vagueness. However, these are sensitive decisions which are vetted within the discretion of competent medical professionals. The Court finds that the definition set forth in A.B. 5:04B is not void for vagueness, and provides specific delineated examples of evidence of such harm. Indeed, the definition set forth by A.B. 5:04B is strikingly similar to that considered in Harper.[8] The challenge to the lack of transcription of the proceedings is coextensive. The Panel is required to note its decision in full. Thus, transcription

---

[8]     In Harper, "likelihood of serious harm" was defined by the Washington code as:

"either: (a) [a] substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (3) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others."

Harper, 494 U.S. at 215, n. 3 (quoting Wash Rev. Code 71.05.020(3)).

is not required pursuant to the Fourteenth Amendment, because the basis of the panel's opinion should be readily apparent and detailed by the eight rudiments in the Hearing Outcome Form.

Similarly, DRNJ argues that patients are deprived adequate representation in these hearings due to lack of assigned counsel. However, throughout the process, the patient is assigned a Client Services Advocate ("CSA") to support him or her in presenting objections to the proposed medications; assist the patient at the hearing, to provide verbal and written notice of the patient's right to appeal; assist in filing an administrative appeal; review the patient's chart if forced medication is administered and once every month thereafter, and document such review; and maintains files on every patient receiving an involuntary medication administrative review. The operative relevant role of the CSA is to assist the patient in his or her objection to the administration of forced medication. "It is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgments." <u>Harper</u>, 494 U.S. at 236.

Next, DRNJ asserts the need for participation of independent decision makers in the Medication Review Hearings. However, like <u>Harper</u>, "[n]one of the hearing committee members may be involved in the inmate's current treatment or diagnosis. . . . In the absence of record evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide an inmate with a full and fair hearing in accordance with the Policy. . . . As we reasoned in *Vitek*, it is only by permitting persons connected with the institution to make these decisions that courts are able to avoid 'unnecessary intrusion into either medical or correctional judgments.' *Vitek, supra, at 496;* see *Turner, 482 U.S., at 84-85, 89.*" <u>Id.</u> at 233-34. "The practical effect of mandating an outside decisionmaker such as an 'independent psychiatrist' or judge in these circumstances may be chimerical. Review of the literature indicates that outside decisionmakers concur with the treating physician's decision to treat a

patient involuntarily in most, if not all, cases.  Review by judges of decisions to override a patient's objections to medication yields similar results.  In comparison, other studies reveal that review by internal decisionmakers is hardly as lackluster as Justice Stevens suggests." Id. at 235, n. 13 (internal references omitted).

Relatedly, Harper and its progeny firmly establish that notwithstanding an individual's substantial interest in avoiding forcible medication and the significant potential side effects of such medication, a patient's interests are "adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge.  The Due Process Clause 'has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer.'" Harper, 494 U.S. at 231.  "Absent evidence of resulting bias, or evidence that the actual decision is made before the hearing, allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" Id. at 235, quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  The Supreme Court has also rejected the contention that a Harper dangerousness hearing must be conducted in accordance with the rules of evidence.  Id. at 235.

However, like the substantive due process analysis above, this holding does not extend to CEPP status patients who have since been determined to no longer constitute a danger and are therefore ready for release.  The private interest at stake with these individuals is higher and any deprivation of their liberty interests from unnecessary forced psychotropic drugging is clearly erroneous.  The Government has no interest in continuing to forcibly medicate them.  Any argument in favor of their continued medication can only be interpreted as a method of punishment for their involuntary commitment and/or a questionable action by the state to

needlessly sedate its patients into complicity. Such action is clearly not in the patient's medical interests. Thus, the <u>Mathews v. Eldridge</u> balancing test for CEPP status patients weighs in favor of their liberty interests, and their continued forced psychotropic medication is therefore a violation of their procedural due process rights.[9]

## 2. Whether A.B. 5:04 B violates the ADA and the RA.

Title II of the Americans with Disabilities Act provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove a violation of Title II, a party must therefore establish: (1) that s/he is a "qualified individual" with a disability;[10] (2) that s/he was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; and (3) that such exclusion or discrimination was due to the disability. <u>Id.</u>; <u>see</u> <u>Muhammad v. Court of Common Pleas of Allegheny County, Pa.</u>, No. 11-3669, 483 Fed. Appx. 759 (3d Cir. May 15, 2012). <u>See also</u> 29 U.S.C. § 794(a) (Section 504 of the Rehabilitation Act) (prohibition on disability

---

[9]     DRNJ raised two additional challenges which relate to the due process analysis above. First, DRNJ argues that A.B. 5:04B violates patients' right of access to the courts by failing to require a judicial hearing and assignment of counsel pursuant to the Due Process Clause. The merits of this challenge are consistent with the procedural and substantive due process rights addressed above. Second, DRNJ submits that the forced administration of antipsychotic drugs raises First Amendment concerns because of the effect on the individual's ability to think and communicate. However, these rights are subject to the same balancing test as liberty interests set forth above. <u>See</u> <u>Jurasek v. Utah State Hosp.</u>, 158 F.3d 506, 511 (10th Cir. 1998).

[10]     A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modification to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

discrimination in federal programs, which additionally requires that the public entity be a

recipient of federal funding, and a showing of discrimination "solely by reason of" a disability).

The Attorney General's Title II regulations are "consistent with" the regulations of Title 28 of

the Code of Federal Regulations implementing Section 504 of the Rehabilitation Act.  See 42

U.S.C. § 12134(b); see also Olmstead v. L.C., 527 U.S. 581, 606, n. 16 (1999).

Enacted in 1990, the ADA is the Federal Government's most recent and extensive

endeavor to address discrimination against persons with disabilities.  Congress for the first time

referred expressly to "segregation" of persons with disabilities as a "form of discrimination," and

to discrimination that persists in the area of "institutionalization." 42 USCS §§ 12101(a)(2), (3),

(5); see also Olmstead, 527 U.S. at 589, n.1.  Congress determined that:

> "(2) historically, society has tended to isolate and segregate
> individuals with disabilities, and, despite some improvements, such
> forms of discrimination against individuals with disabilities
> continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in
> such critical areas as . . . institutionalization . . . ;
>
> [ . . . ]
>
> (5) individuals with disabilities continually encounter various
> forms of discrimination, including outright intentional exclusion,
> the discriminatory effects of . . . overprotective rules and policies,
> failure to make modifications of existing facilities and practices,
> exclusionary qualification standards and criteria, segregation, and
> relegation to lesser services, programs, activities, benefits, jobs, or
> other opportunities[;]
>
> [ . . . ]
>
> (7)  the Nation's proper goals regarding individuals with
> disabilities are to assure equality of opportunity, full participation,
> independent living, and economic self-sufficiency for such
> individuals; and

(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

42 USC §§ 12101(a) (2), (3), (5), (7), (8).

The statute as a whole is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.S. § 12101(b)(1).

On redress for violations of the discrimination prohibition, Congress referred to remedies available under Section 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a. See 42 USCS § 12133 (The ADA's enforcement scheme is that of the "remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973."). In turn, Section 505 of the Rehabilitation Act incorporates the remedies, rights, and procedures set forth in Title VI of the Civil Rights Act of 1964 for violations of section 504 of the Rehabilitation Act. See 29 U.S.C. § 794a(a)(2).

The Code of Regulations further clarifies the non-discrimination prescript:

A public entity, in providing any aid, benefit, or service, may not . . . , on the basis of disability [ ] *[p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others* unless such action is *necessary* to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others[.]

28 C.F.R. 35.130(b)(1)(iv) (emphasis added).[11]

---

[11]    Similar to this forbidden grant of different or separate aids, benefits, or services unless necessary, a public entity may not:

impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program,

The regulations foresee general safety concerns as well, and provide that the public entity "may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. 35.130(h).

Title 42 does not "require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 USC § 12182(b)(3) (specific construction of prohibition of discrimination by public accommodations).

The Department of Justice regulations further provide:

> (a)     This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.

> (b)     In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

---

> or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

> 28 C.F.R. 35.130(b)(8) (emphasis added).

28 CFR 35.139 (nondiscrimination on the basis of disability in state and local government services).

A second exception to the antidiscrimination mandate is available if reasonable modifications would fundamentally alter the nature of the benefit. Specifically, "[r]easonable modifications" are required "in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(b)(7).[12]

Before turning to the legal arguments presented by the parties, the Court is informed by two primary cases which address application of the statutory and regulatory prescripts.

---

[12]    The § 504 regulation upon which the reasonable-modifications regulation is based provides now, as it did at the time the ADA was enacted:

"A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *28 CFR § 41.53 (1990 and 1998 eds.).*

While the part 42 regulations do not define "undue hardship," other § 504 regulations make clear that the "undue hardship" inquiry requires not simply an assessment of the cost of the accommodation in relation to the recipient's overall budget, but a "case-by-case analysis weighing factors that include: (1) the overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget; (2) the type of the recipient's operation, including the composition and structure of the recipient's workforce; and (3) the nature and cost of the accommodation needed." *28 C.F.R. § 42.511(c) (1998)*; see *45 CFR § 84.12(c)(1998)*(same).

Olmstead, 527 U.S. at 606, n. 16.

In Olmstead v. L.C., 527 U.S. 581 (1999), the Supreme Court examined a challenge brought by two voluntarily-admitted mentally ill patients who were found able to live in community-based treatment programs, but were not transferred. The Supreme Court held that the ADA nondiscrimination requirement applied to services already rendered by the state such as the operative community-based transfers. However the Supreme Court cautioned that the nondiscrimination requirement does not impose on states a "standard of care" for medical services rendered, nor does it require the provision of "a certain level of benefits to individuals with disabilities[.]" Id. at 602, n. 14.

In a concurring opinion, Justice Kennedy acknowledged the delicate balance at play regarding the self-determination rights of the mentally ill, in the context relevant therein of less restrictive housing alternatives:

> "For a substantial minority. . . deinstitutionalization has been a psychiatric Titanic. Their lives are virtually devoid of 'dignity' or 'integrity of body, mind, and spirit.' 'Self-determination' often means merely that the person has a choice of soup kitchens. The 'least restrictive setting' frequently turns out to be a cardboard box, a jail cell, or a terror-filled existence plagued by both real and imaginary enemies." Torrey, supra, at 11.

> *It must be remembered that for the person with severe mental illness who has no treatment the most dreaded of confinements can be the imprisonment inflicted by his own mind, which shuts reality out and subjects him to the torment of voices and images beyond our own powers to describe.*

> Id. at 609-610 (J. Kennedy, concurring) (emphasis added).[13]

---

[13]    Justice Kennedy continued:

> It is a common phenomenon that a patient functions well with medication, yet, because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires. This is illustrative of the factors a responsible physician will consider in recommending the appropriate setting or facility for treatment. JUSTICE GINSBURG's [majority] opinion takes

Justice Kennedy resolved that "[i]t is of central importance" that "the greatest deference" should be afforded to "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment[.]" Id. at 610 (J. Kennedy, concurring).

Of note, Justice Kennedy espoused that the majority decision "serve[s] to suggest the theory under which respondents might be subject to discrimination in violation of § 12132." Id. at 612.

> If they could show that persons needing psychiatric or other medical services to treat a mental disability are subject to a more onerous condition than are persons eligible for other existing state medical services, and if removal of the condition would not be a fundamental alteration of a program or require the creation of a new one, then the beginnings of a discrimination case would be established. In terms more specific to this case, if respondents could show that Georgia (i) provides treatment to individuals suffering from medical problems of comparable seriousness, (ii) as a general matter, does so in the most integrated setting appropriate for the treatment of those problems (taking medical and other practical considerations into account), but (iii) without adequate justification, fails to do so for a group of mentally disabled persons (treating them instead in separate, locked institutional facilities), I

---

> account of this background. It is careful, and quite correct, to say that it is not 'the ADA's mission to drive States to move institutionalized patients into an inappropriate setting, such as a homeless shelter . . . .' *Ante*, at 20.

> In light of these concerns, if the principle of liability announced by the Court is not applied with caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition. This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts. . . .

> Id. (J. Kennedy, concurring).

believe it would demonstrate discrimination on the basis of mental
disability.

      Id. at 612 (J. Kennedy, concurring).

      Similar to the case at bar, in Olmstead, the state argued that a mandate of transfer to community-based living would entail a "fundamental alteration" of the state's services and programs, and therefore fit within an exception to the ADA. The majority opinion explained that "[s]ensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." Id. at 604. Olmstead instructs that the court is not to undertake a "simple comparison" to show that "community placements cost less than institutional confinements[,]" but to consider the "increased overall expenses" associated with funding the placements before the state can "take advantage of the savings associated with the closure of institutions." Id. (internal citation and reference omitted).

      Thus, Olmstead concluded that "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 607.

      In Hargrave v. State of Vermont, 340 F.3d 27 (2d Cir. 2003), the Second Circuit Court of Appeals applied the principles in Olmstead to examine the validity of a Vermont Statute which provided a mechanism unique to mentally ill prisoners and civilly-committed patients who were adjudicated dangerous to self and others upon commitment. Specifically, Act 114 established a

mechanism by which a mentally ill civilly-committed or imprisoned patient's previously-executed durable power of attorney (DPOA) for medical treatment preferences could be overridden through a petition by a health care professional to involuntarily medicate the patient. However, the procedure available to other incapacitated patients in Vermont allowed for a DPOA to be overridden only by: 1) the patient's revocation of the DPOA, or 2) a third party's petition to suspend the DPOA in conjunction with that court's appointment of a guardian for the individual. According to Act 114, the mentally ill patient's previously-executed DPOA would be adhered to for 45 days, during which the facility would observe any improvement to the patient's condition in the absence of the rejected medication. If no improvement appeared, the court would determine whether to forcibly administer the medication under Act 114 pursuant to the health care professional's petition. The state-defendants in Hargrave invited the appeals court to hold that initial judicial determination of dangerousness at the time of civil commitment was sufficient to exclude otherwise "qualified individuals" from the protections of the ADA under the "direct threat" exception for the entire length of his or her commitment.

The Vermont statute examined departs from A.B. 5:04B for two initial reasons: Hargrave provided no Harper dangerousness proceeding after civil commitment; relatedly, the relevant procedure therein was seemingly permanent with no review process in place. Hargrave also departs from the case here for another major reason. The issue therein allowed for a patient who was deemed *incompetent* to have his or her medical preferences to limit or reject medication, which were set in place by a previously executed DPOA, to be overridden by a petition of a health care professional. Thus the question in Hargrave turned on the overriding of an incompetent person's medical preferences. Here, incompetence is not at issue, but rather the medical treatment and procedure pursuant to a finding of dangerousness. Indeed in Hargrave,

there is no indication that the health care professional's petition was pursuant to a finding of dangerousness. The only mention of dangerousness therein is with respect to the initial civil commitment hearing.

The Second Circuit Court of Appeals concluded that the ADA's "direct threat" exclusion was inapplicable because the state-defendants "failed to demonstrate that every person subject to Act 114's DPOA-abrogation procedures pose[d] a 'direct threat' of harm to others sufficient to exclude her from the protections of the ADA." Hargrave, 340 F.3d at 36. The conclusion rested on two reasons. First, the court quickly observed that civil commitment in place in Vermont was based on a finding that the individual poses a danger to self or others, "whereas the 'direct threat' defense requires the person to pose a risk of harm to *others*." Id. at 36 (referencing 18 V.S.A. 7101(17)). The court then emphasized the significant delay in place between the initial civil commitment and abrogation of the DPOA, and the lack of an individualized hearing prior to the latter:

> [T]he State does not make an individualized and objective determination of the danger posed by a particular patient *at the time it abrogates* her DPOA. Between the time a patient's commitment order is entered and the time her DPOA may be abrogated under Act 114 (at least 45 days later), many factors may affect the level of danger the patient poses, including, most notably, the fact of commitment itself. As the District Court noted, defendants have offered no evidence that a period of commitment would not significantly mitigate – if not eliminate – the "threat" posed by *some or most patients. See Hargrave v. State of Vermont*, No. 2:99-CV-128, at 20 (D. Vt. Oct. 11, 2001). Defendants have therefore failed to demonstrate that every person subject to Act 114's DPOA-abrogation procedures poses a 'direct threat' of harm to others sufficient to exclude her from the protections of the ADA.

> We therefore conclude that Act 114 excludes from the State's DPOA program "qualified individuals" who meet the essential eligibility requirements for maintaining DPOAs.

<u>Id.</u> at 36.

Finding the "direct threat" exception to be inapplicable, <u>Hargrave</u> turned to whether Act 114 discriminated on the basis of mental illness. First, the court found it "immaterial to the discrimination analysis that Act 114 applies only to a subset of the mentally ill rather than to every mental individual in Vermont. A program may discriminate on the basis of mental illness if it treats a mentally ill individual in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances." <u>Id.</u> at 36 (internal reference omitted). <u>Hargrave</u> then noted Vermont's unequal treatment of incompetent patients based on mental illness, and refused the attempt to categorize the unequal treatment in question based on civil commitment rather than mental illness:

> Act 114 establishes a procedure whereby *only mentally ill patients* who have been found to be incompetent may have their treatment preferences expressed in their DPOAs overridden in family court; equally incompetent patients who are physically ill or injured enjoy the security of knowing that their DPOAs may only be abrogated in probate court after appointment of a guardian to protect their interests.

> Finally, defendants argue that it is the fact of civil commitment, rather than mental illness, that distinguishes those subject to Act 114 from those who are not. However, not all who are subject to civil commitment in Vermont are subject to Act 114 – only those who are civilly committed as a result of mental illness. *See Vt. Stat. Ann. Tit. 18, § 7624(a)(1)-(3)* (subjecting to Act 114 only those patients who have been civilly committed due to mental illness or found mentally ill while incarcerated); *see also id. § 1058* (authorizing civil commitment of persons with untreated tuberculosis); *id. § 8402* (authorizing civil commitment of "drug addicts"). Accordingly, Act 114 discriminates on the basis of mental illness.

> <u>Id.</u> at 36-37 (internal references omitted) (emphasis added).

Last, <u>Hargrave</u> concluded that a violation of the ADA and RA existed because an injunction would not fundamentally alter the state's program authorizing and enforcing DPOAs.

"[T]he specific language of *section 25.130(b)(7)* makes clear that the 'service, program, or activity' at issue is neither Vermont's entire civil commitment program nor the specific procedures set forth in Act 114, but rather, Vermont's program of permitting its citizens to execute DPOAs." Id. at 38.  The court also took care to note that "nothing in this decision precludes statutory revisions that do not single out those who are disabled because of mental illness – for example, revisions that increase the competency threshold for executing a DPOA or that allow the override of *any* incompetent person's DPOA whenever compliance with it would substantially burden the interests of the state."  Id., n. 10.

Turning to the arguments before this Court, Defendants unpersuasively argue that "[n]either the text of the ADA or Rehabilitation Act, nor any case law interpreting these laws, supports Plaintiff's novel argument that the right to refuse treatment is somehow a service program or activity." (Def.'s MSJ Br. at 34.)  The federal code defines "program or activity" as "all of the operations of a department, agency, special purpose district, or other instrumentality of the State or of a local government." 29 USCS § 794(b)(1) (Rehabilitation Act definition of "program or activity" pursuant to nondiscrimination under federal grants and programs).  The regulations further state that the ADA's coverage extends to "all services . . . made available by public entities." 28 C.F.R. 35.102(a).  "According to the Third Circuit, 'this broad language is intended to apply to *anything* a public entity does.'" Soto v. City of Newark, 72 F. Supp. 2d 489, 493-4 (D.N.J. 1999) (quoting Yeskey v. Pa. Dep't of Corr., 118 F.3d 168, 171 (3d Cir. 1997)).  See also Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir. 1997) ("[P]rograms, services, or activities" is a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context[.]"); Kiman v. N.H. Dep't. of Corr., 451 F.3d 274, 284 (1st Cir. 2006) (medical care is a service, program, or activity); Lovell v. Chandler, 303 F.3d 1039,

1053-54 (9th Cir. 2002) (state health insurance is a program, service, or activity).  Indeed,

Hargrove is analogous here.  As explained above, the Second Circuit Court of Appeals

examined, pursuant to the ADA and RA, the state's differential treatment in handling patients'

right to refuse or limit medical treatment.  Here, the state's actions cannot escape the federal

nondiscrimination obligation.

Next, Defendants argue that "in providing administrative rather than judicial hearings to

patients, Defendants are not discriminating against patients because of their mental illness.

Rather, the differential treatment is necessary due to the fundamental distinctions between

psychiatric illness and other forms of illness, as well as the nature of psychiatric commitment to

State hospitals." (Def.'s MSJ Br. at 35.)  Relatedly, Defendants argue that the patients are

excluded from protection under the ADA and the RA pursuant to the "direct threat" exception.

In recognition of the express differential policy applied to the mentally ill who are voluntarily

admitted and a danger, Defendants submit that the voluntary admission itself is a valid

distinguishing feature rather than discrimination based on mental illness. (Defs.' Opp. Br. at 15.)

In oral argument, Defendants additionally asserted that mentally ill patients who voluntarily

commit to state care are automatically subject to an A.B. 5:04B hearing if they exhibit

dangerousness.  Additionally, Defendants contend that dangerousness is the reason for

differential treatment, even in the case of CEPP status patients.  (Defs.' Opp. Br. at 15-19.)

Defendants duly acknowledge the State's "significant interest in maintaining a safe

environment in its hospitals for the patients themselves, other patients, staff and the public.  For

those patients who are dangerous to themselves, others or property, the Policy requires an

administrative hearing, after affording the patient the full panoply of due process protections, in a

shorter period of time than any judicial hearing could be accomplished." (Defs.' MSJ Br. at 35.)

On this last point, DRNJ counters that the Court "should not credit Defendants' unsupported claim that administrative hearings will take place 'in a shorter period of time than any judicial hearing could be accomplished.' (Def. Br. at 25.)" (Pl.'s Opp. Br. at 10.) DRNJ highlights that undisputed facts demonstrate that Defendants conduct civil commitment hearings twice per week in three out of four State psychiatric hospitals, and once per week in the remaining hospital, and conducted a total of 8,636 such hearings in 2011. DRNJ draws out that "[t]he frequency and number of hearings do not support any claim that requiring hearings for involuntary medication would result in delays." (Pl.'s Opp. Br. at 11.) In comparison, only 34 A.B. 5:04B hearings took place in September 2012 across all psychiatric hospitals, annualized at a total of 408 hearings. Indeed, the addition of 408 hearings would constitute a less than 5% increase in total hearings which are already taking place regularly in the same facilities.

What cannot be justified here is the application of A.B. 5:04B to CEPP status patients who have already been determined by a court of law to no longer constitute a danger and are thus eligible for discharge and simply awaiting placement. As of December 2011, the CEPP population comprised approximately one-third of the total population residing at the state hospitals operated by DMHAS (526 of 1,569). Defendants attempt to circumvent this issue by arguing that "the commitment court's previous finding [of non-dangerousness for CEPP status patients] most certainly does not mean that the patient will at no point in the future be dangerous while in State custody. Indeed, the manifestations of mental illness fluctuate. While the State could, and often does, seek to recommit a CEPP patient who has become dangerous, such recommitment is not a constitutionally required prerequisite to involuntary medication. As the Supreme Court held in Washington v. Harper, 494 U.S. 210 (1990), a state may involuntarily medicate an individual who is in state custody, though not necessarily civilly committed because

of mental illness.  Indeed, Justice Blackmun, in the concurrence, emphasized this point:  'much of the difficulty [would have been] lessened' and 'would be protective for all concerned, the inmate, the institution, its staff, the physician, and the state itself.'  Id.at 236-37.  Similarly, in this instance, it is the fact that the patient is still-committed to the custody of the State, not his designated status, that controls." (Defs.' Opp. Br. at 16.)

While the Harper analysis may be particularly instructive to the due process considerations set forth above, the Supreme Court's ruling in Olmstead v. L.C., 527 U.S. 581 (1999), *supra*, guides the discrimination jurisprudence.  New Jersey implements a procedure for voluntarily-admitted mentally ill and dangerous individuals. See id. at 602, n. 14.  As Justice Kennedy set forth in Olmstead, discrimination on the basis of mental disability is demonstrated because the state (1) provides treatment to individuals suffering from medical problems of comparable seriousness, (2) as a general matter, does so in the most integrated setting appropriate for the treatment of those problems (taking medical and other practical considerations into account), but (3) *without adequate justification*, fails to do so for a group of mentally disabled persons. See id. at 62 (J. Kennedy, concurring) (emphasis added).

Nor are Defendants' justifications as to the potential volatility of CEPP patients particularly persuasive.  Surely the Superior Court's finding will take into account the full ambit of sensitivities concerning this population, including the fluctuating manifestations of mental illness.  The state's treatment of CEPP patients cannot escape the protection of the ADA and RA: their treatment cannot be swept under the "direct threat" exception as they no longer constitute a danger; their treatment is facially discriminatory based on their mental illness; and reasonable modifications may be put into place which would not inequitably fundamentally alter the nature of the program.  Indeed, arguably the lack of applicability of A.B. 5:04B to this subset would

place less strain because the state would no longer be required to review and reevaluate the wholesale CEPP subclass pursuant to A.B. 5:04B. Further, to the extent that a threat could be posed in an emergency situation, it would be handled pursuant to A.B. 5:04A. Because the CEPP patient has already been determined by a court of law eligible for release, any new exhibition of dangerousness should be treated as any other mentally ill patient who faces civil commitment due to dangerousness.

The remaining two-thirds of the class are those who are civilly committed based on a finding of danger to self, others, or property, and are then administered psychotropic medication due to an administrative determination that they otherwise pose a likelihood of serious harm to self, others, or property without the medication. The parties argue over whether these patients may escape the nondiscrimination scheme based on whether they pose a direct threat to the health or safety of others pursuant to 42 USC § 12182(b)(3) and 28 CFR 35.139. DRNJ submits that the ADA exception does not apply because A.B. 5:04B includes individuals who are not included within the exception, specifically those who only pose a danger to self. To be sure, an inherent difference exists when one poses a danger to self or others, for it is a general principle of self-determination that one may pose a danger to self based on one's free will and volition. However, the analysis is complicated where an individual is mentally ill, potentially dangerous, and committed to the state pursuant to its *parens patriae* power. The Court is not persuaded to carve out a "direct threat" exception beyond its explicit definition, although absurd results may occur in this context if danger to self is not read within the breadth of the exception. Regardless, the Court has no need to broaden the exception. The regulations foresee general safety concerns and allow the state to "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities[,]" so long as such "safety requirements are based on actual

risks, not mere speculation, stereotypes, or generalizations about individuals with disabilities."
28 C.F.R. 35.130(h).

Ultimately, "adequate justification" exists for differential treatment of the relevant class because the treatment is not based on disability, but based on a finding of dangerousness. Voluntarily committed patients who exhibit dangerousness due to their mental illness are also subject to A.B. 5:04B.[14] Further, a comparison of the forced-medication process of the relevant population with similarly-situated non-mentally ill persons does not lead to a conclusion of discrimination because the underlying issue is the same – the need for medical treatment related to dangerousness. Thus, whether the patient is a danger to self, others, or property, or some combination thereof, is inapposite to the general construction and purpose of the statute to prohibit discrimination of a class or subclass based on mental illness.

### III. CONCLUSION

A.B. 5:04B does not violate substantive and procedural due process rights of the class at large because the forced administration of psychotropic medication does not require a right to a judicial hearing and counsel. However, A.B. 5:04B violates the substantive and procedural due process rights of CEPP status patients who are no longer a danger of harm because no there is no legitimate government objective in their continued forced medication, and such state action is arbitrary, conscience-shocking and oppressive in a constitutional sense. The private interest at stake with CEPP status patients outweighs any state interest in their continued medication. To the extent that A.B. 5:04B does not violate procedural and due process rights, it is not discriminatory because its application is within the ambit of safety concerns and any differential

---

[14]     The Court passes no judgment as to whether the treatment of voluntarily-committed persons subject to A.B. 5:04B is proper.

treatment is based on dangerousness not disability.  However, the application of A.B. 5:04B to CEPP status patients is discriminatory because their dangerousness is no longer at issue.

For the foregoing reasons, the cross-motions for summary judgment are GRANTED in part and DENIED in part.  The Court grants DRNJ's motion for summary judgment with respect to the Fourteenth Amendment due process challenge on substantive and procedural grounds as to the CEPP status patients.  As to the remaining class, the Court finds in favor of Defendants with respect to the substantive and procedural challenge, and the related First Amendment, right to counsel, and access to the courts claims.  Similarly, the Court grants DRNJ's motion for summary judgment with respect to violations of the ADA and RA as to the CEPP status patients, and denies the motion as to the remaining class.  A.B. 5:04B shall therefore no longer be applicable to CEPP status individuals because it violates their due process rights and discriminates against them on the basis of their mental illness, and an injunction shall be issued accordingly.

The Court will enter an order implementing the opinion.


**/s/ Dickinson R. Debevoise**
**Dickinson R. Debevoise, U.S.S.D.J.**


**Dated:  September 27, 2013**